Julie Kelly (Pro Se)
823 Dorgene Lane
Cincinnati OHIO 45244
Telephone (513) 806.4893
*jul_kelly@mac.com*



# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JULIE KELLY, an individual | Civil Case No. ___19CV372 |
| Plaintiff | |
| v. | |
| FIRST DATA CORPORATION, a Delaware corporation; | **COMPLAINT AND JURY DEMAND** |
| FRANK BISIGNANO, an individual; | |
| ROBIN ORDING, an individual; | |
| JACKSON LEWIS PC, a Pennsylvania professional corporation; | |
| MATTHEW BYRNE, an individual; | |
| SAUL EWING ARNSTEIN & LEHR, a Delaware limited liability partnership; and | |
| GILLIAN COOPER, an individual | |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

Plaintiff Julie Kelly ("Kelly" or "Plaintiff") complains against First Data corporation ("First Data"), Frank Bisignano ("Bisignano"), Robin Ording ("Ording"), Jackson Lewis PC ("Jackson Lewis"), Matthew Byrne ("Byrne"), Saul Ewing Arnstein & Lehr ("SEAL"), and Gillian Cooper ("Cooper")(each of First Data, Bisignano, Ording, Jackson Lewis, Byrne, SEAL, and Cooper are referred to herein individual as a "Defendant" and collectively as "Defendants"), and hereby states as follows:

### SUMMARY OF CLAIMS

1.      This is an American's with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA"), Family and Medical Leave Act , 29 U.S.C. §261 et seq. ("FMLA"), Title VII and the Pregnancy Discrimination Act ("PDA") 42 U.S.C. §§2000e-200e-17, the Ohio Civil Rights Act (Chapter 4112 of the Ohio Revised Code)("OCRA"), and tort liability lawsuit seeking actual damages, backpay, frontpay, liquidated damages, punitive and special damages, attorney's fees, and costs of litigation.

### RELATED EEOC/OCRC PROCESS

2.      On May 16, 2018, Kelly filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") alleging violations of the ADA, Title VII, PDA, and the OCRA. The OCRC assumed responsibility for the investigation of the Charge of Discrimination ("Original OCRC Charge").

3.      The Original OCRC Charge was supplemented by correspondence, and then amended, to include retaliatory events that occurred after the filing of the Original OCRC Charge. (together with the Original OCRC Charge, the "OCRC Charge").

4.      Exhibit A contains a true and correct copy of the OCRC Charge.

5. First Data filed its position statement with the OCRC by letter dated July 3, 2018 ("Defendant's Position Statement").

6. Exhibit B is a true and correct copy of the Defendant's Position Statement.

7. In response to the Defendant's Position Statement, Kelly filed a rebuttal by letter dated August 8, 2018 ("OCRC Rebuttal").

8. Exhibit C is a true and correct copy of the Plaintiff's OCRC Rebuttal.

9. The allegations and exhibits contained Plaintiff's OCRC Charge and OCRC Rebuttal are incorporated herein by this reference.

10. The OCRC issued a Letter of Determination of no probable cause dated February 21, 2019 ("OCRC Letter of Determination").

11. The OCRC Letter of Determination was received by Kelly by US Mail on February 27, 2019.

12. Exhibit D is a true and correct copy of the OCRC Letter of Determination.

## PARTIES

13. Kelly is an individual formerly employed by First Data. Kelly resided in Cincinnati, Ohio during all times material to this Complaint.

14. Defendant First Data Corporation is a Delaware corporation doing business in this district.

15. Defendant Bisignano is an individual, and First Data's Chairman & Chief Executive Officer ("CEO").

16. Defendant Ording is an individual, and Vice President of Human Resources ("VP") of First Data, and conducted business in Ohio, including the direct supervision of Kelly's employment with First Data from November 2016 through November 2017.

17.     Bisignano and Ording were, at all times material hereto, agents, employees and servant of the master, First Data, and were acting within the course and scope of each of their agency or employment authority, and with the knowledge, express or implied, of First Data.

18.     Defendant Jackson Lewis is a Pennsylvania professional corporation. Defendant Jackson Lewis is a law firm that has acted on behalf of, and as agent of, First Data, in *Barger v. First Data*, and subpoenaed and deposed Kelly as a third-party witness in that case in Ohio.

19.     Matthew Byrne is a partner at Jackson Lewis who signed documents related to Kelly's deposition filed with the Southern District of Ohio in the *Barger v. First Data* third-party discovery litigation.

20.     Defendant Cooper had been appearing before this Court in *Barger v. First Data* without a pro hac vice admission. Plaintiff demanded to Magistrate Bowman that Ms. Cooper obtain admission, and Mathew Byrne sponsored Defendant Cooper's pro hac vice admission in the Southern District of Ohio in the *Barger v. First Data* third-party discovery litigation.

21.     Defendant SEAL is a Delaware limited liability partnership. Defendant SEAL is a law firm that has acted on behalf of, and as agent of, First Data, in *Barger v. First Data*, subpoenaed and deposed Kelly as a third-party witness in that case in Ohio, and purported to be Kelly's counsel in First Data's Rule 26(a)(1) disclosures in that litigation.

22.     Gillian Cooper is a partner at SEAL who signed documents filed with the Southern District of Ohio in the *Barger v. First Data* third-party discovery litigation, appeared pro hac vice in that litigation, and deposed Kelly in Ohio as a third-party witness in that litigation.

## JURISDICTION AND VENUE

23.        This action involves application of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq.

24.        This action involves application of the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA").

25.        This action involves application of Title VII and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. §§2000e-2000e-17.

26.        This Court has jurisdiction with respect to the FMLA claims pursuant to 29 U.S.C. § 2617(a)(2) (jurisdiction over FMLA claims)

27.        This Court has jurisdiction with respect to the FMLA, ADA, Title VII, and PDA claims pursuant to 28 U.S.C. § 1331 (original jurisdiction over civil actions arising under the Constitution, laws and treaties of the United States).

28.        This case involves claims under the Ohio Civil Rights Act (Chapter 4112 of the Ohio Revised Code)

29.        This action involves common law claims under the laws of the State of Ohio.

30.        This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 with respect to the Ohio state law claims in this action.

31.        Plaintiff's place of employment with First Data was in the State of Ohio and this district.

32.        Defendants Bisignano and Ording ("Individual Defendants") are officers of First Data.

33.        First Data does business in the State of Ohio and in this district.

34.     SEAL does business in the State of Ohio and in this district, and members of the firm have appeared before the Ohio state and federal courts in this district, and deposed Kelly in another matter (*Barger v. First Data et al*) in this district.

35.     Jackson Lewis does business in the State of Ohio and in this district, and members of the firm have appeared before the Ohio state and federal courts in this district, and participated, through the signing of documents and advocacy at hearings before this Court in connection with the deposition of Kelly in another matter (*Barger v. First Data et al*) in this district.

36.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS
## KELLY'S EMPLOYMENT WITH FIRST DATA

37.     Kelly was born November 7, 1977 and is now 41 years of age.

38.     Kelly began her employment with First Data Corporation in 1998, and worked for First Data and its subsidiaries for nearly 20 years, her entire adult life.

39.     Kelly's employment with First Data terminated on November 30, 2017.

40.     During her period of employment with First Data, Kelly served from 2013 to 2017 as Instructional Design & Development Leader, and from February 2017 to November 2017 as Director, Organizational Development – Talent Management.

41.     Kelly's direct supervisor at First Data from September 2013 to approximately August 2014 was Bryan Fricke ("Fricke"), VP of Sales Training/Transformation.

42.     Kelly's direct supervisor at First Data from August 2014 to November 2016 was Steven Barger ("Barger"), Senior Vice President ("SVP") Sales Transformation.

43.     Kelly's direct supervisor at First Data from November 2016 to November 2017 was Defendant Ording, VP Human Resources and Training.

44.     In April 2005, Kelly was promoted into the position of Instructional Design & Development Manager of First Data and began working remotely and exclusively from her home office in Ohio.

