May 25, 2018 Letter to OCRC (Kelly v. First Data)

# EXHIBIT D

## Shawn Shearer

| | |
|---|---|
| **From:** | Shawn Shearer <shawn@shearerlaw.pro> |
| **Sent:** | Thursday, May 17, 2018 12:08 PM |
| **To:** | 'Poole, Jill' |
| **Subject:** | Kelly v First Data |
| **Attachments:** | 07 EEOC ( Julie Kelly) 5.16.18.pdf |

For your information, attached is the EEOC Charge by Ms. Kelly against First Data. I am providing this to you as a courtesy. I would request that you also provide me a courtesy copy of First Data's response when it is sent to the EEOC.

Shawn E. Shearer
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(214) 434-1594
www.shearerlaw.pro

THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE

1

May 25, 2018 Letter to OCRC (Kelly v. First Data)

# EXHIBIT E

# First Data®

First Data Corporation
Employment & Benefits Law Group
6855 Pacific Street, AK-32
Omaha, NE 68106
www.firstdata.com

December 5, 2017

**VIA FEDERAL EXPRESS DELIVERY:** 513-806-4893

**VIA EMAIL TRANSMISSION:** jul_kelly@mac.com

Ms. Julie Kelly
823 Dorgene Lane
Cincinnati, OH 45244

     **RE:**   **Post-Employment Obligations**

Dear Ms. Kelly:

I am an attorney for First Data Corporation and understand that your employment with First Data has recently terminated. I am writing to remind you of some of your post-employment obligations.

In connection with your employment, you signed a binding legal agreement that prohibits you from:

- using or disclosing trade secrets or confidential information.
- directly or indirectly soliciting any First Data customer for 24 months after your employment termination.
- directly or indirectly soliciting any First Data employee for 24 months after your employment termination.
- working for a competitor in any geographic area where First Data provides products or services for 12 months after your employment termination.

Please understand that this letter is not intended to provide an exhaustive list or description of your continued obligations to First Data. First Data takes these agreements and your obligations under them seriously. I encourage you to carefully review all obligations and avoid engaging in any prohibited activity. If you ignore this letter and violate your contractual obligations to First Data, the Company reserves the right to pursue all of its legal rights against you, including suing you for injunctive relief and monetary damages.

This letter is without prejudice or waiver of any and all of First Data's rights and remedies.

Sincerely,

Lori Graesser
Associate General Counsel
O: 402-222-8113
F: 402-916-7598



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.





May 25, 2018 Letter to OCRC (Kelly v. First Data)

# EXHIBIT F

Statement from Mr. Matthew Kelly on the method used to serve Julie Kelly on 5/23/18 by Mr. Gary B. Eidleman, representative for First Data Corporation.

Around 7:25pm on 5/23/18 a man of medium build and a height of about 6 foot knocked on our front door at 823 Dorgene Lane, Cincinnati Oh, 45244. He was dressed in a purple official FedEx uniform polo shirt and light khaki shorts and black sneakers. He was carrying a FedEx letter box and what looked like a handheld signature / tracking device. The alleged FedEx man stated that he had a package for Mrs. Julie Kelly and needed a signature. I stated that my wife was out back with the children. He then asked to go into the back yard. Immediately I stated no, he could wait right where he was. I then shut the door and proceeded to get my wife. This took a few minutes, as my 3 young children were swimming and we cannot let them alone in the pool, my mother (87) was also out back with them.

Once Julie came to the door, the FedEx like man immediately asked if she was Mrs. Julie Kelly, pulled out some paper work and stated she was served by Saul Ewing Arnstein & Lehr, handed her the papers, and left.

As we read the papers, we became aware that there was no envelop, tracking information and the date of the documents was nearly a week old. My wife called FedEx customer service later to see if we could find out some information and we were told that FedEx does not serve subpoenas. We filed a complaint with them that this company would use an imposter to deliver this type of information.

Should you have any questions, please feel free to reach out to me at the below contact information.

Thank you

Matt Kelly

Matt Kelly
513.305.9000
mattkelly0611@gmail.com

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

May 29, 2018

**HAND-DELIVERY**

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati Satellite Office
Mid-Pointe Towers
7162 Reading Road, Suite 1005
Cincinnati, OH 45237

> RE:  Julie Kelly v. First Data Corporation
> DAYB6(27240)05172016
> **Evidence of Retaliation to Filing of Charge of Discrimination (Part 2)**

Dear Ms. Bedinger:

I represent Julie Kelly ("Ms. Kelly") in connection with the above referenced charge of discrimination. By letter to the EEOC dated May 16, 2018, Ms. Kelly alleges First Data Corporation ("First Data") violated the ADA, the PDA and Title VII with respect to discrimination based on sex in the course of Ms. Kelly's employment and termination (the "Charge Letter").

By letter dated May 25, 2018, I advised you of continuing harassment of Ms. Kelly by First Data's outside counsel, Saul Ewing Arnstein & Lehr ("Saul Ewing"). The background on the situation is set forth in the Charge Letter and in my letter to you of May 25th.

> **This letter is to advise you that Saul Ewing, First Data's counsel, continues to harass Ms. Kelly for bringing her own charges of discrimination against First Data.**

Ms. Kelly was "served" a subpoena to testify at a deposition as a third-party witness in a completely separate matter, *Barger v. First Data*, on May 23, 2018. The questionable circumstances regarding that service, including a process server disguised as a FedEx delivery person carrying a FedEx box to conceal the subpoena, is included in my May 25th letter.

Veronica Y. Bedinger
May 29, 2018

In response to that subpoena, Ms. Kelly wrote to Mr. Gary Eidelman, partner of Saul Ewing and lead defense counsel in the *Barger v. First Data* case, asking questions about the subpoena.

Apparently, this morning, May 29th, at 8:30 am, a FedEx delivery arrived at Ms. Kelly's home to deliver a response by Saul Ewing to Ms. Kelly's letter with questions regarding the third-party deposition subpoena she received in the *Barger v. First Data* case. It is beyond pale that Saul Ewing, knowing of the incident involving the process server disguising himself as a FedEx worker, would turn around and send a real FedEx delivery person to Ms. Kelly's door at 8:30 am when they knew Ms. Kelly's children were upset about the first FedEx impersonator delivering the subpoena.

As I indicated in my May 25th letter, I am lead counsel for Plaintiff Barger in the *Barger v. First Data* case. I am also Ms. Kelly's counsel with respect to her charges of discrimination against First Data being investigated by the OCRC. I have not been engaged to defend Ms. Kelly in the third-party deposition of Ms. Kelly First Data is attempting to compel in the *Barger v. First Data* litigation, a case in which Saul Ewing is representing First Data. I have clearly explained to Saul Ewing the scope of my representations, and clearly indicated that I do not represent Ms. Kelly with respect to any issues in the *Barger v. First Data* litigation. Both Ms. Kelly and Mr. Barger have been informed and consented to these scopes of representation. I have also informed Saul Ewing of the limited scope of each of these representations.

Despite having been informed of the limits of my representation, Saul Ewing continues to behave as if I am Ms. Kelly's attorney with respect to the deposition in the *Barger v. First Data* case.

I have attached a copy of the e-mail I received this morning, May 29th, from Ms. Kelly describing her receipt of the FedEx letter from Mr. Eidelman of Saul Ewing. I have also attached a copy of the letter Mr. Eidelman Ewing sent to Ms. Kelly.

Because I do not represent Ms. Kelly with respect to the *Barger v. First Data* matter, I am again seeking assistance from the OCRC to protect Ms. Kelly's interest and the integrity of the OCRC's ongoing investigation of her charges of discrimination against First Data. A deposition of Ms. Kelly in the *Barger v. First Data* case will be nothing more than a fishing expedition by First Data for information that First Data may use in response to her charges of discrimination now being investigated by you. This deposition will have no material meaning to the *Barger v. First Data* case.

Please remember, that the Plaintiff in the *Barger v. First Data* case has neither been deposed nor even received a notice of deposition in that case. For First Data to be seeking Ms. Kelly's testimony as a third-party deponent in that case serves no purposes other than to harass Ms. Kelly for bringing her own charges of discrimination.

As described in my May 25th letter, hiring counsel to defend Ms. Kelly's deposition in the *Barger v First Data* case will be a hardship on the Kelly family, especially given the threats of

Veronica Y. Bedinger
May 29, 2018

First Data to enforce very questionable non-compete and non-solicitation provisions limiting Ms. Kelly's ability to work in the only industry she has known her entire adult working career.

I would ask that the OCRC intervene to file a motion for a protective order or motion to quash in the *Barger v. First Data* case with respect to Ms. Kelly's third-party deposition subpoena. A deposition in the *Barger v. First Data* case will taint the OCRC's investigation of Ms. Kelly's own claims of discrimination against First Data. Moreover, First Data should not be permitted to take sworn deposition testimony of Ms. Kelly regarding her employment at First Data at the same time the OCRC is investigating Ms. Kelly's claims of discrimination, when procedure prohibits Ms. Kelly from engaging in sworn deposition testimony of First Data with regards to Ms. Kelly's claims while the OCRC investigation is ongoing.

The temporal proximity of events clearly demonstrates that First Data is using the threat of a third-party deposition subpoena in the *Barger v. First Data* litigation to intimidate Ms. Kelly with respect to her separate charges of discrimination against First Data. The subpoena will require Ms. Kelly to engage separate counsel, a cost the Kelly family cannot afford after her termination by First Data and restrictions on possible employment imposed by First Data. A deposition of Ms. Kelly was never even mentioned as a possibility in the *Barger v. First Data* case until Ms. Kelly raised her concerns about discrimination. Any assistance the OCRC could provide to ensure the integrity of its investigation against First Data would be appreciated.

Finally, as you will note in the attached letter received by Ms. Kelly from Saul Ewing on May 29th, Mr. Eidelman violates the rules of ethics in several respects. First, Mr. Eidelman gives legal advice to Ms. Kelly in his role as First Data's counsel in the *Barger v. First Data* case. Mr. Eidelman is not Ms. Kelly's attorney and should not be advising her, especially when she has raised her own claims of discrimination against First Data. Second, if Mr. Eidelman believes that I am Ms. Kelly's attorney with respect to the *Barger v. First Data* case (which I am not and Mr. Eidelman is well aware of that fact), Mr. Eidelman should not be communicating with a party he believes is represented by counsel. If Mr. Eidelman truly believed I was representing Ms. Kelly in the *Barger v. First Data* case, his communication must be sent to me – that is not what happened. In either case, Mr. Eidelman has violated the rules of professional conduct. Either he has given legal advice to an unrepresented adverse party or he has communicated with a party that he believes is represented. No matter which is the case, Mr. Eidelman's conduct must be sanctioned and stopped.

I respectfully request, and actually beg, that the OCRC intervene to stop the harassment of Ms. Kelly by First Data and its outside counsel. First Data has no reason to involve Ms. Kelly in the *Barger v. First Data* litigation other than to harass her and make her incur additional costs, which she cannot afford due to her termination by First Data. Any assistance that the OCRC can provide to stop this behavior would be greatly appreciated.

I have no words other than First Data's conduct towards Ms. Kelly is more than outrageous retaliation against Ms. Kelly, now the caretaker of three children under the age of 6, her 83-year old mother-in-law, and her learning disabled brother, for raising her charges of discrimination against First Data. This is the same First Data that has threatened Ms. Kelly with

Veronica Y. Bedinger
May 29, 2018

Page 4

enforcement of 24-month non-compete and non-solicitation provisions in undisclosed documents limiting her employment opportunities. This is the same First Data forcing Ms. Kelly to seek legal counsel to defend a third-party deposition in which she has no material testimony.

Someone must stop this harassment. I hope the OCRC can assist, and I request any assistance the OCRC can provide.

Thank you for taking the time to review these issues. I can be reached at the office (972) 803-4499. I will be traveling taking depositions over the next month, and can also be reached on my cell at (817) 915-8757.

Very truly yours,

Shawn E. Shearer

Attachments:

May 29, 2018 E-mail from Julie Kelly to Shawn Shearer

Letter dated May 25, 2018 from Gary Eidelman (Saul Ewing) to Ms. Kelly (received by FedEx 5/29/18 8:30 am)

cc:     Julie Kelly

THE LAW OFFICE OF SHAWN SHEARER, P.C.

**Shawn Shearer**

| | |
|---|---|
| **From:** | Julie Kelly <jul_glad@mac.com> |
| **Sent:** | Tuesday, May 29, 2018 8:35 AM |
| **To:** | 'Shawn Shearer' |
| **Cc:** | bb@shearerlaw.pro |
| **Subject:** | Letter from Gary E |
| **Attachments:** | Julie Kelly - Response from Gary Eidelman dated 5.25.18 Rec 5.29.18.pdf |

Hello,

I received this response to my letter to First Data's attorney, Gary Eidelman, this morning. For security reasons, my husband answered the door and signed for it. We didn't want to upset the children again or risk endangerment of an impersonator. Looks like it was a REAL FedEx delivery this time. It was quiet unexpected, around 8:34am.

In any case, it appears that he wants me to work through him on dates and then any questions to go through you. Is that even legal? I just don't understand all that.

We should probably get a copy of this to my rep at the OCRC.

Julie Kelly
513.806.4893

Inspire | Lead | Motivate | Transform

1

**SAUL EWING**

**ARNSTEIN**

**& LEHR** ᴸᴸᴾ

Gary B. Eidelman
Phone: (410) 332-8975
Fax: (410) 332-8976
Gary.Eidelman@saul.com
www.saul.com

May 25, 2018

**BY FEDERAL EXPRESS**

Julie Kelly
823 Dorgene Lane
Cincinnati, OH 45244

      Re:    *Steven B. Barger v. First Data Corporation et al.,*
            **Civil Case No. 1:17-cv-4869**

Dear Ms. Kelly:

      I am in receipt of your overnight letter dated May 24, 2018. The deposition subpoena that you were served with is in connection with the lawsuit filed by Steve Barger against First Data Corporation that is pending in New York. Please refer to the caption on page 1 of the subpoena. It is not related to your EEOC charge against First Data.

      I understand that June 25, 2018 is not convenient for you. Please let me know which of the following dates work for your deposition: June 27, 28, July 3, 5, 6, 13, 16, 17, 19, 23, 24, 25, 26. So as not to burden you financially, First Data will pay the costs of childcare for you to attend the deposition.

      If you have any other questions about your deposition, you should speak with your lawyer Shawn Shearer.

              Very truly yours,

              Gary B. Eidelman

cc: Shawn Shearer, Esq.

Centre Square West ♦ 1500 Market Street, 38ᵗʰ Floor ♦ Philadelphia, PA 19102-2186
Phone: (215) 972-7777 ♦ Fax: (215) 972-7725

DELAWARE  FLORIDA  ILLINOIS  MARYLAND  MASSACHUSETTS  NEW JERSEY  NEW YORK  PENNSYLVANIA  WASHINGTON, DC
A DELAWARE LIMITED LIABILITY PARTNERSHIP

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254

DALLAS, TEXAS 75204

OFFICE: (972) 803-4499

SHAWN@SHEARERLAW.PRO

July 10, 2018

**HAND-DELIVERY**

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati Satellite Office
Mid-Pointe Towers
7162 Reading Road, Suite 1005
Cincinnati, OH 45237

RE:  Julie Kelly v. First Data Corporation
DAYB6(27240)05172018; 22A 2018-02392C
**Response to Request for Office Visit**
**Additional Evidence in Support of Charge**
**Evidence of Retaliation to Filing of Charge of Discrimination**

Dear Ms. Bedinger:

As you know, I represent Julie Kelly ("Ms. Kelly") in connection with the above referenced charge of discrimination. By letter to the OCRC dated May 16, 2018, Ms. Kelly alleges First Data Corporation ("First Data") violated the ADA, the PDA and Title VII with respect to discrimination based on sex in the course of Ms. Kelly's employment and termination (the "Charge Letter").

By this letter, I would like to address two primary issues: (i) your request for an office visit to review documents submitted by Ms. Kelly's former employer for purposes of providing a rebuttal, and (ii) providing you an update as to the events over the last several weeks involving the continued harassment of Ms. Kelly through First Data's issuance of a third-party subpoena for her testimony in a completely separate case.

## Request for Office Visit & Submission of Additional Documents to OCRC

Ms. Kelly has received your letter dated July 3, 2018 in which you advised her that the OCRC has obtained information from the Respondent that needs to be discussed, requesting a scheduling of an office visit to review this information, and Ms. Kelly providing a rebuttal. I will be giving you a call to discuss these issues. In the meantime, I am requesting a copy of the

Veronica Y. Bedinger
July 9, 2018

information submitted to the OCRC by the Respondent in this case. Please e-mail or mail the position statement or response submitted to the OCRC to me for review and rebuttal.

In addition, I have additional evidence and documentation to submit to the OCRC for its consideration in evaluating Ms. Kelly's claims. Some of those documents are attached hereto as Exhibit A. If you would like electronic versions of these documents, they can be provided if you would provide me the instructions on how you would like them sent. I am also in possession of additional documents that may be helpful in your evaluation of Ms. Kelly's claims (physicians notes, medical history, etc.) and I would like to discuss how to turn those documents over to you as well as the privacy issues and protections surrounding medical information.

<u>Continued Harassment and Retaliation</u>

By letters dated May 25, 2018 and May 29, 2018, I advised you of First Data's actions to subpoena Ms. Kelly as a third-party witness in a separate case being litigated in the Eastern District of New York (Barger v. First Data).

In these letters, I described for you First Data's retaliation through the threat of issuing a subpoena to Ms. Kelly to give a deposition and then the subsequent issuance of that deposition subpoena to Ms. Kelly in retaliation for raising her claims against First Data being investigated by you. The subpoena Ms. Kelly received from First Data indicated that she was to appear for a deposition in the Barger v. First Data case on June 25, 2018. Ms. Kelly wrote to counsel for First Data and indicated that her attendance that day would be difficult due to her care for her children, elderly mother-in-law, and her brother with learning disabilities. Ms. Kelly also indicated that the date of June 25, 2018 was problematic.

In response, counsel for First Data indicated that First Data would pay the costs of any childcare or other care needed during the time during which Ms. Kelly would be in her deposition in the Barger v. First Data case. However, First Data never withdrew its subpoena, which remained outstanding on June 25, 2018, and with which Ms. Kelly felt compelled to comply by appearance.

On June 25, 2018, Ms. Kelly appeared at the time and place noticed for her deposition in the Barger v. First Data case. She brought her children (all under the age of 6) with her to the location believing, based on First Data's counsel's representations, that childcare would be provided while she was being deposed. When she arrived at the designated place, at the designated time, counsel for First Data was not at the location and the deposition did not occur.

In direct retaliation for Ms. Kelly raising her ADA and Title VII claims, First Data initially threatened to subpoena Ms. Kelly in Barger v. First Data, then when Ms. Kelly's claims were submitted to the OCRC, First Data delivered that threatened subpoena to Ms. Kelly (the circumstances of which involved a process server improperly impersonating a FedEx employee for no reason), and then, to make the harassment and inconvenience of Ms. Kelly even worse, First Data did not even show to take the deposition it had noticed. Ms. Kelly put aside everything she was doing to attend this deposition that was scheduled solely to harass her for

Veronica Y. Bedinger
July 9, 2018                                                                                                    Page 3

bringing this claim before the OCRC. First Data had no intention of taking Ms. Kelly's
deposition on the noticed date. First Data only wanted to attempt to intimidate Ms. Kelly by
threatening a subpoena, attempting to serve a subpoena by covert means, and then failing to
show at the designated time and place for that subpoena, all to increase Ms. Kelly's legal
expenses and dissuade her from proceeding forward with her own claims against First Data you
are investigating.