45.     In her position as Instructional Design & Development Manager, Kelly managed a team of 10 instructional developers (web and video producers) who created learning programs and materials for First Data's approximately 7,000 internal and external sales representatives.

46.     On December 12, 2012, Kelly gave birth to twins.

47.     Kelly's pregnancy with, and delivery of, the twins in 2012 were medically difficult.

48.     Kelly suffered significant post-partum medical issues, both physical and mental, including post-partum depression and anxiety, following the delivery of the twins in 2012.

49.     Ms. Kelly returned to work from her pregnancy leave in March 2013 without change to her pre-leave position or responsibilities.

50.     When Kelly returned to work in March 2013, she continued to work remotely from her home office.

51.     The medical complications from delivery of the twins in December 2012, continued to be treated by physicians from December 2012 to present.

52.     On April 29, 2013, First Data hired a new Chief Executive Officer, Defendant Bisignano.

53.     Kelly's perception was that this hiring caused unsettled feelings among First Data's employees due to Bisignano's history of firings in his prior position.

54.      Immediately following the hiring of Bisignano as CEO, high-ranking leaders of First Data with whom Kelly worked (Peter Boucher, SVP Human Resources, David Kuhl, SVP Global Talent Management) were terminated.

55.      The team (Sales Training/Sales Transformation) with whom Kelly had been working was without senior leadership following these terminations and the team was led by Karen Whalen, SVP Human Resources on a transitional basis.

56.      In late 2013, Fricke, VP Sales Training, was assigned to lead the Sales Training/Sales Transformation Team. Fricke reported to Joe Plumeri, Co-Chairman of First Data.

57.      Under the management of Fricke, Kelly continued to work-from-home.

58.      Kelly's position required travel and Kelly met those obligations, even traveling on trips with her twins and a hired nanny and using her meeting breaks to feed her infants.

59.      While reporting to Fricke, Kelly's job responsibilities remained the same.

60.      In mid-2014, Fricke resigned from First Data.

61.      Barger was hired by First Data on June 30, 2014 as SVP of Sales Transformation.

62.      Kelly began reporting directly to Barger in approximately August 2014.

63.      In October 2014, Kelly was pregnant and her OB-GYN ordered no travel due to her high-risk pregnancy, her pre-existing medical conditions that were continuing following the birth of her twins two years earlier, her prior C-section, her myomectomy, and her age.

64.      Upon receiving this diagnoses, Kelly requested an accommodation from First Data, through her manager Barger and her HR contact James Britt ("Britt"), of continuing to work-from-home and no travel.

65.      Kelly's request for a continued work-from-home accommodation, without travel, was approved by Barger.

66.     Ms. Kelly worked under Barger from home until her child was born on February 20, 2015. During this period, Kelly's productivity was unchanged and she received positive performance reviews.

67.     In approximately January 2015, Bisignano changed First Data's work-from-home policy and the changes required all employees to work in an office, with the exception of those employees involved in direct sales to customers in the field.

68.     The revised work from office applied to employees that had been performing their job duties previously from home. Kelly had been approved to work-from-home since 2005 and she had performed exceptionally, and managed "virtual teams" and supported First Data staff world-wide from her home for nearly a decade.

69.     Employees that had been working from home and did not have a nearby First Data office were required to either resign or move to a location where they could go to a First Data office to work.

70.     During a "town hall" meetings in which the change of policy was addressed, Bisignano justified the change of policy with statements similar to "I cannot work productively from home" and therefore he felt that no one else could do so either.

71.     Bisignano did not give any other explanation for his changes to the work-from-home policy.

72.     On February 20, 2015, Kelly gave birth to a son through a scheduled C-section at approximately 38-weeks of gestation.

73.     The delivery was complicated and Kelly's son was held in the neonatal care unit for 3-days with breathing issues due to underdeveloped lungs.

74.     Ms. Kelly's son was also born with a vascular malformation that required immediate attention and numerous follow-up appointments for the next year with the Cincinnati Children's Hospital Hemangioma and Vascular Malformation Center.

75.     After release from the hospital following the birth of her son, Kelly was required to return to the hospital with a serious, almost deadly, infection of her c-section wounds.

76.     Kelly suffered severe post-partum depression following the birth of her son.

77.     Kelly also suffered other medical conditions resulting from her pregnancy, c-section, and post-partum recovery, including blood infection, post-partum depression, severe recti diastasis, and umbilical hernia.

78.     On April 23, 2015, with her medical complications continuing only 8-weeks after the birth of her son, Kelly returned to work.

79.     Upon returning to work in April 2015, Kelly's job responsibilities remained the same and Kelly worked from home.

80.     During the period between March 2015 and April 2015, Bisignano's and First Data's prohibition on work-from-home began to be enforced on the employees within Kelly's sales transformation team.

81.     The enforcement of Bisignano's and First Data's changed work-from-home policy required Kelly to either work from First Data's Cincinnati office or resign.

82.     None of the First Data employees assigned to the Cincinnati office had job duties related to Kelly's position, her job responsibilities, or the responsibilities of the sales transformation team. None of the employees in the Cincinnati office interacted with Kelly in connection with the performance of her responsibilities within the training and education group.

83.        In April 2015, because under this new policy Kelly would be required to work in the office against her agreed work-from-home accommodation she had received from Fricke, and continued by Barger. Kelly wrote a resignation letter identifying the effects on her health from complying with this new work-from-office requirements. Britt informed Kelly it is was standard procedure to deliver that letter to her supervisor. Kelly delivered her resignation letter to her then supervisor, Barger.

84.        In Kelly's resignation letter to Barger, she informed Barger that she would not be able to make the commute to the Cincinnati office from her home due to health and family and that she wanted to resign and accept the severance package that was being offered.

85.        Barger and Kelly then engaged in an interactive process and discussed Kelly's specific situation, her need for an accommodation for her post-partum depression and other post-partum medical conditions continuing from the birth of her twins and exacerbated by the birth of her son two months earlier.

86.        Kelly requested that Barger and First Data permit her to continue working from home as an accommodation.

87.        Barger approved Kelly's request to continue to work-from-home as an accommodation.

88.        Barger concluded that Kelly's continuation of her work-from-home was not an undue burden on First Data, as she had been working from home with excellent productivity and reviews for more than ten years, because her role did not have any connection whatsoever to the Cincinnati office personal, and because Kelly's role involved supporting First Data's world-wide sales team and remote communications would be required whether Kelly was at home or whether

she was in the Cincinnati office. Barger concluded that work from the Cincinnati office was not essential, necessary or even required, for Kelly to perform the essential functions of her job.

89.     Kelly then continued to work-from-home and reporting to Barger from April 2015 until November 2016, with good performance reviews.

90.     During mid-2016, Kelly was hospitalized for health issues, leading to tests and biopsies, leading to a diagnoses that Kelly was suffering from Non-Alcoholic Fatty Liver Disease (NAFLD), high blood pressure and stress disorder, all of which were believed by her physicians to be continuing conditions from her difficult pregnancies.

91.     Barger was kept informed of Kelly's condition, and Kelly performed her work remotely as she was able, with Barger's permission, during these periods of hospitalization, and Kelly did not receive negative performance reviews from Barger.

92.     Approximately a week before Thanksgiving of 2016, Barger went on leave of absence to recover from cancer surgery and Ording was announced as the interim leader of Kelly's sales training group.

93.     In late December 2016, Barger advised Kelly that he would be returning from leave in mid-January 2017.

94.     On or about January 17, 2017, Ording and Anthony Marino, EVP of HR ("Marino") called a teleconference meeting of the sales training group and announced that Barger had "retired" and that Ording would be the permanent leader of the sales training group.

95.     A few days later, Kelly learned from Barger that he had not "retired" but that he had been terminated the business day before he was scheduled to return from his leave of absence.

96.     Upon taking permanent lead of the sales training group, Ording began enforcing First Data and Bisignano's no work-from-home policy.