There is absolutely no justification for First Data to issue a subpoena of Ms. Kelly to
testify in a wholly-unrelated case and then for First Data to no-show that deposition without
withdrawing their subpoena. First Data is using any means necessary to make Ms. Kelly's legal
issues and costs so expensive that she is unable to afford to pursue her own claims against First
Data while also complying with subpoenas to testify in unrelated cases being litigated against
First Data. I am not going to allow those types of tactics to work, and neither should the OCRC.

I am attaching as <u>Exhibit</u> B the following communications related to this issue and other
retaliatory acts by First Data to supplement the supporting materials I have provided you in
connection with my earlier letters regarding the subpoena:

| | |
|---|---|
| May 24, 2018 | Letter from Ms. Kelly to First Data's counsel |
| May 29, 2018 | E-mail from Ms. Kelly to me attaching response from First Data's counsel |
| June 20, 2018 | Letter to Ms. Kelly from First Data EVP of HR |
| June 21, 2018 | Letter from me in response to First Data EVP Letter |
| June 25, 2018 | E-mail from Ms. Kelly to me advising me that First Data failed to appear at the noticed time and place scheduled for Ms. Kelly's deposition in Barger v. First Data. |
| June 26, 2018 | E-mails from Ms. Kelly detailing (with pictures and videos) her attendance at the date and time required by the subpoena issued by First Data. |
| June 27, 2018 | E-mail to me from Ms. Kelly containing her letter to First Data's counsel regarding First Data's failure to appear. |
| July 6, 2018 | E-mail to me from Ms. Kelly with a letter she had received from First Data's counsel regarding their failure to appear at the scheduled time and place for Ms. Kelly's deposition. |

I will be calling you to arrange for the in-person meeting requested in your July 3rd letter
to give me and Ms. Kelly an opportunity to review First Data's submissions to you for purposes
of preparing Ms. Kelly's rebuttal. If you could provide me a copy of those materials in advance,

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

Veronica Y. Bedinger
July 9, 2018

Page 4

our meeting and my process for providing you a rebuttal could be accelerated.  If possible, please either mail or e-mail me a copy of First Data's position statement submitted to you in response to Ms. Kelly's charges.

I can be reached at the office (972) 803-4499. I will be traveling taking depositions over the next month, and can also be reached on my cell at (817) 915-8757.

Very truly yours,

Shawn E. Shearer

Attachments:

Exhibit A:     Additional Evidence in Support of Charge of Discrimination

Exhibit B:     Additional Evidence in Support of Claim of Retaliation

cc:     Julie Kelly

THE LAW OFFICE OF SHAWN SHEARER, P.C.

# EXHIBIT A

Additional Evidence for

Julie Kelly v. First Data Corporation
DAYB6(27240)05172018; 22A 2018-02392C

OCRC Investigation

July 9, 2018

## Job Information

Kelly,Julie Kathryn

| | |
|---|---|
| From: | 01/01/1900 |
| To: | 11/16/2017 |

View Another Date Range

### Employee Job Information

| | |
|---|---|
| Employee ID: | 121096 |
| Position Number: | 20121096 |
| Department ID/ Name: | 3001001288 / MER/RSAG Sales Trainers |
| Location Code/ Description: | 4667 / Cinci – 11311 Cornell Park Dri |
| Supervisor Name/ Position Number: | Ording,Robin / 30015892 |
| Business Unit: | U.S. National Structure |
| Job Code: | HCM410 |
| Position Title: | Director Training |
| Grade: | 4M |
| Full/Part Time: | Full-Time |
| Regular/Temporary: | Regular |
| Scheduled Weekly hours/ FTE: | 40.00 / 1.000000 |
| Employee Status: | Active |
| Original Hire Date: | 04/20/1998 |
| FD Hire Date: | 04/20/1998 |
| Rehire Date: | |
| Benefits Service Date: | 04/20/1998 |
| BCP Designation | Not Applicable |

### Salary History

| Date of Change | Action | Reason | Pay Rate | Compensation per Frequency | |
|---|---|---|---|---|---|
| 03/16/2017 | Pay Rate Change | Adjustment | 107,500.00 USD | 107,500.00 USD | Annual |
| 01/01/2017 | Pay Rate Change | Merit | 99,581.00 USD | 99,581.00 USD | Annual |
| 01/01/2016 | Pay Rate Change | Merit | 97,628.00 USD | 97,628.00 USD | Annual |
| 01/01/2015 | Pay Rate Change | Merit | 94,784.00 USD | 94,784.00 USD | Annual |
| 03/01/2013 | Pay Rate Change | Merit | 91,800.00 USD | 91,800.00 USD | Annual |
| 06/16/2012 | Pay Rate Change | Internal Equity Adjustment | 90,000.00 USD | 90,000.00 USD | Annual |
| 03/01/2011 | Pay Rate Change | Merit | 73,800.00 USD | 73,800.00 USD | Annual |
| 03/01/2010 | Pay Rate Change | Merit | 70,286.00 USD | 70,286.00 USD | Annual |
| 03/01/2008 | Pay Rate Change | Merit | 68,239.00 USD | 68,239.00 USD | Annual |
| 03/01/2007 | Pay Rate Change | Merit | 64,074.00 USD | 64,074.00 USD | Annual |
| 04/16/2006 | Promotion | In-band/grade Promotion | 61,609.90 USD | 61,609.90 USD | Annual |
| 03/01/2006 | Pay Rate Change | Internal Equity Adjustment | 56,009.00 USD | 56,009.00 USD | Annual |
| 03/01/2006 | Pay Rate Change | Merit | 52,839.90 USD | 52,839.00 USD | Annual |
| 03/01/2005 | Pay Rate Change | Adjustment to Minimum | 51,300.00 USD | 51,300.00 USD | Annual |
| 03/01/2005 | Pay Rate Change | Adjustment to Minimum | 51,181.00 USD | 51,181.00 USD | Annual |
| 03/01/2005 | Pay Rate Change | Merit | 48,895.00 USD | 48,895.00 USD | Annual |
| 03/01/2004 | Pay Rate Change | Merit | 47,014.00 USD | 47,014.00 USD | Annual |
| 03/01/2003 | Pay Rate Change | Merit | 45,206.00 USD | 45,206.00 USD | Annual |
| 03/01/2002 | Pay Rate Change | Merit | 42,849.00 USD | 42,849.00 USD | Annual |
| 03/01/2001 | Pay Rate Change | Merit | 41,201.00 USD | 41,201.00 USD | Annual |
| 10/31/2000 | Promotion | Promotion | 40,000.00 USD | 40,000.00 USD | Annual |
| 09/27/2000 | Data Change | MERIT | 34,430.92 USD | 34,430.92 USD | Annual |
| 07/01/2000 | Pay Rate Change | Merit | 34,430.92 USD | 34,430.92 USD | Annual |
| 05/01/2000 | Pay Rate Change | Salary Review | 32,482.00 USD | 32,482.00 USD | Annual |

| 01/01/2000 | Promotion | Promotion | 29,800.00 USD | 29,800.00 USD | Annual |
| 06/27/1999 | Pay Rate Change | Merit | 25,200.00 USD | 25,200.00 USD | Annual |
| 06/27/1999 | Pay Rate Change | Market Adjustment | 24,000.00 USD | 24,000.00 USD | Annual |
| 04/20/1998 | Hire | New Hire | 18,844.80 USD | 18,844.80 USD | Annual |

Current Additinal Compensation

| Type | Amount | |
|------|--------|--|
| 1 | | — |



7301 Pacific Street A19
Omaha, NE 68114-5447

## Workplace Adjustment Form

The completion of the workplace adjustment form does not guarantee and/or compel the employer to provide the requested adjustment. All requests are subject to review on a case-by-case basis, taking into consideration factors such as job functions, business needs and any applicable laws.

Employee Name: Julie Kelly

Employee ID #: 121096

Employee Phone Number: 513-806-4893

Please explain **Accommodation/Limitation** which support certification
Requesting no travel after 20 weeks pregnant due to history of myomectomy and C-section.

Physician's Name: Christopher M. Fleming, MD

Title/Description of Practice: Seven Hills Woman's Health Center

Address: 7495 State Road, Suite 300
City: Cincinnati State: Ohio Zip: 45255

Phone Number: 513.231.3447 Fax Number: 513.231.3761

*Notice: The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive.*

(Following to be completed by Physician/ Caregiver – prior to completing the form please review the *GINA* notification above.)

1. Does your patient have a physical or mental impairment that warrants a workplace adjustment?

   Yes ☒   No ☐   If *yes*, what is the impairment?   **High-risk Pregnancy**

2. Please indicate what major life activities are limited.

   ☐ Caring for Oneself   ☒ Walking      ☐ Seeing       ☐ Hearing    ☐ Performing Manual Tasks
   ☐ Speaking             ☐ Breathing     ☐ Learning     ☐ Working    ☐ Concentrating
   ☒ Standing             ☐ Sitting       ☐ Toileting    ☒ Lifting    ☐ Interacting with Others
   ☐ Other (Please specify) Travel, including the operation of vehicles



7301 Pacific Street A19
Omaha, NE 68114-5447

3. Please describe the specific type of adjustment needed and provide a detailed description of the adjustment requested, but only select the appropriate adjustment that applies for the impairment described in question #1 above – **PLEASE BE SPECIFIC**

☐ Purchase or Modification of equipment or devices: _____

☐ Ergonomic Assessment: _____

☐ Modification of work schedule (Request for schedule change due to a medical condition requires the completion of the QUESTIONS FOR PHYSICIAN OR OTHER CAREGIVER form)

☒ Other : Limitation and minimized travel and physical activities through the duration of high-risk pregnancy

4. How long will the patient need the adjustment? If you are unable to provide dates, when will he or she be medically reevaluated? Current date through duration of pregnancy expected to be 2/20/15

5. Please review the attached job description. (If a job description was not provided, please discuss the position with the employee to determine essential job duties.) Is the employee able to perform the essential job function of this position with or without an adjustment? Yes ☐     No ☐

Additional comments: Requesting that patient does not travel through duration of pregnancy and proper accommodations are made to allow fulfillment of job duties through current work environment of working from home.

**Please fax completed information to: First Data – 866-620-8941**

Anna S. Zabrecky, MD
Christopher M. Fleming, MD
Xavier G. Ortiz, MD
Michael Fesenmeier, MD
S. Anne Pierson, MD

Sue Holden, CNM
Patricia Molony, CNM
Renee Klee, CNM
Erin Colston, CNM
Patricia Tetrick, CNP

7495 State Road, #300
Telephone: (513) 231-3447

Date _____10·16·14_____

## TO WHOM IT MAY CONCERN:

_____Julie Kelly_____ is under my care. He/She

☑ was seen in my office today.

☐ is released to return to work on _____.

☐ is unable to return to work at this time because _____

_____

☐ is able to return to school on _____.

☐ is/is not able to participate in the physical education program at school.

☑ is pregnant and estimated date of confinement is _____3·5·15_____.

☐ is in good physical health.

☐ surgery is scheduled for _____ and patient may return to work after _____ weeks.

☐ Medications: _____

_____

_____

☑ Restrictions: _____Would prefer No travel_____
_____> Ftr 20 wks pregnent c_____
_____hb C/S & myomectomy_____

☐ Other: _____

_____

_____

Womens Health
Centers

*www.womenshealthcenters.com*

Date: __10|17|14__

Dear __Julie__

Our office has made arrangements for you to have a Cesarean Section at
__Mercy Hospital Anderson__ on __2|20|15__ at
__10:30 Am__ with Dr __Christopher Fleming__ The hospital would like
you to be there at __8:30 Am__ that day. Please remember that you may
not have anything to eat or drink after midnight or for 10 hours prior to your
surgery.

This is the date which has been selected by the scheduling physician for your
c-section based on your history, his or her schedule and the hospital's
scheduling requirements. If you find the date questionable or unacceptable,
please discuss it with the physician at your next appointment.

Our office will contact your insurance company to arrange prior
authorization for your c-section, if necessary. We will contact you if any
additional pre-surgery deposit will be required.

If you have any questions, please feel free to call our office.

Sincerely,

Karen Safriet,
Surgery Coordinator

---

7495 State Road, Suite 300
Cincinnati, Ohio 45255
(513) 231-3447

Anna S. Zabrecky, MD
Christopher M. Fleming, MD
Xavier G. Ortiz, MD
Michael Fesenmeier, MD
S. Anne Pierson, MD
Patricia Tetirick, CRNP, MSN

5718-A Signal Hill C
Milford, Ohio 45150
(513) 231-3447



**Robin Ording**
Vice President, Talent Management & Learning

Robin is responsible for the Talent Management and Learning group at First Data, including strategies, practices, consulting and delivery around performance and talent management, team and executive effectiveness, management and professional development curricula, corporate intern and analyst programs, Owner-Associate referral program, and university hiring. She started with First Data in 2015.

Robin has extensive background in the field of social organizational psychology. She has worked with senior executives in a variety of industries, including financial services, pharmaceuticals, technology and healthcare, hospitality and manufacturing to improve performance through structural redesign, customized employee engagement strategies that positively impact retention and climate, and improved process efficiencies. She has served in a number of HR roles including head of HR, senior HR business partner, head of leadership and executive development, head of talent management, and in compensation.

Most recently, Robin was the head of Corporate Training and Organizational Development at JPMorgan Chase, Inc. where she led a team to drive talent and performance practices, HR strategies, and training. Prior to JPMorgan Chase, Robin was responsible for Organizational Effectiveness for a major line of business at Citigroup, Inc., as well as the Head of Performance Management for the firm globally, touching more than 270,000 employees.

Robin has a Master's Degree in Psychology from Boston University and lives on Long Island with her husband Keith and two children Anya and Kyle.

1/10/17 1:30

<u>Clover Certification</u>

→ BC - Phase1 - missed BSC

→ Phase 4 - Jin, then wrap up

pulling reporting
execution, helpful as mng.

1-1 w/ Robin                    1/10/17

performance review -
    JIN - no ability to do anything?
    boss, just made up
        m -
directive → 10 things to do

Kim Bard - scott Boozer, elearning -
    post elearning - recorded ppt
    ⇒ Lorraine - Super expensive; dont need her
        vendor - for small gap
        twiddling → Sonija

→ eyes on inside -
    consistent approach →

ST Call

≥1 people

Robin        Rhonda
Justin       Karen          timing
Julie        Tony
Lorraine     ED Names

Comp Planning
Retention to keep us
on Compensation

- Tony - appreciate everyone coming together  Timing
Patriots
Learning
a lot

Preamble → Review of structure of org + activity
Clearly opportunity short term
greater Structure long term

= 3 of us are terrific - go forward plan
all confidential
pleased with our work + we are leaders
going forward.

Objective - get to right short term staffing
level

71 to 50 headcount        no hobbies
need our help             no nice to have

- have initial list
what adds value

Robin

Justin, Lorraine, Julie, Ed, James     1/31/17
                                                      11:30

coordinating communications –

pretty emotional day for everyone
"put on" all good for us hats.

Start @
10:30          QA Team → Robin + Karen Beck
                      ↳ eventually go to Pam's team, but not
Keep Suzanne  announced tomorrow
              temp to Julie → QA Team

        don't mention Pam's name –

April 10     Shasta + Suzzan – know it

        Whatsapp – whatsapp ⇔

        dev teader – mark –
                    – TJ, Janet, Sunna

        may or may not roll under Robin

4/6/17 I-1

① Robin — flew on company jet
gap in day —
bad news — airport; 11
airport;
omaha side — 15 mins from site
clear jet — w.
— 6 seats — 700 mph

go direct

② go directly to manager —
PO, bill,
accomadating bad behavior
go directly to
— internal help
financial people know

→ Cathy Benhart —
Angie Liishu —

~ Banks - come over to sms method
handful of banks renewal to sms within
Elliot more detail                              year.
                        Robin 3/1/17 3:00pm

Tony really likes Julie - go
        on on a top Secret

Stacia is opening a brew pup → Changing
                                    business
    - wore through March -
        - Part time basis work

    99% of Stacia's job -
            deep expert; actual role is UP
under leveraged - has it peers on her job
    - potential ideas on how to leverage

    100% could job - a day job
            high scope
            Wait a year -

ePerform - HR owns system              Changes =
                                    promotion
                                    guidelines
infranet site -                        → Robin
    3e0 - administrative -
Insights - Paula = (annual contract
                    procurement guy)

map current criteria to new criteria

① Talent Review + Succession         (25T, 25)
        — Frank templates
    HR — Business — work w/ team + fill out
        forms

② Engagement Survey
            — contract w/ Staci —
                Kathi Benhart + Robin
        managing the process.
    Client feedback — Pam Parker —

③ Career Paths — Al Olivia —
            build career paths
    new program — coaching piece
        for not ready to launch —
        She see through launch —

    BC new hires, → filling in →
            Director — midcycle — m3 — m4
elaine [360, insights, talent review + succession]

    — news release — supv —
— did backwards — get numbers for Julie —

1-1 w/ Mark

3/2/17

1.) Conversation @ Melissa
   A. not working excessive hrs
   B) not in office
   C. doc is 4k kilometer away
                Victoria vrs Queensland
      @ risk of not coming back

8,000

3/2/17  10:00 am

Robin

willing to take on added responsibilities
   ePerform
      Talent Review                    80%
   work w/ Staci
   Pay
   Accept Director - non-mss
      Current role; - end of march - 8      130000
      $99,500 - 36,200 IC:
                           107,500
                           22,500 IC
                           130,000

Staci      8%

Robin   10:AM
3/2/17

Performance
1) Cycle - goal setting
mid
year end

- launch through email -
- update the dates
- links work - Christopher owns
- Careless about

.5 - eperform - go to technology - get form up in
running, test,

Standard reports - hit button; runs, replys to all.
make -
1 or more

[TO DO] Stacia + tech
- understand full
system

eperform -
- managed out all glitches -
- some pieces may be able to get changes -

? STACIA - Fusion 12 upgrade -

Executive level - top 180 - confidential reports - rare - 2x year.
- Frant; Staci stores -

1) Talent Review — launch —
           Work w/ Fuji to print

3) Promotion
      templates —
        — Comp & bend department — SVP promotion
             Brendan Wilson

4) 360 — Administrative — group intipurtation sessions — Robin
            or 1-1 — HR

Insights — Robin & Christopher —

3 regional needs

Engagement Survey —
       — Busitton —

Myrna —
       not until Summer —
       1st year in July —

Home

https://sharepoint.1dc.com/sites/hr/GTM/Pages/Home.aspx



Pinrmm   SharePoint   First Data University   Support   Search   OrgChart

Global Talent Management · GTM Home

## Talent Management & Learning: What we do

The Talent Management & Learning Team's mission is to build individual and organizational capability to advance First Data's culture, people and potential through differentiated business performance

 **Talent Management**   **LEARN** **Learning**   **Firm-Wide Programs**

### Build & Retain

**Hiring + Onboarding Material**

At First Data our team of owner-associates shapes the future of global commerce and delivers value beyond the transaction for our clients. Our success relies on the talent of every owner-associate at First Data and in hiring great people to join our team.

- Welcome to First Data
- Preparing for Your New Hire
- Behavioral Interviewing 101
- Legal Do's and Don'ts for Interviewing

Interview Guide

### Diversity

 UNITY  B  BLACK   Diversity and inclusion are at the bedrock of First Data's values. First Data recognizes the value that Employee Resource Groups (ERG) can contribute in furthering our diversity and inclusion.
SALUTES  WOMEN'S
TOPPRO  JUNTOS
ASIAN

**Talent & Succession Management**

Identifying and developing owner-associates with the potential to fill key business leadership positions is an important part of First Data's strategy and success. Click here to access material for Talent Review.