97.     Ms. Ording advised the sales training team, and Kelly directly, that Ording would be monitoring attendance at the office by looking at security card "swipe-in" information that was reported to her by First Data's security systems.

98.     Ording advised that sales training team that if the office attendance "swipe-in" information was below the required percentage in a month, disciplinary action would take place.

99.     Kelly advised Ording that she had been working from home as an accommodation granted by Fricke and Barger, her prior two supervisors.

100.     Ording did not extend the accommodation and required Kelly to meet the office attendance requirements despite the accommodation previously granted to her.

101.     In January 2017, Ording required Kelly to draft her own job description, which she did.

102.     In January 2017, the sales transformation and training team went through a reorganization that included the termination of 30% of the team.

103.     Kelly was not included in the 30% of the team that terminated and assisted Ording in gathering data for the analysis of the terminations.

104.     Ording continuously bragged to Kelly about the "significant" alleged cost savings that she was obtaining through these terminations.

105.     Ording made offensive and derogatory remarks about past leadership and employees that had been terminated.

106.     Ording's comments made Kelly feel like her job was always at risk if she did not take every action demanded by Ording.

107.     Ording was aware of Kelly's medical condition and request for a work-from-home accommodation. Ording made clear to Kelly that office attendance was required and would be monitored.

108.     Ording was aware that Fricke and Barger had granted Kelly a work-from-home accommodation.

109.     Kelly feared termination of her employment if again she repeated her request for a work-from-home accommodation from Ording again.

110.     Kelly, despite having requested her work-from-home accommodation, continued to go into the Cincinnati office as required by Ording implementing Bisignano's policy.

111.     Ording did not office in Cincinnati and did not visit Cincinnati on business.

112.     Ording managed Kelly remotely from Ording's New York office, remotely from Ording's home office, and remotely while Ording was traveling.

113.     Ording frequently works from her home.

114.     Ms. Ording assigned Kelly to be the interim manager of a group of employees in Hagerstown, Maryland. Kelly managed these employees remotely from Cincinnati, Ohio.

115.     On January 24, 2017, Marino advised Kelly that First Data had granted here 962 shares of restricted stock for her leadership and execution during the transition of the sales training team from Barger to Ording and the reorganization following the terminations of employees.

116.     The restrictions on these granted shares were to lift in three tranches, each annually, with the first vesting to occur on January 24, 2018. Based on the value of the shares at that time, Kelly would have received an additional $1,500 to $2,000, after taxes, annually each of the following three years.

117.    In Kelly's new position, she managed a staff of instructional development managers, instructional developers, project manager and training coordinator. Kelly also developed training programs, curriculum, and training materials. None of the employees managed by Kelly were located in Cincinnati, Ohio.

118.    During the first and second quarter of 2017, Ording began assigning more and more projects to Kelly outside of Kelly's regular job responsibilities.

119.    During this time, Ording asked Kelly to, and she did, put together data, analysis, templates and communications for the entire sales training team (not just Kelly's group) that Ording used to make presentations to senior leadership and Ording represented the work as her own.

120.    The administrative tasks being assigned to Kelly were not in the job description of a director with the level and responsibilities of Kelly to develop and implement training programs for the company.

121.    Ording was unable to fulfill the functions of her position and was demanding that Kelly take on Ording's responsibilities she was unable, incapable, or unwilling to complete, in addition to Kelly's own responsibilities.

122.    Ording often asked Kelly to complete last minute tasks, after hours, because a management committee member needed something done by Ording and she was unable to complete the assignment.

123.    Kelly advised Ording several times of her medical condition involving continuing effects of her pregnancies, including anxiety, stress disorders, high blood pressure, non-alcoholic liver disease, among others.

124. Even knowing Kelly's health condition, Ording continued to insist on work from the office, and continued to pile more and more responsibilities on Kelly.

125. In February 2017, Ording promoted Kelly from manager to director and Kelly received a raise of $8,000 per year for a total salary of $107,500.

126. On or about March 31, 2017, the Vice President of Training in First Data's HR department, began working part-time, remotely, so that she could spend her extra time working with her husband to open a brewery.

127. This Vice President of Training was not disabled on March 31, 2017.

128. Ording transferred the work that could not be performed by this non-disabled VP working part-time (from home) to Kelly who was disabled and prohibited from working remotely and required to work full-time in the Cincinnati office.

129. The work actually performed by the now part-time VP working remotely was minimal and for all practical purposes, her entire VP job duties where transferred to Kelly.

130. Kelly's new position included all of her previous responsibilities plus the additional administrative and reporting duties assigned by Ording, and the responsibilities for the now part-time VP, and additional areas of responsibility in human resources outside of Kelly's defined training and education duties (including, VP & SVP promotion analysis processes, company-wide performance evaluation processes, executive succession planning, responding to audits of the sales training group by outside auditors and internal auditors, and coordination of 360 degree performance evaluation processes by outside vendors).

131. Kelly fulfilled these obligations while driving 1.5 to 2 hours each way to the Cincinnati office where there were no employees of First Data engaged in any of these activities,

and all of her communications with co-workers were by phone, video conference, e-mail and electronic chat capabilities.

132.    Kelly advised Ording of the difficulties of the situation, over work and hours of commuting, were causing her health.

133.    Kelly told Ording that she felt like Ording was trying to force her to quit so that the company did not need to incur the severance expense she had been analyzing as part of the group's mass terminations.

134.    Kelly again asked Ording to work-from-home for medical reasons, or allow a schedule allowing some days of at-home work and others in the office, and Ording refused and continued to enforce the office attendance requirement.

135.    The essential functions of Kelly's job, including the additional responsibilities Ording assigned, could have been performed without any drop in effectiveness from Kelly's home office.

136.    Kelly viewed Ording's management style to be threatening and harsh, with pleasure taken in terminating employees and bragging about cost savings.

137.    Based on Ording's statements, Kelly felt that she needed to comply with Ording's demands despite the impact on her health and well-being, or lose her job.

138.    On July 27, 2017, Kelly was directed by Marino and Ording to use materials Ording had taken from Ording's prior employers for Kelly to use to draft First Data's internal processes. Kelly felt that use of these materials was a breach of ethics, but was ordered to do so anyway by Ording. Kelly felt fear and intimidation.

139.     On July 28, 2017, Kelly was directed by Ording to hide electronic files so that First Data's internal audit team would not see them and want to review them, and told to move the files back after the audit was completed.

140.     Kelly was fearful for her job if she did not comply after the harsh reaction she received from Ording when requesting the continuance of her work-from-home reasonable accommodation.

141.     On October 5, 2017, Kelly suffered chest pains from the heightened anxiety and stress. On that date Kelly was scheduled to conduct an online training session. Kelly contacted Ording and advised Ording that Kelly needed to go to the emergency room for her heart racing and Ording agreed to cover for Kelly in conducting the training session that was scheduled.

142.     The physicians concluded that the stress, anxiety, pressure of the commute, and pressure from performing her assigned duties as well as those of Ording outside of her job were exacerbating her continuing medical conditions from her pregnancies.

143.     After her release from the emergency room, Kelly then had an appointment with her cardiologist to further investigate and test for the cause of her medical condition on October 5, 2017.

144.     Ording was aware of Kelly's emergency room visit and absence from work due to her medical condition.

145.     Kelly's condition on October 5, 2017 was a serious health condition for which FMLA leave was available.

146.     No employee of First Data provided Kelly notice of her eligibility to take FMLA leave after learning of her medical issues that occurred on October 5, 2017.

147.    Kelly had been under the care of physicians and therapists the entire time from 2012 through November 2017 to address her medical conditions.

148.    On November 6, 2017, Ording and Kelly had a "on-on-one" manager/employee telephonic meeting. During this meeting, Kelly announced to Ording that she must leave the company due to health concerns. During this meeting Ording was emphatic that there was nothing more important than family and health and Ording shared her own medical issues with Kelly. Ording directed Kelly to start working with other employees to begin transitioning Kelly's duties and responsibilities to others in preparation for her departure. Ording stated that should would talk to Marino (EVP of HR) to see what First Data could do. Kelly interpreted this statement to mean that Ording was going to speak with Marino about a severance package for Kelly consistent with that provided to employees resigning due to the enforced work-from-office or resign requirement, or that provided to employees terminated by Ording in the en masse firing earlier in the year.