### Assess & Develop

**Performance Management**

 First Data's performance management process is ongoing and year-round. Click here to access ePerform.

- Performance Improvement Process (PIP) – U.S. Manager Toolkit

**Development Planning**

 70  Development Planning is a tool to help identify and track action steps that enable owner-associates (OA) to improve performance in their current role and enhance skills and abilities needed for future, expanded responsibilities and roles.

- Tips for Development Planning
- Global Corporate Development Guide
- Global Corporate Course Catalog

**Promotion Practices**

At First Data we support the career advancement of our owner-associates and follow an annual promotion cycle. As part of the process, we provide managers with promotion guidelines to consider when determining the readiness of OAs for promotion at any level.

### Engage & Enable

**Culture & Leader Team Effectiveness**

## Learning Framework



### New Hire Orientation

New Hire Orientation is a critical part of our onboarding process. Click the link below to access the new hire orientation presentations as well as speaker notes.

 Welcome to **One First Data**

### First Data University

**First Data** UNIVERSITY   First Data's Global University, offers employees across the globe the opportunity to build their careers for the future and help First Data shape the future of global commerce.

- 2016 Global Corporate Catalog

### Programs

WELCOME to the **First Data Way**

WELCOME to the **First Data Way**   Leaders of People

### Coaching

Executive coaching focuses on helping individuals go from where they are, to where they want themselves and their company to be.

- Coaching Providers

If you would like to connect with a coach please contact Robin Onting or Stacia Familo Hopek.

## One First Data

What is One First Data? It's our global owner-associates working together to serve our clients - it's who we are and what we do

 First Data

### Internship Program

An internship with First Data is a PAID pre-professional, carefully monitored work or service experience in which a student has an intentional learning goal and reflects actively on what he or she is learning throughout the experience

### Analyst Program

First Data's two-year, rotational Analyst Program offers early career owner-associates an unmatched opportunity to learn and grow within a team shaping the future of global commerce



### University Relations

- Calendar of events
- Program Overview

### Referral Programs

 Refer a new hire today!

3/3/201_

Home



First Data.    All users are personally responsible for adhering to the First Data Security and Privacy Policies for all data and documents they post on this site.    Powered by Enterprise Automation & Integration

3/3/2017 10:54 AM



Let's start with the folders view with each MC name... this shows so many versions I am a little worries they will start to ask to see all of these and some may not be relevant – if we go there, may want to create a temp folder with just one per year or something to show (then move everything back)

**From:** Kelly, Julie K
**Sent:** Friday, July 28, 2017 4:02 PM
**To:** Ording, Robin
**Subject:** screen shot

WE could show this

| Name | Date modified | Type | Size |
|---|---|---|---|
| Talent and Succession Planning Review July 2017 Part One (3).pptx | 7/17/2017 9:06 AM | Microsoft PowerP... | 1,129 KB |
| Talent and Succession Planning Review July 2017 Part One.pptx | 7/13/2017 2:59 PM | Microsoft PowerP... | 1,127 KB |
| Talent and Succession Planning Review July 2017 PART TWO.pptx | 7/13/2017 12:03 PM | Microsoft PowerP... | 8,590 KB |
| Talent and Succession Planning Review Feb 23 2017 PART TWO.zip | 4/19/2017 12:14 PM | Smartcrypt File | 11,284 KB |
| Talent and Succession Planning Review Feb 23 2017 PART TWO.pptx | 2/27/2017 2:50 PM | Microsoft PowerP... | 11,439 KB |
| Talent and Succession Planning Review Feb 23 2017 PART ONE.pptx | 2/23/2017 3:17 PM | Microsoft PowerP... | 873 KB |
| Talent and Succession Planning Review February 2017 PART TWO v1.pptx | 2/16/2017 9:36 AM | Microsoft PowerP... | 7,701 KB |
| Talent and Succession Planning Review Nov 2016 PART ONE.pptx | 11/30/2016 11:25 ... | Microsoft PowerP... | 807 KB |
| Talent and Succession Planning Review November 2016 PART TWO.pptx | 11/10/2016 9:02 AM | Microsoft PowerP... | 5,195 KB |
| Talent and Succession Planning Review September 2016 PART TWO.pptx | 8/22/2016 4:27 PM | Microsoft PowerP... | 5,196 KB |
| Talent and Succession Planning Review Sept 2016 PART ONE.pptx | 8/22/2016 4:26 PM | Microsoft PowerP... | 806 KB |

**Julie Kelly**
Director, Organizational Development, Sales Transformation
First Data, 11311 Cornell Park Drive, Cincinnati, OH 45242
Office: 513.806.4893

JulieK.Kelly@firstdata.com | firstdata.com

**First Data.**

HRMT 9/26/17
1:pm EST

Tonys team call

1.) Benefits Rollout
        marketing strategy around glassdoor
        glassdoor campaign - those who believe in BO,
        write ups.

    1.) Own it - add a review
    we used to own sup for Glassdoor?
        if you pay - you can respond, video of CEO,

HR - we score in top 20-30% off good benefits

eliminate wellness incentive - now known to go to doc
    smokers will pay more -
        non-smoking rollout on 1/1 - nice

instead of increase, eliminate the incentive

Changing to CVS - 100% preventative meds.

New award for ParentalCare & Dave Thomas
                #34 (tied w/ Comcast)

Very thoughtful, research - etc

2.) Denver - Patel, Adam, → 4 Floors to 1 ←
        Large town halls, group meetings
            relocate? If so, date
                if not, Separation benefit
EFPS + tech                         Severance, bonus + retention
                                                ↓
                                            tie performance

4 point scale

Omaha - next week -
2017 - Baseline ammount -
eliage for all.

**300**

30 IC
(40 1-4)

Jim 4-1    Why let it happen?
     + 4/1
     (horizontal efficencies?)

105
prospects
in top
300

layers known ; spans wider

Back to Denver 520 mngr
          110 mngrs not in Denver

don't make sense; be done with it
3200 - 1500 - should be gone  20
     too mng in dir above

fuck them
n/p

155 mngrs - on list
250 to go to get job done

L4 + apply   100% cash  }  no time /
             30% equity  }  no performance

Catagorize as
Seperation below the line -
pay.

FRi - Houston - no building -
              broker
          Cant do business.

Atl, Hq, CS, Jersey City, Omaha

Cincy - page 4 of listings by location

data visuals.....

rule of thumb —
more Sr evels
dev purposes; not in 4th Qtr
do through ePerfm tool.

- If they do it -
  manage, etc.

L2/L3
expense for 4th
Qtr.           — push —

10-11-17 ——————— Talk to Mark

Julie's Org ————————→

Flattning — HRMT
         spans & layers & treating out
on paper - Flatten org, leave, role.

Mark - manage span & control
     on paper - report to Julie

Mark's title will stay same,
         nothing will change the way
         we work
         Performance Reviews
Comp, etc.

Small Global Utility op

Maureen                    Kathi 200pl
                    get note  — JMG

9/26/17
9:00am

Robin, Juli, Justin, Mary Ann, Christopher
Lorraine

<u>HR level</u>

① Ask from Frank - 15% of people mngrs
   3200 L3/L4

   main focus with poor spans: opportunity to
   flatten. Some appropriate Circumstances

② L4+ Crosslead Survey
            - Results pouring out
      top 180 individual results
            + interviews
            + survey
            data rolls up - top 180; end of we
   Robin will share themes to improve

③ Year end performance
      kick off early Oct
      mid november - rating finalized
      early nov - calibration meeting

④ Sales structure -

⑤ Clever Certification        Oct?
                        new as of Aug!

1-1 w/ Robin                                    10/24/17

1.) All leaduship changes
        big event - BluePay people
              Tony cancelled
              Cameron - in singapore
                  100 needs to host Cameron
    Hotel 110,000 loss    300,000 program
        - mostly on flight -
        Rebook in Feb -
                  change fees -
        reboot come to new year.

Adobe Connect              7-7
    - Adam Schmidt -

    - recommendation ⇒


Richardsons                  7-7

    budget - how often,
    certifications -
    work w/ Justin - update next week
        Johnathan Mc -


Ear for sound for drama

| From: | Kelly, Julie K <JulieK.Kelly@firstdata.com> |
|---|---|
| Sent: | Tuesday, November 14, 2017 2:16 PM |
| To: | Ording, Robin |
| Cc: | jul_kelly@mac.com; Kelly, Julie K |
| Subject: | Julie Kelly |

Robin,

After nearly 20 years of successfully achieving goals, projects and leading stellar teams for First Data, the change in policies, such as the requirement to work in an office location, have proven prohibitive to my success both professionally and personality. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the experiences and positive work life balance the company once promoted.

During the past two years, I have done a highly successful job of balancing the demands of First Data with the ever changing deadlines, priorities, teams and projects. With that said, I have also lost many precious hours that could have been dedicated to what means the most, my health and family. Lost time in the countless hours of commuting to a building where a handful of people report in to. After working successfully from home for nearly 10 years, the change First Data made has contributed to my numerous health issues with increased stress, financial constraints and extraordinary burdens on my family.

Through a long, hard, thought out process, and for my health and family, First Data and I must part ways as of November 30th, 2017. With that said, after my years of driving results, pristine service, dedication and commitment, I will work to successfully transition all of my tasks as appropriate and am asking for the following to assist in my transition:

- 26 weeks' severance
- 2017 bonus payout (pro-rated)
- 2017 unused vacation time payout
- Payout of remaining awarded restricted stock grants
- Eligible for re-hire

I appreciate all that you and First Data have allowed me to achieve over the years and know we can part on mutually positive terms. I will miss being a part of this company but will leave with great appreciation for all I have learned, the opportunities, friendships and experience the company has afforded me.

Sincerely,

**Julie Kelly**
Director, Organizational Development
First Data, 11311 Cornell Park Drive, Cincinnati, OH 45242
513.806.4893

JulieK.Kelly@firstdata.com | firstdata.com

# First Data.

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is

strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

# First Data®

First Data Corporation
Employment & Benefits Law Group
6855 Pacific Street, AK-32
Omaha, NE 68106
www.firstdata.com

December 5, 2017

**VIA FEDERAL EXPRESS DELIVERY:** 513-806-4893

**VIA EMAIL TRANSMISSION:** jul_kelly@mac.com

Ms. Julie Kelly
823 Dorgene Lane
Cincinnati, OH 45244

     **RE:**   **Post-Employment Obligations**

Dear Ms. Kelly:

I am an attorney for First Data Corporation and understand that your employment with First Data has recently terminated. I am writing to remind you of some of your post-employment obligations.

In connection with your employment, you signed a binding legal agreement that prohibits you from:

- using or disclosing trade secrets or confidential information.
- directly or indirectly soliciting any First Data customer for 24 months after your employment termination.
- directly or indirectly soliciting any First Data employee for 24 months after your employment termination.
- working for a competitor in any geographic area where First Data provides products or services for 12 months after your employment termination.

Please understand that this letter is not intended to provide an exhaustive list or description of your continued obligations to First Data. First Data takes these agreements and your obligations under them seriously. I encourage you to carefully review all obligations and avoid engaging in any prohibited activity. If you ignore this letter and violate your contractual obligations to First Data, the Company reserves the right to pursue all of its legal rights against you, including suing you for injunctive relief and monetary damages.

This letter is without prejudice or waiver of any and all of First Data's rights and remedies.

Sincerely,

Lori Graesser
Associate General Counsel
O: 402-222-8113
F: 402-916-7598



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.





**Shawn Shearer**

| | |
|---|---|
| **From:** | Kelly, Julie K <JulieK.Kelly@firstdata.com> |
| **Sent:** | Tuesday, May 12, 2015 4:26 PM |
| **To:** | Barger, Steve |
| **Cc:** | jul_kelly@me.com |
| **Subject:** | WFH Change to Cincinnati Office |
| | |
| **Importance:** | High |

Steve,

After 17 years of successfully achieving projects, goals and requirements working from a home office, the time and costs that it would take to commute into the Blue Ash corporate office (Cincinnati, OH) are prohibitive to my success both professionally and personally. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the positive work life balance the company once promoted. While inevitable, receiving this news so shortly after returning from maternity leave has been quite disheartening.

My position does not require daily interaction with others face to face and will not change once in the Cincinnati, OH location. Moving toward a more virtual learning environment is a must for a company of this size and will only continue to be a priority. This has been a leadership quality I have excelled at bringing to the company working from a remote office. However, I do understand the changes within the company. With that said, I am asking for the following to ease my departure and team's transition to a new leader:

- Ability to assist with hiring my replacement and training / transitioning position
- 34 weeks' severance
- Eligible for re-hire
- Paid for all unused vacation time for 2015
- Payout of awarded restricted stock grants for 2014 and 2015

Let's have a conversation tomorrow (5/13/15) to discuss.

I appreciate all that you and First Data have allowed me to achieve over the years and know we can part on mutually positive terms.


Sincerely,

**Julie Kelly**
Sales Transformation

O 513.806.4893
**First Data.**
**b yond** the transaction
firstdata.com


The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this

communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

# EXHIBIT B

Additional Evidence of Continuing Retaliation

Julie Kelly v. First Data Corporation
DAYB6(27240)05172018; 22A 2018-02392C

OCRC Investigation

July 9, 2018

**CUSTOMER USE ONLY**
FROM:

PHONE: 513 806 4643

Julie Kelly
863 Cougene Lane
Cincinnati, OH 45244

**PAYMENT BY ACCOUNT (if applicable)**

Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS (Customer Use Only)**

☑ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO: (PLEASE PRINT)**          PHONE:

Mr. Gary B. Eidelman
500 E. Pratt Street Suite 900
Baltimore, MD

ZIP + 4® (U.S. ADDRESSES ONLY)

2 1 2 0 2 - 3 1 3 3

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

EM 043841731 US

**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL EXPRESS** ★ ★

**ORIGIN (POSTAL SERVICE USE ONLY)**

| | ☐ 1-Day | ☐ 2-Day | ☐ Military | |
|---|---|---|---|---|
| P.O. ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage | | |
| 45150 | 5-25-18 | $ 24.70 | | |
| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee | |
| 5-24-18 | ☐ 10:30 AM  ☐ 3:00 PM  ☑ 12 NOON | $ | $ | |
| Time Accepted | 10:30 AM Delivery Fee | Return Receipt Fee | | |
| 4:10 ☐ AM ☑ PM | $ | $ | | |
| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees | | |
| $ | $ | $ 24.70 | | |
| Weight  ☐ Flat Rate | Acceptance Employee Initials | | | |
| 1.8 lbs oz | JW | | | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM  ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM  ☐ PM | |

LABEL 11-B, OCTOBER 2016       PSN 7690-02-000-9996           **2-CUSTOMER COPY**

5/24/18

Mr. Gary B. Eidelman
500 E. Pratt Street Suite 900
Baltimore, MD 21202-3133

Dear Mr. Eidelman:

I am writing you in reference to a subpoena I received from you yesterday. I have a few questions because I am not a lawyer and do not completely understand what I am being asked to do, and why.

I just recently filed a complaint with the EEOC and the Ohio Civil Rights Commission related to my employment with First Data. The State of Ohio contacted me on just 2 days ago requesting further information to investigate my case. I didn't realize this was moving so rapidly and that First Data was going to deposed me so quickly.

I am currently unemployed and the full-time care taker of four children, 3 under the age of 5, my brother with learning disabilities and my elderly mother in law. I have commitments on June 25th that I am unable to change. If I had more advanced notice, I might be able to find some friends or save some money to pay for their care for one day, but it would take at least a few months for me to save that much money, especially during the summer. I can try to decide how to cut my budget and let you know when I think I may have enough money saved. No matter what, I am not available at all on June 25.

When I am disposed by you, do I need to bring my entire evidence file and complaint that I filed with the State of Ohio? I guess this all seems very sudden – the State of Ohio gave me the impression that my complaint was in the beginning stages. No one mentioned depositions. If we are able to fine a time when I can arrange for child care and care for my brother and mother in law and appear to talk about my case, can my representative from the State of Ohio come with me?

I'm also confused because I tried to contact FedEx to let them know that their employee, who served the subpoena to me, dropped and left what looked like an expensive pen, FedEx was really confused because they sometimes deliver envelopes that contain subpoenas, but they apparently do not serve subpoenas. I wasn't sure exactly what to do to give them the information they wanted, because there is no tracking number, or anything. Also, the documents were dated last week (5/16/18), nearly a week old – can I give a copy of this subpoena to Federal Express? I didn't know if that is acceptable, but they want more information because they were adamant that Federal Express does not serve subpoenas.

What should I do? Please let me know!

I'm sorry I can't come to talk about my complaint on June 25th, maybe I can have my representative from the State of Ohio call you to fine a time in July. It will take me at least that long, at least to save enough money. I look forward to your response.

Regards,

Julie Kelly

## Shawn Shearer

| | |
|---|---|
| **From:** | Julie Kelly <jul_glad@mac.com> |
| **Sent:** | Tuesday, May 29, 2018 8:35 AM |
| **To:** | 'Shawn Shearer' |
| **Cc:** | bb@shearerlaw.pro |
| **Subject:** | Letter from Gary E |
| **Attachments:** | Julie Kelly - Response from Gary Eidelman dated 5.25.18 Rec 5.29.18.pdf |

Hello,

I received this response to my letter to First Data's attorney, Gary Eidelman, this morning. For security reasons, my husband answered the door and signed for it. We didn't want to upset the children again or risk endangerment of an impersonator. Looks like it was a REAL FedEx delivery this time. It was quiet unexpected, around 8:34am.

In any case, it appears that he wants me to work through him on dates and then any questions to go through you. Is that even legal? I just don't understand all that.

We should probably get a copy of this to my rep at the OCRC.

Julie Kelly
513.806.4893

Inspire | Lead | Motivate | Transform

1

**SAUL EWING**

**ARNSTEIN**

**& LEHR** ᴸᴸᴾ

Gary B. Eidelman
Phone: (410) 332-8975
Fax: (410) 332-8976
Gary.Eidelman@saul.com
www.saul.com

May 25, 2018

**BY FEDERAL EXPRESS**

Julie Kelly
823 Dorgene Lane
Cincinnati, OH 45244

Re:     *Steven B. Barger v. First Data Corporation et al.,*
        *Civil Case No. 1:17-cv-4869*

Dear Ms. Kelly:

I am in receipt of your overnight letter dated May 24, 2018. The deposition subpoena that you were served with is in connection with the lawsuit filed by Steve Barger against First Data Corporation that is pending in New York. Please refer to the caption on page 1 of the subpoena. It is not related to your EEOC charge against First Data.

I understand that June 25, 2018 is not convenient for you. Please let me know which of the following dates work for your deposition: June 27, 28, July 3, 5, 6, 13, 16, 17, 19, 23, 24, 25, 26. So as not to burden you financially, First Data will pay the costs of childcare for you to attend the deposition.

If you have any other questions about your deposition, you should speak with your lawyer Shawn Shearer.

Very truly yours,

Gary B. Eidelman

cc:  Shawn Shearer, Esq.

Centre Square West ♦ 1500 Market Street, 38ᵗʰ Floor ♦ Philadelphia, PA 19102-2186
Phone: (215) 972-7777 ♦ Fax: (215) 972-7725

DELAWARE  FLORIDA  ILLINOIS  MARYLAND  MASSACHUSETTS  NEW JERSEY  NEW YORK  PENNSYLVANIA  WASHINGTON, DC
A DELAWARE LIMITED LIABILITY PARTNERSHIP

First Data.