149.    On November 7, 2017, during Ording's conference call with her team, comprised of Kelly's peers, Ording announced Kelly's termination and stated Kelly would be leaving to focus on her health and family.

150.    On November 14, 2017, Kelly provided Ording a resignation e-mail nearly identical to the resignation she had provided Barger in 2016, citing issues of her health and lack of accommodation as the reason for her resignation, and requested to receive the same termination package the employees in the mass firing had received upon their departure.

151.    A true and correct copy of Kelly's March 12, 2015 e-mail to Barger is attached hereto as Exhibit E.

152.     A true and correct copy of Kelly's November 14, 2017 e-mail to Ording is attached hereto as Exhibit F.

153.     Unlike Barger, Ording did not engage in an interactive process to seek a reasonable accommodation for Kelly's disability. Instead, Ording laughed at Kelly, accepted her resignation, and stated that Kelly would receive no severance and that her restricted shares were to be forfeited (just 8-weeks before the first tranche was to vest).

154.     On November 15, 2017, Ording told Kelly that she had "escalated" Kelly's severance request to Marino and Karen Beck, and then Ording laughed and stated that there would be "no payout" and they can't make an exception if you decide to quit. Ording's attitude was hostile towards Kelly and completely opposite of her demeanor on November 6, 2017.

155.     After the November 15, 2017 call with Ording, Kelly stopped working, used her remaining paid-time-off, and her last day of employment with First Data was November 30, 2017.

156.     Upon termination of Kelly's employment, all of her restricted shares were forfeited. Kelly did not have an exit interview. Kelly did not sign any documents or end of employment papers. Kelly was required to order her own shipping materials at her expense and ship, at her expense, her laptop and other devices in her possession that were issued by First Data.

157.     Upon Kelly's termination, Ording transferred Kelly's job responsibilities to two individuals who were located in the United Kingdom.

### GENERAL ALLEGATIONS
### KELLY'S POST-TERMINATION HARASSMENT BY DEFENDANTS

158.     Five days following termination of Kelly's employment, December 5, 2017, Kelly received a letter from First Data's Omaha based in-house counsel , Lori Graesser, that stated the

Kelly was subject to post-employment obligations, including alleged 24-month non-compete and non-solicit obligations prohibiting Kelly from seeking employment with competitors. These restrictions were purportedly contained in Kelly's restricted share grants; shares she had completely forfeited before any of those shares vested.

159.     Kelly began her career with First Data at age 21, and First Data and the payments industry was the only industry in which Kelly had experience in her 20-year adult job career, as she was employed by First Data that entire time.

160.     Kelly responded to Graesser's letter by requesting a copy of the signed document containing these restrictive covenants. Kelly never received a response to her request from Graesser.

161.     Out of caution, Kelly took the obligations stated in Graesser's letter seriously, and despite several payments industry employers with a corporate presence in the Cincinnati area, Kelly did not seek employment with any company that could be considered a competitor for fear of violating the provisions outlined in the letter from in-house counsel she received.

162.      In August 2018, Barger (Kelly's former supervisor who was terminated while on leave of absence recovering from cancer surgery) filed suit against First Data alleging that First Data violated the FMLA and ADA in connection with his termination. *Barger v. First Data et al* (EDNY Case No. 1:17-cv-4869) (the "Barger Case").

163.     SEAL served as defense counsel for First Data and the other defendants in the Barger Case.

164.     In First Data's Initial Rule 26(a)(1) Disclosures, dated November 26, 2017, in the Barger Case, Kelly was listed by First Data as a potential witness and those disclosures stated that Kelly could only be contacted by Barger's counsel through contacting SEAL.

165.     First Data's Initial Rule 26(a)(1) Disclosures in the Barger Case were submitted to Barger's counsel 12-days after Kelly had delivered her resignation e-mail to Ording on November 14, 2018, which is also 4-days prior to that date known by First Data to be  Kelly's last day of employment with First Data.

166.     First Data knew that Kelly would not be an employee of First Data during the pendency of the remainder of the Barger Case, but listed her as a witness, among others, that could only be contacted by Barger's counsel through SEAL.

167.     Kelly remained listed as a witness that could only be contacted through SEAL on First Data's Rule 26(a)(1) Disclosures in the Barger Case until September 27, 2018.

168.     On April 27, 2018 and May 3, 2018, counsel for Kelly wrote to First Data's in-house legal department asserting that First Data had violated Title VII, PDA , ADA and OCRA by terminating Kelly and failing to accommodate.

169.     On May 10, 2018, only one week after First Data received Kelly's May 3, 2018 demand, SEAL, as counsel for First Data in the Barger Case, notified Barger's counsel that First Data would be taking Kelly's deposition as a third-party witness in the Barger Case.

170.     Notifying counsel for Barger that First Data intended to depose Kelly as a third-party served no purpose other than to harass Kelly for raising her discrimination charges with First Data's in-house legal department a week earlier, and to intimidate Kelly her from filing those charges with the EEOC and OCRC.

171.     Kelly did not have any information relevant to the Barger case because that case involved the termination of a SVP by EVPs and the CEO, and Kelly at the time was only a manager, Barger was based in Atlanta, and  Kelly was based in Cincinnati.

172.     On May 16, 2018, Kelly filed her initial charge of discrimination with the EEOC and OCRC (Exhibit A) and on May 17, 2018, a courtesy copy of that charge was provided to First Data's in-house counsel.

173.     On May 23, 2018, only one week after receiving the charge courtesy copy, First Data, through SEAL, personally served Kelly a third-party subpoena to be deposed in the Barger Case. The subpoena provided that the deposition would be held on June 25, 2018 at a local counsel's offices.

174.     The subpoena served on May 23, 2018 contained only notice for a deposition and that subpoena did not include a request for Kelly's production of documents or things.

175.     To serve the May 23, 2018 subpoena, First Data and SEAL engaged a process server that impersonated a FedEx delivery man to come to Kelly's residence. Kelly's husband answered the door and said Kelly was in the backyard with the children. The FedEx impersonator requested to go into the backyard. Mr. Kelly refused and called Kelly to the door believing she needed to sign for a FedEx delivery. The FedEx impersonator then pulled the subpoena from a FedEx box and announced Ms. Kelly had been served.

176.     Kelly had not been evading service of process prior to this encounter with the FedEx impersonator.

177.     The aggressiveness of the FedEx impersonator scared and frightened Kelly's children.

178.     As of May 23, 2018, the date Kelly was served, no depositions had yet occurred in the Barger Case, and the plaintiff, Barger, had not even be scheduled for a deposition, and none of the defendants in that case had been deposed.

179.     Singling out Kelly for a third-party deposition in the Barger case was an act of intimidation to Kelly in response to her filing of her charge of discrimination with the OCRC and EEOC.

180.     First Data's Barger Case Rule 26(a)(1) Disclosures listed more than 10 current or former employees (not including the individual defendants) as potential witnesses. Throughout the entire discovery process in the Barger Case, Kelly was the only non-party, current or former employee, of First Data deposed by First Data.

181.     Communications regarding Kelly's deposition subpoena occurred between Kelly and SEAL on May 24, 2018 and May 25, 2018, in which Kelly indicated that her understanding was that SEAL was her counsel in the Barger Case. Kelly questioned why her lawyers, SEAL, were seeking to depose her.

182.     In these communications on May 24th and 25th, Kelly expressed confusion because of the timing between her filing the OCRC Charge on May 16th and service of the subpoena in the Barger Case on May 23rd were so close in time that she believed that the subpoena was related to her recently filed charge of discrimination with the EEOC and OCRC.

183.     Ms. Kelly in these May 24th and 25th communications also indicated that scheduling for the designated deposition date of June 25th would be difficult because it was summer and she would need to locate care for her children and change her summer plans.