June 20, 2018


Shawn Shearer
3839 McKinney Ave.
Suite 155-254
Dallas, TX 75204

**Re:    First Data Corporation Severance Plan for U.S. Employees**

Dear Mr. Shearer:

I am in receipt of your correspondence dated April 27, 2018, requesting severance pay for Julie Kelly under the First Data Corporation Severance Plan for U.S. Employees (Severance Plan). After reviewing your client's claim that she was forced to resign due to alleged changes to the terms and conditions of her employment, I am denying your client's claim for 20 weeks of severance pay because she is not eligible for severance under the Severance Plan.

Ms. Kelly's claim is denied because the circumstances surrounding Ms. Kelly's departure from First Data are non-eligible termination reasons under Section 7 of the Severance Plan. In order to be eligible for severance under the Severance Plan, your client must have an eligible termination reason. The Severance Plan provides that terminations resulting from a "voluntary resignation" or a "constructive termination" are non-eligible termination reasons. Here, your client sent an email to Robin Ording on November 14, 2017, advising that she had made the decision to "part ways" with First Data. This email proves that your client voluntarily resigned from her employment. There is no evidence to suggest that First Data terminated Ms. Kelly's employment.

Additionally, even if the Company accepts as true the claim that your client was forced to resign (which is denied), a constructive termination is also a non-eligible termination reason under Section 7 the Severance Plan. First Data adamantly denies that it changed the terms of Ms. Kelly's employment, that it did not keep its promises with respect to her compensation, or that it unfairly delegated work to Ms. Kelly. First Data further denies that it eliminated Ms. Kelly's position. There is simply no evidence to support the conclusion that your client was "forced to resign."

Finally, the Company also questions why Ms. Kelly is now presenting different reasons in support of her claim for severance. As you likely know, Ms. Kelly requested severance in November 2017. In her initial request, Ms. Kelly did not say that she was resigning because of unmet promises of compensation or that she was being asked to do "officer" type duties. Instead, she expressed her frustration with having to commute into a First Data office. It is interesting that Ms. Kelly is now raising new arguments in support

© 2015 First Data Corporation. All Rights Reserved. All trademarks, service marks and trade names referenced in this material are the property of their respective owners.

**First Data.**

of her claim for severance, when she previously understood that she was ineligible for severance.

If your client disagrees with the decision to deny her claim for severance pay, she may appeal this denial by filing a written appeal to the First Data Benefits Committee within 60 days after your receipt of this denial letter. The written appeal can be sent via email to Stephanie.Pulverenti@firstdata.com. During the 60-day period, Ms. Kelly may have reasonable access to pertinent documents and may submit written comments and supporting documents, records and other materials to the BC. The BC will review the appeal and notify you (as her legal representative) by mail of its final decision no later than 60 days (or 120 days in special circumstances) after the BC receives the written appeal.

Sincerely,

*Anthony S. Marino*

Anthony S. Marino
Executive Vice President and
Head of Human Resources

© 2015 First Data Corporation. All Rights Reserved. All trademarks, service marks and trade names referenced in this material are the property of their respective owners.

# THE LAW OFFICE OF SHAWN SHEARER, P.C.
3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

June 21, 2018

**Via E-mail (Jill.Poole@firstdata.com)**

Anthony Marino
Executive Vice President and
Head of Human Resources
First Data Corporation

      Re:    **Julie Kelly**
               **First Data Corporation Plan for U.S. Employees**

Dear Mr. Marino:

    I received your letter dated June 20, 2018 by e-mail from Jill Poole, First Data's Senior Counsel. In this letter you addressed First Data's reasons for denying Ms. Kelly severance benefits under First Data's Severance Plan for US Employees (Severance Plan).

    You clearly have not been advised of the nature of Ms. Kelly's claims against First Data. Ms. Kelly was never seeking benefits under the Severance Plan. Rather, the amounts that she would have received under the Severance Plan were being used as a measure of what she was willing to accept to settle her Americans with Disabilities Act (ADA) claims before they needed to be brought to the EEOC and Ohio Civil Rights Commission. That offer to accept the equivalent amount as would have been received under the Severance Plan in exchange for Ms. Kelly executing a complete release of claims in favor of First Data is revoked.

    Ms. Kelly underwent two extremely difficult pregnancies. Her medical issues following these pregnancies were significant and continue today. These issues are difficult to talk about with management, especially in the environment First Data has created where job security is a daily question on every employees mind, even though First Data's financial results for 2017 included net profit of nearly $1.5 billion on more than $12 billion in revenue.

    Ms. Kelly completed all of the documentation to request, and she was granted, an accommodation under the ADA to work from home despite the change in First Data policy requiring office attendance for non-sales positions. This accommodation was granted by her prior managers, in part, because First Data's Cincinnati office did not have any other employees in Ms. Kelly's group. Office attendance was not an essential function of her job, as she had no colleagues with whom she worked at that location. Working from home allowed Ms. Kelly to attend to her own medical issues (including severe post-partum depression), as well as care for her elderly mother-in-law and her learning disabled brother. While working from home, Ms. Kelly's performance was outstanding and she never received any negative reviews and continually expanded her scope of responsibilities. The accommodation granted by her prior supervisors was working without any issues and excellent employee performance.

Anthony Marino
June 21, 2018

Page 2

When Ms. Ording became Ms. Kelly's direct supervisor, Ms. Ording revoked Ms. Kelly's previously granted accommodation under the ADA and required Ms. Kelly to begin working from the First Data Cincinnati office (sometimes up to a two hour drive each way). Ms. Ording bragged to Ms. Kelly about her cost-cutting prowess through terminations. Despite attempts to raise the hardship the drive was taking on her health, it was clear that Ms. Ording would not be receptive to any suggestion that Ms. Kelly's accommodation be reinstated. In fact, Ms. Kelly's perception was that if she even raised the issue with Ms. Ording, she would become part of the next round of firings for firing sake. Or more appropriately, firings to create a fear within the workforce in the name of driving productivity – a management style with little change of success and a demonstration of management's lack of care for its work force. Despite all the high platitudes expressed by First Data with respect to diversity issues, the actions of First Data demonstrate a working environment devoid of caring for disabled employees. The environment of disdain for disabilities at First Data had created an atmosphere where resignation outweighed continuing to work in such an environment. Ms. Kelly was constructively discharged in violation of the ADA.

Despite its pleas otherwise, First Data does not want disabled employees in its workforce. Ms. Kelly could no longer make the daily drive and attend to her own disabilities and those of her family, and still continue working from the office where she had no colleagues and only attended meetings by phone when she was in Cincinnati. All of the functions of her job performed in the office could have been performed from her home as she had been doing for years. There was no business justification for the revocation of her ADA accommodation, and her work from home accommodation was clearly reasonable and not an undue hardship on First Data, as it had worked fantastically for years and Ms. Kelly received positive reviews from her managers the entire time.

Ms. Kelly has already raised her ADA issues through filing of a Charge of Discrimination with the EEOC and the Ohio Civil Rights Commission (OCRC). The OCRC is now in the process of investigating her claims and Ms. Kelly will be seeking her remedies in that forum, and if necessary in federal court. These remedies will include back-pay (7 months of pay now and growing daily), front-pay, punitive damages and other available remedies. If First Data would like to discuss settlement of Ms. Kelly's claims, First Data can make an offer and Ms. Kelly will consider that offer and respond.

Very truly yours,

Shawn E. Shearer

**From:** Julie Kelly
**Sent:** Monday, June 25, 2018 1:55 PM
**To:** 'Shawn Shearer'; 'BB'
**Subject:** FD No Show 6.25.18
**Importance:** High

Shawn & Brenda,

Just wanted to send you a quick email about a situation I had. I feel that what happened to me today
may have some relevance to the continued vengeance FD seems to have against me and be used as
further evidence in my case. I was ordered to show for a deposition today, June 25th, 2018. This was for
the Steven Barger case, which I do not have any council or representation on. While I responded to the
FD attorney, Mr. Gary Eidelman 2 times, he never formally cancelled the meeting and I felt obligated to
show up. My 3 small children and I went downtown this morning for the meeting, arrived on time and
there was no one there. To prove that I was there, I took the attached videos. Furious that FD and this
law firm would act so incredibly unprofessional, I sent a handwritten note (also attached) to Mr.
Eidelman. I don't know if this type of behavior is common or not, but it clearly shows disrespect and
continued aggression toward me and my children.

We should get this over to my state representative right?

Attachments:

- **001 Barger Case JK Dep 6.25.18.jpg**
  Proof of attendance
- **002 Barger Case JK Before Depo 6.25.18.mp4**
  Video before scheduled dep – at location.
- **003 Barger Case JK Dep No Show 6.25.18.mp4**
  Video after I was told there was no one there, I also saw that no one was there.
- **004 C&L Business Card.jpg**
  The gentleman I spoke with at the Cook & Logothetis, LLC firm.
- **005 FD No Show for Julie Kelly Depo Letter 6.25.18.jpg**
  Letter I sent to Mr. Eidelman, after his no-show.

Thank you,

Julie Kelly
513.806.4893

Inspire    |    Lead    |    Motivate    |    Transform

**Timeline of Events for Julie Kelly deposition on the Steve Barger v. First Data Case**

June 25th, 2018

1. **9:45 am** – Parked across the street from the Main library downtown (will probably process tonight and then the date will show June 25 instead of pending)



2. **9:54 am** - We arrived on time to the building of 30 Garfield Place at 9:54 am yesterday. I have a video of us outside the building. This is a very quiet part of town. We only passed 2 men while walking from our car to the building. It was raining, and we had a small tattered umbrella and the shorter man made a joke that we needed a larger umbrella. We waited at the entrance to the Cincinnati Club for a few moments while I made a video. The 2 men went into the building.



3. **9:59 am** - We went into the building, and had to walk up a staircase to the front reception. The security detail saw me with 3 small children and asked where we were going. I said Suite 540 and he pointed us to the elevators and said go to floor 5. We took about a minute to walk over, as the kids were in awe of the building, so he pointed again to the elevators. He seemed impatient to have small children in his beautiful, quite lobby.

    We went up to floor 5. The office was right outside the elevators. I took a video quickly to prove I was there on time. Video time stamp is 9:59am. Im the background you can see that we are on Floor 5 (signage) and the window and door to the

office.



4. **10:00 am -** I rang the doorbell (the only way to get in). A young man, about 27-29 answers. He is in a blue dress shirt and pants. Dark thick hair. Could be Asian. I ask for Gary Eildman and we walk in. He asks again. I state that I'm here to see Gary Eildman for a deposition at 10am. The office is very quite. There is no receptionist. The children sit on a small waiting room couch.

5. **10:00 am – 10:01 am -** I mention that I was told there would be child care for my children while I was in the meeting. My children then found that the coffee table leaves could go up and down and I make a joke that that is the children's entertainment. ( I have a photo of them on the couch stamped at 10:00am). He smiles and says he will go ask someone and will be right back. A moment later, another young man, a bit taller and with glasses and a white dress shirt comes out and looks confused. The first man states that if there is a 3rd party meeting, it is in a room right here, and he points to a vacant, closed door space about 5 feet in front of me. Clearly there is no one at this office and both men are confused. The office feels quite empty in fact.



6. **10:02 am** - I ask for their names so I have some type of record of who I spoke with. The first young man provides the business card of Clement L. Tsao. He says we are more than welcome to stay, but I can clearly see that no one is there or will be coming. They both retreat to their offices. A moment later I tell them we are going to leave and sorry to bother them. They not once asked for my name or law firm or anything. They were clearly confused and had no idea to expect me.

7. **10:03 am** - Outside, I make another video, that is stamped 10:03am. I state that no one was here and no child care. The video shows empty halls / building.



8. **10:04 am** - business card stamped 10:04 am



9. **10:10 am** - The next photo I have is outside the building, down the block about 200 yards in front of Pres James Garfield's statue. I posted this photo of the kids to my private facebook page with the caption of 'Trip downtown this

morning!' – geotagged to Carew Tower, once we returned home from our trip. – Heck we have 13 likes!



10. **10:57 am** - I was pretty upset that no one showed and on the way home, stopped at the dollar store to get a pen and paper and wrote a quick note to Gary E. I wish I could have texted him, but I guess that's not how these legalities work. In any case, I stopped and had a mail slip run off at the library and got the letter to him in the mail. I've got a photo of the letter, too, 10:57am.





**From:** Julie Kelly
**Sent:** Tuesday, June 26, 2018 6:47 PM
**To:** 'Shawn Shearer'
**Cc:** 'Brenda Barger'
**Subject:** RE: Forgot to mention.. FD No Show 6.25.18

Shawn,
Here is some additional context / detail of the events that happened yesterday 6.25.18. Let me know if you'd like me to package this timeline into a pdf with the images embedded. Can't do video, but I can get screenshots.

- We arrived on time to the building of 30 Garfield Place at 9:54am yesterday. I have a video of us outside the building. This is a very quite part of town. We only passed 2 men while walking from our car to the building. It was raining and we had a small tattered umbrella and the shorter man made a joke that we needed a larger umbrella. We waited at the entrance to the Cincinnati Club for a few moments while I made a video. The 2 men went into the building.

- We went into the building, and had to walk up a staircase to the front reception. The security detail saw me with 3 small children and asked where we were going. I said Suite 540 and he pointed us to the elevators and said go to floor 5. We took about a minute to walk over, as the kids were in awe of the building, so he pointed again to the elevators. He seemed impatient to have small children in his beautiful, quite lobby,

- We went up to floor 5. The office was right outside the elevators. I took a video quickly to prove I was there on time. Video time stamp is 9:59am. Im the background you can see that we are on Floor 5 (signage) and the window and door to the office.

- I rang the doorbell (the only way to get in). A young man, about 27-29 answers. He is in a blue dress shirt and pants. Dark thick hair. Could be Asian. I ask for Gary Eildman and we walk in. He asks again. I state that I'm here to see Gary Eildman for a deposition at 10am. The office is very quite. There is no receptionist. The children sit on a small waiting room couch.

- I mention that I was told there would be child care for my children while I was in the meeting. My children then found that the coffee table leaves could go up and down and I make a joke that that is the children's entertainment. ( I have a photo of them on the couch stamped at 10:00am). He smiles and says he will go ask someone and will be right back. A moment later, another young man, a bit taller and with glasses and a white dress shirt comes out and looks confused. The first man states that if there is a 3rd party meeting, it is in a room right here, and he points to a vacant, closed door space about 5 feet in front of me. Clearly there is no one at this office and both men are confused. The office feels quite empty in fact.

- I ask for their names so I have some type of record of who I spoke with. The first young man provides the business card of Clement L. Tsao. He says we are more than welcome to stay, but I can clearly see that no one is there or will be coming. They both retreat to their offices. A moment later I tell them we are going to leave and sorry to bother them. They not once asked for my name or law firm or anything. They were clearly confused and had no idea to expect me.

- Outside, I make another video, that is stamped 10:03am and have a photo of the business card stamped 10:04 am.

- I was pretty upset that no one showed and on the way home, stopped at the dollar store to get a pen and paper and wrote a quick note to Gary E. I wished I could have texted him, but I guess

that's not how these legalities work. In any case, I stopped and had a mail slip run off at the library and got the letter to him in the mail. I've got a photo of the letter, too, 10:57am.

- The next photo I have is outside the building, down the block about 200 yards in front of James Garfield's statue. I posted this photo of the kids to my private facebook page with the caption of 'Trip downtown this morning!' – geotagged to Carew Tower, once we returned home from our trip. – Heck we have 13 likes!



Julie Kelly
513.806.4893

Inspire | Lead | Motivate | Transform

**From:** Shawn Shearer <shawn@shearerlaw.pro>
**Sent:** Monday, June 25, 2018 4:06 PM
**To:** Julie Kelly <jul_glad@mac.com>
**Cc:** Brenda Barger <bb@shearerlaw.pro>
**Subject:** Re: Forgot to mention.. FD No Show 6.25.18

This type of behavior from an attorney is not normal. We will take care of getting your message and attachments to the OCRC investigator.

On Mon, Jun 25, 2018, 3:25 PM Julie Kelly <jul_glad@mac.com> wrote:

I forgot to mention. FD said they would pay for childcare, so that is why I took the kids with me. They at least got to get a little history lesson about James Garfield.


Julie Kelly

513.806.4893

Inspire | Lead | Motivate | Transform

**From:** Julie Kelly <jul_glad@mac.com>
**Sent:** Monday, June 25, 2018 2:55 PM
**To:** 'Shawn Shearer' <shawn@shearerlaw.pro>; 'BB' <bb@shearerlaw.pro>
**Subject:** FD No Show 6.25.18
**Importance:** High

Shawn & Brenda,

Just wanted to send you a quick email about a situation I had. I feel that what happened to me today may have some relevance to the continued vengeance FD seems to have against me and be used as further evidence in my case. I was ordered to show for a deposition today, June 25th, 2018. This was for the Steven Barger case, which I do not have any council or representation on. While I responded to the FD attorney, Mr. Gary Eidelman 2 times, he never formally cancelled the meeting and I felt obligated to show up. My 3 small children and I went downtown this morning for the meeting, arrived on time and there was no one there. To prove that I was there, I took the attached videos. Furious that FD and this law firm would act so incredibly unprofessional, I sent a handwritten note (also attached) to Mr. Eidelman. I don't know if this type of behavior is common or not, but it clearly shows disrespect and continued aggression toward me and my children.

We should get this over to my state representative right?

Attachments:

- **001 Barger Case JK Dep 6.25.18.jpg**
  Proof of attendance
- **002 Barger Case JK Before Depo 6.25.18.mp4**
  Video before scheduled dep – at location.
- **003 Barger Case JK Dep No Show 6.25.18.mp4**
  Video after I was told there was no one there, I also saw that no one was there.
- **004 C&L Business Card.jpg**
  The gentleman I spoke with at the Cook & Logothetis, LLC firm.

- **005 FD No Show for Julie Kelly Depo Letter 6.25.18.jpg**
  Letter I sent to Mr. Eidelman, after his no-show.

Thank you,

Julie Kelly

513.806.4893

I n s p i r e  |  L e a d  |  M o t i v a t e  |  T r a n s f o r m

**From:** Julie Kelly
**Sent:** Wednesday, June 27, 2018 10:03 AM
**To:** 'Brenda Barger'; shawn@shearerlaw.pro
**Subject:** Inquiry to Mr. Eidelman

Hi Shawn and Brenda,

I have yet to hear anything from Gary Eidleman or anyone in his firm, on his no-show to my deposition on Monday, so I'm sending him another letter. Hopefully I can get some answers soon. His (and I'm assuming First Data's) games are getting tiresome and stressful.

Let's add this to my file for the state of Ohio. Thx

Julie Kelly
513.806.4893

I n s p i r e   |   L e a d   |   M o t i v a t e   |   T r a n s f o r m

6/27/18

Mr. Gary B. Eidelman
500 E. Pratt Street Suite 900
Baltimore, MD 21202-3133

Dear Mr. Eidelman:

I have not heard a word from First Data's legal team, you, nor anyone within your law firm about my deposition. I took your subpoena very seriously and while I told you that date was not going to work for me, went out of my way to accommodate your legal request and attend. I came prepared to be unrepresented for this deposition. You failed to get back to me after the second letter to either reschedule another date and / or to confirm that the June 25th was cancelled. YOU and YOUR FIRM were clearly requesting my presence at a legal meeting and yet you failed to be responsible, respectful and professional in all regards. You stated that First Data would pay for childcare, which I assumed would be at the deposition, if that is incorrect, that is another reason you should have been more responsible with your communication with me. While I asked that you not continue to use FedEx, I assumed that you knew of alternative methods to reach me, it is 2018. Can we use email going forward?