184.     On May 29, 2018, SEAL responded to Kelly's inquiries and SEAL indicated that First Data would provide child care for Ms. Kelly's children during her deposition.

185.     On June 6, 2018 and June 20, 2018, First Data denied Kelly's request to be treated as part of the group of employees entitled to bonus payments as severance from employment.

186.    On June 25, 2018, Kelly appeared at the designated time and place for her deposition pursuant to the subpoena served on May 23, 2018, and no representatives of SEAL or First Data were at the designated location at the designated time.

187.    Kelly took contemporaneous photographs of her attendance at the designated time and place and on June 25, 2018, and sent a letter to SEAL confirming she had appeared as directed in the subpoena.

188.    The evening of June 25th, Barger's counsel advised SEAL that Kelly had appeared that day at the designated time and place for her deposition.

189.    On June 26, 2018, at a deposition in the Barger Case occurring in Atlanta, Georgia, SEAL partner, Gary Eidelman, went on the record and accused Kelly of lying about her attendance on June 25th. Present at the deposition to hear these defamatory comments from Eidelman were several of Kelly's former collogues.

190.    On June 27, 2018, at another deposition in Atlanta, Barger's counsel went on the record to confirm that Kelly did, in fact, attend the June 25th deposition at the designated time and place.

191.    On June 27, 2018, Kelly sent another letter to SEAL regarding the failure of SEAL and First Data to appear at the designated time and place on June 25, 2018.

192.    On July 3, 2018, SEAL took the following two actions in contravention of their duty to Kelly as her listed counsel in the Barger Case Rule 26(a)(1) disclosures:

 (i) Gillian Cooper signed and submitted Defendant's Position Statement (Exhibit B) with the OCRC in her role representing First Data against Kelly's OCRC Charge, and

(ii)    Gillian Cooper sent a letter to Kelly seeking to reschedule her deposition in the Barger Case while Kelly remained listed in First Data's Rule 26(a)(1) disclosures as a witness that could only be contacted through SEAL .

193.    On July 10, 2018, Gillian Cooper purportedly called Kelly and left a voicemail seeking to reschedule Kelly's deposition and did not disclose she had represented First Data adverse to Kelly before the OCRC. Kelly did not receive the voicemail message.

194.    As of July 10, 2018, (i) Kelly had not received a copy of First Data's OCRC position statement and was not aware that SEAL, through Cooper, had appeared adverse to Kelly with regards to her OCRC Charge and (ii) Kelly believed SEAL was representing her as her counsel in the Barger Case.

195.    On July 12, 2018, Kelly received a copy of the First Data position statement and Cooper's letter, both dated July 3, 2018.

196.    On July 12, 2018, Kelly wrote to the SEAL managing partner to complain that her counsel in the Barger Case (in which Barger was raising discrimination claims against First Data) was now representing First Data adverse to her with respect to her OCRC Charge (in which Kelly was raising discrimination claims against First Data).

197.    On July 18, 2018, Kelly amended her Charge of Discrimination to incorporate the events since the filing of the initial OCRC Charge ("OCRC Charge Amendment") and alleging her summons to testify at deposition, served by a FedEx impersonator, and non-appearance of First Data and SEAL at her scheduled deposition, among other acts by First Data, SEAL, and Cooper, with respect to the Barger Case were designed as retaliation against Kelly for raising her charges of discrimination with the OCRC and EEOC.

198.    On July 19th and July 20th, 2018, Kelly and SEAL's managing partner exchanged communications regarding the conflict issues raised by Kelly regarding SEAL representing her in the Barger Case and adverse to her in her OCRC Charge.

199.    On July 23, 2018, five days after Kelly amended her charge of discrimination, without ever engaging in a good faith meet and confer, SEAL filed a Motion to Compel in the Southern District of Ohio (S.D.OH 1:18-mc-00010 related to EDNY 1:17-cv-04869-FB-LB) (the "Kelly Compel Proceeding") seeking that Kelly reappear for her deposition that she attended on June 25th, and litigation involving First Data, represented by SEAL, against Kelly appearing pro se commenced.

200.    The pleadings, exhibits and docket of the Kelly Compel Proceeding are incorporated herein by this reference.

201.    Before initiating the Kelly Compel Proceeding, First Data and SEAL had received Kelly's OCRC charge, as it had been amended and supplemented, and knew that Kelly had made allegations therein regarding the stress and anxiety she had experienced from Ording while employed by First Data.

202.    On July 27, 2018, Kelly filed a motion to quash the subpoena on the grounds that Kelly had fully performed through her June 25th attendance at the time and place designated.

203.    On July 31, 2018, Gillian Cooper e-mailed Kelly seeking dates for her to attend another deposition.

204.    On August 2, 2018, Kelly, Cooper and Eidelman engaged in an e-mail exchange regarding Kelly's deposition and her attendance at her prior noticed deposition.

205.    On August 3, 2018, Copper and Byrne filed a response to Kelly's Motion to Quash the second subpoena seeking her deposition and production of documents.

206.    On August 7, 2018, Kelly sent her reply in support of her charge of discrimination to the OCRC investigator with a copy hand-delivered to the OCRC on August 8, 2018.

207.    On August 8, 2018, Kelly received a letter from this Court setting a conference call hearing for August 14, 2018 to address the issues surrounding the Motion to Compel and Motion to Quash Kelly's subpoena in the Barger Case.

208.    On August 14, 2018, Kelly filed a motion for sanctions with respect to the conduct of Cooper, Byrne, SEAL, and Jackson Lewis in their pursuit of her deposition and documents in the Barger Case.

209.    On August 14, 2018, a teleconference hearing was held on the motion to compel before Magistrate Bowman. During that call, Cooper spoke on behalf of First Data despite not having been admitted pro hac vice into this Court. Magistrate Bowman treated the conference call as a status/scheduling conference and did not address the substance of the Motions. Without entering an order, obtained the parties agreement to another date for the deposition (August 31, 2018) under the May 23rd served subpoena to occur.

210.    On August 14, 2018, following the telephonic hearing, SEAL issued a second subpoena for the deposition of Ms. Kelly and included the date set during Magistrate Bowman's hearing, and SEAL added a document production subpoena that was not included in the initial deposition subpoena. The addition of the document request was not part of the agreement to a new deposition date.

211.    SEAL never sought an order from the EDNY Magistrate Judge to permit the issuance of a subpoena in the Barger Case for a second deposition of Kelly.

212.    Kelly was served the second subpoena, containing a summons for both a deposition and document production, on August 20, 2018.

**COMPLAINT AND JURY DEMAND**                                                              27

213.     On August 31, 2018, at 11:07 a.m., Kelly in-person filed for a protective order in this Court to prevent her deposition scheduled for that morning. See Kelly Compel Proceeding docket.

214.     Kelly then proceeded towards the designated location a block away from the Potter Stewart Courthouse for her deposition scheduled to start at noon. When Kelly arrived at the office building where her deposition was to be held, Kelly became aware that First Data had brought Ording as a corporate representative to be in attendance to watch her deposition in the Barger Case.

215.     Ording did not have any information regarding Barger's supervision of Kelly because Ording was not part of Barger's organization at any time that Kelly reported to Barger.

216.     On August 31, 2018, each of the Defendants were aware of the allegation Kelly had made in the OCRC Charge against Ording, including stress and anxiety caused by Ording to Kelly.

217.     Kelly did not attend the August 31, 2018 deposition due to Ording's presence. Kelly, upon learning of Ording's presence, left the premises and went directly to her physician where she received medication for anxiety and stress.

218.     Ording's presence, and prior abusive conduct towards Kelly was the trigger for the re-occurrence of Kelly's symptoms on August 31, 2018.

219.     After additional litigation in the Kelly Compel Proceeding, a third deposition was scheduled for October 15, 2018 to be held in a mediation room at the federal courthouse in Cincinnati for five-hours with Kelly being provided the right to call three breaks (two for five minutes and one for fifteen minutes).