For your information, I did record my trip downtown yesterday. I have photos and videos that were taken on an iPhone that clearly include the time, date and coordinates of my location. I also have the business card that the Cook & Logothetis, LLC employee provided me. I doubt he would forget us, either. Its probably not every day that you have 3 small children come into your law firm. I'm sure the security detail to the building could do the same, as it's a historic landmark in Cincinnati. Please let me know if I can provide these to you through a digital method.

On a related note, I find it interesting that some of my ex- First Data peers were NOT subpoenaed, but rather asked to do a casual phone conversation or meeting. Interesting that you first brought on this entire pursuit once I stepped up to disclose my situation with First Data through the State of Ohio. Why is this? Why do I continue to be harassed? Is this something the First Data legal team put you up to? How can we put a stop to this? I have NO representation for the Steven Barger v First Data case – at all. In fact, I know very few details on the case. I have my own distinct case that I work on with my council. This needs to be *completely* understood by you and your firm. Is that clear?

I look forward to hearing back from you as soon as possible. As you know, I have many responsibilities now that are not exclusive to you or your case.

Here are ways you can contact me *without* using FedEx:

- Return receipt email through Outlook with a copy in the USPS. Jul_kelly@mac.com
- Certified mail through USPS

Regards,


Julie Kelly

**From:** Julie Kelly
**Sent:** Friday, July 6, 2018 6:23 PM
**To:** Shawn@shearerlaw.pro; bb@shearerlaw.pro
**Subject:** UPS Letter of request to schedule deposition for Steven Barger vFirst Data case

Hi Shawn & Brenda –

Hope you're doing well and enjoyed the 4th!

I received the attached letter from a Gillian A. Cooper, yesterday July 5th, 2018, an attorney that represents Defendants in the Steven B. Barger v. First Data case. She apparently works with Gary Eidleman. Saul Ewing Arnstein & Lehr, LLP did use UPS this time, which was just fine. She said she left me a voice message, but goodness, I don't check that and if she had an 'Unknown Caller' number, I wouldn't answer. How do they get phone numbers anyway, google or does First Data provide that information for past employees?

Can we please add this to my documents for the OCRC case? Perhaps they want her to work with me rather than Gary. Shall I give her a call on Monday to set up a time to schedule my deposition? I'm assuming I can ask her any questions at that time, regarding the case, etc.

Thank you,

Julie Kelly
513.806.4893

Inspire  |  Lead  |  Motivate  |  Transform

**SAUL EWING**

**ARNSTEIN**

**& LEHR** LLP

Gillian A. Cooper

Phone: (609) 452-5021

Fax: (609) 452-6103

Gillian.Cooper@saul.com

www.saul.com

July 3, 2018

**Via UPS**
Julie Kelly
823 Dorgene Lane
Cincinnati, Ohio 45244

    Re: *Steven B. Barger v. First Data Corporation, et al.,*
        **Civil Case No. 1:17-cv-4869**

Dear Ms. Kelly:

    I work with Gary Eidelman and represent Defendants in the above-referenced matter. On June 21, 2018, I called you at (513) 806-4893 to discuss scheduling your deposition and left you a voicemail. I have not yet heard back from you. Please call me at (609) 452-5021 to discuss scheduling your deposition.

    Thank you for your time and attention to this matter.

                      Very truly yours,

                      Gillian A. Cooper

Marc A. Citron • Princeton Managing Partner

650 College Road East, Suite 4000 • Princeton, NJ 08540-6603 • Phone: (609) 452-3100 • Fax: (609) 452-3122

DELAWARE FLORIDA ILLINOIS MARYLAND MASSACHUSETTS NEW JERSEY NEW YORK PENNSYLVANIA WASHINGTON, DC

A DELAWARE LIMITED LIABILITY PARTNERSHIP

**Shawn Shearer**

| | |
|---|---|
| **From:** | Shawn Shearer <shawn@shearerlaw.pro> |
| **Sent:** | Wednesday, July 11, 2018 12:38 PM |
| **To:** | Veronica.Bedinger@civ.ohio.gov |
| **Subject:** | RE: 27240 Kelly v. First Data |

Ms. Bedinger – I am not seeking your involvement in a judicial matter. Rather, I am simply advising you of the conduct of the Respondent, First Data, in the matter you are investigating.

First Data's actions against Ms. Kelly are in direct retaliation for raising her claims of discrimination. I am not seeking the OCRC's assistance in any way to intervene to prevent the continuing pressure and expense on Ms. Kelly by First Data.

I am simply asking that the OCRC take note that when Ms. Kelly raised her potential claims of discrimination with First Data, First Data's immediate response was to threaten to subpoena her in a completely separate matter. I am also asking the OCRC take note that when Ms. Kelly did file her Charge of Discrimination with the OCRC, First Data's immediate response was to issue a subpoena to Ms. Kelly to testify in a completely separate matter. This involved Ms. Kelly needing to obtain legal advice and rearrange her schedule for the care of her children, elderly mother, and learning disabled brother so that she could attend the deposition. First Data even promised to pay for the care of Ms. Kelly's family while she was being deposed. Ms. Kelly then appeared at the time and place of the noticed deposition and First Data did not show. First Data's failure to appear at a deposition they scheduled and noticed had no effect other than to inconvenience Ms. Kelly and force her to incur expenses.

If First Data's conduct was the direct result of Ms. Kelly raising the claims you are investigating, that conduct constitutes actionable retaliation.

We fully understand that the OCRC cannot intervene in this separate matter. However, what the OCRC can do is evaluate whether the actions of First Data constitute retaliation against Ms. Kelly for bringing her allegations of, and Charge of Discrimination, against First Data. If through this subpoena process, First Data is harassing or intimidating Ms. Kelly, they are separately violating all of the statutes set forth in the Charge of Discrimination you are investigating.

In other words, in conducting your examination and investigation of First Data, Ms. Kelly is asking the OCRC to determine that First Data's conduct since her raising actionable discrimination claims constitutes retaliation against Ms. Kelly in violation of those statutes. I am merely keeping you informed of the ongoing retaliation against Ms. Kelly in the case you are investigating.

First Data's conduct in subpoenaing Ms. Kelly is evidence of retaliation. We are asking nothing more than for you and the OCRC to evaluate whether that conduct is illegal and sanctionable retaliation as part of Ms. Kelly's Charge of Discrimination filed in the case your are investigating.

In my view, the timing of the threat of subpoena, the timing of the issuance of the subpoena, the intimidation by a process server impersonating a FedEx employee and disturbing Ms. Kelly's children, and then the failure of First Data to appear for the deposition it scheduled and noticed, all show that First Data has taken all of those actions for the sole purposes of harassing and intimidating Ms. Kelly because she filed this Charge of Discrimination with the OCRC. Had Ms. Kelly not filed this Charge of Discrimination, she would not have been subpoenaed, she would not have incurred legal expense on an unrelated matter, and her and her family would not have been disturbed and inconvenienced by preparing for and attending a deposition that First Data never intended to hold.

This type of harassment by First Data is illegal retaliation against Ms. Kelly for raising charges of discrimination with your office and should be found to be illegal retaliation by your office.

While the OCRC cannot intervene in the legal action in which Ms. Kelly is being subpoenaed, the OCRC can find that First Data is retaliating against Ms. Kelly for raising her Charges of Discrimination that you are investigating.

Shawn E. Shearer
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(972) 803-4499
www.shearerlaw.pro

THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE

**From:** Veronica.Bedinger@civ.ohio.gov
**Sent:** Wednesday, July 11, 2018 6:21 AM
**To:** Shawn Shearer
**Subject:** RE: 27240 Kelly v. First Data

Mr. Shearer:

We cannot be involved in any judicial matters (subpoena, police, court, depositions etc.).

Have a Great and Productive Day

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati/Dayton Satellite Office
Mid-Point Towers
7162 Reading Road, Suite 1005
Cincinnati OH 45237
513-351-2541 Direct Dial
513-351-2616 Fax



Confidentiality Notice: This e-mail message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please advise the sender immediately.

**From:** Shawn Shearer [mailto:shawn@shearerlaw.pro]
**Sent:** Tuesday, July 10, 2018 8:59 PM
**To:** Bedinger, Veronica <Veronica.Bedinger@civ.ohio.gov>
**Subject:** Re: 27240 Kelly v. First Data

2

Ms. Bedinger:

I jwant to make sure that you are clear as to the reason that the letter you received on July 10, 2018 was given to you.

It was given to you as evidence. Ms. Kelly does not expect, nor does she require, any level of action from your Commission that requires jurisdiction with regards to her receipt of the subpoena. This subpoena is simply being given to you so that the Commission can fully understand the way in which First Data is harassing Ms. Kelly. For example, (this is purely hypothetical, and we are in no way suggesting that this is happening) if someone related to her former employer was stalking her at her home, we would understand that the Commission is not Ms. Kelly's local police department, and as such lacks jurisdiction over that matter. However, we would present the incident as harassment, and therefore as evidence of retaliation. It is only in this capacity that we are giving you this information. The nature of the fact that it is a subpoena, is irrelevant to you with regards to enforcement of that subpoena.

What is at, issue is the fact that Ms. Kelly's former employer is using a law firm and a fraudulent deposition as a way to waste her time, resources, and abuse the legal system. This behavior is a direct result of Ms. Kelly's notification to her former employer of her intent to file a claim with you, and then her follow through in filing that claim.

If you would prefer, Ms. Kelly can provide you with a sworn affidavit about these activities, as well as a time stamped video she has of herself at the designated fraudulent deposition time and place, proving that she showed up and no one was there, and the subpoena does not have to be part of your evidence. Let me know if you would prefer that as a substitute

Yours truly,

Shawn Shearer

> Shawn E. Shearer
> The Law Office of Shawn Shearer, P.C.
> 3839 McKinney Avenue #155-254
> Dallas, TX 75204
> (972) 803-4499
> www.shearerlaw.pro
>
> THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED
> INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED
> RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY
> ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN
> ERROR, PLEASE DELETE

On Jul 10, 2018, at 12:15 PM, "Veronica.Bedinger@civ.ohio.gov" <Veronica.Bedinger@civ.ohio.gov> wrote:

> Mr. Shearer:
>
> The Commission has no jurisdiction regarding the subpoena for the Barger deposition or how she was served. We will investigate her allegations regarding the termination/resignation.
>
> Have a Great and Productive Day

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati/Dayton Satellite Office
Mid-Point Towers
7162 Reading Road, Suite 1005
Cincinnati OH 45237
513-351-2541 Direct Dial
513-351-2616 Fax

<image001.png>

Confidentiality Notice: This e-mail message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please advise the sender immediately.

**From:** Shawn Shearer [mailto:shawn@shearerlaw.pro]
**Sent:** Tuesday, July 10, 2018 3:06 PM
**To:** Bedinger, Veronica <Veronica.Bedinger@civ.ohio.gov>
**Subject:** Re: 27240 Kelly v. First Data

Ms. Bedinger:

Ms. Kelly understands that the Commission has no jurisdiction with regards to the subpoena she provided you as evidence of First Data's ongoing harassment of and retaliation against her. Ms. Kelly is not seeking any legal aid from the Commission with regards to defense of that subpoena. The subpoena is only being provided in the context of proof of an event that occurred - Ms. Kelly's former employer, First Data, in an effort to further intimidate and financially disadvantage Ms. Kelly because Ms. Kelly filed formal charges with your Commission against her former employer, is harassing Ms. Kelly with the subpoena. Through Mr. Eidelman and Saul Ewing, First Data dispatched an imposter; a large man, dressed in a Federal Express uniform, to Ms. Kelly's home, at a time when they knew her children would be present, and attempted to serve her her a third party subpoena to testify in an unrelated case. Federal Express does NOT provide service of subpoenas by their employees. Eidelman then offered to provide Ms. Kelly free child care during the deposition, and then when Ms. Kelly appeared at the noticed location at the scheduled time, Eidelman was nowhere to be found.

Ms. Kelly had no idea that she had been named a witness in an unrelated case at First Data. The unrelated case in which Ms. Kelly was subpoenaed has been ongoing for more than a year, yet Ms. Kelly was not notified of her involvement until AFTER she notified First Data of her intent to file her own claim with your Commission. When Ms. Kelly arrived, with her children in tow, there was no child care, and there WAS no deposition. The entire thing was a fraud. This ruse is an example of the lengths to which First Data is willing to go to retaliate against former employees. It is on that basis alone, as evidence of retaliation for bringing the very claim you are investigating, that the subpoena was included as part of the letter you received today.

Please do not hesitate to contact me if you have any further questions.

Yours truly,

Shawn Shearer

4

Shawn E. Shearer
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(972) 803-4499
www.shearerlaw.pro

THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR
PRIVILEGED INFORMATION AND IS INTENDED FOR USE
ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF
THIS INFORMATION OR ANY ATTACHMENTS IS
FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR,
PLEASE DELETE

On Jul 10, 2018, at 9:58 AM, "Veronica.Bedinger@civ.ohio.gov" <Veronica.Bedinger@civ.ohio.gov>
wrote:

Good Afternoon:

The Commission **does not have jurisdiction** regarding the subpoena issued to Ms. Kelly
to give a disposition in the Steven Barger v. First Data case. Ms. Kelly may obtain an
attorney to represent her with the disposition. Please do not include us in any
correspondence regarding the subpoena for any disposition.

Attached is the position statement. Please provide the written rebuttal by July 25, 2018.

Have a Great and Productive Day

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati/Dayton Satellite Office
Mid-Point Towers
7162 Reading Road, Suite 1005
Cincinnati OH 45237
513-351-2541 Direct Dial
513-351-2616 Fax

<image001.png>

Confidentiality Notice: This e-mail message is intended only for the person or entity to which it is addressed
and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and
destroy all copies of the original message. If you are the intended recipient but do not wish to receive
communications through this medium, please advise the sender immediately.

<27240 position statement.pdf>

## EXHIBIT B

**SAUL EWING ARNSTEIN & LEHR** LLP



Gillian A. Cooper
Phone (609) 452-5021
Fax (609) 452-6103
Gillian.Cooper@saul.com
www.saul.com

July 3, 2018

**Via Federal Express and Electronic Mail**
Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
7162 Reading Road, Suite 1005
Cincinnati, Ohio 45237

        Re:    *Julie Kelly v. First Data Corporation*
               **DAYB6(27240)05172018**

Dear Investigator Bedinger:

      This firm represents Respondent First Data Merchant Services, the former employer of Charging Party Julie Kelly. First Data Merchant Services is a subsidiary of First Data Corporation. This letter sets forth the Company's Position Statement to the above-referenced Charge of Discrimination.

      Charging Party alleges the Company discriminated against her on the basis of a disability in violation of the Americans with Disabilities Act and sex in violation of the Pregnancy Discrimination Act. She also alleges that she was constructively discharged and that the Company retaliated against her by serving her with a deposition subpoena six months following her voluntary resignation of employment. First Data denies that it discriminated or retaliated against Charging Party on the basis of disability, sex, or any other protected characteristic. First Data also denies that it constructively discharged Charging Party. To the contrary, Charging Party resigned from her employment due to personal and/or family reasons, including the possibility of homeschooling her children.

      At various times during her nearly-20-year employment, Charging Party was permitted to work from home, as were many other employees, not as a medical accommodation, but on a temporary, as-needed basis. In 2015, the Company revised its work from home policy, which subsequently required all non-client-facing employees to be present in a First Data office location. As a result of this policy change, Charging Party was required to work in a nearby First Data office location for two years from 2015, through November 2017, when she voluntarily resigned. Following her return from FMLA-leave in 2015, thereafter, Charging Party never advised the Company that she had a disability and she never requested an accommodation to work from home due to a disability. Further, Charging Party was not disabled. First Data was under no obligation to accommodate her.

Marc A. Citron - Princeton Managing Partner
650 College Road East, Suite 4000 ♦ Princeton, NJ 08540-6603 ♦ Phone (609) 452-3100 ♦ Fax: (609) 452-3122

DELAWARE  FLORIDA  ILLINOIS  MARYLAND  MASSACHUSETTS  NEW JERSEY  NEW YORK  PENNSYLVANIA  WASHINGTON, DC
A DELAWARE LIMITED LIABILITY PARTNERSHIP

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 2

Rather, the Charge details a purported need to work from home due to Charging Party's "long" commute and to alleviate the need for childcare. Neither a commute, (long or short), nor the need for childcare is a disability under either the ADA or the PDA, and such personal matters do not require an accommodation. Even if Charging Party requested an accommodation to work from home to avoid a commute or for childcare, the Company was not required to accommodate Charging Party's desire for convenience.

## 1.    FACTUAL BACKGROUND

First Data is a financial services company that provides, among other things, credit, debit, check, and electronic payment solutions. The Company offers a suite of systems, services, and products to businesses and financial institutions. First Data is proud of its longstanding commitment to equal employment opportunity (EEO) and its policies strictly prohibit discrimination on the basis of an employee's disability, gender, or any other protected characteristic. First Data employees may utilize a multi-faceted complaint resolution procedure to raise issues of alleged discrimination, harassment, and retaliation. *See* First Data's Response to Request for Information (RFI Response), Exhibits 1-6. Employees are informed of First Data's EEO policies and procedures and may report discrimination, retaliation, or harassment to anyone in management, to a member of the Human Resources (HR) Department, or by calling First Data's Ethics Hotline. Retaliation for engaging in protected activity is prohibited. *Id.*

### 1.1.    Charging Party's Employment with First Data

Charging Party began her employment with the Company in 1998. During her employment, Charging party requested, and was granted various leaves of absence and an accommodation due to a disability. On September 26, 2011, Charging Party requested an FMLA leave of absence due to her own illness. Charging Party returned to work on November 2, 2011, without any restrictions. *See* RFI Response, Exhibits 10-11. On November 21, 2012, Charging Party requested and was approved for an FMLA leave of absence for the birth of her child. The leave start date was December 17, 2012. Charging Party returned to work on February 25, 2013, without any restrictions. *See* RFI Response, Exhibits 12-13.

In October 2014, Charging Party requested and was approved for an accommodation for "no travel through expected end date of 2/20/2015," due to her high risk pregnancy. *See* RFI Response, Exhibits 14-15.

On January 12, 2015, Charging Party requested an FMLA leave of absence for the birth of her child. Charging Party returned to work on April 20, 2015, without restrictions. *See* RFI Response, Exhibits 16-17.

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 3

In November 2016, Robin Ording, Vice President of Talent Development, became the interim leader of the Sales Transformation and Training Group and began overseeing Charging Party's employment. *See* Affidavit of Robin Ording dated June 29, 2018, ¶¶ 4-7. Ms. Ording worked closely with Charging Party. Charging Party never advised Ms. Ording that she had a disability, nor that she was receiving any sort of accommodation due to a disability. *Id.* at ¶¶ 11-14. Further, at the time Ms. Ording took over the Sales Transformation and Training Group, if Charging Party had previously received a medical accommodation due to a disability, Ms. Ording would have been made aware of any such accommodation by the Human Resources Department. *Id.* at ¶ 14.

In February 2017, Ms. Ording promoted Charging Party to a Director position. *Id.* at ¶ 8. Charging Party took on additional work duties and received a raise and a retention bonus as a result of the promotion. *Id.* at ¶¶ 9-10.

### 1.2.    First Data's Work From Home Policy

In 2015, First Data revised its work from home policy so that all non-client-facing positions would be required to work in a First Data office location. The goal of the policy was to "unite and inspire all [employees] to achieve higher levels of operational excellence and innovation that is critical for economic success." *See* RFI Response, Exhibit 7. The policy allows for exceptions subject to manager approval. *Id.* From 2015, until her voluntary resignation in 2017, Charging Party was expected to work in a nearby First Data office in compliance with the work from home policy.