220.     The deposition was held on October 15, 2018, and again First Data, SEAL, Jackson Lewis, Cooper and Byrne brought Ording as First Data's corporate representative.

221.     Ording was not an essential attendee at the deposition, and First Data, SEAL, Jackson Lewis, Cooper and Byrne, had been advised that Ording's presence at the August 31, 2018 deposition was the cause of Kelly's anxiety and stress reaction requiring her to seek medical care.

222.     Despite this knowledge, Defendants First Data, SEAL, Jackson Lewis, Cooper and Byrne again brought Ording to the deposition for no purpose other than to continue to retaliate against, harass and intimidate Kelly for bringing her own charges of discrimination against First Data.

223.     Kelly produced documents, and was deposed on October 15, 2018 for a total of five hours.

224.     SEAL's representative (Gillian Cooper) called two of Kelly's breaks. Of the entire five hour period of the deposition, less than 50 minutes were spent by Cooper asking questions of Kelly regarding the Barger Case and her management by Barger. The remainder of the deposition was spent by Cooper seeking information with respect to Kelly's pending OCRC Charge and the events between May 2018 and October 2018 regarding the litigation and events surrounding Kelly's deposition and the Kelly Compel Proceeding. No questions were asked about anything involving Ms. Ording's actions or conduct related to the Barger Case.

225.     During the October 15, 2018 deposition of Kelly, the following exchange between the SEAL partner taking the deposition, Defendant Cooper, and Kelly occurred while discussing First Data's Rule 26(a)(1) disclosures in the Barger Case:

Kelly:     So when you sent me the full – you just said that this is how you schedule deposition, right, for a case, you use this document?

Cooper:    Well, it's a tool about contacting witnesses.

Kelly:     Contacting?

Cooper:    Right.

Kelly:     Okay. So when you sent me the full 26(a) last week, I saw there were a lot of my
           peers in my same position that reported to Barger.

Cooper:    Um-hmm.

Kelly:     When were those folks subpoenaed and when were their depositions held?

Cooper:    They weren't necessarily all subpoenaed or deposed.

Kelly:     Why was I?

Cooper:    Because at the time that the depositions started in this case, you had filed a
           charge. . . .

226.    Defendant Cooper admitted on the record of Kelly's October 15, 2018 deposition
that of all the employees that reported to Barger listed on First Data's Rule 26(a)(1) Disclosures
in the Barger Case, Kelly was singled out for subpoena, litigation, and deposition because she
had filed her own charge of discrimination against First Data.

227.    The deposition of Kelly in the Barger Case was motivated entirely as a means to
retaliate against, harass and intimidate Kelly for bringing her own charges of discrimination
against First Data.

228.    The October 15, 2018 deposition of Kelly was used for the improper purpose of
discovery in this case (then being investigated by the OCRC) while Kelly was appearing pro se
and unrepresented in the Barger Case as a third-party witness, and in the Kelly Compel
Proceeding, regarding the scope of that third-party subpoena.

## COUNT I
## INTERFERENCE WITH FAMILY AND MEDICAL LEAVE ACT ENTITLEMENTS

229.     Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

230.     This Count I is alleged against First Data, Bisignano, and Ording.

231.     First Data was Kelly's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

232.     Defendant Bisignano was Kelly's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

233.     Defendant Bisignano revoked and modified First Data's work-from-home policy.

234.     Defendant Ording was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

235.     Defendant Ording enforced the revoked and modified work-from-home policy.

236.     Defendant Ording was required to provide Kelly notice of FMLA eligibility upon learning facts of eligibility.

237.     Kelly was an "eligible employee" as that term is defined in the FMLA, 29 U.S.C. §2611(2).

238.     Kelly's post-partum medical issues (physical and mental), liver issues, and cardiac events were each a "serious health condition" for purposes of the FMLA. 29 U.S.C. §2612(a)(1)(D).

239.     Kelly's had previously only taken FMLA leave due to complications during pregnancy and following the birth of a child.

240.     Prior to October 5, 2018, First Data and Ording were aware of Kelly's post-partum related physical and mental conditions for which she was being treated by a physician.

241.     On October 5, 2018, First Data and Ording were aware of Kelly's cardia issues, triggered by stress and anxiety, that occurred at the First Data Cincinnati office and that caused her to seek medical assistance at the emergency room for those conditions.

242.     First Data and Ording were aware that Kelly took time-off due to her serious health condition on October 5, 2018.

243.     On October 5, 2018, First Data and Ording had knowledge that Kelly's leave may be for an FMLA qualifying reason.

244.     First Data, Ording and Bisignano failed to provide notice of Kelly's eligibility to take FMLA leave within five days of acquiring knowledge that Kelly's leave may be for an FMLA qualifying reason.

245.     First Data's, Ording's and Bisignano's failure to provide Kelly notice of eligibility for FMLA leave within five days of acquiring that knowledge was in contravention of 29 C.F.R. §825.300(b)(1) and constituted interference with Kelly's rights under 29 U.S.C. §2612.

246.     Had Kelly been informed of her eligibility to take up to 12-weeks of FMLA leave following her October 5, 2017 cardiac issues, Kelly would have had a choice other than to prefer her health over her job and taken such leave without resigning by email approximately six weeks later in November 2017, under the pressure and anxiety.

247.     First Data and the Individual Defendants had engaged in a pattern and practice of en masse termination of employees during 2015, 2016, and 2017, on a quarterly basis.

248.     Kelly was aware of these mass firing events.

249.     Ms. Kelly's direct supervisor, Barger, was notified of his termination in January 2017 while he was on leave of absence.

250.     First Data's and Bisignano's practice of terminating employees while on leave of absence created an atmosphere discouraging Ms. Kelly from exercising her right to request leave of absence under the FMLA.

251.     This discouragement from exercising entitlement to FMLA leave interfered with Kelly's entitlements pursuant to 29 U.S.C. §2612.

252.     Had Kelly taken up to 12-weeks of FMLA leave following her cardiac issues on October 5, 2018, the continuing stress and anxiety imposed on her by Ording over the following six-weeks leading to her delivery of a request for accommodation or resignation in November 2018, would not have occurred.

253.     First Data's human resources department has a specialized Leave Management Team of professionals trained in the requirements of the FMLA.

254.     Ording is a Vice President of Human Resources and has been trained in the requirements of the FMLA.

255.     Defendant First Data and Ording violated the FMLA's eligibility notice requirements with full knowledge of an employer's obligation under the FMLA to provide timely notice.

256.     Defendants First Data's and Ording's violations of the FMLA were not based on a good faith and reasonable belief that the failure to provide eligibility notice timely was compliant with the FMLA.

257.     Each of First Data and Ording knew that failure to provide eligibility notice was in contravention of their obligation under the FMLA.

## COUNT II
## AMERICAN'S WITH DISABILITIES ACT – FAILURE TO ACCOMODATE

258.    Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

259.    This Count II is alleged against Defendant First Data.

260.    First Data is a "covered entity" as defined in 29 U.S.C. §12111(2).

261.    Kelly was an "employee" (as defined in 29 U.S.C. §12111(4)) of First Data.

262.    Kelly was and is a "qualified individual" (as defined in 29 U.S.C. §12111(8)).

263.    Kelly's post-partum induced illnesses (depression, anxiety, liver, cardiac) were each a "disability" (as defined in 29 U.S.C. §12102(1), "disability") as they impaired "major life activity" (as defined in 29 U.S.C. §12102(2)(A)).

264.    Kelly requested, and was granted, a reasonable accommodation from both of her two supervisors prior to Ording.

265.    Kelly worked remotely for nearly 12 years (2005 to 2017) with the approval of her managers, including with an approved accommodation from the new prohibition on work-from-home granted for her disability by her two supervisors prior to Ording (Fricke and Barger).

266.    While working remotely under Fricke and Barger, Kelly performed the essential functions of her job.

267.    Working remotely is a common practice among First Data's management.

268.    The VP of Training whose responsibilities were transferred to Kelly in March 2017, was permitted to work remotely, and part-time, while she worked with her husband to open up their new brewery business.