Although Charging Party was required, (just like all other employees), to work in a First Data office location, she was permitted (when needed) to work from home. For example, on August 9, 2017, Charging Party emailed Ms. Ording advising that two of her children had enterovirus (hand, foot, and mouth disease). *See* Ording Affidavit, ¶¶ 20-21; *see also* RFI Response, Exhibit 19. She also advised that her oldest child was leaving for college that weekend and did not want her to watch the younger children. *Id.* Charging Party told Ms. Ording that she needed the next two days off to take care of her children and was "available to do emails and calls as necessary," i.e., while working from home. *Id.* Ms. Ording responded, "Oh No!!!! Of course, hope they all feel better." *Id.*

As another example, on October 24, 2017, Charging Party emailed Ms. Ording stating that one of her children was sick and that she needed to take the child to the doctor. *See* Ording Affidavit, ¶¶ 22-23; *see also* RFI Response, Exhibit 20. Charging Party stated that she would "put in a request to [work from home]/sick time[.]" *Id.* Ms. Ording responded, "Ok no worries[.]" *Id.* Charging Party's assertion that Ms. Ording refused to allow her to work from home is without merit. It is clear Charging Party was permitted to work from home as needed when she submitted a request.

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 4

### 1.3. Employee Productivity Tracking

First Data, (like all employers), manages employee productivity in a variety of ways. One of the Company-wide tools used is referred to as a "People & Expense Management Report." *See* Ording Affidavit, ¶ 25. This is a monthly report providing data on the number of days employees worked, days in or out of the office. Charging Party alleges her "swipe-ins" were monitored and that if an employee's swipe-ins were below a threshold, disciplinary action would take place. *See* Julie Kelly Affidavit dated May 16, 2018, ¶ 27. Charging Party was never disciplined as a result of the number of her swipe-ins. *See* Ording Affidavit, ¶¶ 26-29.

Additionally, Charging Party assisted in developing guidelines to improve the Sales Transformation and Training Group's productivity surrounding this area. On June 20, 2017, Charging Party circulated an email detailing "general guidance on work – primarily around accountability, communication, etc." *See* Ording Affidavit, ¶¶ 29-31; *see also* RFI Response, Exhibit 18. The guidelines set forth suggestions for employees to use when out of the office. *Id.* One of the guidelines states:

> Life happens to all of us and work flexibility is one way we create a positive working culture. Work from home requests can occur periodically to accommodate unusual circumstances (but are not to be on a regular and ongoing schedule). Discuss and obtain approval from your manager. Log WFH time in the OOO tool (for both partial time and any full days).

*Id.* Not only was Charging Party permitted to work from home when necessary, but she assisted in drafting guidelines about work from home expectations for other employees to follow.

### 1.4. Charging Party Resigns to Spend Time with Her Family

In November 2017, Charging Party shared with Ms. Ording that due to a series of recent family events, (including her step-daughter's well-being and her decision to potentially homeschool her children), Charging Party and her husband decided it would be best for her to resign her employment. *See* Ording Affidavit, ¶¶ 32-38. In response, Ms. Ording suggested that rather than resigning, Charging Party should consider requesting a leave of absence or permission to work from home. *Id.* Charging Party decided against Ms. Ording's suggestion. *Id.*

On November 14, 2017, Charging Party emailed notice of her resignation of employment effective November 30, 2017. *See* RFI Response, Exhibit 21. Charging Party stated that "[a]fter nearly 20 years of successfully achieving goals, projects and leading stellar teams for First Data, the change in policies, such as the requirement to work in an office location, have proven

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 5

prohibitive to my success both professionally and personality [sic]." *Id.* Charging Party wrote that she:

> [L]ost many precious hours that could have been dedicated to what means the most, my health and family. Lost time in the countless hours of commuting to a building where a handful of people report in to. After working successfully from home for nearly 10 years, the change First Data made has contributed to my numerous health issues with increased stress, financial constraints and extraordinary burdens on my family.

Prior to reading the November 14, 2017 email, Charging Party never informed Ms. Ording that the commute was causing her health or financial issues. *See* Ording Affidavit, ¶ 38. However, based on Ms. Ording's prior communications with Charging Party about the personal and family issues she was experiencing at that time, she assumed that Charging Party did not want to share the personal and sensitive information with the Company, and therefore, chose to blame the commute instead. *Id.* Charging Party's employment ended on November 30, 2017.

## 2.    LEGAL ARGUMENT

Charging Party alleges that her resignation constitutes a constructive discharge and that First Data discriminated against her on the basis of disability in violation of the ADA and on the basis of sex in violation of the PDA. Charging Party further alleges that First Data retaliated against her and subjected her to a hostile work environment.

### 2.1.    Charging Party ADA Disability Discrimination Claim Fails

Any claim that First Data constructively discharged Charging Party under the ADA fails because she cannot establish a *prima facie* claim of disability discrimination. First, Charging Party is not disabled under the ADA. Second, Charging Party voluntarily resigned her employment to spend more time with her family. Under no circumstances was Charging Party constructively discharged.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Both the ADA and Ohio law prohibit employers from discriminating against qualified individuals with disabilities. *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 822 (S.D. Ohio 2004) ("the essential elements of a claim under Ohio law and the ADA are the same") (citations omitted).

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 6

ADA discrimination claims are governed by the *McDonnell Douglas* burden-shifting framework. *See, e.g., Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under that framework: (i) the charging party must first "establish a *prima facie* case of discrimination;" (ii) then the employer must articulate legitimate, non-discriminatory reasons for its actions; and finally (iii) "the [charging party] must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Id.*

"To prove a *prima facie* case of disability discrimination, a [charging party] must show that (1) [s]he is disabled, (2) [s]he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) [s]he suffered an adverse employment action because of [her] disability." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). The charging party must prove that her disability was the "but-for" cause of her termination. *Id.*

Here, Charging Party fails to establish a *prima facie* case of disability discrimination under the ADA or Ohio law because she is not disabled. During her employment, Charging party requested, and received multiple FMLA-leaves and an accommodation due to a disability in late 2014/early 2015. However, following her return from FMLA-leave in April 2015, Charging Party did not request any disability accommodations, nor did she ever advise First Data that she was disabled. Thus, First Data neither denied Charging Party an accommodation, nor was any prior accommodation revoked. Moreover, even if Charging Party were disabled (which she is not), she did not request an accommodation due to a disability, and she was never subjected to an adverse employment action because she voluntarily abandoned her job.

### 2.1.1. Charging Party is Not Disabled Under the ADA

The fact that Charging Party suffered various medical issues during her lifetime does not automatically qualify her as disabled under the ADA. To prevail on an ADA claim, a charging party must initially satisfy two requirements to establish a *prima facie* case of discrimination. A charging party must have an impairment, and the impairment must interfere with a major life activity. *See Farmer v. National City Corp.*, No. C-2-94-966, 1996 WL 887478, *5 (S.D. Ohio April 5, 1996).

A person is disabled if she has a "a physical or mental impairment that substantially limits one or more [of her] major life activities." 42 U.S.C. § 12102(2). An impairment "substantially limits" a major life activity if it prevents the person from performing an activity that an average person in the general population can perform, or if it significantly restricts the duration, manner, or condition under which the individual can perform such activity, as compared to the average person in the population. 29 C.F.R. §1630.2(j)(ii). "'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or to a large degree." *Mahon v. Crowell,*

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 7

295 F.3d 585, 590 (6th Cir. 2002) (citations omitted). For example, "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *McKay v. Toyota Motor Mfg. U.S.A.*, 110 F.3d 369, 373 (6th Cir. 1997). In other words, the impairment must substantially limit employment in general, not merely the particular job that the plaintiff wishes to hold. *See Vass v. Riester & Thesmacher Co.*, 79 F. Supp. 2d 853, 861 (6th Cir. 2000). "Major life activities" include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 29 C.F.R. §1630.2(i)(1)(i).

Here, Charging Party is not disabled under the ADA. Although Charging Party mentions that she suffered from various medical conditions during her lifetime, she does not set forth what disability was the basis for the alleged discriminatory treatment. Rather, Charging Party makes a blanket statement that the "physical and mental conditions resulting from [her] two pregnancies are 'disabilities[.]'" Charging Party does not state what these "physical and mental conditions" are. Further, Charging Party does not allege what major life activity is substantially limited.

Although she details a desire to work from home, Charging Party does not allege that she suffered a medical condition that prevented her from driving. In fact, there is no question that Charging Party is able to drive without restrictions. Rather, she alleges that it would be more convenient for her if she worked from home and that the "long" drive was stressful. Notably, Charging Party lives less than 20 miles[1] from the First Data office, so it is unclear how that drive resulted in a 90-minute to a two-hour commute. *See* Kelly Affidavit, ¶ 32.

### 2.1.2. First Data Did Not Take Any Adverse Employment Action Against Charging Party

First Data did not take any adverse employment action against Charging Party at all, let alone because of an alleged disability. There is no evidence that Charging Party suffered any adverse employment action solely because of her alleged disability. *See Johnson v. City of Mason*, 101 F. Supp. 2d 566, 573 (S.D. Ohio 2000). Rather, the facts demonstrate Charging Party voluntarily abandoned her employment and she was not constructively discharged.

In order to establish a claim of constructive discharge, a charging party must provide that the employer made working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996). Moreover, even though there is no evidence of discrimination in this

---

[1] Charging Party's address is 823 Dorgene Lane, Cincinnati, Ohio 45244. *See* Kelly Affidavit, ¶ 2. First Data's office is located at 11311 Cornell Park Drive, Cincinnati, Ohio 45242. According to maps.google.com, the distance between the two locations is approximately 16-17 miles, which is estimated at 23-39 minutes.

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 8

case, even if there was, mere discriminatory treatment is not sufficient to establish constructive discharge. Rather, a person must demonstrate aggravating factors that constitute "at least a continuous and severe pattern of discriminatory treatment." *Trepka, v. Cleveland City School Dist. Bd. of Ed.*, 28 Fed. Appx. 455, 459 (6th Cir. 2002). Additionally, there must be some evidence that the employee's resignation was the intended and foreseeable result of the employers actions. *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987).

Here, Charging Party concedes that in 2015, First Data implemented a policy requiring employees to work in an office. Requiring employees to work in the office in no way rises to the level of deliberately creating an intolerable working condition. Further, between 2015 and 2017, Charging Party was required to work at a First Data office location. When requested, Charging Party was permitted to occasionally work from home on an as-needed basis. *See* Ording Affidavit, ¶¶ 15-23; *see also* RFI Response, Exhibits 19-20. Additionally, at the time Charging Party gave notice of her resignation, Ms. Ording suggested Charging Party request a leave of absence or request permission to temporarily work from home. *See* Ording Affidavit, ¶¶ 32-34. Accepting Charging Party's allegations as true, that she resigned because of the stress of her commute, this does not prove that First Data intended that Charging Party resign, let alone that a reasonable person would have felt compelled to resign under those circumstances.

## 2.2. Charging Party's Failure to Accommodate Claim Fails

Charging Party's failure to accommodate claim fails because Charging Party did not request an accommodation due to a disability, First Data did not fail to provide a necessary accommodation, and First Data did not revoke any previously granted accommodation. Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The term "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

In order to establish a *prima facie* case for failure to accommodate, a charging party must show that: "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x 974, 982-83 (6th Cir. 2011).

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 9

Here, as discussed *supra*, Charging Party is not disabled within the meaning of the ADA. First Data did not know, nor did it have reason to know about a disability because Charging Party was not disabled. Further, Charging Party did not request an accommodation. Finally, First Data neither failed to provide an accommodation, nor did it revoke any previously granted accommodation.

### 2.2.1. Charging Party Did Not Request an Accommodation

As part of the *prima facie* case, a charging party "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007) (citation omitted). The Sixth Circuit has explained:

> Our case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation. On one hand, we have held that the ADA does not require employees to use the magic words "accommodation" or even "disability." On the other hand, "the employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." The employee also must make it clear that the request is being made because of the employee's disability.

*Judge v. Landscape Forms, Inc.*, 592 Fed. Appx. 403, 407 (6th Cir. 2014) (citations and internal quotation marks omitted). In *Leeds v. Potter*, 249 Fed. Appx. 442 (6th Cir. 2007), the Court agreed that the plaintiff's statements that his job was "kicking his ass" were "not nearly specific enough to be considered requests for accommodations" because "the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Id.* at 449.

Here there is no evidence that Charging Party requested an accommodation to work from home due to a disability. Charging Party did not submit any medical records to First Data requesting such an accommodation. Further, Charging Party was granted permission to work from home when requested on an as needed basis.

### 2.2.1. First Data Was Not Required To Provide an Accommodation

There is no evidence that First Data knew Charging Party needed an accommodation due to a disability. The ADA makes employers responsible only for "known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). The Sixth Circuit has said, citing EEOC guidance, that "[t]here is no question that the EEOC has placed the initial burden of requesting an

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 10

accommodation on the employee. The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998).

First Data never failed to provide an accommodation due to a disability (because Charging Party never requested one), nor did it revoke an accommodation. First Data revised its work from home policy in 2015. *See* Ording Affidavit, ¶ 15; *see also* RFI Response, Exhibit 7. Charging Party's failure to accommodate claim fails as a matter of law.

Furthermore, in addition to being meritless, Charging Party's allegation that she was discriminated against in violation of the ADA when First Data "revoked" her previous "accommodation" is time-barred by statute. Charging Party alleges that her previous "accommodation" (allegedly granted to her by her prior supervisor, Steven Barger) was unlawfully revoked when Ms. Ording became her supervisor in November 2016. Charging Party was required to have filed a Charge of Discrimination for that allegedly unlawful act within 300 days of its occurrence. 42 U.S.C. § 2000e-5(e). Because more than 300 days have passed since her alleged reasonable accommodation was revoked, the claim is time-barred by statute.[2]

### 2.3. Charging Party's PDA Claim Fails

Title VII of the Civil Rights Act of 1964 prohibits discrimination "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In 1978, after the Supreme Court held in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), that Title VII did not prohibit discrimination because of pregnancy, Congress responded with the PDA, amending Title VII to include discrimination on the basis of pregnancy within the category of unlawful gender discrimination. *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1223-24 (6th Cir. 1996). The PDA provided that the terms "because of sex" or "on the basis of sex" in Title VII shall include "on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. § 2000e(k).

Employers are not required to treat pregnant employees in any special way. Rather, such employees must be treated the same as other employees on the basis of their "ability or inability to work." *Ensley-Gaines*, 100 F.3d at 1226 (citing 42 U.S.C. § 2000e(k)). The PDA protects a

---

[2] First Data denies that Charging Party was granted a reasonable accommodation due to a disability under the ADA because Charging Party alleges that the prior "reasonable accommodation" had been granted to her by Steven Barger. The Company notes here that counsel for Charging Party, Shawn Shearer, is Mr. Barger's son-in-law and Mr. Shearer currently represents Mr. Barger in the matter of *Steven Barger v. First Data, et al.* that was repeatedly referenced in Charging Party's Charge. First Data has no documentation that Mr. Barger ever granted Charging Party an ADA accommodation. As such, there was no accommodation to have been revoked in January 2017, as alleged.

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 11

pregnant woman's right to remain in the work place, that is, it "protect[s] female workers from being treated differently from other employees simply because of their capacity to bear children." *Int'l Union, United Auto., etc. v. Johnson Controls*, 499 U.S. 187, 205 (1991).

Here, in 2012, Charging Party gave birth to twins. Charging Party requested and was granted leave under the FMLA. She admittedly returned to work with no changes to her position or responsibilities. *See* Kelly Affidavit, ¶ 9. In 2015, Charging Party gave birth to another child. *See* Kelly Affidavit, ¶ 18. Again, Charging Party requested, and was granted leave. Upon completion of that leave, Charging Party returned to work without restrictions.

Charging Party alleges First Data discriminated on the basis of sex in violation of the PDA due to "medical conditions arising out of her two pregnancies[.]" She does not, however, specify that those alleged "medical conditions" were the basis of any discriminatory treatment in 2017. Thus, it is unclear how First Data allegedly discriminated against Charging Party for pregnancy-related medical conditions or childbirth-related medical conditions more than two years after the pregnancy and childbirth. During both pregnancies and births, Charging Party was granted a leave of absence and returned to work without restrictions. Thus, she fails to allege a violation of the PDA.

### 2.4. Charging Party's Retaliation Claim Fails[3]

To state a *prima facie* case of retaliation, a charging party must offer evidence that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to a protected activity. *See Nicholson v. City of Clarksville, Tenn.*, 530 Fed. Appx. 434, 446 (6th Cir. 2013). "Absent special circumstances," however, "an adverse employment decision that predates a protected activity cannot be caused by that activity." *Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia De Puerto Rico*, 671 F.3d 49, 56 (1st Cir. 2012).

Here, Charging Party alleges that First Data retaliated against her by subpoenaing her as a fact witness for a deposition in another lawsuit. Six months before the Charge was filed, on November 26, 2017, First Data served Rule 26(a) Initial Disclosures in the Barger-lawsuit pending in the United States District Court for the Eastern District of New York identifying Charging Party, a former-First Data employee, as an individual who may have knowledge of discoverable information. The alleged protected activity took place after Charging Party's employment ended, and therefore, Charging Party's claim for retaliation fails as a matter of law.

---

[3] First Data incorporates by reference its letter to the OCRC dated June 6, 2018, with Exhibits.

Veronica Y. Bedinger, Civil Rights Investigator
Ohio Civil Rights Commission
July 3, 2018
Page 12

### 3.    CONCLUSION

As is evident from the facts discussed throughout this Position Statement, including the legal arguments, Charging Party never requested an accommodation due to a disability, was never denied an accommodation, and resigned her employment for personal reasons. Accordingly, First Data requests that the OCRC close its investigation and dismiss this matter finding that no violation has been established.

The exhibits referenced in the Position Statement, attached to the Response to the Request for Information, and any supplemental information that may be provided to the OCRC by First Data constitute confidential personnel records and other records of First Data and are included in this response on the assumption that the OCRC will limit its disclosure to its employees as necessary for review of this matter.

If you need any further information, please contact me.

Respectfully submitted,

*/s/ Gillian A. Cooper*
Gillian A. Cooper

cc:    Gary B. Eidelman, Esq. (via electronic mail)

# EXHIBIT C

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

August 8, 2018

<u>**VIA E-MAIL & USPS**</u>

Veronica Y. Bedinger
Civil Rights Investigator
Ohio Civil Rights Commission
Cincinnati Satellite Office
Mid-Pointe Towers
7162 Reading Road, Suite 1005
Cincinnati, OH 45237

   RE:  Julie Kelly v. First Data Corporation
      DAYB6(27240)05172016

Dear Investigator Bedinger:

  This firm represents Julie Kelly ("Ms. Kelly" or "Charging Party") in connection with the above referenced charge of discrimination. By letter to the EEOC dated May 16, 2018, Ms. Kelly alleges First Data Corporation ("First Data") violated the ADA, the PDA and Title VII, with respect to discrimination based on sex, and the corresponding provisions of Ohio law, in the course of Ms. Kelly's employment and termination (the "Charge Letter"). Since the filing of the Charge Letter, this firm, on behalf of Ms. Kelly, has also provided you additional communication by e-mail and letter, with exhibits, supporting the allegations in the Charge Letter, and the subsequent misconduct of First Data and its agents since that filing.