269.    Bisignano was responsible for the revocation and modification of First Data's work-from-home policy.

270.     Kelly requested that First Data and Ording reinstate her remote work accommodation.

271.     First Data and Ording denied Kelly's work-from-home and modified schedule reasonable accommodation requests.

272.     First Data and Ording had granted a modified work schedule and remote work request to the VP of Training who was not disabled.

273.     First Data and Bisignano never articulated a justifiable business reason for revoking the work-from-home policy or for full-time at-the-office attendance. First Data and Bisignano never articulated that Kelly's attendance at-the-office was needed for performance of her job duties.

274.     Kelly's ability to function for years remotely while abled, with a work-from-home accommodation while disabled, and with excellent reviews during those periods demonstrates that office attendance full-time is not an essential function of Kelly's position.

275.     First Data and Ording did not engage in an interactive process regarding Kelly's request for a reasonable accommodation.

276.     Failure to accommodate is a violation of the ADA. 42 U.S.C. §12112(b)(5)(A).

277.     First Data's conduct and actions towards the terms and conditions of Kelly's employment violated 42 U.S.C. §12112.

278.     Kelly is entitled to punitive damages pursuant to 42 U.S.C. §1981a.

## COUNT III
## VIOLATIONS OF TITLE VII & PREGNANCY DISCRIMINATION ACT

279.     Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

280.     This Count III is alleged against Defendant First Data.

281.     Kelly's medical conditions arose out of her two pregnancies.

282.     First Data had knowledge that Kelly's medical conditions were the results of pregnancy complications and post-partum medical complications.

283.     All of the above claimed actions by First Data and its agents and employees discriminated against Kelly on the basis of sex under Title VII and the PDA. 42 U.S.C. §§2000e-2000e-17.

## COUNT IV
## RETALIATION

284.     Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

285.     This Count IV is alleged against all the Defendants.

286.     All of the events, litigation, and actions taken by First Data, SEAL, Jackson Lewis, Cooper and Byrne from May 2018 to October 2018 in connection with Kelly's third-party deposition in the Barger Case were motivated by one or more of the following: Kelly raising her charge of discrimination to First Data's in-house legal department; Kelly's filing of her charge of discrimination with the EEOC and OCRC; and/or Kelly amending her charge of discrimination being investigated by the OCRC.

287.     Within less than 10-days, each time Kelly provided notice of her charges of discrimination or filed documents in connection with the charges, the Defendants took prompt action to harass Kelly in the Barger Case.

288.     The temporal proximity between each of Kelly's actions in pursuing her charges of discrimination under the ADA, Title VII, PDA and OCRA, and the retaliatory action against her with regards to her subpoena, motions to compel, protective orders, and sanction motions, demonstrate clear retaliatory intent.

289. Of all ten current or former employees listed on First Data's Rule 26(a)(1) disclosure in the Barger Case, Kelly was the only one that was subpoenaed to give a deposition.

290. Defendant Cooper of SEAL admitted during Kelly's October 15, 2018 deposition in the Barger Case that the sole motivation for choosing Kelly for a deposition in the Barger Case was because Kelly had filed her own charge of discrimination.

291. The selection of Kelly as the only one of ten chosen is direct evidence of discrimination.

292. In the Barger Case, Defendant Byrne, of Jackson Lewis, served as local counsel in the Kelly Compel Proceeding, signed documents, provided Cooper pro hac vice admission sponsorship, coordinated Kelly's deposition and litigation, argued before Magistrate Bowman on behalf of First Data against Kelly, and participated in the August and October depositions of Kelly in the Barger Case.

293. The selection of Kelly and the protracted litigation against her was motivated solely as retaliation for raising her charges of discrimination.

294. The prohibition against retaliation under the Ohio Civil Rights Act and the ADA are not limited to "employers" and third-parties, such as SEAL, Jackson Lewis, Cooper and Byrne.

### COUNT V
### VIOLATIONS OF THE OHIO CIVIL RIGHTS ACT

295. Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

296. This Count V is alleged against all of the Defendants.

297.     Defendants conduct alleged above with respect to Title VII, PDA, and ADA, and retaliation, also constitute violations of the Ohio Civil Rights Act ("OCRA"), Chapter 4112 of the Ohio Revised Code.

298.     Under the OCRA, retaliation by any "person" against Kelly because she opposed unlawful discriminatory practices or because Kelly made a charge, testified, assisted or participated in any investigation, proceeding or hearing under Sections 4112.01 or 4112.02 is unlawful. O.R.C. §4112.02(I).

299.     Under the OCRA, it is unlawful for any "person" to aid, abet, incite, compel, or coerce the doing of any act declared unlawful as a discriminatory practice, to obstruct or prevent any person from complying with the OCRA, or to attempt to directly or indirectly commit any act declared an unlawful discriminatory act. O.R.C. §4112.02(J).

300.     All of the Defendants violated the OCRA, directly or through aiding, abetting, inciting, compelling, or coercing another, with respect to the treatment of Kelly while employed from November 2017 through November 2018, and after her employment terminated through retaliation.

## COUNT VI
## CONSTRUCTIVE DISCHARGE UNDER ADA/TITLE VII/PDA/OCRA

301.     Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

302.     This Count VI is alleged against Defendants First Data, Ording and Bisignano.

303.     For the reasons set forth above with respect to the OCRA, Title VII, PDA, ADA failure to accommodate, FMLA failure to notify of eligibility, the discriminatory atmosphere created by Ording and First Data, termination of Barger while he was on approved leave of

absence, all illegal, made Kelly's working conditions so difficult and unpleasant that resignation was her only choice.

304.     Kelly's decided to resign because of this atmosphere created by tangible illegal acts that a reasonable person under the same circumstances would feel compelled to resign.

**COUNT VII**
**NEGLIGENT, RECKLESS AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

305.      Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

306.     This Count VII is alleged against Defendants First Data, Ording, SEAL, Jackson Lewis, Cooper, and Byrne.

307.     First Data, through Kelly's supervisors Fricke, Barger, and Ording, knew that Kelly suffered from depression, stress and anxiety ailments.

308.     With this knowledge, SEAL and First Data intentionally singled Kelly out for deposition in the Barger Case to intentionally harass and intimidate.

309.     After Kelly filed her Initial OCRC Charge, First Data and SEAL were aware of Kelly's depression and anxiety issues, and intentionally failed to appear at Kelly's deposition noticed for June 25th.

310.     After the filing of Kelly's Amended OCRC Charge, First Data, SEAL, Cooper, Jackson Lewis, and Byrne were aware of Kelly's depression, stress, and anxiety issues, and knew that Ording had contributed to, and triggered, anxiety events in Kelly.

311.     First Data, SEAL, Cooper, Jackson Lewis and Byrneintentionally brought Ording to Cincinnati to serve as corporate representative at the scheduled August 31, 2018 deposition.

312. As a direct result of Ording's presence, Kelly suffered an anxiety attack that required medical attention.

313. After the August 31st deposition did not proceed, First Data, SEAL, Cooper, Jackson Lewis, and Byrne filed motions to compel for the sole purpose of mocking and harassing Kelly for her anxiety and panic attack triggered by Kelly through motions to compel and discovery seeking confirmation that the attack was real.

314. In the third-attempt to depose Kelly, knowing that Ording had triggered her medically confirmed anxiety and panic attack on August 31st, First Data, SEAL, Cooper, Jackson Lewis, and Byrne again intentionally brought Ording to Kelly's deposition on October 15th.

315. Ording's presence at that deposition served no purpose other than to further harass and intimidate Kelly.

316. Ording had no knowledge or assistance to provide at the deposition for the Barger Case, because at all times relevant to Kelly reporting to Barger, Ording was in the human resources department, and Barger and Kelly reported into the Global Business Solutions Group. Ording knew nothing about Barger's management of Kelly and knew nothing of the facts of the Barger case other than for the few months that she served as interim leader of Barger's group while he was on leave (November 19, 2017 to January 13, 2018).