  By letter to you and the Ohio Civil Rights Commission ("OCRC"), Ms. Gillian Cooper, of the law firm Saul Ewing Arnstein & Lehr ("Saul Ewing"), delivered to you First Data's Position Statement (the "Position Statement") with respect to the allegations contained in the Charge Letter. The copy of the Position Statement the Charging Party received did not include exhibits to the Position Statement. In particular, the Charging Party has been unable to review the Declaration of Ms. Robin Ording that was attached to the Position Statement as, what appears from the Position Statement, to be important "evidence" being considered without the ability of the Charging Party to respond adequately to the contents of that sworn statement. Nevertheless, this letter constituted Ms. Kelly's reply to the contents of the Position Statement.

Veronica Y. Bedinger
August 8, 2018                                                                                          Page 2

## I.     OVERVIEW

The First Data's Position Statement is based solely upon the "factual" statements of Ms.
Ording, and the unsubstantiated, and unsworn, statements of Saul Ewing. As is evident from Ms.
Kelly's Charge Letter and the communications from this firm regarding the conduct of Saul
Ewing in continuing to harass Ms. Kelly for bringing these claims, the only evidence and analysis
from First Data is from the individuals (Ording and Gillian Cooper) and the firms (First Data and
its agent Saul Ewing) directly implicated in the alleged wrongdoing. The position of First Data
and its agents have not been reviewed by an independent party prior to its presentation to the
OCRC. Saul Ewing is not in a position as outside counsel to adequately serve the function of
filtering information appropriately to avoid misrepresentations of fact to the OCRC. Saul Ewing
is implicated directly in the continuing retaliation against Ms. Kelly.

The attorneys at Saul Ewing are witnesses, not counsel. As such, their self-serving
statements should be viewed in that light – unsworn and unsubstantiated statement of witnesses,
not as counsel for First Data. Saul Ewing, on First Data's behalf, has taken actions against Ms.
Kelly in furtherance of First Data's animus against her for raising the claims subject of the Charge
Letter. If this case proceeds to litigation, Charging Party will seek the disqualification of Saul
Ewing from representing First Data's interest.

The Position Statement completely mischaracterizes the statement of facts included in the
Charge Letter. This is not the case of a woman seeking to avoid work. This is a case of a woman
that continued her drive to work, provided excellent service to her employer for more than two
decades, some of that service as part of reasonable accommodations granted by the company after
interactive discussions with her managers. This case is about an inexperienced manager, Ms.
Robin Ording, taking over a department she knew nothing about and with absolutely no
experience in managing employees with disabilities.

This case is about the complete disregard of the right to work, with reasonable
accommodations of an individual disabled from the complications of two difficult pregnancies.
This case is about the atmosphere of First Data in which there is constant fear of termination for
no reason, no tolerance for the disabled, and the resulting poor and illegal decisions that arise
from that atmosphere by self-interested and obedient managers turning a blind-eye to their
obligations under the law. From at least late 2016 until present, at First Data there has been no
place for accommodating the needs of the disabled, especially accommodating the needs of a
mother experiencing the medical effects of two pregnancies.

If Ms. Kelly, an employee that performed for 20-plus years in the only job she has had her
adult life with an unblemished record, can be terminated based on the revocation of a reasonable
accommodation, arising from complications from pregnancy, with absolutely no business
justification, the ADA, Title VII and the Ohio law are meaningless of no protection to the citizens
of Ohio.

**Most importantly, no matter the validity of the underlying claim for discrimination
against Ms. Kelly by Ms. Ording and First Data, the conduct of First Data and its agent,**

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018

Page 3

**Saul Ewing, to retaliate against Ms. Kelly for simply raising and then bringing her claim is, in and of itself, evidence of the animus within First Data to the disabled and a separate violation of the law. (See Exhibit R-1 Amended/Supplemental Charge). First Data's and Saul Ewing's conduct since the time Ms. Kelly raised her charges is as, if not more, egregious that the original conduct of revoking a previously granted accommodation that was not causing any undue burden.**

## II.   DISQUALIFICATION/COMPLICITY OF SAUL EWING (FIRST DATA'S COUNSEL)

First Data's Position Statement was signed by Gillian Cooper of Saul Ewing. Saul Ewing and Ms. Cooper have been directly involved in the ongoing retaliation against Ms. Kelly. The OCRC should give no credibility to the self-serving testimony of First Data's witness (Robin Ording) and the self-serving analysis of First Data's counsel, Saul Ewing.

During May, June and July, 2018, the Charging Party provided numerous communications to the OCRC regarding the continuing harassment of Ms. Kelly by First Data and its counsel Saul Ewing by seeking her testimony as a third-party witness in the case of *Barger v. First Data*. In that case, Saul Ewing and Ms. Cooper have appeared as counsel defending First Data against Plaintiff Barger's allegations of First Data's violations of the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA).

In First Data's initial F.R.C.P. 26(a) disclosures in the *Barger* case, Saul Ewing and First Data disclosed Ms. Kelly as a potential witness and indicated that any contact with Ms. Kelly by Plaintiff Barger's counsel must be directed to Saul Ewing. Saul Ewing represented to Plaintiff Barger's counsel through such disclosure that Saul Ewing represented Ms. Kelly.

When Ms. Kelly raised her own issues of discrimination with First Data's in-house counsel, Saul Ewing and First Data set on a course of harassment and intimidation. When Ms. Kelly raised the possibility of bringing the complaints alleged in the Charge Letter, Saul Ewing threatened Ms. Kelly with calling her as a third-party deponent in the *Barger v. First Data* case. When Ms. Kelly did file the Charge Letter, Saul Ewing and First Data followed through with that threat and subpoenaed Ms. Kelly as a third-party deponent. Ms. Kelly rearranged her summer schedule to comply with the subpoena issued by First Data and Saul Ewing. Ms. Kelly appeared at the time and place specified for the deposition. Saul Ewing and First Data, however, did not appear at the time and place they had designated in the subpoena. SaTl Ewing and First Data NO-SHOWED a deposition that they noticed, while Ms. Kelly, a non-party under went expense and time to show for that deposition.

then, First Data and Saul Ewing, had the gall to file a motion to compel Ms. Kelly to give the deposition for which she showed and they had no-showed. Ms. Kelly responded to that motion *pro se.* Ms. Kelly believed Saul Ewing was her lawyer because of the F.R.C.P. 26(a) disclosures filed by Saul Ewing in the *Barger v. First Data* case.

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018
Page 4

In addition, Saul Ewing's conduct on July 3, 2018 was unethical and a disgrace to the legal profession under any possible ethical standard for the conduct of an attorney. It also constituted unlawful continuing harassment of Ms. Kelly for raising the discrimination claims that are subject of the Charge Letter. On July 3, 2018, Ms. Kelly believed Saul Ewing was her counsel in the *Barger* case because of the Rule 26(a) disclosures that had been filed. On July 3, 2018, Ms. Cooper, on behalf of Saul Ewing, contacted Ms. Kelly by, according to Ms. Cooper, a call to Ms. Kelly's personal cell phone number, to request new dates on which she could give her deposition in *Barger v. First Data*.

On July 3, 2018 (well after the Charge Letter was filed), Ms. Cooper of Saul Ewing attempted to cajole Ms. Kelly to agree to a new deposition date (somehow to replace the deposition that Saul Ewing no-showed) in *Barger v. First Data*, when Ms. Kelly believed Saul Ewing, Ms. Cooper, and her supervising partner, Gary Eidelman, were serving as her counsel in that case. At the same time Ms. Cooper was trying to improperly coax Ms. Kelly to testify (with Ms. Kelly believing she was her lawyer), Ms. Cooper was simultaneously finishing and filing the Position Statement against Ms. Kelly in this case that she filed with the OCRC on July 3, 2018.

Ms. Cooper and Saul Ewing have taken adverse positions (both in *Barger v. First Data* and in this case *Kelly v. First Data)* against an individual that believed that she was represented by Saul Ewing. Ms. Cooper and Saul Ewing knew Ms. Kelly believed them to be her counsel in *Barger v. First Data*. The conduct of Ms. Cooper and Saul Ewing on July 3, 2018 is without any justification whatsoever, is sanctionable, and a violation of every ethical rule on the topic. See, e.g., Model Rules of Professional Conduct 1.7.

The conduct and statements of of Saul Ewing and Ms. Cooper, acting under the supervision and direction of Gary Eidelman, in defending First Data in the Position Statement, is a completely self-serving excuse and diversion from the violation of their ethical responsibilities to Ms. Kelly, and their retaliatory conduct on behalf of First Data against Ms. Kelly for raising the charges that are subject of the OCRC's ongoing investigation in this case.

The entire Position Statement signed by Ms. Cooper and Saul Ewing must be read in light of Ms. Cooper's and Saul Ewing's complicity and direct action to continue the discriminatory retaliation against First Data.

At no time prior to July 3, 2018 did Ms. Cooper of Saul Ewing ever indicate that Saul Ewing was representing First Data adverse to Ms. Kelly in this case. Yet, the entire time, knowing Ms. Kelly believed them to be her attorneys in *Barger* based on First Data's F.R.C.P. 26(a) disclosures signed by Saul Ewing.

An attorney's deception of a "client" to advance the interest of another client is beyond any possible standard of professional conduct. On July 3, 2018, Ms. Cooper and Saul Ewing knew Ms. Kelly believed Saul Ewing was her counsel in the *Barger v. First Data* case. On July 3, 2018, Saul Ewing contact Ms. Kelly to ask when she could testify in the *Barger v. First Data* case. At almost exactly the same time as that contact, on July 3, 2018, Ms. Cooper signed and filed the

Veronica Y. Bedinger
August 8, 2018

Position Statement in this case on behalf of First Data adverse to Ms. Kelly without ever disclosing their adverse interest to Ms. Kelly.

Ms. Kelly did not know that Saul Ewing had chosen to represent First Data in connection with her complaints in the Charge Letter until a copy of the Position Statement was presented to her in July, in person by you and your staff, while MS. Kelly and her husband were at the OCRC's office in Cincinnati. Up until that point, Ms. Kelly did not believe that Saul Ewing was adverse to her interests and, in fact, thought Saul Ewing would be representing her in the *Barger v. First Data* case based on the F.R.C.P. 26(a) disclosures.

It was not until after Ms. Kelly received a copy of the Position Statement that she realized that Saul Ewing and Ms. Cooper, who had been contacting her for months, were acting not as her counsel, but as counsel adverse to her interests in her complaint in the Charge Letter.

Saul Ewing is culpable for the injuries to Ms. Kelly and should not be permitted to serve as her counsel in this investigation or in any subsequent litigation arising out of the facts set forth in the Charge Letter.

## III.   SEPARATE CAUSE OF ACTION - RETALIATION BY FIRST DATA AND SAUL EWING POST NOTICE OF ALLEGATIONS AND CHARGE

A complete history over the period from when my firm raised Ms. Kelly's concerns about violations of her statutory rights as outlined in the Charge Letter and through today is attached as Exhibit A through Exhibit V. **It is evidence of the severity of the claims that it takes more than 20 exhibits to chronicle the history of the backlash against Ms. Kelly for her raising her claims subject of the Charger Letter.** This timeline of events spans from Ms. Kelly first raising her potential claims to in-house counsel at First Data on April 27, 2018 through her *pro* se response to First Data's and Saul Ewing's motion to compel Ms. Kelly to testify in a case in which Ms. Kelly believed Saul Ewing was serving as her counsel.

The actions of First Data and their counsel Saul Ewing clearly demonstrate retaliation against Ms. Kelly for raising her claims of discrimination to First Data's in-house legal department and then filing her claims. This retaliation following Ms. Kelly's discharge from employment, based solely on claims arising from during her employment, is actionable as retaliation in violation of the ADA, PDA, Title VII, and Ohio law. No matter the underlying validity of Ms. Kelly's original claims (which are discussed in detail below), the retaliatory actions by First Data, and the unethical means by which they were implemented by First Data's agent Saul Ewing, and, in particular, Ms. Cooper and Mr. Eidelman, creates a completely separate cause of action. Individuals exercising their rights to petition the EEOC and OCRC with grievances as to their treatment by their employer, even if no longer employed by that employer, may not be harassed and subjected to humiliation, cost and inconvenience in wholly unrelated matters in retaliation for raising these claims.

The retaliation by First Data and Saul Ewing against Ms. Kelly is obvious from these few dates.

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

Veronica Y. Bedinger
August 8, 2018

| | |
|---|---|
| **April 27, 2018** | **Initial letter sent to First Data raising discrimination claims (Ex. A)** |
| May 01, 2018 | First Data's Response to Initial Claims (Ex. B) |
| May 03, 2018 | Second letter to First Data re: discrimination claims (Ex. C) |
| **May 10, 2018** | **First Data notices intent to issue subpoena to Ms. Kelly (Ex C-1)** |
| | |
| **May 16, 2018** | **Ms. Kelly's Charge Letter filed with EEOC and OCRC (Ex D-1)** |
| May 17, 2018 | Courtesy copy of Charge Letter provided to First Data (Ex D-2) |
| **May 23, 2018** | **Subpoena Served on Julie Kelly (Ex E)** |

In just less than two weeks (April 27 to May 10), First Data's in-house legal department received the first notice of Ms. Kelly's complaints surrounding her termination of employment and then First Data issued a notice of intent to issue Ms. Kelly a subpoena to give a deposition in a case in which she was not a party and has no relevant information. A case that has been in discovery for more than three months and a deposition of Ms. Kelly never discussed. A case in which even the Plaintiff had not yet been deposed. The May 10th threat to issue a third-party subpoena to Ms. Kelly was in direct response and retaliation to her raising claims of discrimination with First Data's in-house legal department on April 27th.

The retaliation escalated further after Ms. Kelly followed-through and filed her Charge Letter (May 16 to May 23). No longer was the third-party subpoena merely a threat by First Data and Saul Ewing, but in retaliation for bringing the claims set forth in the Charge Letter, First Data and Saul Ewing followed through by subpoenaing Ms. Kelly in a case in which she has no interest and has no relevant information. The animus for raising discrimination claims is obvious.

Ms. Kelly raised her issues of discrimination with First Data on April 27th and May 3rd. On May 10th First Data's counsel advised Plaintiff Barger's firm that it intended to subpoena Ms. Kelly in the *Barger v. First Data* case. On May 16th Ms. Kelly filed her Charge Letter and on May 17th provided First Data a courtesy copy of the filing. Then, on May 23rd, First Data served (through surreptitious means – See Ex. E) Ms. Kelly a subpoena to testify in a case to which she is not a party and has no relevant information.

Since the *Barger v. First Data* case was filed in August 2017, First Data has not subpoenad any other employee or former employee under Mr. Barger's management while at First Data. The ONLY former employee managed by Mr. Barger to be subpoenaed in his case was the Charging Party. The only former employee of Mr. Barger against whom a motion to compel testimony has been filed is Ms. Kelly. The only former employee of Mr. Barger hauled into federal court by First Data and Saul Ewing to testify is Ms. Kelly. The only former employee of Mr. Barger that has been forced to change her summer schedule to attend a deposition that did not occur is Ms. Kelly. The only former employee of Mr. Barger that has been publicly accused (wrongly) of failing to abide by a subpoena is Ms. Kelly. Such public accusations harm Ms. Kelly's job search by wasting her time, and harm her reputation while seeking employment (a mere search of litigation involving Ms. Kelly now brings a wrongful motion to compel immediately to a background report). The retaliatory actions of Saul Ewing on behalf of First

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

Veronica Y. Bedinger
August 8, 2018

Page 7

Data constitute adverse employment actions against Ms. Kelly for raising the charges that are the subject of the Charge Letter.

The temporal proximity of these events shows nothing other than First Data's, and their agent Saul Ewing's, intentional and deliberate retaliation against Ms. Kelly for even raising the claims (despite their actual validity). See *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516 (6th Cir. 2008)

In reviewing Exhibits A through V, keep in mind that at the time Ms. Kelly was subpoenaed in the *Barger v. First Data* case, Plaintiff Barger had not even been noticed to testify. In fact, First Data had only subpoenaed Mr. Barger's physicians. Ms. Kelly has no information relevant to Mr. Barger's claims. Mr. Barger was Ms. Kelly's supervisor. Ms. Kelly did not control his employment. Ms. Kelly does not know the conditions or facts surrounding his termination.

This exhaustive listing of events to harass Ms. Kelly over just three months is indicative of the hostile environment at First Data to those that raise issues of discrimination. If you raise issues, First Data's outside counsel will attack you in any way possible. The cost, expense and emotional toll Ms. Kelly for merely raising her claims has been significant. Ms. Kelly received a subpoena and went through the cost and hassle, not because she had any information to offer at a deposition, but solely because she dared raise the issues set forth in the Charge Letter.

**Whether or not the underlying claims made by Ms. Kelly in the Charge Letter have validity (this firm is insistent that they do), the conduct of First Data and Saul Ewing, including Ms. Cooper, are new and wholly separate acts of retaliation that are actionable in and of themselves.** An amended/supplemental charge of discrimination to address these actions was filed on July 18, 2018 incorporating Ms. Kelly's retaliation claims discussed in Sections II and III above.

Saul Ewing is liable for continuing retaliation against Ms. Kelly, the damage to her reputation by the filing of an unjustified motion to compel (Ms. Kelly complied with the subpoena and appeared at the designated time and place and it was Saul Ewing that no showed the court's order they themselves issued), inhibiting Ms. Kelly's mitigation the damages by consuming her time over months dealing with a subpoena, and inhibiting Ms. Kelly's mitigation of damages by publicly accusing her of failing to comply with an issued subpoena when it was Saul Ewing that did not comply with the subpoena. *Aria v. Raimondo,* 860 F.3d 1185 (9th Cir. 2017).

## IV.    VIOLATION OF THE ADA, PDA, TITLE VII AND OH REV. STAT SEC. 4112.01 *et seq.*

Disability and Pregnancy

As outlined in the Charge Letter, Ms. Kelly is 40 years old and worked her entire adult life for First Data. Over more than 20-years of service, Ms. Kelly's reviews and performance are outstanding without any blemishes.

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

Veronica Y. Bedinger
August 8, 2018

Page 8

The Charge Letter and documentation provided to the OCRC outline Ms. Kelly's medical issues and disabilities arising out of two difficult pregnancies. This firm has reviewed the Ms. Kelly's medical records.