317. First Data and SEAL's use of a process server disguised as a FedEx deliveryman intentionally inflicted emotional distress on Kelly.

318. First Data, SEAL, Cooper, Jackson Lewis and Byrne, by singling-out and targeting Kelly for a third-party deposition in the Barger Case, recklessly and intentionally caused emotional distress to Kelly.

319.    Jackson Lewis and Byrne knew of the harassment of Kelly by First Data, Cooper and SEAL when and after they accept the engagement as local counsel for First Data in the Barger Case. With this knowledge, Jackson Lewis and Byrne sponsored the pro hac vice admission of Defendant Cooper of SEAL in the Barger Case. The acts of sponsoring the continuation of this conduct by First Data, SEAL and Cooper recklessly and intentionally inflicted emotional distress on Kelly.

320.    SEAL's breach of its attorney-client relationship with respect to representing Kelly as disclosed in First Data's Rule 26(a)(1) disclosure, and then intentionally taking an adverse position against Kelly in her charge of discrimination against First Data recklessly and intentionally inflicted emotional distress on Kelly.

321.    All of the actions described in this complaint from Kelly's cardiac emergency hospitalization through Kelly's October 15th deposition by First Data, SEAL and Jackson Lewis, were designed to inflict emotional distress on Kelly, whom they all knew was being treated for depression, stress and anxiety.

322.    SEAL's false statements on the record about Kelly's falsely alleged non-appearance at her June 25th deposition intentionally, recklessly, and negligently inflicted emotional distress on Kelly.

323.    First Data, SEAL, Cooper, Jackson Lewis and Byrne acted with intentional disregard for the possibility that their actions would create emotional distress.

324.    Kelly's potential for emotional distress was known, and the resulting emotional distress foreseeable.

325.    The results of Kelly's emotional distress manifested themselves physically, including blood pressure, sleeplessness, panic attacks, hospitalizations, and medical treatments.

326.    First Data, SEAL, Cooper, Jackson Lewis and Byrne negligently inflicted emotional distress on Kelly.

327.    Kelly's emotional distress suffered was severe and required medical treatment.

328.    Kelly is entitled to punitive damages for reckless and intentional infliction of emotional distress.

## COUNT VIII
## EAVESDROPPING/INVASION OF PRIVACY

329.    Kelly incorporates and restates each of the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

330.    This Count VIII is alleged against Defendants First Data, Ording, SEAL, Jackson Lewis, Cooper and Byrne.

331.    Kelly entered the mediation room at the Potter Stewart Courthouse at the same time as Barger's counsel in the Barger Case.

332.    When Kelly entered the mediation room at the Potter Stewart Courthouse for her deposition in the Barger Case on October 15, 2018, in the room were the court reporter, Gillian Cooper of SEAL, Ording, and Matt Byrne of Jackson Lewis.

333.    No one in the room advised Kelly that the conference phone in the room had been engaged and had an open line at the time Kelly entered the room.

334.    The conference call at the October 15, 2018 deposition, had been engaged by SEAL, Cooper, Byrne and Jackson Lewis prior to Kelly and Barger's counsel arrival at the room without with Kelly or Barger's counsel witnessing the numbers called or persons engaged on the call. This conference call could have only been engaged by Byrne, Cooper, or Ording.

335.     When Cooper went on the record to begin the deposition, she announced that two individuals, Jill Poole and Lori Graesser, both in-house counsel for First Data in Omaha, were on the call.

336.     At the time of Cooper's announcement of Poole's and Graesser's presence, no statements were made from Poole, Graesser, or anyone else that may have been on the conference line announcing their presence.

337.     During Kelly's entire deposition, a laptop or pad was positioned across the table from Kelly with its camera pointed directly at Kelly.

338.     The laptop or pad was not used by any of the participants during the deposition and its location and placement never changed.

339.     During breaks in Kelly's deposition, Kelly spoke off the record with the court reporter casually, and then privately with Barger's counsel, who is her counsel in this case.

340.     During breaks in the deposition, the laptop/pad was never removed from the room.

341.     Kelly noticed that the conference line on the conference room phone was never disengaged during the breaks.

342.     Upon information and belief, subject to further discovery, First Data, SEAL, Cooper, Jackson Lewis and Byrne surreptitiously created a video recording or live stream of Kelly's deposition without her knowledge and without notice of video recording of the deposition.

343.     Upon information and belief, subject to further discovery, SEAL, Cooper, Jackson Lewis and Byrne, intentionally left the conference room line open so that the participants on the

other end of the call could eavesdrop on the conversations between Kelly and her attorney in this case.

344.     Through written communications following her deposition, Kelly requested that SEAL and Jackson Lewis identify all individuals that were privy to either the audio or video of Kelly's deposition.

345.     SEAL, Cooper, Jackson Lewis and Byrne have refused to answer those questions other than to say that Poole and Graesser were announced as being on the phone. SEAL and Jackson Lewis will not respond to inquiries regarding whether Poole and Graesser were the only ones on the phone or viewing a video stream of the deposition. SEAL and Jackson Lewis will not respond to inquiries regarding whether the deposition was recorded or streamed on video.

346.     SEAL, Cooper, Jackson Lewis, and Byrne, given the opportunity prior to filing this Complaint, did not deny that the laptop was being used to create video images of Kelly's deposition.

347.      Based on the notice of deposition and the announcement of those present on the phone by Cooper, Kelly had no reason, legal or represented, to believe that her deposition was to be live streamed or recorded by audio means, and Kelly had no reason to believe that anyone other than those present in the room and Poole and Graesser as announced, were listening or viewing the deposition.

348.     Kelly had no notice that the live lines (audio and video) would remain open and operational during breaks taken off-the-record during her deposition.

349.     Conversations occurred between Kelly and her attorney in this case that were privileged and listened to by opposing counsel.

350.     Kelly's deposition was taken at the Potter Stewart Courthouse using the federal space occupied by this Court as ordered by Magistrate Bowman.

351.     Kelly appeared at the time and location and the federal courthouse as ordered by Magistrate Bowman.

352.     The events alleged in this Count occurred inside of the Potter Stewart federal courthouse using the internet and telephone systems provided at that facility by the federal court.

353.     The conduct complained of in this Count is a violation of Kelly's privacy under Ohio law.

354.     If the audio or video was transmitted to Maryland, the primary office location of the SEAL partner on the Barger Case, the conduct complained of in this Count is in violation of Maryland's all-party consent statute. Maryland Code §10-402.

**WHEREFORE,** Plaintiff requests that this Court enter judgment against First Data on all Counts, Defendant Ording on Counts I, IV, V, VI, VII, and VIII, Defendant Bisignano on Counts I, IV, and VI, and against Defendants SEAL, Cooper, Jackson Lewis, and Byrne on Counts IV, V, VII, and VIII, and Plaintiff is entitled to the following relief:

(i)      Compensatory and actual damages under all Counts, including without limitation back-pay and front-pay, lost wages, salary, bonuses, insurance, stock options, restricted stock units, medical costs, emotional distress damages;

(ii)     Interest on damages;

(iii)    FMLA liquidated damages under 29 U.S.C. §2617(a)(1)(A)(iii);

(iv)    Punitive damages under the ADA and Title VII, 42 U.S.C. §1981a;

(v)     Punitive damages for violations of the OCRA;

(vi)    Punitive damages for the intentional infliction of emotional distress;

(vii)   Punitive damages for invasion of privacy;

(viii)   Reasonable attorney's fees, reasonable expert fees, and other costs;

(ix)   Plaintiff be granted a trial by jury as to all issues in this Complaint;

(x)   Negative inferences or such other remedies be imposed for any destruction of evidence by Defendants, as the Court deems appropriate;

(xi)   Such further relief, including equitable relief and special damages, to which the Plaintiff is entitled under the law and as the Court deems appropriate.

DATED:    May 20, 2019

Respectfully Submitted,

Julie Kelly, Plaintiff (Pro Se)