Briefly, the timeline is below.

| | |
|---|---|
| October 2011 | Ms. Kelly undergoes surgery for the removal of uterine myoma. |
| December 2012 | Ms. Kelly gave birth, after a difficult pregnancy, to twins. |
| March 2013 | Ms. Kelly returns to her First Data position, working remotely with no changes to position or responsibilities. |
| October 2014 | Ms. Kelly was pregnant with her son born prematurely in February 2015. Because of her high-risk pregnancy, Ms. Kelly completed First Data's Work Place Adjustment Form based on her physician's recommendation for no travel due to a history of myomectomy and prior C-section. This request was approved by First Data.  The "estimated date of confinement" specified by her OBGYN was March 5, 2015. |
| December 2014 | Ms. Kelly received emergency care for premature labor, cramping and pregnancy complications.  Ms. Kelly continued to work full-time remotely. |
| January 2015 | First Data revises its work-from-home policy. Ms. Kelly continues working from home with her manager's approval based on the accommodation granted in October 2014. |
| February 2015 | Ms. Kelly's son was delivered by c-section at only 38-weeks of gestation. The infant was placed in neonatal care and was born with vascular malformation requiring immediate attention and years of appointments at Cincinnati Children's Hospital Hemangioma and Vascular Malformation Center. |
| March/April 2015 | Ms. Kelly is treated for severe, almost deadly, infection of her c-section incision. Ms Kelly suffered severe post-partum depression, recti-diastasis and umbilical hernia. |
| April 23, 2015 | Ms. Kelly returned to work after 8-weeks from the birth of her son as consistent with First Data's policies for births by c-section. The change in First Data work-from-home policy had been implemented during her absence. |

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018                                                                                    Page 9

| | |
|---|---|
| May 12, 2015 | Ms. Kelly contacts her manager, Steve Barger, to resign due to her health conditions arising from her pregnancies. Mr. Barger engages in an interactive with Ms. Kelly and based on those discussions, Mr. Barger and Ms. Kelly agreed that Ms. Kelly could continue to work remotely despite the implementation of the new policy. Mr. Barger granted Ms. Kelly a reasonable accommodation for her disabilities arising out of her two difficult pregnancies. See Barger's declaration attached as Exhibit Z. |
| April – July 2016 | Ms. Kelly is hospitalized for health issues, including non-alcoholic fatty liver disease, high blood pressure, stress disorder and anxiety from the continuation of pregnancy complications. Ms. Kelly continued to remotely fulfill her job functions and received excellent reviews from her manager. |
| November 19, 2016 | Mr. Barger begins FMLA leave to recover from cancer surgery. Ms. Robin Ording is appointed as interim leader of Mr. Barger's sales transformation and sales training team and becomes Ms. Kelly's manager |
| Nov/Dec 2016 | Ms. Kelly's work-from-home accommodation is revoked by Ms. Ording. Ms. Kelly suffered additional stress and anxiety related to the burdens of losing her reasonable accommodation, but she continued to perform her job functions without blemish and with outstanding reviews. Ms. Kelly also was diagnosed with thyroid medical issues during this period. |
| May 2017 | Thyroid issues continued. Ms. Kelly underwent MRI's, Xrays, thyroid lab tests. She sought treatment for continuing stress and anxiety disorders and continuing physical and mental effects of her pregnancies. Ms. Kelly complied with Ms. Ording's and First Data's revocation of her accomodation and implementation of a policy requiring to work from the office. Ms. Kelly's health conditions worsened. |
| Sept/Oct 2017 | Ms. Kelly, while in the office and suffering from anxiety and stress, suffered a cardiac episode (chest pain, dizziness, and low lung volume arising from stress, anxiety and continuing complications from pregnancy) while in First Data's Cincinnati office and is driven from the office to the emergency room on September 29, 2017. Follow-up appointments and monitoring of cardiac issues during October 2017. Ms. Ording was aware of Ms. Kelly's medical condition. Ms. Kelly continued to perform the functions of her job, even receiving outstanding reviews for her work. |

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Veronica Y. Bedinger
August 8, 2018                                                                Page 10

November 2017          Ms. Kelly requests that Ms. Ording grant a reasonable
                       accommodation for health reasons or she would resign. Ms. Ording
                       accepts the resignation and does not engage in an interactive
                       process to address Ms. Kelly's disabilities and health conditions in
                       a manner previously addressed by her prior managers.

Revocation of Accommodation

        During this entire period, October 2014 through November 2017, Ms. Kelly was disabled
for purposes of the ADA and Ohio law. Ms. Kelly continued to perform the essential functions of
her job with an accommodation exempting her from the no work-from-home policy that served
no purpose in her situation where none of the First Data employees she interacted with were not
in the Cincinnati office and she always communicated remotely, whether from home or in the
Cincinnati office. Ms. Ording, her supervisor, has testified that she manages employees across
the globe remotely without issue.

        Ms. Kelly's accommodation was not an undue burden on First Data. Ms. Kelly had been
performing her functions remotely for a decade with no performance issues.

        When Ms. Ording revoked Ms. Kelly's accommodation disability conditions worsened.

Failure to Engage in Interactive Process

        The clearest evidence of First Data's and Ms. Ording's animus against the disabled can
be seen in this very simple example.

        After Ms. Kelly's son was born in February 2015, and she returned to work, First Data
began enforcing its policy against working from home, even if work in the office was not an
essential function of the job. In response to this policy's impact on her health, Ms. Kelly wrote
to her then supervisor, Mr. Steve Barger, by e-mail on May 12, 2015 (Ex. X):

        Steve,

        After 17 years of successfully achieving projects, goals and requirements
        working from a home office, the time and costs that it would take to
        commute into the Blue Ash corporate office (Cincinnati, OH) are
        prohibitive to my success both professionally and personally. I have been
        fortunate to have 'grown-up' with First Data and have greatly appreciated
        the positive work life balance the company once promoted. While
        inevitable, receiving this news so shortly after returning from maternity
        leave has been quite disheartening.

        My position does not require daily interaction with others face to face and
        will not change once in the Cincinnati, OH location. Moving toward a

THE LAW OFFICE OF SHAWN SHEARER, P.C.

more virtual learning environment is a must for a company of this size and
will only continue to be a priority. This has been a leadership quality I
have excelled at bringing to the company working from a remote office.

In response to this e-mail, Mr. Barger, a veteran manager nearly 70 years old,
instinctively knew that the loss of Ms. Kelly's talent was a loss to First Data and to his team.
Mr. Barger responded to Ms. Kelly's notice of resignation by engaging her in an interactive
process to discuss her disabilities arising from her two difficult pregnancies. Because of these
conversations and interaction, Mr. Barger made the managerial decision to allow Ms. Kelly to
continue to work in the same manner in which she had been working for years as a reasonable
accommodation and Ms. Kelly did not resign and continued to provide her recognized skills and
performance to First Data. Mr. Barger did exactly what a manager should do when receiving an
e-mail such as that he received from Ms. Kelly in May 2015. He engaged in an interactive
process to discuss her concerns and made appropriate and reasonable accommodations to address
his employee's disabilities.

Ms. Ording's conduct just over two years later stands in stark contract to the actions of
Mr. Barger. When receiving a nearly identical e-mail, but with even more indication of disability
issues, Ms. Ording responded 180 degrees opposite of the manner in which Mr. Barger
responded.

In late 2016, Ms. Ording revoked Ms. Kelly's reasonable accommodation provided by
her prior two managers and was requiring office attendance (including electronically monitoring
of badge-ins). Then, on November 14, 2017, by e-mail, Ms. Kelly expressed the very same
issues to Ms. Ording that she had expressed to Mr. Barger. In fact, her request of Ms. Ording was
even more direct than that received by Mr. Barger two years earlier. Ms. Kelly directly indicated
to Ms. Ording that the stress and her health were at issue and the choice was resign for the sake
of avoiding the stress that she was under physician's care to treat and the impact on her health.
On November 14, 2017, Ms. Kelly informed Ms. Ording the following (Ex. Y)(compare to the
May 2015 e-mail to Mr. Barger Ex. X – the two are nearly identical, other than the inclusion of a
blatant appeal to health and stress issues included in the e-mail to Ms. Ording):

Robin,

After nearly 20 years of successfully achieving goals, projects and leading
stellar teams for First Data, the change in policies, such as the requirement
to work in an office location, have proven prohibitive to my success both
professionally and personality. I have been fortunate to have 'grown-up'
with First Data and have greatly appreciated the experiences and positive
work life balance the company once promoted.

During the past two years, I have done a highly successful job of
balancing the demands of First Data with the ever-changing deadlines,
priorities, teams and projects. With that said, I have also lost many
precious hours that could have been dedicated to what means the most, <u>my</u>

Veronica Y. Bedinger
August 8, 2018

> health and family. Lost time in the countless hours of commuting to a
> building where a handful of people report in to. After working
> successfully from home for nearly 10 years, the change First Data made
> has contributed to my numerous health issues with increased stress,
> financial constraints and extraordinary burdens on my family.

Unlike Mr. Barger, Ms. Ording, when faced with an obviously direct request for an accommodation, chose a completely different route than Mr. Barger. Rather than engage in an interactive process with Ms. Kelly as Mr. Barger did, Ms. Ording gladly accepted Ms. Kelly's resignations and laughed, literally laughed, at Ms. Kelly's request for severance. Ms. Ording has no tolerance for disabilities or health issues within her organization.

It seems inconceivable, but it is a fact, that Ms. Ording, a 30-year plus human resources professional, is numb and oblivious to the requirements of the ADA, PDA, Title VII, and OH Rev. Code 4112.01 *et seq* as it applies to disabilities arising out of pregnancy complications.

Ms. Ording has testified under oath that over her entire 30-year HR career, not a single employee of hers has requested a reasonable accommodation for a disability and, correspondingly, she has testified that she has never granted an employee's reasonable accommodation request. It is unfathomable that over 30-years managing employees at huge institutions like Citi, Chase, and First Data, Ms. Ording never had an employee request an accommodation. A perfect example of such a request is Ms. Kelly's November 14, 2017. Ms. Ording clearly does not know what a reasonable accomodation looks or sounds like, and Ms. Ording has no sensitive to an issue that should top of mind of any human resources professional. Ms. Ording is, frankly, incompetent, to be a manager in the field of human resources.

The obvious explanation of Ms. Ording's testimony that she has never received an accommodation request is that (i) Ms. Ording does not comprehend the concept of accommodating disabled employees in a manner that is reasonable and that is not an undue hardship on the employer, and (ii) the atmosphere at First Data is such that Ms. Ording's blind adherence to the enforcement of the no-work from home policy outweighs the legal requirement to accommodate disabled employees. Ms. Kelly had discussed her conditions, at a high level, with Ms. Ording. As a 30-year career professional, Ms. Ording should have heard these discussions as a cue to begin an interactive process to discuss accommodations. Ms. Ording was tone deaf to the signals. Then, when Ms. Ording received Ms. Kell's "resignation" e-mail, as a career HR professional, she should have seen the obvious request for an accommodation. Ms. Ording again was tone deaf and instead of seeking accommodations, laughed at Ms. Kelly and accepted the accommodation.

Mr. Barger was sensitive enough to realize that Ms. Kelly's attempted resignation in 2015 was a request for an accommodation (even though that request hardly mentioned health issues). Mr. Barger properly discussed the issue with Ms. Kelly and made an exception to the no work from home rule as an accommodation. From that time forward, Ms. Kelly received outstanding reviews of her work and commitment to First Data, including outstanding reviews

Veronica Y. Bedinger
August 8, 2018                                                                    Page 13

from Ms. Kelly and financial rewards from First Data's EVP of HR. Ms. Kelly's performance over a 10-year period under prior supervisors was unblemished.

Ms. Ording, on the other hand, upon taking Mr. Barger's supervisory position, revoked the accommodations Ms. Kelly's prior managers had granted. Ms. Ording, when faced with a request for an accommodation (nearly identical, but more direct on health and stress issues, to that received by Mr. Barger), did not engage in an interactive process and merely accepted the resignation, laughed at Ms. Kell's request for severance, and now has the gall to file a sworn statement in the Position Statement trying to justify her decision.

Ms. Ording's actions were a violation of the ADA, PDA, Title VII, and OH Rev. Code Sec. 4112.01 *et seq*. There is no excuse. When faced with a request for an accommodation like Ms. Kelly's on November 14, 2017, Ms. Ording intentionally chose to ignore the law (she is a 30-year HR professional trained and aware of the law and has decades of experience).

Ms. Ording was more interested in keeping her bosses happy through cost controls and terminations within her group than she was listening to an employee's request for an accommodation. Ms. Ording knew better and is trained in HR. Ms. Ording bragged about her cost cutting and created an atmosphere of fear for job loss to control her employees. Ms. Kelly attempted to subtly raise her disability issues in this hostile atmosphere. Ms. Kelly strongly requests that the OCRC continue its investigation into the conduct of First Data and Saul Ewing. Ms. Ording's self-serving claims serve only to demonstrate her lack of observation and lack of listening to the employees she manages.

Very truly yours,

Shawn E. Shearer

cc:     Julie Kelly

THE LAW OFFICE OF SHAWN SHEARER, P.C.

**EXHIBIT F**

| | |
|---|---|
| **From:** | Kelly, Julie K <JulieK.Kelly@firstdata.com> |
| **Sent:** | Tuesday, November 14, 2017 2:16 PM |
| **To:** | Ording, Robin |
| **Cc:** | jul_kelly@mac.com; Kelly, Julie K |
| **Subject:** | Julie Kelly |

Robin,

After nearly 20 years of successfully achieving goals, projects and leading stellar teams for First Data, the change in policies, such as the requirement to work in an office location, have proven prohibitive to my success both professionally and personality. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the experiences and positive work life balance the company once promoted.

During the past two years, I have done a highly successful job of balancing the demands of First Data with the ever changing deadlines, priorities, teams and projects. With that said, I have also lost many precious hours that could have been dedicated to what means the most, my health and family. Lost time in the countless hours of commuting to a building where a handful of people report in to. After working successfully from home for nearly 10 years, the change First Data made has contributed to my numerous health issues with increased stress, financial constraints and extraordinary burdens on my family.

Through a long, hard, thought out process, and for my health and family, First Data and I must part ways as of November 30th, 2017. With that said, after my years of driving results, pristine service, dedication and commitment, I will work to successfully transition all of my tasks as appropriate and am asking for the following to assist in my transition:

- 26 weeks' severance
- 2017 bonus payout (pro-rated)
- 2017 unused vacation time payout
- Payout of remaining awarded restricted stock grants
- Eligible for re-hire

I appreciate all that you and First Data have allowed me to achieve over the years and know we can part on mutually positive terms. I will miss being a part of this company but will leave with great appreciation for all I have learned, the opportunities, friendships and experience the company has afforded me.

Sincerely,

**Julie Kelly**
Director, Organizational Development
First Data, 11311 Cornell Park Drive, Cincinnati, OH 45242
513.806.4893

JulieK.Kelly@firstdata.com | firstdata.com

# First Data.

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is

strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

# EXHIBIT E

| From: | Kelly, Julie K |
|---|---|
| To: | Barger, Steve |
| Cc: | jul_kelly@me.com |
| Subject: | WFH Change to Cincinnati Office |
| Date: | Tuesday, May 12, 2015 5:26:05 PM |
| Attachments: | image001.png |
| Importance: | High |

Steve,

After 17 years of successfully achieving projects, goals and requirements working from a home office, the time and costs that it would take to commute into the Blue Ash corporate office (Cincinnati, OH) are prohibitive to my success both professionally and personally. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the positive work life balance the company once promoted. While inevitable, receiving this news so shortly after returning from maternity leave has been quite disheartening.

My position does not require daily interaction with others face to face and will not change once in the Cincinnati, OH location. Moving toward a more virtual learning environment is a must for a company of this size and will only continue to be a priority. This has been a leadership quality I have excelled at bringing to the company working from a remote office. However, I do understand the changes within the company. With that said, I am asking for the following to ease my departure and team's transition to a new leader:

- Ability to assist with hiring my replacement and training / transitioning position
- 34 weeks' severance
- Eligible for re-hire
- Paid for all unused vacation time for 2015
- Payout of awarded restricted stock grants for 2014 and 2015

Let's have a conversation tomorrow (5/13/15) to discuss.

I appreciate all that you and First Data have allowed me to achieve over the years and know we can part on mutually positive terms.


Sincerely,


**Julie Kelly**
Sales Transformation

O  513.806.4893



firstdata.com

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

## EXHIBIT D

 **OHIO CIVIL RIGHTS COMMISSION**

Governor John R. Kasich
Commissioners: Lori Barreras, Chair | Juan Cespedes | William Patmon, III | Dr. Carolyn Peters | Madhu Singh
Executive Director G. Michael Payton

February 21, 2019

Julie Kelly
823 Dorgene Lane
Cincinnati, OH 45244

Tony Marino
Executive VP Human Resources
First Data Corporation
5565 Glenridge Connector #2000
Atlanta, GA 30342

## LETTER OF DETERMINATION
### Julie Kelly v. First Data Corporation
### DAYB6(27240)05172018; AMENDED 22A-2018-02392C

**FINDINGS OF FACT:**

Charging Party filed a charge of discrimination with the Ohio Civil Rights Commission ("Commission") alleging Respondent engaged in unlawful discriminatory practices. All jurisdictional requirements for filing a charge have been met.

After receiving the charge, the Commission conducted an investigation into Charging Party's allegations against Respondent. During the investigation, the Commission considered relevant documents and testimony. The information gathered does not support a recommendation that Respondent unlawfully discriminated against Charging Party. Specifically, the Commission was unable to substantiate Charging Party's allegation of retaliation. The Commission does not have jurisdiction in a third-party subpoena issued for Charging Party to give testimony. It is undisputed that throughout Charging Party's employment she was granted FMLA and reasonable accommodation requests when she presented medical certification. Respondent revised its work from home policy in 2015 and all employees with non-client facing were required to be in the office. Charging Party did not provide Respondent with medical certification requesting a reasonable accommodation after the 2015 work from home policy took effect. Charging Party was involved in developing guidelines, that state in part, work from home requests can occur periodically to accommodate unusual circumstances (but are not to be on a regular and ongoing schedule); your commute, short or long, should not have a bearing on your workday commitments. Charging Party was granted the ability to work from home when she had an emergency situation. Charging Party submitted her letter of resignation on November 13, 2017, however the Commission was unable to substantiate Charging Party's working conditions were so intolerable that a reasonable person would have no other alternative but to resign.

**DECISION:**

The Ohio Civil Rights Commission determines it is **NOT PROBABLE** that Respondent has engaged in an unlawful discriminatory practice in violation of Ohio Revised Code Chapter 4112. Therefore, the Commission hereby orders that this matter be **DISMISSED**.

Julie Kelly v. First Data Corporation
DAYB6(27240)05172018; AMENDED, 22A-2018-02392C
Page 2

## NOTICE OF RIGHT TO REQUEST RECONSIDERATION:

Pursuant to Ohio Administrative Code § 4112-3-04, you have the right to request reconsideration of this determination of the Commission. The application must be in writing and state specifically the grounds upon which it is based. If you wish to appear before the Commissioners to present oral arguments supporting your request, you must specifically make a request to appear in writing.

This request must be sent to the Compliance Department, Ohio Civil Rights Commission, 30 East Broad Street, 5th Floor, Columbus, Ohio 43215. You must submit the request for reconsideration, along with all additional evidence or supporting documentation, within **TEN (10) days** of the date of mailing of this notice. Any application for reconsideration or additional materials received by the Compliance Department in the Commission's Columbus Central Office after the ten-day period has expired will be deemed untimely filed. Extensions of this ten-day filing period are not permitted.

## FOR DUAL FILED CHARGES ONLY:

If your charge was filed with both the Commission and the U. S. Equal Employment Opportunity Commission (EEOC), you have the right to request that the EEOC conduct a review of the Commission finding. The request for such a review must be sent directly to the EEOC State and Local Coordinator at 101 W. Ohio St., Suite 1900, Indianapolis, IN 46204. To secure such a review, you must request it in writing within **FIFTEEN (15) days** of Commission's finding, unless you request a reconsideration by Commission. In that event, our final finding, and the time for you to request review by EEOC, will be determined by Commission's action on your reconsideration request.

## NOTICE OF RIGHT TO PETITION FOR JUDICIAL REVIEW:

A determination of the Commission that constitutes a Final Order is subject to judicial review, wherein the court reviews the contents of this letter and determines if there are sufficient factual findings supporting why the Commission did not issue a complaint. A petition for judicial review must be filed in the proper common pleas court within **THIRTY (30) days** of the date the Commission mailed this Final Order. The right to obtain judicial review and the mode and procedure thereof is set forth in Ohio Revised Code § 4112.06.

The judicial review process is not a means to reexamine the investigation or further pursue your allegations through the Commission. You may consult with an attorney for information on available options.

A Probable Cause finding is not a Final Order and is not subject to judicial review by a court. All other determinations of the Commission constitute a Final Order and are subject to judicial review by a court.

FOR THE COMMISSION,

Kathy Haley Ross
Acting Regional Director
937-285-6500