

# Transcript of Julie Kelly

**Date:** October 15, 2018
**Case:** Barger -v- First Data Corporation, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Julie Kelly

1 (1 to 4)

Conducted on October 15, 2018

---

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF NEW YORK
 3                    * * *
 4   STEVEN B. BARGER, an
 5   individual,
 6          Plaintiff,
 7          vs.              CASE NO. 1:17-CV-4869
 8   FIRST DATA CORPORATION, a
 9   Delaware corporation; and
10   FRANK BISIGNANO, DAN
11   CHARRON, ANTHONY MARINO,
12   KAREN WHALEN, and RHONDA
13   JOHNSON, each an individual,
14          Defendants.
15                    * * *
16          Deposition of JULIE KELLY, Witness
17   herein, called by the Defendants for
18   cross-examination pursuant to the Rules of Civil
19   Procedure, taken before me, Lisa M. Conley
20   Yungblut, a Notary Public within and for the State
21   of Ohio, at the Potter Stewart Courthouse, 100
22   East Fifth Street, Room 203, Cincinnati, Ohio, on
23   Monday, the 15th of October, 2018, at 12:07 p.m.
24                    * * *
25
```

---

**Page 2**

```
 1      EXAMINATION CONDUCTED          PAGE
 2   BY MS. COOPER:                     8
 3
 4          EXHIBITS MARKED            PAGE
 5   (Thereupon, Kelly Exhibit 5, a 1-page
 6   letter dated 5/16/18 to Julie Kelly
 7   from Gary Eidelman, with attachment,
 8   was marked for purposes of
 9   identification.). . . . . . . . . . .    26
10   (Thereupon, Kelly Exhibit 9, a 1-page
11   letter dated 5/24/18 to Gary Eidelman
12   from Julie Kelly, was marked for
13   purposes of identification.). . . . . .   32
14   (Thereupon, Kelly Exhibit 10, a 1-page
15   letter dated 5/25/18 to Julie Kelly
16   from Gary Eidelman, was marked for
17   purposes of identification.). . . . . .   39
18   (Thereupon, Kelly Exhibit 11, a 1-page
19   letter dated 5/29/18 to Gary Eidelman
20   from Julie Kelly, was marked for
21   purposes of identification.). . . . . .   43
22   (Thereupon, Kelly Exhibit 12, a 1-page,
23   handwritten letter dated 6/25/18 to
24   Gary from Julie Kelly, was marked for
25   purposes of identification.). . . . . .   58
```

---

**Page 3**

```
 1   (Thereupon, Kelly Exhibit 13, a 1-page
 2   letter dated 6/27/18 to Gary Eidelman
 3   from Julie Kelly, was marked for
 4   purposes of identification.). . . . . .   61
 5   (Thereupon, Kelly Exhibit 14, a
 6   multi-page Motion for Sanctions, was
 7   marked for purposes of identification.)   71
 8   (Thereupon, Kelly Exhibit 15, a 2-page
 9   Defendants' Initial Disclosures, was
10   marked for purposes of identification.)   71
11   (Thereupon, Kelly Exhibit 16, 2 2-sided
12   pages of e-mails, the top dated 7/13/18
13   to Gillian Cooper from Julie Kelly, was
14   marked for purposes of identification.)   89
15   (Thereupon, Kelly Exhibit 17, 2 2-sided
16   pages of e-mails, the top dated 7/20/18
17   to Timothy Callahan from Julie Kelly,
18   was marked for purposes of
19   identification.). . . . . . . . . . . .  100
20   (Thereupon, Kelly Exhibit 18, a 1-page
21   e-mail dated 7/24/18 to Barry Levin
22   from Julie Kelly, was marked for
23   purposes of identification.). . . . . .  107
24
25
```

---

**Page 4**

```
 1   (Thereupon, Kelly Exhibit 19, a 1-page
 2   e-mail dated 7/31/18 to Julie Kelly
 3   from Gillian Cooper, was marked for
 4   purposes of identification.). . . . . .  116
 5   (Thereupon, Kelly Exhibit 20, 1 page of
 6   e-mails, the top dated 8/2/18 to
 7   Gillian Cooper from Julie Kelly, was
 8   marked for purposes of identification.)  118
 9   (Thereupon, Kelly Exhibit 6, a 1-page
10   letter dated 8/14/18 to Julie Kelly
11   from Gillian Cooper, with attachment,
12   was marked for purposes of
13   identification.). . . . . . . . . . . .  124
14   (Thereupon, Kelly Exhibit 21, a 4-page,
15   2-sided Request for Order Granting
16   Motion for Sanctions, was marked for
17   purposes of identification.). . . . . .  126
18   (Thereupon, Kelly Exhibit 7, a 2-page,
19   2-sided Order, was marked for purposes
20   of identification.). . . . . . . . . .  149
21   (Thereupon, Kelly Exhibit 22, a 2-page,
22   2-sided e-mail dated 10/2/18 to Gary
23   Eidelman from Julie Kelly, was marked
24   for purposes of identification.). . . .  159
25
```

---

Transcript of Julie Kelly
Conducted on October 15, 2018

---

**Page 5**

1 (Thereupon, Kelly Exhibit 8, a 2-page,

2 2-sided Notice of Electronic Filing

3 dated 10/9/18, was marked for purposes

4 of identification.). . . . . . . . . .    162

5 (Thereupon, Kelly Exhibit 23, a 1-page

6 document titled Confidential, from

7 Julie Kelly, Bates SBB-00780, was

8 marked for purposes of identification.)    169

9 (Thereupon, Kelly Exhibit 24, multiple

10 documents, the top being a 4-page

11 e-mail dated 10/2/18 to Gary Eidelman

12 from Julie Kelly, was marked for

13 purposes of identification.). . . . . .    187

14 (Thereupon, Kelly Exhibit 25, a

15 multi-page document reflecting from FDC

16 Litigation to Julie Kelly, was marked

17 for purposes of identification.). . . .    189

18 (Thereupon, Kelly Exhibit 26, a 1-page

19 document reflecting Additional

20 harassment/threats, was marked for

21 purposes of identification.). . . . . .    192

22 (Thereupon, Kelly Exhibit 27, a 3-page,

23 handwritten document dated 11/10/16,

24 was marked for purposes of

25 identification.). . . . . . . . . . . .    194

---

**Page 6**

1 (Thereupon, Kelly Exhibit 28, 1 page of

2 e-mails, the top dated 1/13/17 to Julie

3 Kelly from Robin Ording, was marked for

4 purposes of identification.). . . . . .    196

5 (Thereupon, Kelly Exhibit 29, a 1-page

6 Invoice dated 10/15/18, was marked for

7 purposes of identification.). . . . . .    199

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 7**

1 APPEARANCES:

2      On behalf of the Plaintiff:

3           The Law Office of Shawn Shearer

4      By:  Shawn Shearer

5           Attorney at Law

           3839 McKinney Avenue

6           Suite 155-254

           Dallas, Texas 75204

7           972-803-4499

           shawn@shearerlaw.pro

8

9      On behalf of the Defendants:

10          Saul Ewing Arnstein & Lehr, LLP

11     By:  Gillian A. Cooper

          Attorney at Law

12          650 College Road East

          Suite 4000

13          Princeton, New Jersey 08540-6603

          609-452-5021

14          gillian.cooper@saul.com

15          and

16          Jackson Lewis

17

18     By:  Matthew R. Byrne

          Attorney at Law

19          2600 PNC Center

          201 East 5th Street

20          Cincinnati, Ohio 45202

          513-898-0050

21          Matthew.Byrne@jacksonlewis.com

22

23     ALSO PRESENT:

          Robin Ording

24          Jill Poole (by phone)

          Lori Graesser (by phone)

25               * * *

---

**Page 8**

1          JULIE KELLY

2 of lawful age, Witness herein, having been first

3 duly sworn as hereinafter certified, was examined

4 and deposed as follows:

5          CROSS-EXAMINATION

6 BY MS. COOPER:

7      Q.  Good afternoon, Ms. Kelly.  My name

8 is Gillian Cooper.  I'm an attorney at Saul Ewing

9 Arnstein & Lehr.  We represent First Data

10 Corporation in this matter.  We also represent the

11 individual defendants who are:  Frank Bisignano,

12 Dan Charron, Anthony Marino, Karen Whalen, and

13 Rhonda Johnson.  We are here today for your

14 deposition, so I just want to go over a couple of

15 procedural things and some ground rules.  So in

16 the room with us today, we have Robin Ording, who

17 is the corporate representative for First Data, so

18 she's here in that capacity.  We also have with us

19 Matthew Byrne from Jackson Lewis; he is local

20 counsel here in Ohio.  On the phone, we have Lori

21 Graesser and Jill Poole, who are in-house counsel

22 at First Data.

23          And Mr. Shearer is the plaintiff's,

24 Steve Barger's, attorney.  Is it correct that he

25 does not represent you in connection with this

---

Transcript of Julie Kelly
Conducted on October 15, 2018

---

9

1 deposition?
2     **A. That's correct.**
3     Q. Okay.
4     MR. SHEARER: But I want to make
5 clear for the record -- this is Shawn Shearer of
6 the law office of Shawn Shearer, counsel for the
7 plaintiff, Steve Barger -- that I am also counsel
8 for Ms. Kelly in connection with her complaint and
9 charge of discrimination that has been filed with
10 the Ohio Civil Rights Commission currently being
11 investigated, right to sue letter has not yet been
12 issued, and so that representation needs to be
13 recognized.
14     MS. COOPER: Okay. So it's noted for
15 the record.
16 BY MS. COOPER:
17     Q. So also here in the room is
18 Ms. Yungblut. Am I saying that correctly? Okay.
19 She is the court reporter. It is her job to take
20 down everything that we say today. So for her
21 purposes and for her sanity, what we try to do is
22 not talk over one another, because she can't write
23 down what we're saying if we're both talking at
24 the same time. So I will do my very best to allow
25 you to finish what you're saying, and I ask that

10

1 you do the same and allow me to finish my question
2 before you begin to answer.
3     I also ask -- she can't write down or
4 can't record nonverbal cues. So if you were to
5 shake your head yes or no, she can't record that
6 down, so I just ask that all of your answers be
7 verbal --
8     **A. Understood.**
9     Q. -- so that the record is clear.
10 Okay. So we're going to start with some
11 introduction. I'm going to ask that you state
12 your name and your home address for the record.
13     **A. Julie Kelly. 823 Dorgene Lane,**
14 **Cincinnati, Ohio 45244.**
15     Q. Okay. You understand that you are
16 under oath today?
17     **A. Yes.**
18     Q. Do you understand that that means
19 that you are sworn to tell the truth?
20     **A. Yes.**
21     Q. You understand that even though we
22 are in an informal setting, your testimony has the
23 same force and effect as if we were in front of a
24 judge and a jury?
25     **A. Yes.**

---

11

1     Q. Do you understand that your testimony
2 is under oath and subject to the penalty of
3 perjury?
4     **A. Yes.**
5     Q. If you don't understand one of my
6 questions, just let me know, and I can rephrase
7 it. If you need a break, let me know, and we will
8 take it. There is a court order that sets forth
9 what breaks will take place today. The order,
10 which I will go through a little bit more
11 specifically in a few moments, provides for two
12 5-minute breaks and then a 15-minute break.
13     **A. Okay.**
14     Q. The one thing I would like to note,
15 is that if I've asked a question, that you answer
16 the question before we take the break so that
17 there's no pending question before a break.
18     **A. Got it.**
19     Q. Are you currently taking any
20 medication that would affect your ability to
21 understand and answer my questions today?
22     **A. I am taking medication, but I don't**
23 **believe it would impact.**
24     Q. Okay. That's fine. Is there any
25 reason that you would not be able to give full,

12

1 complete, and truthful answers to my questions
2 today?
3     **A. Not that I know of.**
4     Q. What did you do to prepare for
5 today's deposition?
6     **A. Well, I read what I could on PACER.**
7 **I do have a regular public PACER account.**
8     Q. Okay.
9     **A. However, I do not pay for any**
10 **documents. So that's really my knowledge. I**
11 **would like you to give me a summary of the charge**
12 **or the case of Steve's.**
13     Q. So we will -- I will ask you very
14 specific questions. Because this is your
15 deposition, you are not permitted to ask
16 questions. If you have a question about a
17 question that I have asked or need some context,
18 you can ask me that.
19     But I want to talk -- you said you
20 checked PACER. What exactly did you look at?
21     **A. Just the docket listings.**
22     Q. The docket listings for what?
23     **A. For the Barger case.**
24     Q. For the case that's pending in New
25 York?

---

Transcript of Julie Kelly
Conducted on October 15, 2018

13

1    A.  Yes.
2    Q.  Okay.  So you say you have a public
3  access account?
4    A.  Um-hmm.
5    Q.  Were you able to see any of the
6  filings in the New York case?
7    A.  I think the public ones I could pay
8  for, but I don't have the means to pay for.
9    Q.  Okay.  So you didn't actually click
10  the link and pull up or download any of the
11  documents?
12    A.  No.  I think it charges $5.50 or -- I
13  don't know.
14    Q.  Okay.  Did you do anything else to
15  prepare for today's deposition?
16    A.  I did look for documents as the
17  subpoena --
18    Q.  Okay, okay.  We'll talk about the
19  documents in a couple of minutes.  Did you meet
20  with any attorney to talk about --
21    A.  I can't afford to have another
22  attorney, quite honestly, so no.
23    Q.  Okay.  Did you talk to Mr. Shearer
24  about today's deposition?
25    A.  I talked to Mr. Shearer about my

14

1  individual case.
2    Q.  Okay.  I'm not asking about your
3  charge.
4    A.  Right.  So no.
5    Q.  Okay.  So you did not talk to him
6  about today's deposition?
7    A.  No.
8    Q.  Did you arrive with Mr. Shearer
9  today?
10    A.  He did bring me because I am taking
11  medication.
12    Q.  Okay.  So were you not able to drive?
13    A.  You know, I may be able to drive, but
14  I'm taking precautions right now.
15    Q.  Okay.  Because you're concerned about
16  your ability to drive, does that have any effect
17  on your ability to answer questions?
18    A.  I don't think so.
19    Q.  Okay.  So you arranged with
20  Mr. Shearer that he would drive you to today's
21  deposition?
22    A.  Um-hmm.
23    Q.  So did you speak to him about
24  setting -- or about arranging that?
25    A.  Yes.

15

1    Q.  Okay.  Did you discuss the deposition
2  at all during --
3    A.  No.
4    Q.  -- those conversations?
5    Okay.  What did you discuss?
6    A.  Just that, you know, I might need a
7  ride and we're both going to the same place.
8    Q.  Okay.  When did that conversation
9  take place?
10    A.  This morning, quite honestly.
11    Q.  So you did not know how you were
12  getting to today's deposition until this morning?
13    A.  No.  You know, at first I was going
14  to have my oldest daughter bring me, quite
15  honestly.
16    Q.  Okay.  Then, how did that change?
17    A.  She was out with her friends last
18  night and didn't get home until earlier this
19  morning.
20    Q.  Okay.
21    A.  Does that -- sorry.
22    Q.  This morning when you realized that
23  your daughter would not drive you today, did you
24  reach out to Mr. Shearer?
25    A.  I did.

16

1    Q.  Okay.  Was it via text or via phone?
2    A.  I just called him on the phone, quite
3  honestly.  We're both going to the same place, so
4  that's it.
5    Q.  Prior to today's conversation, did
6  you have any conversations with Mr. Shearer about
7  today's deposition?
8    A.  No.
9    MR. SHEARER:  I'm objecting to the
10  extent that this requires any privileged
11  conversation.
12    MS. COOPER:  Noted.  We're talking
13  about today's deposition.  We're not talking
14  about --
15    MR. SHEARER:  This is where we're
16  going to have an issue today because today's
17  deposition and the proceedings that got us here
18  are exactly going to be a part of the claim that's
19  pending before the OCRC, and it's also the claim
20  that is part of the amended complaint, which is
21  the behavior of Saul Ewing and First Data from the
22  time the first subpoena was noticed until today is
23  part of the claim.  So any conversation regarding
24  how that impacts her claim is privileged and she
25  can't answer it.

Transcript of Julie Kelly
Conducted on October 15, 2018

---

17

1    MS. COOPER: But you don't represent
2 her in connection with this deposition.
3    MR. SHEARER: No, no. Let's look --
4 if you want to do this now, it says any person,
5 any person can raise a claim of privilege in this
6 deposition. It doesn't have to be a party, it
7 doesn't have to be counsel for the witness, any
8 person can.
9    MS. COOPER: What is the privilege?
10    MR. SHEARER: The privilege is any
11 conversations that I have had with her about this
12 deposition or about what has led up to this
13 deposition and how it impacts her case and her
14 claims with the OCRC is privileged.
15    MS. COOPER: You do not represent
16 Ms. Kelly in connection with this deposition.
17    MR. SHEARER: It doesn't matter.
18 Read --
19    MS. COOPER: It does matter.
20    MR. SHEARER: Rule 30(c)(1) says any
21 person in a deposition, any person, it doesn't say
22 a party, it doesn't say a counsel.
23    MS. COOPER: Right, but there has to
24 be an attorney-client relationship.
25    MR. SHEARER: There is an

---

18

1 attorney-client relationship.
2    MS. COOPER: Not in connection with
3 this deposition.
4    MR. SHEARER: Well, then, ask her
5 about the deposition, but there's an
6 attorney-client -- the privilege doesn't have to
7 apply to this deposition. The privilege applies
8 to her claim.
9    MS. COOPER: I'm not asking about her
10 claim.
11    MR. SHEARER: Well, to the extent
12 that you ask her about conversations about this
13 deposition, they impact her claim.
14    MS. COOPER: So now you do represent
15 her in connection with this deposition?
16    MR. SHEARER: I represent her in
17 connection with her claim against First Data.
18    MS. COOPER: We're not going to talk
19 about that.
20    MR. SHEARER: Well, we are talking
21 about that. This deposition is her claim.
22    MS. COOPER: Mr. Shearer, your
23 objection is noted for the record. We will
24 proceed.
25 BY MS. COOPER:

---

19

1    Q. Besides Mr. Shearer, did you talk to
2 anyone else about this deposition?
3    **A. My husband.**
4    Q. Okay. What were those conversations?
5    **A. Oh, just prepping me. He's done them**
6 **before, I've never done them.**
7    Q. How was he prepping you?
8    **A. Just general conversation.**
9    Q. What sort of questions?
10    **A. You look people in the eye, you**
11 **answer the questions directly, those types of**
12 **things.**
13    Q. Okay. What have you told your
14 husband about this deposition and about
15 Mr. Barger's case?
16    **A. Well, you know, I don't know much**
17 **about the case other than what I've read on PACER,**
18 **like I previously said to you, so he's going to**
19 **know even less than that. You know, all we really**
20 **know is there's -- what is it listed as -- an FMLA**
21 **case in the federal court.**
22    Q. Did you have any other conversations
23 with -- besides your husband, with anyone else
24 about today's deposition?
25    **A. No, ma'am.**

---

20

1    Q. Okay. Did you have any conversations
2 with anyone from Mr. Shearer's office about
3 today's deposition or Mr. Barger's claim?
4    **A. No, ma'am.**
5    Q. Okay. What documents did you review
6 for today's deposition?
7    **A. Well, I just read online on PACER the**
8 **dockets, so they weren't documents. It was**
9 **just --**
10    Q. Okay. Did you review any e-mails,
11 any e-mails that you might have had with
12 Mr. Barger or Mr. Shearer about today's deposition
13 or any e-mails you might have had with anyone from
14 my firm?
15    **A. I have some e-mails from you I looked**
16 **at.**
17    Q. Okay.
18    **A. And I think maybe one from**
19 **Mr. Eidelman.**
20    Q. Okay. All right. Have you ever
21 given a deposition before?
22    **A. No.**
23    Q. Have you ever testified in court
24 before?
25    **A. No.**

Transcript of Julie Kelly

Conducted on October 15, 2018

6 (21 to 24)

21

1    Q. Have you ever been a party to a
2 lawsuit before?
3    **A. No.**
4    Q. Have you ever been a party to a
5 criminal proceeding?
6    **A. No.**
7    Q. Okay. We're just going to go through
8 some background questions, let me get to know you
9 a little bit more. Did you graduate from high
10 school?
11    **A. Yes.**
12    Q. When did you graduate?
13    **A. 1996.**
14    Q. Okay. Did you go to college?
15    **A. I did.**
16    Q. Where did you go?
17    **A. I went to Catawba College in North**
18 **Carolina, and then I also did work at FIU, Florida**
19 **International University. And then I also did**
20 **lots of work through Harvard Business School. I**
21 **did courses through there and various other**
22 **professional development and technical courses.**
23    Q. Okay. So when you say worked, you
24 mean you were employed by those institutions or
25 you did school work, coursework?

22

1    **A. I did coursework, and most of those**
2 **were paid for and sponsored by First Data.**
3    Q. Okay. Do you have a bachelor's
4 degree?
5    **A. No.**
6    Q. Okay. Do you have an associate's
7 degree?
8    **A. No.**
9    Q. Are you currently employed?
10    **A. No.**
11    Q. Who was your last employer?
12    **A. First Data.**
13    Q. Okay. And when did that employment
14 end?
15    **A. That ended November 30th, 2017.**
16    Q. Okay. When did you start working for
17 First Data?
18    **A. I started working for First Data**
19 **officially as a full-time employee, I believe it**
20 **was April 15th, 1998.**
21    Q. Okay, okay. So you were employed by
22 First Data for almost 20 years?
23    **A. Yes.**
24    Q. Okay. All right. So I do want to
25 make very clear that the questions -- a lot of the

23

1 questions I'm going to be asking you about are
2 about things that have been filed in this
3 miscellaneous action, and we're going to go
4 through some of the documents you drafted and
5 filed and then some of the responses. And then
6 we're going to talk about your relationship with
7 Mr. Barger when he was head of the sales
8 transformation group and we'll talk a little bit
9 about that. I want to make it very clear that we
10 are not talking about anything that relates to
11 your charge that's currently pending with the Ohio
12 Commission of Human Rights.
13    What is your e-mail address?
14    **A. J U L underscore Kelly at mac dot**
15 **com. And I also have one at J U L underscore Glad**
16 **at mac dot com.**
17    Q. Why the two e-mail addresses?
18    **A. The original Glad is 20-plus years**
19 **old, and I've just never changed it. So the other**
20 **one is an alias, it just goes with the same**
21 **account.**
22    Q. So if someone were to e-mail the
23 J U L underscore Glad e-mail account, does that
24 get forwarded to --
25    **A. It's the same account.**

24

1    Q. They have two unique e-mail
2 addresses, though, so they're two separate
3 accounts?
4    **A. No.**
5    Q. How does that work, how are they the
6 same; if they have two separate unique e-mail
7 addresses, how is it the same account?
8    **A. I don't know how it works, quite**
9 **honestly, but it's similar for First Data, they**
10 **have all of these aliases. So I had e-mail**
11 **addresses of Julie K at First Data, I also had**
12 **Julie dot Kelly at First Data, also Julie dot**
13 **Glad, at all of these different -- but they go to**
14 **the same account.**
15    Q. They might go to the same in-box, but
16 they're two separate e-mail addresses?
17    **A. Yeah.**
18    Q. Okay. Does anybody else have access
19 to either of those e-mails?
20    **A. (Shaking head.)**
21    Q. Have you provided the password?
22    **A. No.**
23    Q. Okay. Does anybody else check either
24 of those e-mail account inboxes?
25    **A. Not that I'm aware of.**

Transcript of Julie Kelly
Conducted on October 15, 2018

7 (25 to 28)

---

25

1    Q.  Does anybody else have the capability
2  to send an e-mail from either of those e-mail
3  accounts?
4    **A.  Not that I'm aware of.**
5    Q.  Okay.  When did you create the J U L
6  underscore Kelly at mac dot com?
7    **A.  Maybe 15 years ago.**
8    Q.  And you still use both?
9    **A.  I primarily use Kelly.**
10    Q.  Okay.  I've noticed that on the
11  e-mails that you send, you will copy the other
12  e-mail; if it comes from J U L underscore Kelly,
13  you'll copy the J U L underscore Glad e-mail
14  account?
15    **A.  Um-hmm.**
16    Q.  Is there a reason that you do that?
17    **A.  I just copy myself, and so in my**
18  **address book, it says Julie.**
19    Q.  Okay.
20    **A.  So whether it's Glad or -- I have no**
21  **idea.**
22    Q.  Okay.  All right.
23    **A.  It's just common practice --**
24    Q.  Okay.
25    **A.  -- for me to copy myself.**

---

27

1  is the original that will go into the record.  So
2  I just ask that you don't write on any of these.
3    **A.  Okay, okay.**
4    MS. COOPER:  And I have copies for
5  all of you.
6  BY MS. COOPER:
7    Q.  Have you seen this document before?
8    **A.  Oh, yes.**
9    Q.  Okay.  When did you see it?
10    **A.  I first received and saw this**
11  **document on May 23rd, 2018.**
12    MS. COOPER:  Okay.  And so let me
13  just state for the record that this is the letter
14  dated May 16th, 2018 from Gary Eidelman to
15  Ms. Kelly enclosing the subpoena, that together is
16  Kelly Exhibit 5.
17    MR. SHEARER:  For the record, can you
18  indicate the date of this again?
19    MS. COOPER:  The subpoena is dated
20  May 16, 2018, and it commands appearance on June
21  25th, 2018.  Did I say May 16, 2018?  I don't know
22  if I said '16 or '18.
23  BY MS. COOPER:
24    Q.  Okay.  So you said you received this
25  document on May 23rd.  How did you receive it?

---

26

1    Q.  Okay.  So the first thing I want to
2  give you to is -- so under the Federal Rules,
3  you're entitled to a witness fee for appearing
4  here today for your deposition, so I'm going to
5  give you the check.  Under the court order, we're
6  also reimbursing you for your child care costs.
7  So I just ask that when you receive that, I don't
8  know if it's a bill or an invoice or --
9    **A.  I do have an invoice, but we'll see**
10  **if it goes the full amount.**
11    Q.  Okay.  So let me give you this, this
12  is the witness fee, so I just -- it's for $62.80
13  based on the federal requirements.  I just want to
14  give you that.
15    **A.  Okay.**
16    Q.  And then we're going to go ahead
17  and -- these documents I've already pre-marked.
18    (Thereupon, Kelly Exhibit 5, a 1-page
19  letter dated 5/16/18 to Julie Kelly from Gary
20  Eidelman, with attachment, was marked for purposes
21  of identification.)
22  BY MS. COOPER:
23    Q.  So I'm going to show you what has
24  been marked as Kelly 5.  The one thing I ask that
25  you don't write anywhere on this document.  This

---

28

1    **A.  There was -- I was out back with my**
2  **children in the pool, and my husband kind of came**
3  **and got me and said there's a delivery, a FedEx**
4  **deliveryman at the door, and he needs you to come**
5  **sign for a package.  So it took me a little while**
6  **to get to the door because I had children outside.**
7  **You can't leave young children in a pool.  And so**
8  **I walked over, and there was a guy dressed in**
9  **khakis and a purple shirt and had a FedEx box in**
10  **his hand, one of those small packages, letter**
11  **package.  And he took a white envelope and handed**
12  **it to me and said:  Ms. Kelly, you've been served,**
13  **and then walked away.**
14    **So at that point, I was a little**
15  **taken aback.  What's going on?  You know, I**
16  **thought this was a FedEx person, but, clearly, it**
17  **wasn't.  A little upset.  My children are, you**
18  **know, obviously wanting to get back in the pool.**
19  **I opened the package and I see a subpoena for a**
20  **Steven Barger versus First Data case and I'm being**
21  **commanded by the court to show up for a**
22  **deposition.**
23    Q.  Okay.  Did you have any conversations
24  with the process server?
25    **A.  I didn't, not that I recall.**

Transcript of Julie Kelly
Conducted on October 15, 2018

---

29

1     Q. Okay. Did he say anything to you?
2     **A. I think he asked me if I was**
3 **Mrs. Kelly, Mrs. Julie Kelly, my name.**
4     Q. Okay. You said he was wearing khakis
5 and a purple shirt; is that correct?
6     **A. I believe so.**
7     Q. Okay. What kind of car was he
8 driving?
9     **A. From my front door, you cannot see my**
10 **driveway, so I see no vehicles.**
11     Q. Okay. Was he wearing any clothing
12 that identified FedEx?
13     **A. I think what tipped me off was,**
14 **obviously, the khakis and the FedEx package.**
15     Q. Okay. So he was holding a FedEx
16 package. Did he say that he worked for FedEx?
17     **A. No.**
18     Q. Okay. Did he --
19     **A. But he was impersonating, I'm sorry,**
20 **clearly to me and my family and my children, a**
21 **FedEx employee.**
22     Q. Why do you say he was impersonating a
23 FedEx employee?
24     **A. Just the way he acted with the**
25 **clothing, the way he was at the door saying he had**

---

30

1 **a package for me and that I needed to sign for,**
2 **and the FedEx box. I mean, to an average person,**
3 **I think that would make you think it's something**
4 **from FedEx.**
5     Q. But he did not say that he was FedEx?
6     **A. No. He impersonated a FedEx person,**
7 **clearly.**
8     Q. Okay. Did you have any idea that you
9 would be served with a subpoena?
10     **A. I didn't. This was quite shocking.**
11     Q. Okay. So I'm not going to introduce
12 it as an exhibit, but I'm going to read from a
13 letter or an e-mail dated May 10, 2018 from
14 Mr. Shearer to Mr. Eidelman of my office. The
15 Subject is: Deposition of Julie Kelly.
16     MR. SHEARER: Why aren't we entering
17 this as an exhibit?
18     MS. COOPER: Because I don't want to.
19 I'm just going to reference one part and I'm going
20 to ask you a question about it.
21 BY MS. COOPER:
22     Q. So in this e-mail, Mr. Shearer
23 writes: Ms. Kelly has not given me authorization
24 to accept service of process on her behalf in any
25 matter. So did you have a conversation with

---

31

1 Mr. Shearer about this deposition subpoena?
2     **A. No. Mr. Shearer and I spoke about my**
3 **own claim.**
4     Q. Okay. So did you tell him that he
5 did not have authorization to accept service?
6     **A. I don't even know what that means.**
7 **Sorry.**
8     Q. Okay. So you did not --
9     **A. Why would someone accept service;**
10 **what does that mean?**
11     Q. So you did not have a conversation
12 about authorization of accepting service?
13     **A. No. I have no idea what that means.**
14     Q. Okay. Did you say anything to the
15 process server that you were expecting the
16 subpoena?
17     **A. Not that I can recall.**
18     Q. Okay. Do you remember what time the
19 process server showed up to your house?
20     **A. You know, it was evening, after**
21 **dinner. It's kind of a blur, but I would say**
22 **between 6:30 and 7:30.**
23     MS. COOPER: Okay. We pre-marked
24 these, so I will leave these pre-marked, but this
25 will be then Kelly 9.

---

32

1     (Thereupon, Kelly Exhibit 9, a 1-page
2 letter dated 5/24/18 to Gary Eidelman from Julie
3 Kelly, was marked for purposes of identification.)
4     MR. SHEARER: What do you want her to
5 do with 5?
6     MS. COOPER: I will take that back.
7 Thank you.
8 BY MS. COOPER:
9     Q. Okay. So when you received the
10 subpoena, you said it was May 23rd. What did you
11 do after you saw the subpoena?
12     **A. Let's see, it is a blur. I was**
13 **really upset because, quite honestly, I didn't**
14 **know why I was being, you know, summoned or**
15 **commanded to speak to you guys. I think at first**
16 **I talked to a few attorneys, friends that I just**
17 **have, relatives actually, to see if FedEx was**
18 **allowed to distribute subpoenas or serve**
19 **subpoenas, whatever you want to call it, and they**
20 **said no.**
21     Q. Okay. Who were these people that you
22 spoke to?
23     **A. They're just family.**
24     Q. What were their names?
25     **A. Just my family.**

---

Transcript of Julie Kelly
Conducted on October 15, 2018

9 (33 to 36)

---

**33**

1    Q.  Okay.  But what -- how many people
2 did you talk to?
3    A.  Just two.
4    Q.  What were those two people's names?
5    A.  My cousin Brian and my cousin Tommy.
6    Q.  Okay.  Did you talk to anybody else
7 about --
8    A.  My husband was there, so --
9    Q.  Okay.  Did you talk to Mr. Shearer
10 about the subpoena?
11    A.  I don't -- no, I don't believe so.
12    Q.  Okay.  So you received the subpoena,
13 you spoke to a couple of people, family members,
14 about the subpoena?
15    A.  Well, really, it was just can
16 FedEx -- that was my big question, can FedEx serve
17 subpoenas.
18    Q.  Okay.  Did you talk to anyone at
19 FedEx?
20    A.  I did.  I called to see if I could
21 get some type of tracking number.
22    Q.  Okay.  When was that conversation
23 with FedEx?
24    A.  It was that evening.
25    Q.  Okay.  So on the 23rd?

**34**

1    A.  Um-hmm.
2    Q.  What did FedEx tell you?
3    A.  They told me that they do not issue
4 subpoenas.
5    Q.  Okay.  And so after --
6    A.  And they were going to look in to see
7 if someone -- they were going to investigate to
8 see if someone -- a FedEx delivery person was
9 being impersonated or someone was impersonating a
10 FedEx person.
11    Q.  Okay.  Did you talk to anybody else?
12    A.  (Shaking head.)
13    Q.  No.  Okay.  When did you first
14 have -- what was the first time you had any
15 contact with either Gary Eidelman, myself, or
16 anybody at the Saul Ewing Arnstein & Lehr law
17 firm?
18    A.  Probably that subpoena.
19    Q.  So that subpoena was the first time
20 you knew that the firm existed?
21    A.  Yeah.
22    Q.  Okay.
23    A.  Yes.  I'm sorry.
24    Q.  So I'm going to show you what we have
25 marked as Kelly 9, and I apologize that we are

**35**

1 going a little bit out of order.  You can take a
2 couple of moments and look at the document I just
3 handed you.  Do you recognize this document?
4    A.  Yes.
5    Q.  What is it?
6    A.  This is a letter I wrote to Mr. Gary
7 Eidelman on May 24th, 2018.
8    Q.  Did you draft this letter?
9    A.  Yes.
10    Q.  Did you show anybody this letter?
11    A.  Probably my husband.
12    Q.  Okay.  Did anybody review the letter
13 or make any edits?
14    A.  Probably my husband.
15    Q.  Okay.  Did you discuss it with
16 anyone?
17    A.  Probably my husband.
18    Q.  Okay.  So did you discuss this letter
19 with Mr. Shearer or anyone at --
20    MR. SHEARER:  Objection.  No, no, you
21 can't.  The discussion --
22    MS. COOPER:  This letter is not
23 privileged.
24    MR. SHEARER:  Right, but the
25 discussion is.

**36**

1    MS. COOPER:  No, it's not.
2    MR. SHEARER:  It is.  If she's
3 seeking legal advice, if she's seeking legal
4 advice, whether she talked to me or not, you can't
5 ask whether she talked to me about legal advice.
6    MS. COOPER:  I'm not asking about
7 legal advice.  I'm asking about this letter that
8 was sent to Mr. Eidelman about this deposition.
9    MR. SHEARER:  Okay.  And your
10 question is:  Did I give her legal advice about
11 this letter?
12    MS. COOPER:  That was not my
13 question.  My question was:  Did she talk to you
14 about this letter, that's not legal advice.
15    MR. SHEARER:  Okay.  That's fine.
16 You can go ahead and answer that.  I mean, you can
17 go ahead and answer that.
18 BY MS. COOPER:
19    Q.  Did you talk to Mr. Shearer about
20 this letter?
21    A.  No.
22    Q.  Did you talk to Mr. Shearer about the
23 subpoena?
24    A.  No.  I mean, not that -- not then.  I
25 mean, maybe eventually.

---

Page 37

1    Q.  Did you talk to anyone at
2    Mr. Shearer's office about the subpoena?
3        A.  (Shaking head.)
4        Q.  So I'm going to ask -- in the third
5    paragraph, I'm going to ask you to read that
6    paragraph that begins, I am currently unemployed,
7    if you can read that out loud for the record,
8    please.
9        A.  Out loud?
10       Q.  Yes.
11       A.  I am currently unemployed and the
12   full-time care taker of four children, three under
13   the age of 5, my brother with learning
14   disabilities, and my elderly mother-in-law.  I
15   have commitments on June 25th that I am unable to
16   change.  If I had more advance notice, I might be
17   able to find some friends or save some money to
18   pay for their care for one day, but it would take
19   at least a few months for me to save that much
20   money, especially during the summer.  I can try to
21   decide how to cut my budget and let you know when
22   I think I might have enough money saved.  No
23   matter what, I am not available at all on June
24   25th.
25       Q.  Okay.  I'm also going to ask you that

---

Page 38

1    you read the last paragraph beginning:  I'm sorry.
2        A.  I'm sorry I can't come to talk about
3    my complaint on June 25th.  Maybe I can have my
4    representative from the State of Ohio call you to
5    find a time in July.  It will take me at least
6    that long at least to save enough money.  I look
7    forward to your response.
8        Q.  Okay.  So you sent this letter to
9    Mr. Eidelman on May 24th.  In it you say that you
10   have commitments on June 25th that you're unable
11   to change and that you say, no matter what, I am
12   not available at all on June 25th; that's correct?
13       A.  To talk about my complaint on June
14   25th.
15       Q.  Okay.  Were you available to talk
16   about something else on June 25th?
17       A.  At the time that I sent this letter,
18   I was not.
19       Q.  Okay.  So at some point after June --
20   I'm sorry, May 24th, you became available to speak
21   on June 25th?
22       A.  Here's what happened.  I never got a
23   cancellation.  I received no further communication
24   from Saul Ewing, yourself, or Mr. Eidelman.
25   Actually, I don't think we even had contact

---

Page 39

1    previously up until the scheduled deposition.  No
2    cancellation, no information that it was
3    rescheduled, no new subpoena.  I was commanded by
4    the court to attend, and that's when I changed
5    what I had going on that day.
6        Q.  You said you received no
7    communication from Mr. Eidelman, my law firm, or
8    myself after the subpoena?
9        A.  No.  After, I think there was one
10   more letter.
11       Q.  Okay.  At any time, when you became
12   available on June 25th, did you contact Saul Ewing
13   or Mr. Eidelman or myself to let us know that you
14   were now available?
15       A.  You know, I'm in business.  Something
16   is put on my calendar and has not been changed
17   from the originator, I am obligated to show up.
18       Q.  Okay.  I can take that back.  Thank
19   you.
20       (Thereupon, Kelly Exhibit 10, a
21   1-page letter dated 5/25/18 to Julie Kelly from
22   Gary Eidelman, was marked for purposes of
23   identification.)
24   BY MS. COOPER:
25       Q.  I'm going to show you what has been

---

Page 40

1    marked as Kelly 10.  You can take a moment to look
2    at this document.  Do you recognize this letter?
3        A.  Um-hmm, I do.
4        Q.  Okay.  So this is a letter dated May
5    25th sent to you from Gary Eidelman.  I'm going to
6    read the letter.  It says:  Dear Ms. Kelly, I am
7    in receipt of your overnight letter dated May
8    24th, 2018.  The deposition subpoena that you were
9    served with is in connection with the lawsuit
10   filed by Steve Barger against First Data
11   Corporation that is pending in New York.  Please
12   refer to the caption on page 1 of the subpoena.
13   It is not related to your EEOC charge against
14   First Data.  I understand that June 25th, 2018 is
15   not convenient for you.  Please let me know which
16   of the following dates work for your deposition:
17   June 27, 28, July 3, 5, 6, 13, 16, 17, 19, 23, 24,
18   25, 26.  So as not to burden you financially,
19   First Data will pay the cost of childcare for you
20   to attend the deposition.  If you have any other
21   questions about your deposition, you should speak
22   with your lawyer, Shawn Shearer.
23       Did you ever respond to Mr. Eidelman
24   or anyone at Saul Ewing about those alternative
25   dates that were proposed?

Transcript of Julie Kelly
Conducted on October 15, 2018

41

1    A.  I believe I did respond to this.
2    Q.  Okay.  Did you respond and pick a new
3 date?
4    **A.  I did not because I was waiting on**
5 **some answers to my questions, questions in the**
6 **previous letter, and then I believe -- and it's**
7 **kind of a blur, but I believe that there were**
8 **other questions I was waiting to be answered.**
9    Q.  Like what sort of questions?
10   **A.  Who was going to -- who represents me**
11 **and what am I supposed to be doing?  I know at**
12 **first I was confused over which case this was for**
13 **because I wasn't --**
14   Q.  Right.  So in this letter from
15 Mr. Eidelman, it says:  The deposition subpoena is
16 served in connection with the lawsuit filed by
17 Steve Barger.
18   **A.  Um-hmm.**
19   Q.  It is not related to your EEOC charge
20 against First Data.  So did that not clarify
21 what --
22   **A.  Well, then, he says to speak with my**
23 **lawyer, Shawn Shearer, who's not my attorney for**
24 **this case.  So why would I talk to him?**
25   Q.  Okay.  But you received this letter,

42

1 but you did not respond and pick an alternative
2 date that was provided in this letter?
3    **A.  Not at that time.  Not at this time.**
4    Q.  Did you ever provide an alternative
5 date?
6    **A.  I don't know.**
7    Q.  Okay.  So also in this letter, it
8 says:  So as not to burden you financially, First
9 Data will pay the cost of childcare for you to
10 attend the deposition.
11   **A.  I did misunderstand that.**
12   Q.  What did you understand that to mean?
13   **A.  I thought childcare was going to be**
14 **provided at the deposition.**
15   Q.  Okay.  Why did you believe that?
16   **A.  I don't know, quite honestly.  I**
17 just -- (shaking head).
18   Q.  Okay.  But you will agree that the
19 letter does not say that childcare will be
20 provided?
21   **A.  Right.  I mean, it says, yeah,**
22 **they'll pay the cost.**
23   Q.  Okay.
24   **A.  I did misinterpret that.**
25   Q.  Let me take that.  Thank you.

43

1    (Thereupon, Kelly Exhibit 11, a
2 1-page letter dated 5/29/18 to Gary Eidelman from
3 Julie Kelly, was marked for purposes of
4 identification.)
5 BY MS. COOPER:
6    Q.  So you receive that letter from
7 Mr. Eidelman.  What did you do after receiving
8 that letter?
9    **A.  Oh, goodness, I honestly can't tell**
10 **you exactly what I did after I received that**
11 **letter.**
12   Q.  Did you show the letter to anybody?
13   **A.  Probably my husband.**
14   Q.  Okay.  Did you show the letter to
15 Mr. Shearer?
16   **A.  No.**
17   Q.  Okay.  Did you talk to Mr. Shearer
18 about that letter?
19   **A.  No.  I had a lot going on.  It was**
20 **probably late at night when I finally opened the**
21 **mail.  I don't know.**
22   Q.  Okay.  I'm going to show you Exhibit
23 11.
24   **A.  Oh, I opened it in the morning.**
25   Q.  Okay.  So what is this document that

44

1 I just showed you?
2    **A.  So this is a response to**
3 **Mr. Eidelman.  I believe I had asked him not to**
4 **use FedEx because we needed to get some security**
5 **cameras set up at our house due to the way the**
6 **subpoena was first issued.  And so he did not**
7 **respect that and he sent FedEx again, so just**
8 **asking him why.**
9    Q.  I'm sorry, you said you had requested
10 that Mr. Eidelman not use FedEx?
11   **A.  Oh, maybe I requested that here.**
12 **Well, I assumed he would get that.  He had sent it**
13 **the first time.**
14   Q.  Okay.  Even though you know that --
15 you know now that the process server was not a
16 FedEx --
17   **A.  Yeah.  I didn't know that on June**
18 **29th.**
19   Q.  Okay.
20   **A.  They were still doing an**
21 **investigation.**
22   Q.  Okay.  So did you draft this letter?
23   **A.  I did.**
24   Q.  Is that your signature at the bottom?
25   **A.  Um-hmm.**

Transcript of Julie Kelly
Conducted on October 15, 2018

---

45

1    Q.  Did you discuss this letter with
2  anybody?
3    **A.  Probably the same, my husband.  I'm**
4  **sure he had some edits for me as well.**
5    Q.  Anybody else besides your husband?
6    **A.  No.**
7    Q.  Okay.  Have you -- you said that you
8  were planning on installing video cameras or
9  surveillance cameras?
10   **A.  Um-hmm.**
11   Q.  Have you --
12   **A.  We have them, um-hmm.**
13   Q.  When were those installed?
14   **A.  Oh, gosh, I can't remember.**
15   Q.  But was it before or after --
16   **A.  It was after.**
17   Q.  Okay.
18   **A.  Yeah.  You just can't see -- usually,**
19  **we don't get this type of thing happening in our**
20  **neighborhood, quite honestly.**
21   Q.  What type of thing?
22   **A.  Random people coming up to your door,**
23  **banging on your door serving papers.**
24   Q.  So you -- the process server banged
25  on your door?

---

46

1    **A.  Well, knocked on the door.  I don't**
2  **know.  I didn't answer the door.**
3    Q.  So you don't know if he rang the door
4  bell or --
5    **A.  We don't get someone impersonating or**
6  **looking like a FedEx person coming to our door, so**
7  **we want extra protection going forward.**
8    Q.  Again, why do you think he looked
9  like a FedEx employee?
10   **A.  What he was wearing --**
11   Q.  Okay.
12   **A.  -- is very similar to what all of the**
13  **FedEx people wear in our neighborhood, and he had**
14  **a FedEx package in his hand.**
15   Q.  Okay.  But you did not see the
16  vehicle he drove?
17   **A.  No.  You cannot see vehicles in my**
18  **driveway from my front door.**
19   Q.  Okay.  And he wasn't wearing any item
20  of clothing that said FedEx?
21   **A.  I don't know.**
22   Q.  Okay.  You say in this letter that
23  you were going to work with FedEx to figure out
24  who the impersonator was?
25   **A.  Um-hmm.**

---

47

1    Q.  Did you have any more conversation
2  with FedEx?
3    **A.  I had one and they didn't find**
4  **anything, so I guess the case was closed.**
5    Q.  So how many conversations in total
6  did you have with FedEx?
7    **A.  Two.**
8    Q.  Two, okay.  When was the first
9  conversation?
10   **A.  It was the evening that I received**
11  **the subpoena.**
12   Q.  Okay.  And the second?
13   **A.  I think it was the next day, a couple**
14  **of days later.  I honestly can't remember.  I may**
15  **have written it in a notebook.  I don't know.**
16   Q.  Okay.  So you also say in this
17  letter:  Shawn Shearer, Esq., is not my lawyer on
18  the Steven Barger versus First Data case.
19   **A.  Right.  Mr. -- I'm sorry.**
20   Q.  That's okay.
21   **A.  Mr. Eidelman had said in his previous**
22  **letter to speak with Mr. Shearer about -- if I had**
23  **any questions, and I just wanted it to be clear**
24  **that Mr. Shearer was not my lawyer for this case.**
25   Q.  Okay, understood.  Okay.  I can take

---

48

1  that back.  What is your telephone number?
2    **A.  513-806-4893.**
3    Q.  Okay.  Did you ever receive a
4  voicemail message from either myself or anybody
5  from my firm?
6    **A.  I received one just recently, it was**
7  **a couple of weeks ago when we had a conference**
8  **call with Judge Bowman.  I was actually on the**
9  **line and I think you left me a message.**
10   Q.  Right, yes.  So that was -- I believe
11  the judge wanted us to call back in?
12   **A.  Yeah.  I was already on the line,**
13  **yeah.  So yes, I got that message a couple of days**
14  **later.**
15   Q.  Okay.  Did you receive any other
16  voicemail messages from either myself or any
17  person at my firm?
18   **A.  No.**
19   Q.  Okay.  Have you checked your call
20  history to see if there were any calls or any
21  messages from --
22   **A.  I don't normally do that.**
23   Q.  Okay.  So you don't recall receiving
24  a missed call on June 21st or a voicemail message
25  from me?

---

Transcript of Julie Kelly
Conducted on October 15, 2018

---

49

1    A.  Oh, no.
2    Q.  Okay.
3    A.  I think I just listened to your other
4  one the other day, that's why it's in the top of
5  my mind.
6    Q.  All right.  Do you normally save
7  voicemail messages?
8    A.  No.  I may have a couple from when my
9  children were born or something like that, but no.
10    Q.  So is it a practice that you go
11  through and delete your voicemail messages?
12    A.  Honestly, you know what happens,
13  someone will call me, my mom or someone will say
14  your voicemail is full, go delete some, so I'll
15  just go through and delete some.
16    Q.  Have you gone back and looked to see
17  if there are any voicemail messages from June
18  21st?
19    A.  I haven't, no.
20    Q.  Okay.  All right.  So you sent this
21  letter.  Did you give it back to me yet?
22    A.  Yeah.
23    Q.  All right.  So you sent the last
24  letter that we just looked at on May 29th?
25    A.  Um-hmm.

50

1    Q.  Did you have any contact with anyone
2  at my firm or myself after this letter before June
3  25th, which is the date that the deposition was
4  originally scheduled for?
5    A.  I don't know off the top of my head
6  unless I looked at a calendar or something.
7    Q.  Okay.
8    A.  I don't believe so, but --
9    Q.  Okay.  So you never at any time told
10  either myself, Mr. Eidelman, or anyone in my law
11  firm that you were now available on June 25th?
12    A.  (Shaking head.)
13    Q.  Okay.
14    A.  No.
15    Q.  You've said a couple of times about a
16  cancellation, you've never received a confirmed
17  cancellation?
18    A.  Um-hmm.
19    Q.  What do you mean by a confirmed
20  cancellation?
21    A.  Just it doesn't even have to be
22  confirmed, but someone cancelling a meeting or
23  rescheduling a meeting, I never received a
24  notification that something was canceled.
25    Q.  Okay.  Although, when we looked at

51

1  Kelly 10, the May 25th letter from Gary Eidelman,
2  he said:  I understand June 25th is not convenient
3  for you.  Please let me know which of the
4  following dates work.
5    A.  Um-hmm.
6    Q.  So how is that not confirming that
7  you're not available on June 25th and here are
8  other dates, let me know what works for you?
9    A.  He didn't say it's canceled.
10    Q.  So you wanted someone to say in
11  writing that the deposition on June 25th is
12  canceled?
13    A.  Or rescheduled.
14    Q.  Okay.  Well, if you say that you're
15  not available and we say, okay, here are other
16  dates, and then you never chose any of other dates
17  that were provided --
18    A.  So I assumed the original date is
19  still valid.
20    Q.  Based on what?
21    A.  Based on the fact that there was
22  never another date agreed upon by anyone or issued
23  by a new subpoena.  I don't know how it works.
24  I'm not an attorney.
25    Q.  Okay.  So if you don't know how it

52

1  works and my office is sending you a letter saying
2  here are other dates that are available, why did
3  you not choose one of those dates?
4    A.  Like I said earlier, I was waiting on
5  some questions to be answered by Mr. Eidelman.
6    Q.  Okay.  Which were what questions?  In
7  your May 29th letter, you asked for the name of
8  the process server, of the person who served the
9  subpoena?
10    A.  Um-hmm.
11    Q.  Did you --
12    A.  Yes.
13    Q.  You did not say that I will agree to
14  a date once you provide me that name?
15    A.  No.  Sorry.
16    Q.  Okay.  All right.  When did you
17  decide that you were going to appear on June 25th?
18    A.  I think it was that Friday before.  I
19  think it was Monday.
20    Q.  Okay.  Right, the 25th was a Monday.
21  So what was that, the 22nd?
22    A.  Yeah.  I was coordinating things.
23    Q.  Okay.  So on Friday, the 22nd, you
24  made the decision to appear at the deposition?
25    A.  Yeah.  I made some arrangements.

Transcript of Julie Kelly
Conducted on October 15, 2018

---

53

1   Q.  Okay.  Did you talk to anybody about
2   that decision?
3       **A.  My husband and my oldest daughter.**
4   Q.  Okay.  What did you discuss?
5       **A.  Changing our plans.**
6   Q.  Okay.
7       **A.  Because I was commanded by the court**
8   **to be there, I received no notification, no**
9   **further answers to my questions, so I assumed that**
10  **the 25th was still on; and I also knew if I didn't**
11  **show up for the 25th, I could be held in contempt**
12  **because that subpoena was still valid.**
13  Q.  Okay.  So did you talk to Mr. Shearer
14  about appearing on June 25th?
15      **A.  No.**
16  Q.  Okay.  Did you talk to anyone from
17  his office about appearing?
18      **A.  No.  I spoke with my husband and my**
19  **oldest daughter --**
20  Q.  Okay.
21      **A.  -- so we could change our plans.**
22  Q.  Okay.  Did you think about reaching
23  out to anyone at my law firm to --
24      **A.  I hadn't heard from anyone from your**
25  **law firm for weeks, so quite honestly, I thought**

---

54

1   **it was a trap.**
2   Q.  What do you mean by a trap?
3       **A.  I thought if I go, they're going to**
4   **be there, great; and then if I don't go because we**
5   **never set a new date, I'm held in contempt.  I was**
6   **very worried.**
7   Q.  Okay.
8       **A.  It's very -- you know, I abide by the**
9   **law.**
10  Q.  Okay.
11      **A.  When you get a subpoena, an average**
12  **person, it's not an easy thing.**
13  Q.  Right.  But, yet, you get the
14  subpoena and then you put in writing that you are
15  absolutely unavailable on June 25th?
16      **A.  Okay.**
17      MR. SHEARER:  Objection.  That's not
18  what the testimony was.
19      MS. COOPER:  Okay.
20  BY MS. COOPER:
21  Q.  So I will read the letter.  In your
22  May 24th, 2018 letter, you say, quote:  No matter
23  what, I am not available at all on June 25th.
24      **A.  Correct.  Now, can I see that a**
25  **second?**

---

55

1   Q.  (Indicating.)
2       **A.  Sorry, I just want this to go on the**
3   **record too.  This was when I was confused as to**
4   **what this subpoena was about because I had just**
5   **filed my own case, and that's clearly in here.**
6   **And at the bottom, I say:  I'm sorry I cannot come**
7   **to talk about my complaint on June 25th.  So**
8   **clearly, at the time I had questions and I was**
9   **confused as to what the subpoena was originally**
10  **about.  So absolutely, I cannot be there was -- I**
11  **was assuming at the time that it was to talk about**
12  **my complaint.**
13  Q.  Okay.  So you were available on June
14  25th, but just not to talk about your complaint;
15  is that what you're saying?
16      **A.  It could have been possible.**
17  Q.  Okay.
18      **A.  This was a very stressful time.**
19  Q.  All right.  Okay.  So let's talk
20  about June 25th.  June 25th, 2018 was a Monday.
21  How did you start out that morning?
22      **A.  Well, I probably got up at 6:00, got**
23  **my children up, got my children ready.  They knew**
24  **we had somewhere to go that day.  I probably said**
25  **it was an adventure, we were doing something fun.**

---

56

1   **You know, we got dressed.  We had breakfast, and**
2   **we got packed in the car, and we headed to the**
3   **address on the subpoena.**
4   Q.  Okay.  Again, why did you decide to
5   bring your children with you?
6       **A.  I was under the impression that**
7   **childcare would be provided at the deposition.**
8   Q.  Okay.
9       **A.  I attend mom groups and I attend a**
10  **women's group at my church, and, you know, I had a**
11  **lot going on, I assumed it was the same.**
12  Q.  What do you mean, what was the same?
13      **A.  Childcare was provided.**
14  Q.  Okay.  So you're telling me that you
15  get this subpoena, which you say is, you know, a
16  legal document that's issued by the court, you're
17  going to abide by it, and the letter from
18  Mr. Eidelman says we will reimburse you for
19  childcare costs, but, yet, you're confused --
20      **A.  I wasn't confused.  I just**
21  **interpreted it differently.**
22  Q.  Okay.  So where Mr. Eidelman says,
23  quote:  So as not to burden you financially, First
24  Data will pay the cost of childcare for you to
25  attend the deposition, you interpreted that to

---

Transcript of Julie Kelly
Conducted on October 15, 2018

15 (57 to 60)

---

**57**

1 mean bring your children to the deposition, we
2 will provide a baby-sitter?
3   **A. I did.**
4   Q. Okay. So June 25th, 2018, you appear
5 at the location in the subpoena for the
6 deposition. How many children did you have with
7 you?
8   **A. Three.**
9   Q. Three. Okay. What happened when you
10 got to the location?
11   **A. We went up, we went inside.**
12 **Actually, you have to ring a buzzer to get inside.**
13 **And I asked for Mr. Eidelman for the 10:00 -- I**
14 **believe it was 10:00, deposition.**
15   Q. And then what?
16   **A. And the person I spoke with,**
17 **Mr. Clement, I believe, he gave me his business**
18 **card, didn't know what I was talking about, didn't**
19 **know Mr. Eidelman, and was going to check with his**
20 **colleague to see what was going on and just told**
21 **us to have a seat.**
22   Q. Okay. But what happened after he
23 said he was going to --
24   **A. He went and checked, and his**
25 **colleague came out, too, and they said that there**

---

**58**

1 **was nothing scheduled.**
2   Q. Okay. Did you call anybody while you
3 were at the office location?
4   **A. No.**
5   Q. Okay. Did you call anyone from
6 Mr. Eidelman's office or my office?
7   **A. I wasn't at your office.**
8   Q. No. Did you call anyone at our
9 office about --
10   **A. No. I didn't have -- I wrote a**
11 **letter I dropped in the mail later.**
12   Q. Okay. So where did you -- actually,
13 let's go ahead.
14   (Thereupon, Kelly Exhibit 12, a
15 1-page, handwritten letter dated 6/25/18 to Gary
16 from Julie Kelly, was marked for purposes of
17 identification.)
18   THE WITNESS: I probably called my
19 husband, quite honestly.
20 BY MS. COOPER:
21   Q. Okay. I'll show you this. Do you
22 recognize this document?
23   **A. Yeah.**
24   Q. Did you draft this document?
25   **A. I did.**

---

**59**

1   Q. Is that your signature?
2   **A. Yeah.**
3   Q. Okay. Where did you draft this
4 document?
5   **A. In my car.**
6   Q. Okay. So in your car, and then did
7 you show anybody this document?
8   **A. No.**
9   Q. Okay. So it begins: Gary, I never
10 received a confirmed cancellation. Again, what
11 does that mean?
12   **A. That means no one told me that the**
13 **deposition was not going to take place on June**
14 **25th, 2018 --**
15   Q. Okay.
16   **A. -- by letter, by phone, by e-mail, by**
17 **text, no one told me.**
18   Q. Okay. But you said that you had not
19 checked to see if there are any voicemail messages
20 from me?
21   **A. I wouldn't know your number. I**
22 **wouldn't know --**
23   Q. Okay. But if you're saying you never
24 received a call cancelling the deposition, if you
25 don't --

---

**60**

1   **A. No.**
2   Q. -- know my number, how would you --
3 you didn't check any voicemail, I mean --
4   **A. Well, would your number come up Saul**
5 **Ewing? I don't know. If it would, I probably**
6 **would have listened to it, if you called --**
7   Q. Okay.
8   **A. -- but I didn't.**
9   Q. You didn't check?
10   **A. I didn't see anything, no.**
11   Q. Okay. So in the second paragraph,
12 it's kind of hard to see, it says: I have not
13 heard back from you after my last letter, and if
14 we need to set a rescheduled date, please use USPS
15 to communicate next steps. As you know, I do not
16 have any legal representation for this case.
17   **A. Um-hmm.**
18   Q. Okay.
19   **A. Yes.**
20   Q. So you say if we need to set up a
21 rescheduled date, please use USPS. How come you
22 never responded to any of the other reschedule
23 date suggestions that were provided in the earlier
24 letter?
25   **A. Like I said, I was waiting on some**

---

Transcript of Julie Kelly
Conducted on October 15, 2018

---

61

1  **answers to those questions, and then, you know, I**
2  **received no further communication.**
3    Q.  Okay.  All right.
4    **A.  So --**
5       (Thereupon, Kelly Exhibit 13, a
6  1-page letter dated 6/27/18 to Gary Eidelman from
7  Julie Kelly, was marked for purposes of
8  identification.)
9       MR. SHEARER:  Was that letter that we
10 just did No. 12; is that what we marked that?
11      MS. COOPER:  Yes.
12 BY MS. COOPER:
13   Q.  Okay.  Do you have any photos or
14 videos from your trip to the law firm on June
15 25th?
16   **A.  Yes.**
17   Q.  Did you bring them with you today?
18   **A.  I brought the photos.**
19   Q.  All right.  So we'll go through --
20 actually, do you have those now?
21   **A.  Do you just want --**
22   Q.  Yeah, I'll take the stack.  Thank
23 you.  Do you have copies of this or can I keep
24 this?
25   **A.  I didn't make any other copies.  I**

---

62

1  **wasn't told to duplicate.**
2    Q.  Right, we didn't say that.
3       MR. SHEARER:  Can we just have them
4  go into the record?
5       MS. COOPER:  Yeah.  I'm just trying
6  to decide --
7       MR. SHEARER:  I don't have copies
8  either.
9       MS. COOPER:  I don't know if I want
10 to.  We'll take a break in a little bit and I'll
11 look at them, and then we'll figure out how we're
12 going to handle that.
13      THE WITNESS:  Sorry.
14      MS. COOPER:  That's okay.  Most of
15 the time when we do depositions, we're in an
16 office and we can easily make copies, but I'll
17 review them and we'll figure that out on the
18 break.
19 BY MS. COOPER:
20   Q.  I'm going to show you Exhibit 13, and
21 do you recognize this document?
22   **A.  I do.**
23   Q.  Did you draft this document?
24   **A.  Yes.**
25   Q.  Did you discuss this document with

---

63

1  anyone?
2    **A.  Probably my husband.**
3    Q.  Anybody besides your husband?
4    **A.  No, ma'am.**
5    Q.  Did anybody make any edits to the
6  document?
7    **A.  Maybe my husband.  I honestly can't**
8  **remember.  There's been a lot of letters I've been**
9  **writing.**
10   Q.  Okay.  So in the second sentence, you
11 say:  I took your subpoena very seriously, and
12 while I told you that date was not going to work
13 for me, went out of my way to accommodate your
14 legal request and attend.  But I believe you said
15 multiple times that you never communicated that
16 you were now able to attend with Mr. Eidelman or
17 myself?
18   **A.  Right.  You guys set the date.  I**
19 **assumed that date stuck unless you told me**
20 **otherwise.**
21   Q.  Okay.  You also say in the same
22 paragraph:  You stated that First Data would pay
23 for childcare, which I assumed would be at the
24 deposition.  If that is incorrect, that is another
25 reason you should have been more responsible with

---

64

1  your communication with me.
2    **A.  Again, that's where I misinterpreted.**
3  **We spoke about that earlier.**
4    Q.  Okay.  So the third paragraph,
5  begins:  On a related note, I find it interesting
6  that some of my ex First Data peers were not
7  subpoenaed, but, rather, asked to do a casual
8  phone conversation or meeting.  What ex First Data
9  peers are you talking about?
10   **A.  I spoke with one person who had a**
11 **conversation with you guys.**
12   Q.  Who was that?
13   **A.  Nick Mantia.**
14   Q.  When did you speak to Nick Mantia?
15   **A.  This may have been in June.  I really**
16 **don't know.**
17   Q.  Okay.  Did you speak to any other --
18   **A.  No.**
19   Q.  When you say ex First Data peers, so
20 would that imply that it was more than one person?
21   **A.  He's the only one I spoke with.**
22   Q.  Okay.  What did you and Mr. Mantia
23 discuss?
24   **A.  He just told me he had a conversation**
25 **with your law firm.**

---

---

65

1    Q. Okay.
2    A. I don't know who.
3    Q. Okay.
4    A. No details, just --
5    Q. Okay. What did you tell him about
6 your potential deposition or did you?
7    A. I didn't talk about it.
8    Q. Okay. What else did Mr. Mantia
9 discuss with you?
10    A. Nothing related to the Barger case.
11    Q. Okay. Were your communications with
12 Mr. Mantia via telephone or e-mail, text?
13    A. Phone.
14    Q. Phone, okay. Did you have any
15 follow-up conversations with him in writing?
16    A. No.
17    Q. Okay. Did you have any other e-mail
18 communications with any other either current or
19 former First Data employees?
20    A. No.
21    Q. Okay. Did you have any conversations
22 with Steve Barger about --
23    A. No.
24    Q. -- the subpoena?
25    Q. About his case?

---

66

1    A. No.
2    Q. About the deposition?
3    A. No.
4    Q. Okay. When was the last time you
5 spoke to Mr. Barger?
6    A. It's been awhile.
7    Q. Okay. Can you give me a year; were
8 you still working at First Data?
9    A. Maybe a couple of months ago.
10    Q. Couple of months ago?
11    A. Um-hmm.
12    Q. What did you discuss?
13    A. Probably just checked in with my
14 kids, hi, how are you doing. I check in on his
15 health to see how he's doing.
16    Q. This was over the phone?
17    A. Um-hmm.
18    Q. Okay. Have you had any e-mail
19 communications with Mr. Barger?
20    A. Yes. They're all included.
21    Q. Okay. Did you have any conversations
22 with Mr. Barger after you had received the
23 subpoena?
24    A. Maybe. I don't know.
25    Q. Okay.

---

67

1    A. It wouldn't have been about -- we
2 don't discuss the case.
3    Q. So you've never had a conversation
4 with Mr. Barger about his lawsuit?
5    A. No.
6    Q. Okay. Have you had a conversation
7 with any First Data employee, whether current or
8 former, about the lawsuit?
9    A. The only thing would have been with
10 Nick.
11    Q. Okay. And what did you discuss?
12    A. He just told me he was speaking with
13 Rhonda Johnson. I think they have a complicated
14 relationship, I'm not sure, and I believe she
15 works at First Data still. I'm not sure. But she
16 had told him he was going to be getting a call and
17 he was going to be speaking to your law firm, and
18 that was the extent of it.
19    Q. Okay. Did he tell you the content
20 of --
21    A. He did not.
22    Q. Okay. And you've had no other
23 conversations about Steve Barger or his lawsuit?
24    A. No.
25    Q. Okay.

---

68

1    A. Do you want that?
2    Q. I can take that, yes. Thank you. So
3 I want to ask you about a statement you made a
4 couple of times about your representation.
5    A. Um-hmm.
6    Q. You said that you did not learn about
7 Saul Ewing or Gary Eidelman or myself until you
8 received the subpoena in May of this year?
9    A. Correct.
10    Q. Okay. You've said a couple of times
11 that you believe that Saul Ewing is your attorney
12 in connection with this case?
13    A. Yes.
14    Q. Why do you believe that?
15    A. I believe that because I received the
16 subpoena from you to talk about the plaintiff, so
17 my first gut reaction was that if I need counsel
18 or I have questions about the case -- because they
19 want me to come and talk about the plaintiff, they
20 are my attorneys, counsel, lawyer, whatever.
21    Q. Okay. What made you form the basis
22 that receiving the subpoena made Saul Ewing your
23 attorney?
24    A. (Shaking head.)
25    Q. Did anybody tell you that?

Transcript of Julie Kelly
Conducted on October 15, 2018

---

69

1    A.  No.  That's what I interpreted as of
2  receiving that subpoena.
3    Q.  So you had not had any conversations
4  with any attorneys at Saul Ewing about
5  representation?
6    A.  No.
7    Q.  Okay.  Did anyone from Saul Ewing
8  ever tell you that they were your attorney?
9    A.  That's what I assumed.
10    Q.  My question is:  Did anybody at Saul
11  Ewing ever tell you that they are your attorney?
12    A.  I'm not sure.
13    Q.  Okay.
14    A.  I'd have to look back through the
15  letters because I know in my gut I thought that
16  Saul Ewing was going to represent me for the
17  Barger case.
18    Q.  Why?
19    A.  Because of how the subpoena was
20  issued to me.
21    Q.  So the fact that you got a subpoena
22  makes you think that the attorney who sent the
23  subpoena was now your attorney?
24    A.  That's how I interpreted it.  I
25  didn't go to years of school for law, so that was

---

70

1  my first gut reaction.
2    Q.  Did you ever ask anybody at Saul
3  Ewing whether they were your attorney?
4    A.  I did, multiple times.
5    Q.  What answer did you receive?
6    A.  I received a smart aleck response
7  from Mr. Eidelman:  How did you ever get that
8  idea?  I think you mentioned something in an
9  e-mail, and then I know it's been in a couple of
10  the papers that have been filed.
11    Q.  Okay.  So you've been told no, that
12  Saul Ewing is not your attorney?
13    A.  Um-hmm.
14    Q.  Okay.  And, yet, you've raised that
15  multiple times about --
16    A.  Right, because then later I found out
17  there was a list that my name was on where I was a
18  witness and I could only be spoken to about the
19  case through you, which made me again feel that
20  you were my counsel on the Barger case.
21    Q.  What is that list that you received?
22    A.  It is called a 26(a), and you
23  actually sent me the full thing last week.
24    Q.  Okay.
25    A.  I had never seen that before.

---

71

1    Q.  Well, actually --
2    A.  I saw an excerpt of it.
3    Q.  Right.  Actually, you -- let me -- so
4  the Rule 26(a) initial disclosures that you just
5  mentioned, when was the first time that you saw
6  the full document?
7    A.  Last week.
8    Q.  Last week, you had never seen the
9  full document prior to that?
10    A.  No.
11    Q.  You said you saw an excerpt?
12    A.  Um-hmm.
13    Q.  What was that excerpt?
14    A.  That excerpt was my name and it was
15  in one of my filings.  It was Mr. Shearer's
16  declaration.
17    Q.  Okay.  So prior to last week, you had
18  never seen a full of the initial disclosures?
19    A.  Correct.
20    Q.  Okay.
21      (Thereupon, Kelly Exhibit 14, a
22  multi-page Motion for Sanctions, was marked for
23  purposes of identification.)
24      (Thereupon, Kelly Exhibit 15, a
25  2-page Defendants' Initial Disclosures, was marked

---

72

1  for purposes of identification.)
2  BY MS. COOPER:
3    Q.  Okay.  I'm going to show you what we
4  have marked as Exhibit 14.
5    A.  Um-hmm.
6    Q.  What is that document?
7    A.  This is my motion for sanctions that
8  I filed on, looks like -- I always have to check
9  these because the clerks do not file adequately
10  here.
11    Q.  Right.  What do you mean by that,
12  don't file adequately?
13    A.  It's not timely and they often mess
14  up the docket names.
15    Q.  Okay.
16    A.  I have had a couple of issues.
17    Q.  Okay.  So it looks like there is a
18  time stamp?
19    A.  Yeah, that's what I was looking at.
20  So it was filed on the 14th of August at 9:02.
21    Q.  And this is -- I'm sorry, what was
22  that document again?
23    A.  This is a motion for sanctions.
24    Q.  Okay.  Did you draft this document?
25    A.  I did.

---

Transcript of Julie Kelly
Conducted on October 15, 2018

---

73

1    Q.  Okay.  Did anybody assist you in
2  drafting this document?
3    **A.  My -- not drafting it, editing.**
4    Q.  Who was that?
5    **A.  My mother-in-law is an editor.**
6    Q.  What sort of editor?
7    **A.  She worked for a Veteran's magazine**
8  **until she retired, so just a general editor.**
9    Q.  Okay.  And so you showed her this
10 document before filing it?
11   **A.  Yeah.**
12   Q.  Did you e-mail it to her?
13   **A.  No.**
14   Q.  So you printed out the document and
15 she reviewed it?
16   **A.  Um-hmm.**
17   Q.  Okay.  Was she with you to make edits
18 or how did she --
19   **A.  She lives with us.**
20   Q.  All right.
21   **A.  Is there something specific I'm**
22 **looking for?**
23   Q.  I'm going to -- okay.  So on page 3,
24 the first full paragraph, I have tried everything,
25 that paragraph, you say:  I have tried everything

---

74

1  I can think of to figure out what is going on
2  here.  First, Mr. Eidelman tells the court that he
3  is my lawyer in the Barger versus First Data case.
4  What court are you referring to?
5    **A.  The Eastern New York court.  Well,**
6  **when was this filed?  It's probably both Ohio and**
7  **New York.**
8    Q.  Okay.  When did Mr. Eidelman tell the
9  Eastern District that he was your attorney?
10   **A.  I'm assuming it's this 26(a).**
11   Q.  Okay.  So tell me what you know about
12 26(a) initial disclosures; how are they used in
13 litigation?
14   **A.  All I know is that it's a list of**
15 **people for a court case that they can talk to.**
16   Q.  Okay.  And do they get filed with the
17 court?
18   **A.  I don't know.**
19   Q.  Okay.  So you don't know if
20 Mr. Eidelman ever told the court that he was your
21 attorney?
22   **A.  I'm assuming -- it has a number to**
23 **it.  I'm assuming it gets filed.**
24   Q.  Okay.  Have you read Rule 26(a)?
25   **A.  I probably did.**

---

75

1    Q.  Okay.
2    **A.  I've got -- actually, I've got a copy**
3  **of my legal reference here too.**
4    Q.  Okay.  So on page 4, the second
5  paragraph in background, it says:  In November
6  2017, unbeknownst to me and without even asking if
7  I could afford their lawyer, First Data included
8  me as a potential witness in the case of Barger
9  versus First Data.  First Data's disclosures say
10 that I, Julie Kelly, may only be contacted through
11 the undersigned counsel.
12   **A.  Um-hmm.  That's what I told you, I**
13 **saw that excerpt.**
14   Q.  So when did you see the excerpt?
15   **A.  I don't know the exact date off the**
16 **top of my head.**
17   Q.  Okay.
18   **A.  I know it's an exhibit.**
19   Q.  All right.  The next paragraph, on
20 May 26, 2018:  I filed a charge of discrimination
21 with the OCRC against my former employer, First
22 Data.  Then, the legal harassment started.  A week
23 later, on May 23rd, a man masquerading as a FedEx
24 employee knocked on my door, demanded to enter my
25 home to get to the backyard where my children

---

76

1  were, and then pulled a subpoena out from behind
2  the decoy FedEx box he was holding.
3    **A.  Um-hmm.**
4    Q.  Okay.  So I want to talk about what
5  you wrote here as opposed to your testimony
6  earlier in this deposition.  So earlier you
7  testified that your husband answered the door?
8    **A.  Yes.**
9    Q.  And you were not sure whether he
10 knocked or rang the door bell?
11   **A.  My husband actually wrote a statement**
12 **that states that he answered the door and this is**
13 **who was there.**
14   Q.  Okay.
15   **A.  And how -- that's where this comes**
16 **into play, he wanted to actually go to the**
17 **backyard, he said that to my husband.**
18   Q.  Okay.  Did you hear him say that to
19 your husband?
20   **A.  No.**
21   Q.  Okay.  So your husband told you that
22 the process server asked to go to the backyard?
23   **A.  Yes.**
24   Q.  Okay.  And what did your husband say?
25   **A.  He said no.**

Transcript of Julie Kelly
Conducted on October 15, 2018

77

1    Q.  Did you call the police?
2    **A.  No.**
3    Q.  Why not?
4    **A.  I don't know at the time.**
5    Q.  Okay.  The statement that your
6  husband wrote, is that in this pack?
7    **A.  I don't know.  I think I filed it.**
8  **It may have gone to the OCRC.**
9    Q.  Okay.  All right.
10   **A.  More than likely.**
11   Q.  That's something that I'll have to
12 make a note that we will have to --
13   **A.  I think it's -- I think it's an**
14 **exhibit, quite honestly.**
15   Q.  Okay.
16   **A.  If not, I can get it.**
17   Q.  Okay.  So if you can turn to page 5.
18   **A.  Um-hmm.**
19   Q.  The second paragraph, beginning
20 Mr. Eidelman.  Mr. Eidelman was told via e-mail
21 and US mail that I had gone to the law firm for my
22 deposition on June 25th.  For some reason that I
23 still do not understand, Mr. Eidelman decided to
24 discuss the private e-mail he had received and
25 went, quote, on the record, end quote, with a

78

1  bunch of people I used to work with at First Data
2  sitting right there, including one in-house lawyer
3  named Jill Poole, who was involved in my
4  discrimination claim against First Data in a
5  different deposition in Atlanta, a deposition that
6  had absolutely nothing to do with me and slandered
7  me, accusing me of lying about attending my
8  deposition.
9        Where did you learn this information
10 from?
11   **A.  I learned this from Mr. Shearer.**
12   Q.  Okay.  What did he tell you?
13   **A.  What went on, my name was slandered.**
14   Q.  Okay.
15   **A.  I was made out to be a liar.**
16   Q.  Okay.  And so when did you have that
17 conversation?
18   **A.  Before the 14th when I filed this.**
19   Q.  Okay.
20   **A.  I don't know the exact date or time.**
21   Q.  Do you know whose deposition was
22 taking place?
23   **A.  I don't.**
24   Q.  Okay.  Was this conversation via
25 telephone or e-mail?

79

1    **A.  Probably.**
2    Q.  Which?
3    **A.  Probably telephone.**
4    Q.  Telephone?
5    **A.  Yeah.**
6    Q.  Okay.  All right.  So if you turn to
7  page 8, you have a list of bullet points.  You
8  say -- the first bullet point is -- can you just
9  read that for the record?
10   **A.  Yes.  My name was not removed from**
11 **First Data's 26(a) disclosure in the Barger case,**
12 **and First Data's disclosure still says that I can**
13 **only be contacted through Saul Ewing.  Are they**
14 **still my lawyer?**
15   Q.  Okay.  So how do you know that the
16 26(a) initial disclosures had not been updated or
17 that your name had not been removed?
18   **A.  I got an excerpt as an exhibit**
19 **through Mr. Shearer's declaration.**
20   Q.  An expert?
21   **A.  An excerpt.**
22   Q.  Okay.
23   **A.  So had it been updated, I didn't know**
24 **that at the time I wrote this.**
25   Q.  Okay.  So I want to show you what

80

1  we've marked as Exhibit 15.  Thank you.  Exhibit
2  15 is -- what is Exhibit 15?
3    **A.  This looks like an excerpt of 26(a).**
4    Q.  What do you mean, an excerpt?
5    **A.  It's not complete.**
6    Q.  What's missing from it?
7    **A.  It goes from page 0 to 5 to 8.**
8    Q.  Okay.  And this document, what did
9  you do with this?
10   **A.  I believe this is part of the exhibit**
11 **for what I filed on the 14th.**
12   Q.  Okay.  And so this is the excerpt
13 that you were referring to that Mr. Shearer
14 provided you?
15   **A.  You're providing this document, so**
16 **I'm --**
17   Q.  Right.  But this document, if you
18 look at the top, we see the case number, doc
19 number 7 dash 1 filed 8/14/18.  The document we
20 just looked at, Exhibit 14, was document numbered
21 7.  So this being 7 dash 1 was an exhibit or a
22 part of 7, your motion --
23   **A.  Okay.**
24   Q.  -- for sanctions.
25   **A.  It's just not --**

Transcript of Julie Kelly
Conducted on October 15, 2018

---

81

1     Q.  It's just not connected.
2     **A.  Yeah, that's fine.**
3     Q.  Right. So is this the excerpt that
4 you are referring to?
5     **A.  Yeah, if this is exactly as I filed**
6 **and pulled. I don't know. You're giving me this,**
7 **so I don't know if it's been changed.**
8     Q.  Yes. The Exhibit A page I took off,
9 but if we see at the top, it's part of --
10     **A.  Right. I never, I never saw the**
11 **complete 26(a) until you sent it to me last week.**
12     Q.  Okay. But you received a partial
13 from Mr. Shearer?
14     **A.  Right.**
15     Q.  And this is the document that
16 Mr. Shearer sent to you?
17     **A.  As long as you're saying you pulled**
18 **it from what I filed.**
19     Q.  Okay. When did you receive this
20 excerpt?
21     **A.  Obviously, before 8/14. I don't --**
22 **probably 8/13. I don't know.**
23     Q.  Okay. So if this is the document
24 that made you believe that Saul Ewing was your
25 attorney --

82

1     **A.  Yes.**
2     Q.  -- if you did not receive it until
3 8/13, then, why did you believe Saul Ewing was
4 your attorney prior to that date?
5     **A.  Again, I told you the way I received**
6 **the subpoena, I thought that Saul Ewing was my**
7 **attorney because I was being called to testify or**
8 **to talk to you about the plaintiff.**
9     Q.  Okay. Do you --
10     **A.  Then, then, no, I didn't quite**
11 **understand it at the time, if that was -- sorry,**
12 **if that was going to be your next question.**
13     Q.  Okay. Do you understand now that
14 Saul Ewing is not your attorney?
15     **A.  You are not my attorney?**
16     Q.  Correct.
17     **A.  Then, yes.**
18     Q.  Okay. So --
19     **A.  So what does this mean, then? Can**
20 **you clarify what it means, if you are not my**
21 **attorney, but I can only be contacted through you**
22 **about this case?**
23     Q.  Right. So these are initial
24 disclosures. These documents are not filed with
25 the court. They are exchanged with opposing

83

1 counsel. They are never filed with the court.
2 They might have been filed in the last month or so
3 with the motion practice we've been engaged in.
4 But it is about scheduling depositions or
5 scheduling contacts with witnesses. So I want to
6 ask -- oh, it's not on here actually.
7     **A.  Can I ask one more question?**
8     Q.  Um-hmm.
9     **A.  So when you sent me the full -- you**
10 **just said that this is how you schedule**
11 **depositions, right, for a case, you use this**
12 **document?**
13     Q.  Well, it's a tool about contacting
14 witnesses.
15     **A.  Contacting?**
16     Q.  Right.
17     **A.  Okay. So when you sent me the full**
18 **26(a) last week, I saw that there were a lot of my**
19 **peers in my same position that reported to**
20 **Mr. Barger.**
21     Q.  Um-hmm.
22     **A.  When were those folks subpoenaed and**
23 **when were their depositions held?**
24     Q.  They weren't necessarily all
25 subpoenaed or deposed.

84

1     **A.  Why was I?**
2     Q.  Because at the time that depositions
3 started in this case, you had filed a charge,
4 Mr. Shearer was representing you in connection
5 with that charge, and the rules of professional
6 conduct that govern attorneys provide that an
7 attorney cannot contact an individual who is
8 represented by counsel, and because at that point
9 you were represented by Mr. Shearer -- and I know
10 since then you have said multiple times that he
11 does not represent you in connection with that
12 deposition, but the rules do not provide
13 representation for particular matters. It says if
14 a person is represented, we have to go through
15 counsel, and so because you were represented, we
16 wanted to make sure that all communications with
17 you were on the record. There have also -- as you
18 will admit or you have admitted, there were some
19 miscommunications about the childcare. So we
20 wanted to make sure that our communications with
21 you and when we questioned you and talked to you
22 about Mr. Barger's case that Mr. Shearer had an
23 opportunity to be present and that we had a
24 recorded transcript so that there was no confusion
25 going forward.

85

1      A.  But didn't Mr. Shearer -- I mean,
2  he's been involved with this case a long time.  I
3  mean, didn't he tell you or Mr. Eidelman that he
4  did not represent me?
5      Q.  Yes, he did.  But at that point, you
6  had a pending charge against the company, and we
7  made the decision to depose you, which is our
8  right under the rules of court.
9      A.  Interesting.  Okay.  Are we done with
10 this?
11     Q.  Yeah, I'll take that back.  So have
12 you seen any other versions of Rule 26(a)
13 disclosures?
14     A.  Yes.  You sent it to me last week.
15     Q.  Besides the one I sent to you last
16 week, have you seen any other versions?
17     A.  Not that I know of.
18     Q.  Okay.
19     A.  No.
20     MS. COOPER:  Let's go ahead and take
21 the first 5-minute break.
22     (Brief recess.)
23 BY MS. COOPER:
24     Q.  We can go back on.  I just want to go
25 back to the date that you were served with the

86

1  subpoena, May 23rd, you said that your kids were
2  in the pool --
3      A.  Um-hmm.
4      Q.  -- when you said your husband told
5  you that there was somebody at the door?
6      A.  Um-hmm, yes.
7      Q.  Where were your kids when you went to
8  the front door to talk to the process server?
9      A.  Behind me.
10     Q.  Okay.  So your kids were with you at
11 the front door?
12     A.  They had to get out of the pool and
13 come with me.
14     Q.  So they came with you, and, you know,
15 did they have a conversation with the process
16 server?
17     A.  No.  They're very friendly.  They
18 didn't say anything to him.  They just asked:
19 Mommy, who is that, who is that man?
20     Q.  How old are they?
21     A.  I have two five-year-olds and a
22 three-year-old.
23     Q.  Also, you said that you talked to
24 your cousins, Tommy and Brian, was it?
25     A.  Um-hmm.

87

1      Q.  About the subpoena.  What is their
2  occupation?
3      A.  One is an attorney and one is in the
4  Army actually.
5      Q.  Which one is the attorney?
6      A.  Brian.
7      Q.  Brian, what's his last name?
8      A.  Weaver.
9      Q.  What's Tommy's last name?
10     A.  Weaver.
11     Q.  Okay.  So you spoke to Brian, your
12 cousin, about the subpoena?
13     A.  I just asked him about subpoenas in
14 general.
15     Q.  What did you ask him?
16     A.  I asked him how he could be served.
17     MR. SHEARER:  Wait a second.
18 Objection.  To the extent that he's an attorney,
19 she shouldn't be testifying as to what he told her
20 about the law.
21     THE WITNESS:  That's true, yeah,
22 that's privileged.
23 BY MS. COOPER:
24     Q.  Is Brian your attorney?
25     A.  Could be in that situation.

88

1      Q.  But you have said multiple times in
2  writing that you are unrepresented in connection
3  with this?
4      MR. SHEARER:  You've got the
5  privilege all wrong again.  If she asks somebody
6  about legal advice and he's an attorney, that
7  conversation is privileged whether or not it's in
8  this matter or another, the request for legal
9  advice and providing of legal advice is
10 privileged.
11 BY MS. COOPER:
12     Q.  So are you saying that at any point
13 in connection with this subpoena, have you been
14 represented, have you had an attorney?
15     MR. SHEARER:  Objection.
16     MS. COOPER:  Okay.  Are you
17 instructing your witness or Ms. Kelly not to
18 answer?
19     MR. SHEARER:  No.  I'm objecting to
20 your question.
21     MS. COOPER:  Your objection is noted
22 for the record.
23 BY MS. COOPER:
24     Q.  At any time during this deposition
25 process, since you've received the subpoena, have

Transcript of Julie Kelly
Conducted on October 15, 2018

**89**

1 you been represented by counsel in connection with
2 this deposition?
3    **A. I thought you represented me.**
4    Q. Okay. So did you ask your cousin,
5 Brian, whether Saul Ewing would be your attorney
6 if they served you a subpoena?
7    **A. No. I asked him how subpoenas could**
8 **be served, that was the extent of the**
9 **conversation.**
10    Q. Okay.
11    **A. End of story.**
12    Q. Okay. If you believed that Saul
13 Ewing was your attorney, why did you not call Saul
14 Ewing?
15    **A. I sent you a letter -- Mr. Eidelman a**
16 **letter and asked him. If you want to reference**
17 **those again, we can.**
18    Q. Right. All right. We're going to
19 get back to the e-mails now. This was all before
20 you saw the Rule 26(a), the initial disclosures?
21    **A. Yes.**
22    Q. Okay.
23    (Thereupon, Kelly Exhibit 16, 2
24 2-sided pages of e-mails, the top dated 7/13/18 to
25 Gillian Cooper from Julie Kelly, was marked for

**90**

1 purposes of identification.)
2 BY MS. COOPER:
3    Q. So I'm showing you what has been
4 marked as Exhibit 16. Do you recognize this
5 document?
6    **A. Yes, and I actually referenced this a**
7 **little while ago.**
8    Q. What part did you reference?
9    **A. When I was asking you and**
10 **Mr. Eidelman if you were my lawyers, and**
11 **Mr. Eidelman had a very snarky remark back to me:**
12 **Where did you ever get that idea?**
13    Q. Okay.
14    **A. On page 2.**
15    Q. Okay. So let's -- so this is an
16 e-mail chain. Let's start -- because it's an
17 e-mail chain, it kind of goes back in time. So if
18 we can turn to page 3, again, a little bit of the
19 way down, it says: From Cooper Gillian A., from
20 me, dated Tuesday, July 10th, 2018, To and then
21 it's to J U L underscore Kelly at mac dot com,
22 copying Gary Eidelman. Can you read the e-mail to
23 me?
24    **A. Dear Ms. Kelly, we are in receipt of**
25 **your letter dated June 27th, 2018. You should**

**91**

1 **have received a letter from me last week. The**
2 **letters must have crossed paths in the snail mail.**
3 **You provided your e-mail address in the letter, so**
4 **hopefully, this will be most efficient to connect.**
5 **I'm hoping I can clear a few things up. You may**
6 **or may not be aware, but there are restrictions**
7 **that prevent attorneys from communicating with**
8 **individuals who are known to be represented by**
9 **counsel. After we received the charge you filed**
10 **with the OCRC, even though it's entirely unrelated**
11 **to the Barger lawsuit, and learned that you were**
12 **represented by counsel in that case, we were**
13 **required to follow those rules that prevent us**
14 **from communicating with someone who is represented**
15 **by an attorney. Since servicing -- since serving**
16 **the deposition subpoena, however, you have**
17 **indicated that you are not represented by counsel**
18 **and willing to speak to us about the Barger**
19 **lawsuit. Can we set up a call this week? And**
20 **hopefully by arranging a call, we can avoid a**
21 **deposition altogether. Let me know what works**
22 **best for you and we can set this up.**
23    Q. And then did you respond to my
24 e-mail?
25    **A. I did. I asked you if you were my**

**92**

1 **lawyer.**
2    Q. Okay. And above that at 10:05,
3 Mr. Eidelman responded. And could you please read
4 what Mr. Eidelman wrote?
5    **A. He said that you are his associate**
6 **and we are contacting you by e-mail.**
7    Q. Okay. So he says: No, she is my
8 associate. Per your letter, we are contacting you
9 by e-mail. And then what did you respond?
10    **A. I asked Mr. Eidelman if he was my**
11 **lawyer, and I misspelled Mr., must have been auto**
12 **correct, so I sent it again, apologizing. And**
13 **then I get: No, I have not and never have been.**
14    Q. Wherever did you get that idea?
15    Q. Okay. Again, so where did you get
16 that idea?
17    **A. Again, from the subpoena --**
18    Q. Okay.
19    **A. -- because I received it from Saul**
20 **Ewing, Mr. Eidelman in particular. I believe he**
21 **was on the first one.**
22    Q. Okay.
23    **A. And I was being asked to come and**
24 **talk to you, who are the attorneys for the**
25 **defendant, about the plaintiff, Mr. Barger.**

Transcript of Julie Kelly
Conducted on October 15, 2018

93

1      Q.   Okay.
2      A.   And that's what I say right here, you
3  gave me that idea as you are the lawyer for First
4  Data's defendants.
5      Q.   Okay.  Well, that's a little
6  different than what you have said.
7      A.   That's what I am meaning.
8      Q.   So what are you meaning?
9      A.   That's the same to me.
10     Q.   What?
11     A.   From what I saw on that subpoena, you
12 were the attorneys for the defendants asking me to
13 speak about the plaintiff.
14     Q.   Okay.  Are you a defendant in
15 Mr. Barger's lawsuit?
16     A.   No.
17     Q.   Okay.
18     A.   But you were asking me to come and
19 speak about the plaintiff, so I'm assuming whether
20 it's called counsel or attorney or lawyer, I
21 assumed that that's what you were.
22     Q.   Okay.  So you're saying here that you
23 gave me the idea, as you are the lawyer for First
24 Data's defendants?
25     A.   Yeah.  I did not elaborate on what I

94

1  just said, but it's the same thing.
2      Q.   Okay.  And so what did I respond?
3      A.   You said:  We are not your lawyers.
4  Please provide us with dates that you are
5  available for a deposition.  If we cannot agree to
6  a date, we will be forced to move before the
7  United States District Court for the Southern
8  District of Ohio to compel your deposition.
9      Q.   Okay.  And what did you respond?
10     A.   I responded with:  Quite honestly, I
11 have no idea who either of you are other than
12 lawyers for First Data defendants in a federal
13 lawsuit.  I don't understand why I'm being asked
14 to provide other dates for a deposition when I
15 showed up to the original not-canceled one.
16     Q.   Okay.  I want to go back to when you
17 say that you spoke with -- here, I can take that
18 one.
19          You said you spoke to Nick Mantia.
20 Who called whom?
21     A.   I have no idea.
22     Q.   Okay.  And when was the conversation?
23     A.   I have no idea.  I told you that
24 earlier.
25     Q.   Okay.

95

1      A.   Honestly, I think one of my kids had
2  had an accident in the pool and we were trying to
3  figure out how to clean it, so I was very
4  distracted.
5      Q.   What do you mean, when was the --
6      A.   When I was talking to Nick.
7      Q.   Okay.
8      A.   That was --
9      Q.   Okay.
10     A.   That's how I remember it, so I don't
11 know when it was, sometime this summer.
12     Q.   So we've talked a bit about the need
13 for childcare in connection with the subpoena
14 and -- the deposition, I'm sorry.  You've also
15 said that you had to arrange for care for your
16 brother and your mother-in-law?
17     A.   Um-hmm.
18     Q.   Okay.  What sort of care would you
19 need to arrange for them?
20     A.   To make sure that there was someone
21 at my home.  My mother-in-law lives in the bottom
22 floor in her own apartment.  She does not drive.
23     Q.   Okay.
24     A.   And then I have a special needs
25 brother who needs assistance to and from work,

96

1  those types of things.
2      Q.   Okay.  So your brother works?
3      A.   He does.
4      Q.   Okay.  Did you have to arrange for
5  care for him for today's deposition?
6      A.   I did not.
7      Q.   Okay.  And what about your
8  mother-in-law?
9      A.   No.  We have a sitter at the house,
10 so it is arranged with the sitter.
11     Q.   Okay.  And this is your
12 mother-in-law, who you said reviewed and was the
13 editor at a magazine or some sort of publication?
14     A.   Yes, um-hmm.
15     Q.   Okay.  At some point, you contacted
16 Barry Levin at my law firm?
17     A.   Um-hmm.
18     Q.   How did you receive Mr. Levin's name?
19     A.   Your website.
20     Q.   Okay.  Why were you reaching out to
21 him?
22     A.   Because, quite honestly, I wasn't
23 getting anywhere with yourself and Mr. Eidelman.
24 I felt like I was being targeted and harassed, and
25 I thought he was your boss, quite honestly.

Transcript of Julie Kelly
Conducted on October 15, 2018

25 (97 to 100)

97

1     Q.  Okay.  What --
2     A.  I don't know if he is or not.
3     Q.  What conduct made you feel targeted
4  and harassed?
5     A.  For one, the subpoena, the way that
6  came to me, and then no one showing up for the
7  subpoena.
8     Q.  Okay.  So those two instances are
9  what led you to feel harassed.  Was there anything
10 else that led you to feel harassed?
11    A.  It was just the whole conduct felt
12 unethical to me.
13    Q.  What other conduct?
14    A.  The conduct that Mr. Eidelman and
15 yourself were conducting towards me, it felt
16 hostile.
17    Q.  Okay.  I'm asking for specifics, what
18 conduct; you said serving the subpoena?
19    A.  Um-hmm.  The e-mails.
20    Q.  The e-mails that I just read, the
21 e-mails that --
22    A.  Yes, specifically the one where
23 Mr. Eidelman responds:  Wherever did you get that
24 idea?
25    Q.  Okay.  And so that you believe is --

98

1  that's what forms your opinion that there was
2  harassment?
3     A.  Well, that's one instance.
4     Q.  What else?
5     A.  And the letters, and then obviously
6  standing me up for a scheduled subpoena.
7     Q.  Okay.  Were there other letters that
8  you received besides the ones that we have gone
9  through today from --
10    A.  I don't believe so.
11    Q.  Okay.
12    A.  I mean, I keep track of everything.
13    Q.  Okay.
14    A.  I think you have them.
15    Q.  So the May 25th letter from
16 Mr. Eidelman, I think that's the only one we've
17 talked about, and then my e-mail to you on July
18 10th where I say we are in receipt of your letter,
19 I was hoping I could clear a few things up that
20 we've just gone through -- I'm not going to read
21 it again.  What else made you feel harassed or
22 made you believe that there was unethical conduct?
23    A.  I also found out through the OCRC
24 that you were the one who filed against me for my
25 case, and on the same day, you tried to reach out

99

1  to me to get me to talk to you about the Barger
2  case.
3     Q.  What do you mean, went against you?
4  Without getting into --
5     A.  You were adverse to me in your
6  response.
7     Q.  Because I represent First Data?
8     A.  Yes.
9     Q.  Okay.  When did you find out that I
10 represented First Data?
11    A.  When I got a copy of what you filed
12 with the OCRC.
13    Q.  Okay.  And so because I represent
14 First Data, you believe that to be --
15    A.  I read what you wrote, Gillian.
16    Q.  Okay.  All right.  We've agreed not
17 to --
18    A.  We're not going to talk about that,
19 but let's just put it that way.
20    Q.  All right.  So that is -- in this
21 case, what sort of conduct contributed to your
22 belief that there's been harassment?
23    A.  Well, what I already said.
24    Q.  Okay.
25    A.  And then when I got further

100

1  information about your activity.
2     Q.  What further activity, what activity?
3     A.  What we just mentioned.  It starts to
4  overlap.  It starts to be clearly that what is
5  going on is for my OCR case, what we cannot talk
6  about today.
7     Q.  Right.  And we have not talked about
8  your OCRC --
9     A.  OCRC.
10    Q.  Thank you.  And we have not talked
11 about it and we won't.
12    A.  Right, but that's some of the
13 harassment.
14    Q.  So the fact that I represent First
15 Data you believe is harassment?
16    A.  Yes.
17    Q.  Okay.
18       (Thereupon, Kelly Exhibit 17, 2
19 2-sided pages of e-mails, the top dated 7/20/18 to
20 Timothy Callahan from Julie Kelly, was marked for
21 purposes of identification.)
22 BY MS. COOPER:
23    Q.  Okay.  So you e-mailed Barry Levin.
24 Did you receive a response back from Mr. Levin?
25    A.  I don't believe so.

Transcript of Julie Kelly
Conducted on October 15, 2018

---

101

1    Q.   Did you receive a response back from
2  anyone?
3    **A.   I received a response from Timothy**
4  **Callahan, the junior or the third, I'm not sure.**
5  **Is it the third?**
6    Q.   It might be.
7    **A.   I don't know.**
8    Q.   Actually, no.  It's the second, Jr.
9    **A.   Okay, yeah.**
10   Q.   Okay.  So you received a response
11 back from Mr. Callahan?
12   **A.   Uh-huh.**
13   Q.   And rather than ask you if you
14 remember what he wrote, I will show you Exhibit
15 17.  Again, it's an e-mail chain, so if we turn to
16 the second and third page.
17   **A.   Um-hmm.**
18   Q.   So Mr. Callahan e-mailed you on July
19 19th, 2018.  And can you please read
20 Mr. Callahan's e-mail?
21   **A.   Sure.  To Julie Kelly.  I didn't know**
22 **I would be reading all day.  But the e-mail you**
23 **sent me on Thursday evening, July 12th, 2018, to**
24 **Barry Levin, the managing partner of Saul Ewing**
25 **Arnstein & Lehr, LLP, has been referred to me**

---

102

1  **because I serve as the general counsel to the law**
2  **firm.  I have looked into the events mentioned in**
3  **your e-mail.  Under the circumstance --**
4  **circumstances, I believe it's best to respond as**
5  **follows:**
6        **No. 1, my law firm represents First**
7  **Data Corporation and certain others in connection**
8  **with a lawsuit filed on behalf of Steven Barger**
9  **against our clients.  Neither Mr. Levin nor Gary**
10 **Eidelman nor Gillian Cooper nor me nor anyone else**
11 **who works at my law firm represents you.  As a**
12 **former employee of First Data Corporation, you may**
13 **have knowledge that is relevant to the case, so we**
14 **would like to take your deposition.**
15   Q.   Okay.  I'm going to stop you there.
16 We don't have to read the rest of it.  You're free
17 to take a look at it, but we don't need to read
18 the rest of it.
19   **A.   Okay.**
20   Q.   So you received this letter from
21 Mr. -- or this e-mail from Mr. Callahan.  You
22 respond back -- let's go back to the first page of
23 Exhibit 17.
24   **A.   Um-hmm.**
25   Q.   So you reply back July 20th, 2018.

---

103

1  Go to the second full paragraph, fifth line from
2  the bottom starts:  While I, that sentence.
3    **A.   Oh, yes.**
4    Q.   Okay.  Can you read while I don't
5  recall and then read the rest of that?
6    **A.   Yes.  While I don't recall promising**
7  **to pay Saul Ewing, it is my -- in that my name**
8  **appears on a list of people given by Mr. Eidelman**
9  **to the court months ago and that on that document**
10 **Saul Ewing instructs Mr. Barger's counsel that I**
11 **can only be contacted about the Barger case**
12 **through Saul Ewing.  I guess Saul Ewing is called**
13 **undersigned counsel, but I don't know what that**
14 **means.**
15   Q.   Okay.  So I want to -- we talked
16 about the initial disclosures?
17   **A.   Yes, we have.**
18   Q.   And you said that you received them
19 before you made that filing on August 14th, 2018?
20   **A.   Um-hmm.**
21   Q.   You said you received it probably the
22 day before?
23   **A.   Yeah, like I don't know.**
24   Q.   But this is almost a month before
25 because that was August 14th, this is July 20th.

---

104

1  So when did you receive the initial disclosures?
2    **A.   I may not have received it, but I**
3  **heard of it.**
4    Q.   Who told you?
5    **A.   I heard from --**
6        MR. SHEARER:  Objection.
7        MS. COOPER:  Okay.  Noted for the
8  record.
9  BY MS. COOPER:
10   Q.   Who told you that?
11       MR. SHEARER:  To the extent it
12 requires you to reveal conversations with counsel,
13 I instruct her not to answer.
14       MS. COOPER:  Okay.  Well, does it
15 require --
16 BY MS. COOPER:
17   Q.   Did you have a conversation with an
18 attorney about the Rule 26(a) disclosures?
19   **A.   I looked up what a 26(a) was on the**
20 **Internet.**
21   Q.   Okay.  And why did you look that up
22 on the Internet?
23   **A.   Because I want to know what this list**
24 **is.**
25   Q.   Okay.  So somebody told you that

---

Transcript of Julie Kelly
Conducted on October 15, 2018

---

105

1 there was the initial disclosure list?
2 **A. I don't know.**
3 Q. Okay.
4 **A. I know you didn't have me read the**
5 **second part of Mr. Callahan's letter to me.**
6 Q. You can read it if you --
7 **A. But I just wanted to bring up that**
8 **that's kind of what really made me respond,**
9 **because I felt that he didn't care about my**
10 **complaints and he was -- of harassment, and he was**
11 **brushing it under the table when he clearly could**
12 **have said thank you for letting me know, I can**
13 **look into it. I was just very put off by that and**
14 **very confused on his response.**
15 Q. Okay. So it's clear, Mr. Callahan's
16 e-mail continues and it says: Suffice it to say
17 that we respectfully disagree with a number of
18 your assertions, especially to the extent that
19 they suggest that anyone at my law firm acted
20 inappropriately with regard to attempting to
21 schedule your deposition. That said, I do not
22 believe that further discussion of this matter in
23 an e-mail from me would be productive at this
24 time.
25     So you were not happy with that

106

1 response?
2 **A. No. But I see there is a little play**
3 **on words here in my opinion where he said**
4 **attempting to schedule. He doesn't mention how I**
5 **got stood up.**
6 Q. Okay.
7 **A. So whether or not that is, I mean,**
8 **that's kind of how I'm interpreting that.**
9 Q. Okay. All right.
10 **A. Can I ask a question?**
11 Q. No. Actually, go ahead.
12 **A. I just want to know if we're going to**
13 **be able to talk about the Barger case?**
14 Q. Yes, we will.
15 **A. Okay.**
16 Q. In a couple of your communications
17 with Mr. Callahan, you have asked that Saul
18 Ewing's lawyer get in touch with you?
19 **A. Um-hmm.**
20 Q. Why are you looking to talk to Saul
21 Ewing's attorney?
22 **A. That is for my OCRC case.**
23 Q. But you wrote it in connection with
24 the third-party witness subpoena?
25 **A. Yes.**

107

1 Q. Okay. But you want to talk to Saul
2 Ewing's attorney related to your OCRC charge?
3 **A. Yes, because some of the people at**
4 **Saul Ewing are going to be witnesses once I'm able**
5 **to move forward with my OCRC case.**
6 Q. Okay.
7     (Thereupon, Kelly Exhibit 18, a
8 1-page e-mail dated 7/24/18 to Barry Levin from
9 Julie Kelly, was marked for purposes of
10 identification.)
11 BY MS. COOPER:
12 Q. Let me show you what's been marked as
13 Exhibit 18. Have you seen this document before?
14 **A. What is wrong with my spacing? Yes,**
15 **I have.**
16 Q. Okay. What is this document?
17 **A. Can I take a moment to read this?**
18 Q. Sure.
19 **A. So I wrote this after you filed a**
20 **motion to compel me for a subpoena I showed up for**
21 **in the State of Ohio. I sent this e-mail to**
22 **Mr. Callahan and Mr. Levin.**
23 Q. Okay. You say in here that, quote:
24 They have lied to the court in Ohio.
25 **A. Yes.**

108

1 Q. What were the lies that were told to
2 the court?
3 **A. The motion to compel.**
4 Q. Okay.
5 **A. You can't compel me to something I**
6 **already did.**
7 Q. Okay. What is the basis for that
8 statement, why do you believe that you can't be
9 compelled to do something that you've already
10 done?
11 **A. Because the motion to compel is to**
12 **get you to do something, and your motion to compel**
13 **was for the first subpoena, which I showed up at.**
14 Q. Okay. Right. But we agree that
15 there was apparently some confusion about whether
16 you would be showing up?
17 **A. No, there was no confusion.**
18 Q. Okay. So let me ask you this, then,
19 if we had shown up on June 25th, you had three
20 children with you?
21 **A. Um-hmm.**
22 Q. You have testified that you
23 misunderstood that childcare would not be
24 provided, but that it would be reimbursed?
25 **A. Um-hmm.**

Transcript of Julie Kelly
Conducted on October 15, 2018

---

109

1    Q.   Would you have expected that the
2  deposition go forward while you had three
3  children?
4    **A.  I would.  I would have made something**
5  **work, of course.**
6    Q.   What would you have done?
7    **A.  I would have called my oldest**
8  **daughter.**
9    Q.   To what?
10   **A.  Come get the children.**
11   Q.   Okay.  And how long would that have
12 taken?
13   **A.  10 minutes.**
14   Q.   Okay.  So you live 10 minutes away
15 from the office where the deposition took place?
16   **A.  She does during the summer.**
17   Q.   Okay.  All right.  So had the
18 deposition gone forward, you would have made
19 arrangements for your children to be picked up so
20 you --
21   **A.  Absolutely.**
22   Q.   Okay.  I'll take that.  Thank you.
23 What is a Rule 11 or what is Rule 11?
24   **A.  Rule 11, from my understanding, is**
25 **when an attorney has not told the truth on**

---

110

1  **something and I'm asking them to correct it in a**
2  **certain amount of time, I believe it's 21 days.**
3    Q.   Where did you learn that?
4    **A.  Google.**
5    Q.   What did you Google?
6    **A.  Lawyers lying.**
7    Q.   Okay.  And --
8    **A.  Or attorneys lying or something like**
9  **that, I can't remember.**
10   Q.   So you Googled lawyers lying,
11 attorneys lying, and what website did you go to?
12   **A.  Oh, gosh, I don't know.  I used a**
13 **bunch, Cornell a lot.**
14   Q.   What did you read?
15   **A.  Basically read what you can write.**
16 **You can send a notification to an attorney about**
17 **your complaint asking them to take it back, redact**
18 **it, I'm not sure what the terms are, and I believe**
19 **they have 21 days before it can go forward to a**
20 **judge or a magistrate.**
21   Q.   Okay.  Does the rule apply to anyone
22 else besides attorneys?
23   **A.  I don't know.**
24   Q.   Okay.  And, again, what was the lie
25 that you believed Saul Ewing had to retract?

---

111

1    **A.  I had some bullet points in my**
2  **e-mail.**
3    Q.   But I'm asking you what you recall of
4  the lie.
5    **A.  Well, a big one would be the whole**
6  **motion to compel.**
7    Q.   Okay.  Explain to me how that is a
8  lie.
9    **A.  Because I showed up for the subpoena**
10 **that the motion to compel was based upon.**
11   Q.   Okay.  And I agree that you showed up
12 on June 25th, which is the date that was
13 designated.  Has Saul Ewing, myself, or
14 Mr. Eidelman, ever told the court that you did not
15 show up?
16   **A.  They told -- Mr. Eidelman told on the**
17 **record and these documents were filed that I did**
18 **not show up.**
19   Q.   Right, that was on June 25th.  But
20 has --
21   **A.  Those papers were filed as exhibits**
22 **with the court.**
23   Q.   Right.  You filed them?
24   **A.  Um-hmm.**
25   Q.   Okay.  Has Saul Ewing ever told the

---

112

1  court, ever said in a court filing that Saul Ewing
2  filed, not that you filed, that Saul Ewing filed,
3  that you believe is not truthful, has Saul Ewing
4  ever filed a document that said you did not show
5  up?
6    **A.  I'd have to go through them line by**
7  **line again, there's so many.**
8    Q.   Okay.  So is it to say that your
9  basis that Saul Ewing violated Rule 11 is because
10 on June 25th during a deposition Mr. Eidelman said
11 that he believed that you did not show up?
12   **A.  I have to read the Rule 11.  Do you**
13 **have it?**
14   Q.   I do, but I'm not going to enter it.
15 I'm just asking you what you can recall about it.
16   **A.  I didn't review that document.**
17   Q.   So you did not review the Rule 11
18 e-mail?
19   **A.  No.  I thought I was coming here to**
20 **you talk about the Barger case and not**
21 **specifically the Ohio case, so no.**
22   Q.   Okay.  Besides the motion to compel,
23 what do you believe are other lies that Saul Ewing
24 has said?
25   **A.  I would have to review the documents.**

113

1 **Again, I did not prepare to speak about the Ohio**
2 **filings.**
3 Q. We're talking about the filings that
4 brought us to your deposition today.
5 **A. Right. I was not prepared to talk**
6 **about those. I was prepared to talk about the**
7 **Barger case.**
8 Q. That's fine. From what you recall,
9 what are the other lies?
10 **A. Again, I would have to take a look at**
11 **the documents.**
12 Q. So you don't remember any off the top
13 of your head?
14 **A. No. I mean, you threw me off by**
15 **taking all of this time to talk about this Ohio**
16 **case, so --**
17 Q. That's fine. You do not have
18 electronic filing privileges in this miscellaneous
19 action?
20 **A. That's correct. I got denied twice.**
21 Q. Okay. So when you file anything, how
22 do you file?
23 **A. I drive down to the courthouse, park**
24 **my car, usually have a kid or two in toe, and go**
25 **through security at the courthouse, and walk into**

114

1 the clerk's office and have it filed.
2 Q. Okay. Has anybody assisted you in
3 any of the filings?
4 **A. My husband brought one down.**
5 Q. Okay. So your husband filed one of
6 the documents on your behalf?
7 **A. Yeah. I can't remember which one it**
8 **was. I think it was to get electronic filing**
9 **rights, actually.**
10 Q. Okay. Actually, I do think I recall
11 reading that in one. Okay. So the actual
12 documents that you file, who drafts them?
13 **A. I do.**
14 Q. Does anybody assist you in drafting
15 any of the documents?
16 **A. No.**
17 Q. Okay.
18 **A. Maybe Google, I might research some**
19 **things.**
20 Q. Okay. So do you have access to any
21 case law books or websites?
22 **A. What is that?**
23 Q. Okay.
24 **A. Oh, just to like quote things?**
25 Q. Any --

115

1 **A. I Google certain situations.**
2 Q. So what's a situation that you have
3 Googled?
4 **A. Again, I would have to look through**
5 **the documents. I just told you this, I've written**
6 **so much and was not prepared. Had I known we were**
7 **going to be discussing this, I would have read all**
8 **of the documents over the last weekend.**
9 Q. Okay. At some point you filed a
10 declaration of Mr. Shearer, so I don't know if I
11 want to --
12 **A. I believe that's when I was slandered**
13 **by Mr. Eidelman.**
14 Q. I'm sorry, what was the slander?
15 **A. When he was calling me a liar.**
16 Q. Okay. What were you told?
17 **A. Basically, that I was -- I did not**
18 **show up for the deposition on the 25th.**
19 Q. Okay. So who told you that?
20 **A. Mr. Shearer.**
21 Q. Okay. All right. So you file a
22 declaration on --
23 **A. And that's in there.**
24 Q. Okay. Who drafted Mr. Shearer's
25 declaration?

116

1 **A. I would assume he did.**
2 Q. Okay. So you did not draft the
3 declaration?
4 **A. No.**
5 Q. Okay. Did you ask him to draft the
6 declaration?
7 **A. I may have.**
8 Q. Okay. Why did you need a declaration
9 from Mr. Shearer?
10 **A. To prove to the court what was going**
11 **on.**
12 Q. What was going on?
13 **A. I was being told that I was a liar,**
14 **first, with the motion to compel. Look, I am**
15 **trying to be the room mother at my school, I need**
16 **a background check, and if my name comes up for**
17 **this -- all of this stuff we've been talking about**
18 **for the last couple of hours, it could have been**
19 **avoided completely. I did nothing wrong.**
20 Q. Okay. So First Data filed the motion
21 to compel on July 23rd, 2018. Let's see. Okay.
22 (Thereupon, Kelly Exhibit 19, a
23 1-page e-mail dated 7/31/18 to Julie Kelly from
24 Gillian Cooper, was marked for purposes of
25 identification.)

Transcript of Julie Kelly
Conducted on October 15, 2018

---

117

1  BY MS. COOPER:
2      Q.  I'm going to show you what's been
3  marked as Document 19.  Have you seen this
4  document before?
5      **A.  Yes.**
6      Q.  Okay.  And what is the date of this
7  document?
8      **A.  This is July 31st.**
9      Q.  And what is it?
10     **A.  This is an e-mail from yourself,**
11 **Gillian Cooper, basically saying that you want to**
12 **resolve this thing in Ohio and offering up -- you**
13 **want me to pick one of these three dates.**
14     Q.  Okay.
15     **A.  And I did respond that I could not**
16 **make these dates.**
17     Q.  Right.  And so I write in an effort
18 to resolve the pending motion in the Southern
19 District of Ohio, please advise if you are
20 available for a deposition on the following dates
21 and times, and then I provide August 28, 29, and
22 30.  I say:  If you agree to be deposed on one of
23 the above dates, we can file a consent order to
24 schedule the deposition and resolve the
25 outstanding motion.  If the dates work but times

---

118

1  do not, please let me know and we can discuss a
2  different start time.
3      **A.  Um-hmm.**
4      Q.  Do you remember receiving this
5  e-mail?
6      **A.  I do.**
7      Q.  Okay.
8          (Thereupon, Kelly Exhibit 20, 1 page
9  of e-mails, the top dated 8/2/18 to Gillian Cooper
10 from Julie Kelly, was marked for purposes of
11 identification.)
12 BY MS. COOPER:
13     Q.  I'm going to show you what we've
14 marked as Exhibit 20.  Okay.  And we start at the
15 bottom, it is an e-mail from you dated August 2nd,
16 2018.  And what do you write?
17     **A.  I am not available on either of those**
18 **dates.**
19     Q.  Okay.  And then if you turn to the
20 next page, you say, what?
21     **A.  I have requested a hearing on this**
22 **issue.**
23     Q.  Okay.  So if what you just said a
24 couple of moments is that you're very concerned
25 about your name appearing in any sort of filing,

---

119

1  you know, if you have to go through a background
2  check or any sort of -- you know, for any job
3  application or whatever it may be, and then I
4  reached out to you and suggested a couple of dates
5  to resolve the pending motion, and you respond
6  back that you are not available on those dates and
7  that you have requested a hearing; is that
8  correct?
9      **A.  Um-hmm.**
10     Q.  Okay.  And so then I reply, say:
11 Understood.  Based on your representation that you
12 are unavailable on August 28th, 29th, and 30th, we
13 do not expect your appearance on those dates.  And
14 then if you please read what you responded back to
15 me.
16     **A.  Yes.  You do not seem to grasp what I**
17 **am saying.  I'm telling you out of a courtesy that**
18 **I am unavailable on those dates.  I am under no**
19 **obligation to tell you.  I am doing it because I**
20 **am a courteous person and do not waste other**
21 **people's time like you wasted my time and a day of**
22 **my children's summer break when you didn't show up**
23 **for the June 25th at 10:00 at Cook & Logothetis,**
24 **LLC, 30 Garfield Place, Suite 540, Cincinnati,**
25 **Ohio 45202.  I did what the subpoena required, you**

---

120

1  **didn't.  Please do what I asked you to do when I**
2  **filed the Rule 11 and tell the Court the truth.  I**
3  **have done what the subpoena told me to do.**
4      Q.  Here I am asking you if we can agree
5  to a date and resolve the motion and enter a
6  consent order, and you say that you were telling
7  me out of courtesy that you're unavailable, but
8  you have no obligation to do so.
9          I want to go back to the original
10 back-and-forth back in June -- or I guess May
11 about scheduling the deposition where you tell me
12 that you're unavailable or you tell Mr. Eidelman
13 that you're unavailable, but, yet, you show up.
14 And then here again, you're saying you're
15 unavailable.  I'm saying:  I understand based on
16 your representation that you're unavailable, we do
17 not expect your appearance.  And then you respond
18 and say:  I'm telling you out of courtesy that I
19 am unavailable.  I'm under no obligation to tell
20 you.  I'm doing it because I am a courteous person
21 and do not waste other people's time like you
22 wasted my time.  And then we've already read it
23 through.
24     **A.  Um-hmm.**
25     Q.  So why didn't you say at that point,

---

Transcript of Julie Kelly
Conducted on October 15, 2018

121

1  you know, I don't want there to be a court
2  document, I want to resolve this motion, let's
3  pick a date?
4      **A.  I can't tell you that.  I was very**
5  **upset at this time.  There are laws about how many**
6  **subpoenas that you can do.  You filed against me.**
7  **I was lied about.  You still had not responded**
8  **about the Rule 11.  What do you think an average**
9  **person would do, Gillian?**
10     Q.  What is the rule that you're
11  referring to with subpoenas?
12     **A.  I can't remember, 30-something.**
13     Q.  Okay.
14     **A.  Again, I did not prepare to talk**
15  **about this.**
16     Q.  I understand, I understand.  But I'm
17  talking to you about this miscellaneous action, I
18  can ask you questions related to that.
19     **A.  Sure, that's fine, but I'm telling**
20  **you that I don't have the docket in front of me.**
21  **I don't have all of these --**
22     Q.  I'm asking you what remember, what
23  you can tell me about --
24     **A.  I am doing my best, I am.**
25     Q.  So what is the rule about subpoenas?

122

1      **A.  You can issue one subpoena, you can**
2  **show up, and you can give 7 hours, I think it's**
3  **one day, and then in order to issue a second**
4  **subpoena, you need to get approval from the judge**
5  **of the case wherever that case is.**
6      Q.  Okay.  Where did you learn that?
7      **A.  Cornell Law dot com.**
8      Q.  I'll take that one back.
9      **A.  It's the one that I use the most.**
10     Q.  Okay.
11     THE WITNESS:  Do you mind, I need to
12  take some medication?
13     MS. COOPER:  Sure.  Do you want to
14  take a break?  We have a 5-minute break and a
15  15-minute break.
16     THE WITNESS:  What time is it?
17     MS. COOPER:  2:30.  Do you want to do
18  the 15-minute now?
19     THE WITNESS:  Sure.
20     MS. COOPER:  We'll go off the record.
21     (Brief recess.)
22  BY MS. COOPER:
23     Q.  So at some point during this process,
24  we had a call with Judge Bowman on August 14th,
25  2018.  It was a conference call.  I don't believe

123

1  that was the one that I left you the message about
2  it, I think it was the second one.  On August
3  14th, 2018, we had a conference call with the
4  court.  What do you recall about that
5  conversation?
6      **A.  I recall -- let me think about this.**
7  **It started very late.**
8      Q.  Yes.
9      **A.  And the deputy clerk had a dentist**
10  **appointment and that's why he was late.**
11     Q.  Yes.
12     **A.  And the judge -- was it Bowman, is**
13  **it?**
14     Q.  Yes.
15     **A.  Magistrate Stephanie Bowman, it felt**
16  **to me her impression of this case was just to be a**
17  **scheduler for a deposition.  So when she started**
18  **out the call, she said -- I can almost quote her**
19  **on this, because I do remember.  She said:  I'm**
20  **here to help you guys schedule a deposition.**
21     Q.  Okay.
22     **A.  And, clearly, I mean, that was a part**
23  **of it, but during that call, I agreed to show up.**
24  **She didn't file an order.  She didn't even -- she**
25  **hadn't even read any of the documents that had**

124

1  **been filed, she did say that, and she was not**
2  **going to rule on them until a later date.  But at**
3  **that time, you also decided to issue a different**
4  **type of subpoena, a second subpoena, with**
5  **different requirements.**
6      Q.  Okay.  So was there any conversation
7  on that call or any discussion during that call
8  about a subpoena requesting documents?
9      **A.  You stated that you were going to**
10  **create a second subpoena and add additional**
11  **requirements for documents.**
12     Q.  Okay.  So I'm going to show you what
13  has been marked as Exhibit 6.
14     (Thereupon, Kelly Exhibit 6, a 1-page
15  letter dated 8/14/18 to Julie Kelly from Gillian
16  Cooper, with attachment, was marked for purposes
17  of identification.)
18  BY MS. COOPER:
19     Q.  And what is this document?
20     **A.  This is your second subpoena.**
21     Q.  Okay.
22     **A.  Actually, probably your first to me**
23  **maybe.  My second subpoena for the Steven Barger**
24  **case.**
25     Q.  Right.  But it's the first one that I

Transcript of Julie Kelly
Conducted on October 15, 2018

125

1 signed?
2     **A. Sure.**
3     Q. Okay. And what is the date on the
4 subpoena?
5     **A. The 31st of August.**
6     Q. Oh, to --
7     **A. I'm sorry. It is dated August 14th.**
8 **I don't think I got it until August 19th or**
9 **something. I wrote down the date I received it in**
10 **the mail.**
11     Q. Okay. Because you agreed also on
12 that call that you would accept service via
13 regular mail?
14     **A. Right.**
15     Q. Did you receive an electronic copy of
16 the subpoena?
17     **A. I'd have to look through my e-mail.**
18     Q. Okay. And so I know you brought some
19 documents with you today. We have not reviewed
20 them. We got copies made. We will review them
21 before the end.
22     **A. It's probably in there if you sent**
23 **it. I think I printed all of your e-mails.**
24     Q. So this was the subpoena that was
25 issued for October 31st, 2018.

126

1     **A. Um-hmm.**
2     Q. Thank you. Okay. So on August 29th,
3 2018, you filed a request for order granting
4 motion for sanctions. Do you recall that filing?
5     **A. I do.**
6     Q. Okay. So in -- well, why did you
7 file this request?
8     **A. To try to speed things along.**
9     Q. Okay.
10     **A. Again, I did not review the docket.**
11 **I did not review these in the past couple of days.**
12     Q. That's fine.
13     (Thereupon, Kelly Exhibit 21, a
14 4-page, 2-sided Request for Order Granting Motion
15 for Sanctions, was marked for purposes of
16 identification.)
17 BY MS. COOPER:
18     Q. So you wanted to move things along.
19 How long did defendants have to respond to your
20 motion for sanctions?
21     **A. 14 days.**
22     Q. Okay.
23     **A. I'd have to refer to my --**
24     Q. Okay.
25     **A. -- local rules. I'm not sure.**

127

1     Q. So you looked in the rules for the
2 timeline?
3     **A. I did. I have the Ohio Rules as well**
4 **as Magistrate Bowman's rules.**
5     Q. Okay. So I'm going to show you
6 what's been marked as Exhibit 21. This is the
7 request for order granting motion for sanctions.
8     **A. Um-hmm.**
9     Q. And you write in here at the bottom
10 of the first page: More than 14 days have passed
11 since I filed my motion for sanctions and Your
12 Honor issued the above minute entry. So before
13 you filed this motion -- or did anybody assist you
14 in drafting this motion?
15     **A. No.**
16     Q. Okay. Did anybody review this
17 document?
18     **A. Again, my husband could have**
19 **reviewed, edited it, I don't know.**
20     Q. Okay. You said you checked the rules
21 for this 14-day requirement?
22     **A. Um-hmm.**
23     Q. What rule was it?
24     **A. I think for responding to a motion.**
25 **I don't know, but that's probably what it was.**

128

1     Q. Okay. If you turn to the last page,
2 page 7, the last page, at the top, can you read
3 that, the first three lines?
4     **A. On page 7?**
5     Q. Yes.
6     **A. My children are confused and asking:**
7 **Momma, why won't these people leave you alone? We**
8 **already went downtown to see them and they were**
9 **not there. Why won't they leave us alone?**
10     Q. Is that a direct quote?
11     **A. Almost.**
12     Q. Okay. So what have your children --
13 what have you told your children about this?
14     **A. I haven't told them much, but they're**
15 **wondering why Momma is always researching, having**
16 **to go downtown, file documents. Their summer**
17 **plans had been interrupted because I feel**
18 **threatened that someone is going to come knock on**
19 **my door, someone is going to bring someone to this**
20 **town for the second time because they know I feel**
21 **threatened by them.**
22     Q. What makes you feel threatened?
23     **A. You read my OCRC. First of all, I**
24 **submit my things for my case and then all of a**
25 **sudden, Saul Ewing feels like they can just**

Transcript of Julie Kelly
Conducted on October 15, 2018

---

129

1  subpoena me with a fake FedEx guy, which I get a
2  subpoena. The whole process I feel threatened by,
3  and I guess that's not an excuse for anything,
4  obviously, I showed up.
5      Q.  Okay.
6      A.  And then to hear that Mr. Eidelman
7  can just lie about me in front of my past
8  colleagues and then also -- or people I may have
9  known at First Data --
10     Q.  Sorry, who --
11     A.  -- on the record.
12     Q.  Who was it that he --
13     A.  I don't know who was in the room.
14     Q.  Okay.
15     A.  And what I got from Mr. Shearer is
16 blacked out, but I saw what Mr. Eidelman said
17 about me.
18     Q.  Okay.  All right.
19     A.  I mean, how would you feel if someone
20 said that about you?
21     Q.  Okay.  I'll take that back.  Thank
22 you.  So the date that we agreed upon for your
23 deposition was August 31st, 2018 at --
24     A.  It was.
25     Q.  -- at 12 noon?

---

130

1      A.  Sorry.  Um-hmm.
2      Q.  Tell me about that day.
3      A.  That day -- as you know from our
4  conversation with Magistrate Bowman, I did not
5  agree to the requirements for the second subpoena,
6  first of all, and I told you that on the call.  I
7  did not have documents that would be of relevance,
8  and I did not agree with that.  I did try to get a
9  recording of that call, but, apparently,
10 Magistrate Bowman does not record her calls.  So
11 you knew that.  So that morning, I filed -- I went
12 downtown, I filed a protective order at the court.
13 I think that's stamped 11:07, and this was one of
14 the issues I had with the clerks where they were
15 not filing timely, even if I waited there.  So I
16 know there was an issue with that getting through
17 on PACER.  At that point, I went and I got a
18 coffee.  I've got receipts if you need them.
19     Q.  Okay.  I will make a request for
20 those receipts.
21     A.  Sure.  And you know where the
22 courthouse is, you know where the PNC building is.
23 I thought I saw Ms. Robin Ording.  There's not
24 many people that walk on the streets in
25 Cincinnati.

---

131

1      Q.  Okay.
2      A.  And then I went inside and I saw her
3  name on the book.  I freaked out.  I had to go see
4  my doctor.  I was under medication.
5      Q.  You went into the PNC building?
6      A.  Yes.
7      Q.  Okay.  What time was that?
8      A.  I don't know.
9      Q.  Okay.  Well, if you said you filed a
10 little after 11 a.m.?
11     A.  Um-hmm.
12     Q.  You got your coffee?
13     A.  Um-hmm.
14     Q.  We'll confirm with the receipt.
15     A.  Um-hmm.
16     Q.  And then you walked to the PNC
17 building, and where did you see her name?
18     A.  It was on the sign-in sheet.
19     Q.  Which was where?
20     A.  On the left -- on the right side,
21 it's past the bank.
22     Q.  Okay.  So you walk in, you said the
23 bank is where, on the left side or the right side?
24     A.  I think it's on the left.  I can't, I
25 can't remember.

---

132

1      Q.  Okay.  And then --
2      A.  You know, that whole day is a blur
3  from what you did to me.
4      Q.  So you walk in, where do you recall
5  the sign-in sheet being?
6      A.  On a desk.  I --
7      Q.  Okay.  Where, where was the desk?
8      A.  I believe it was to the right.
9      Q.  Okay.
10     A.  There's a waiting area where you can
11 sit.
12     Q.  Okay.  So you go -- but you had
13 already filed the motion for protective order?
14     A.  Um-hmm.
15     Q.  So why did you come to the building?
16     A.  I was waiting to hear.  I don't have
17 electronic filing stuff, so my whole idea was I'd
18 go and if my protective order is filed, you will
19 let me know --
20     Q.  Okay.  So it --
21     A.  -- if it was approved.
22     Q.  So you were going to come to the
23 deposition and wait to see if it was going to be
24 granted?
25     A.  Yes.

---

Transcript of Julie Kelly
Conducted on October 15, 2018

133

1      MS. COOPER:  Okay.  Pause for just a
2  second.  We're not going to take a break.
3      (Off the record.)
4  BY MS. COOPER:
5      Q.  We can go back on.  So the day of the
6  31st, you file the motion a little after 11.  Did
7  you talk to anybody about the filing?
8      A.  I did upload a copy of my stamped
9  page to the cloud.
10     Q.  But what do you mean?
11     A.  I just save all of my documents in
12 the cloud.
13     Q.  How did you upload a copy of the
14 document?
15     A.  From my phone.
16     Q.  So you took a picture --
17     A.  Um-hmm.
18     Q.  -- of the filing page, and you did
19 what; how do you upload it?
20     A.  I hit Save and it saves it to my
21 files.
22     Q.  Does anyone have access?
23     A.  Yeah, I share, I share that with
24 quite a few people.
25     Q.  Okay.  Your entire cloud or that

134

1  document specifically?
2      A.  I have separate folders that I share
3  with separate people for certain things, and in
4  this instance, this filing was in regards to my
5  OCRC case, so it went to my OCRC.
6      Q.  The motion for protective order that
7  you filed in this miscellaneous matter --
8      A.  Is evidence for my OCRC case.
9      Q.  Okay.  Why do you believe that?
10     A.  Because I have felt threatened, I
11 have been harassed, and all of this is something I
12 cannot talk about today.
13     Q.  Okay.  Why can't you talk about that?
14     A.  Because it is in regards to my OCRC
15 claim.
16     Q.  Okay.  But why --
17     A.  We're not here to talk about my OCRC
18 claim.
19     Q.  We're not, but we're here to talk
20 about the 31st, in part.
21     A.  Um-hmm.
22     Q.  So we are going to talk about what
23 happened on the 31st and what you discussed about
24 that deposition that day.
25     A.  Okay.

135

1      Q.  So before you filed the motion for
2  protective order, did you tell anyone that you
3  would be filing that document?
4      A.  I can't remember.
5      Q.  Okay.  So you filed it a little after
6  11, you uploaded it to the cloud, and then did you
7  have any phone conversations with anyone about it?
8      A.  I can't remember.
9      Q.  Okay.
10     A.  I was nervous as it is.  I don't
11 know.
12     Q.  Okay.  And so you testified that you
13 believe you saw Ms. Ording on the street, and then
14 you went into the PNC building and saw her name on
15 the sign-in sheet?
16     A.  Um-hmm.
17     Q.  Did anybody tell you that Ms. Ording
18 was at the deposition?
19     A.  No.  I knew she was there, no one had
20 to tell me.
21     Q.  You knew she was there how?
22     A.  I just told you.
23     Q.  Okay.  All right.  But you would have
24 filed the protective order or the motion for
25 protective order regardless of whether Ms. Ording

136

1  was there?
2      A.  Yes.
3      Q.  Okay.
4      A.  It's like I told you, the request for
5  documents was invasive and burdensome to me as
6  well as threatening as this whole process.
7      Q.  Okay.
8      A.  And you were aware of that.
9      Q.  Okay.  And so you waited until the
10 morning of the deposition to file the motion
11 for --
12     A.  Look, I don't have electronic filing
13 rights.  I have responsibilities.  I have a
14 family.  I can't just, poof, file something.  I'm
15 not an attorney.  It takes me awhile to write this
16 stuff.
17     Q.  Okay.  So I want to talk a little bit
18 about -- well, you filed a supplement on September
19 4th, Document No. 13, but I want to start talking
20 about some of the content in here.  You talk about
21 you were employed by First Data for 20 years.  My
22 final two supervisors were Plaintiff Barger and
23 then Ms. Ording.  So tell me a little bit about
24 your relationship with Mr. Barger when he was your
25 supervisor.

137

1    A.  So I first started working with
2  Mr. Barger, I would say, maybe spring, early
3  summer of 2014.  He was a consultant.  He came
4  on -- Joe Plumeri, who was I believe on the board
5  at First Data, brought him on to really
6  transform -- basically, keep our sales force from
7  becoming just a new rate in a terminal to doing
8  really business services and doing more
9  consultative sale.  I assisted him.  Bryan Fricke,
10 I don't know if you've heard that name, he was my
11 supervisor at the time, and he reported to Joe
12 Plumeri, and Steve was a consultant.  So we all
13 worked together on certain road shows, writing
14 curriculum, writing programs, doing measurement on
15 the effectiveness of programs, so on and so forth.
16      My first meeting with Barger was -- I
17 mean, he was a man of great charisma.  Even over
18 the phone, he would just -- you didn't type on
19 multi-task, you listened to every word that he had
20 to say.  He was an incredible speaker, very
21 inspirational, and you respected him immediately.
22 When Mr. Fricke left the business, they did not
23 fill his position immediately.  They had
24 Mr. Barger step in.
25   Q.  Okay.

138

1    A.  And --
2    Q.  When was that?
3    A.  I want to say maybe late summer 2014,
4  maybe in the summer.  I don't have exact dates.
5    Q.  So what was your title at this time?
6    A.  I was a manager of instructional
7  design.  It probably said manager of training.
8    Q.  Manager of training?
9    A.  Um-hmm.
10   Q.  Okay.  How long did you have -- did
11 you hold that title?
12   A.  Oh, gosh, I don't know.
13   Q.  Okay.  So it wasn't -- so when did
14 you -- was your title always manager of training?
15   A.  For a long time.
16   Q.  Okay.  Did it ever change after
17 summer of 2014?
18   A.  It did.
19   Q.  When?
20   A.  This was post Mr. Barger.
21   Q.  Okay.  So when did it change?
22   A.  Under Ms. Robin Ording.
23   Q.  Okay.  What did it change to?
24   A.  It changed to director of training.
25   Q.  So was that a promotion?

139

1    A.  I believe so.
2    Q.  Okay.  Did you receive an increase in
3  salary or a bonus?
4    A.  I received additional
5  responsibilities from a VP who was going to be
6  working I think a third of the time or something
7  to start her own brewery.  I'm not sure of the
8  details, but I was taking on her responsibilities.
9  So I was given the director title along with a
10 base salary increase, and I think because it moved
11 me up a level, I was eligible for a different type
12 of a bonus.
13   Q.  Okay.  Did you receive an additional
14 bonus?
15   A.  I did not.
16   Q.  Okay.  So when Mr. Barger oversaw the
17 group, how often did you see him in person?
18   A.  Maybe once or twice a year, not
19 often.  I did not work in the same office as he
20 did.
21   Q.  Okay.  So how did you usually
22 communicate?
23   A.  Videoconference.  We had a couple of
24 different platforms that we utilized, the phone
25 almost a couple of times a day at first.  He was

140

1  learning about the business.  He was learning
2  about, you know, how I worked, my team.
3    Q.  And what was he learning about?
4    A.  What we did.
5    Q.  Okay.
6    A.  How First Data worked, how we could
7  all work together.  Bryan Fricke left abruptly,
8  so, you know, he had to come in and learn.  It was
9  quite difficult when someone new takes on.
10   Q.  So I guess tell me a little bit about
11 your day-to-day type work when Mr. Barger took
12 over as your head.
13   A.  So at the time, gosh, we would have
14 been starting to write a completely new curriculum
15 for a new hire program for our sales.  They
16 changed the name.  It was the time we were
17 changing them from account executives to business
18 consultants, so that was rewriting an entire
19 program from scratch.  So we would work on that.
20      We also had various things with the
21 corporate university.  We had gone through --
22 prior to Mr. Fricke coming on board, we had gone
23 through a huge shift when Frank Bisignano came on
24 to the company.  We had had an amazing online
25 university called Mind Spring and there was a lot

141

1  of pieces that my team was responsible for that we
2  had to pick up and with a lot of people exiting
3  the company. So there were various tasks. But
4  mainly, my group was responsible for instructional
5  design and development as well as measurement for
6  the sales organization training.
7      Q.  What does that mean, measurement?
8      A.  You measure the effectiveness of your
9  practice. So basically, you do a training
10 program, you want to see how that impacted, you
11 know, your learners, not just immediately. You
12 know, everybody can do a sheet, yeah, the food was
13 great, you know, but we went further with that, so
14 really measuring, you know, what did they
15 comprehend, and then beyond that, how did they
16 change their behaviors on the job.
17     Q.  Okay. And so was this a new process
18 that was implemented when Mr. Barger took over?
19     A.  No, no. This is common adult
20 learning. These are common practices.
21     Q.  It's a common practice in --
22     A.  Yeah. What was new when Mr. Barger
23 took over was Joe Plumeri's vision, as well as him
24 I'm sure, was to make it the First Data way, not
25 just this was our process. It was consultative

142

1  selling, but the First Data way, on how to sell
2  and really getting that out to all of our business
3  consultants. So it was a transformation.
4      Q.  Okay. How many managers were I guess
5  under Barger, like same level as you, when
6  Mr. Barger took over?
7      A.  Oh, maybe one or two.
8      Q.  Okay.
9      A.  I can't really remember, maybe one or
10 two.
11     Q.  Do you remember who they were?
12     A.  I think David Short was one, and
13 Michele Mohan may be another.
14     Q.  Okay. When Mr. Barger took over,
15 what was the head count of the group?
16     A.  I wouldn't -- I wouldn't remember
17 that.
18     Q.  Okay.
19     A.  I mean, gosh, that was, what, four
20 years ago.
21     Q.  Yeah. Okay. All right. Well, so
22 Mr. Barger takes over. How did the group change
23 under his leadership?
24     A.  It was amazing. I mean, he took the
25 time to get to know people. He met with them

143

1  individually. He knew everybody's kids' names,
2  what sports they did, their birthdays. I mean, he
3  just had a fantastic memory. And he really showed
4  concern, genuine concern, for people and that was
5  kind of his thing, genuine concern, and he pushed
6  that out to the entire corporation. And, you
7  know, while I didn't have -- you know, I wasn't
8  there on site with him, you know, he was always a
9  very supportive manager. You know, you could tell
10 he had tons of experience.
11     Q.  Okay. So it's clear that you believe
12 that he really cared about his people and took
13 time to get to know them. Tell me a little bit
14 about his management of the group. Did he -- was
15 he a micro manager, did he delegate, how did he
16 manage?
17     A.  So I think at first, he was micro
18 manager a little bit. And, you know, it's quite
19 common when people take over organizations or
20 different groups, they want to understand why
21 you're doing what you're doing, and they might
22 have ideas to, you know, make that a better
23 process or change it or move things around. So
24 you'll see in my documents, I do get frustrated
25 with him because he wanted to know what I was

144

1  doing on a Sunday when I was cooking dinner and he
2  wanted an update on something. So you know, at
3  first, you know, it's kind of -- you know, he was
4  a little micro manager, but then he -- once it's
5  almost like he got to trust you, then, if you did
6  have situations that you needed his help on, he
7  wouldn't want to solve those for you, he would
8  want to talk you through you coming up with your
9  own solution, and I learned quite a bit from him
10 in some of those processes.
11         He gave me an awesome project. It
12 was -- it had a code name, I won't mention it, but
13 it did turn out to be the Apple Pay when First
14 Data had roll out, and he allowed me to be a
15 part of that huge project and that was just an
16 incredible experience for me.
17     Q.  What was your role in that project?
18     A.  I was responsible for learning the
19 product and learning all of the training and
20 curriculum.
21     Q.  About what time was that?
22     A.  I want to say 2015.
23     Q.  Okay.
24     A.  Yeah, but I'm not sure.
25     Q.  Okay. What did some of your

Transcript of Julie Kelly
Conducted on October 15, 2018

---

145

1 colleagues think about Mr. Barger's leadership;
2 did you ever have any conversations with them?
3        MR. SHEARER: Objection. You can
4 answer.
5        THE WITNESS: Yeah, I can't -- I
6 can't speculate what other people might think or
7 say.
8 BY MS. COOPER:
9    Q. That's fine. But did you have any
10 conversations with your colleagues about
11 Mr. Barger?
12   **A. I'm sure we did, yeah.**
13   Q. Okay. Did your colleagues tell you
14 that they liked the group under his leadership?
15   **A. Again, I don't want to, you know,**
16 **speculate what or misinterpret what they may have**
17 **or may not have said. I really don't remember.**
18   Q. Okay. But you did have conversations
19 about his leadership?
20   **A. I mean, it was very positive, you**
21 **know, of the team.**
22   Q. Okay. Did anyone ever complain to
23 you about his leadership?
24   **A. Not that I can think of.**
25   Q. Okay. So you don't recall any

---

146

1 employee complaining to you about Mr. Barger's
2 running of the group?
3    **A. Maybe he was hard on them.**
4    Q. Okay.
5    **A. Again, I don't -- I don't -- I don't**
6 **really remember.**
7    Q. Okay.
8    **A. I mean, they may have had similar**
9 **experiences. Again, I don't want to speculate**
10 **what anyone else went through.**
11   Q. What do you mean, similar
12 experiences?
13   **A. Like how he was hard on me at first**
14 **and challenged me.**
15   Q. Okay. So are there any particular
16 employees that you're thinking of when you talk
17 about -- you know, I understand that you don't
18 want to speculate what they thought about him, but
19 it seems that you've had some conversations
20 about --
21   **A. Oh, no. I'm just -- I don't know.**
22   Q. Okay. So you can't recall a
23 conversation with any colleagues about
24 Mr. Barger's leadership?
25   **A. Let me think for a second. I'm sure**

---

147

1 there was, but let me see if I can come up with an
2 **example. Maybe Matthew McDonald.**
3    Q. Okay. And when was -- when were
4 those conversations?
5    **A. Probably 2015.**
6    Q. What were some of the things that you
7 remember about the conversation?
8    **A. He was -- he challenged him,**
9 **challenged. Matthew reported to me but had a lot**
10 **of guidance from Steve, and he really appreciated**
11 **that.**
12   Q. Did any employee ever complain to you
13 about Mr. Barger?
14   **A. Yes.**
15   Q. Okay. Who complained to you?
16   **A. It was Nick Mantia.**
17   Q. Okay. What did he complain about?
18   **A. Nick had some problems, and I think**
19 **he was just really looking for Steve to be there**
20 **every day for him and not push him and challenge**
21 **him. He just wanted to be there and have a task**
22 **list of 15 things to do a day and be done, not to**
23 **have to think and not have to -- again, Nick may**
24 **have been under the influence of some certain**
25 **things, but I -- I don't know.**

---

148

1    Q. Okay. You mentioned earlier about
2 Nick Mantia, that there was some sort of issue
3 with Rhonda Johnson. What was that issue?
4    **A. I don't know if it was an issue. I**
5 **don't understand their relationship.**
6    Q. Okay. Just what do you mean by that,
7 what is their relationship?
8    **A. I just remember that he had calls**
9 **with her. He was always in her office, and I**
10 **think it's when he was sick. I'm not sure.**
11   Q. Okay. All right. So Nick Mantia
12 complained to you at some point about Mr. Barger?
13        MR. SHEARER: Objection.
14 BY MS. COOPER:
15   Q. Or you had conversations with
16 Mr. Mantia about --
17   **A. Again, I don't want to speculate what**
18 **he was going through. I'm sure it's --**
19   Q. Okay.
20   **A. It's none of my business.**
21   Q. Any other employees complain to you?
22   **A. Not that I remember.**
23   Q. Okay. There's one thing that you put
24 into a filing on September 13th when you filed --
25 it's Docket No. 17, it's a reply in support of

Transcript of Julie Kelly
Conducted on October 15, 2018

38 (149 to 152)

149
1 motion for sanctions, and you asked for
2 terminating sanctions. What are terminating
3 sanctions?
4 **A. I believe they're basically to**
5 **eliminate someone's rights to do something.**
6 Q. So what rights were you seeking to be
7 eliminated?
8 **A. I can't remember. I'd have to read**
9 **the context. It may have been something I saw on**
10 **Google Cornell. I don't know.**
11 Q. Okay.
12 (Thereupon, Kelly Exhibit 7, a
13 2-page, 2-sided Order, was marked for purposes of
14 identification.)
15 BY MS. COOPER:
16 Q. I'm going to show you what has been
17 marked as Exhibit 7, which is another lesson to me
18 that I shouldn't pre-mark exhibits at the
19 beginning of the deposition because it changes
20 things around a little bit. Okay.
21 So do you recognize this document?
22 **A. I do.**
23 Q. This is Docket No. 25?
24 **A. Um-hmm.**
25 Q. It is an order dated September 19,

150
1 2018. Okay. So the court writes that the matter
2 is currently before the court based upon the
3 filing of a motion to compel the deposition of
4 you. The judge goes through a little bit of the
5 procedural history. She writes: The matter was
6 previously before the court for a telephone status
7 conference to discuss the above-mentioned motions.
8 At that time, Ms. Kelly agreed to appear for a
9 deposition on August 31st, 2018, and the Court
10 requested further briefing on the motion for
11 sanctions. Ms. Kelly then filed a motion for an
12 order on her motion for sanctions as well as a
13 motion for protective order. Ms. Kelly did not
14 appear for her deposition on August 31, 2018,
15 which led the Court to schedule another conference
16 for September 18th.
17 Okay. I'm going to skip through a
18 couple of lines. And then on page 2, the first
19 full paragraph, it says: Ms. Kelly's motion for
20 protective order is also denied, and Ms. Kelly is
21 ordered to bring with her to the deposition the
22 documents in her possession that are requested in
23 the subpoena for the August 31, 2018 deposition
24 that was served on August 20th, 2018.
25 And then the bottom on page 2, it

151
1 says: Defendant's motion to compel is granted,
2 Ms. Kelly must appear for deposition on October
3 15, 2018 at 12 noon. Ms. Kelly must bring any and
4 all documents in her possession as requested in
5 the subpoena previously issued for the August 31,
6 2018 deposition. And then the judge goes through
7 some more specifics about the breaks, et cetera.
8 Do you recall receiving this order?
9 **A. Yes.**
10 Q. Okay. Did you talk about this order
11 with anyone?
12 **A. I'm sure my husband and I went over**
13 **it.**
14 Q. Okay. Was there any part of this
15 order that you found to be confusing?
16 **A. Not confusing, but it does not feel**
17 **like it's complete. It does not state why I did**
18 **not show up for the August 31st, so it makes it**
19 **sound like I just decided not to show up, when**
20 **there were contributing factors to why I did not**
21 **show up.**
22 Q. Okay. Which were what?
23 **A. For you bringing people to**
24 **Cincinnati.**
25 Q. Okay. So the judge issues this

152
1 order. Was there anything else that you thought
2 needed -- that was confusing or you did not
3 understand?
4 **A. Yes. Because the motion to compel**
5 **was originally filed for a subpoena that I showed**
6 **up for, so I don't know -- I don't understand how**
7 **a second subpoena could be issued. It's very**
8 **confusing. The first one is still out there.**
9 Q. Okay. But then in August, we
10 discussed a new subpoena or a subpoena for August
11 31st that would command documents?
12 **A. Which I objected to.**
13 Q. Right, you objected to bringing
14 documents, and then you didn't appear for the
15 deposition. But I'm asking specifically what part
16 of this order did you find confusing?
17 MR. SHEARER: Objection.
18 THE WITNESS: Objection, yeah. I
19 just didn't agree with it and that's why I filed
20 what I did.
21 BY MS. COOPER:
22 Q. Got it. Okay. So what do you do
23 when you don't agree with an order, what is the
24 procedural step, when there's an order issued?
25 **A. I would look it up online, and I'm**

Transcript of Julie Kelly
Conducted on October 15, 2018

153

1 going to file my reasoning for why I do not agree
2 with what the judge ordered, and it goes up to the
3 next level.
4    Q.  Which is what?
5    A.  To the judge.
6    Q.  But to which judge?
7    A.  In this case.
8    Q.  Because this is -- I'm sorry.
9    A.  It's Magistrate Bowman, and it's
10 going to go to the judge on the case to review,
11 which is Susan Dlott.
12    Q.  Okay.  Do you understand that Judge
13 Bowman is a magistrate judge, she is --
14    A.  I do.
15    Q.  She is a judge?
16    A.  Um-hmm.
17    Q.  Okay.  So what is that process called
18 when you want to take it --
19    A.  An appeal.
20    Q.  An appeal.  Okay.  How did you learn
21 about the process of how to, as you put it, appeal
22 the magistrate judge's order?
23    A.  My crash course in Law 101 this
24 summer.
25    Q.  Okay.  Did you talk to anybody about

154

1 that process?
2    A.  I don't know.
3       MR. SHEARER:  Objection.  To the
4 extent that you spoke to counsel and received
5 advice, then, you shouldn't answer that.  Proceed.
6       THE WITNESS:  I am pro se for this
7 whole case that we're talking about today, which I
8 did not know we were talking about, that was very
9 misleading in the first place, and I'm trying to
10 represent myself.  If I talk to other people about
11 it, I'm allowed to do that.
12 BY MS. COOPER:
13    Q.  Right, you are allowed to do that,
14 and I am allowed to ask you about that.  I'm not
15 saying that you're not allowed to talk to anybody
16 about it, but I am allowed to ask you about it.
17    A.  That's fine.
18    Q.  That's what I'm doing, I'm asking you
19 about who you spoke to about this order.
20    A.  I spoke to I don't know how many
21 people.  I don't know who they were.  I can't
22 remember this whole -- especially this stuff
23 because it's been such a blur over what you've
24 done to me this whole summer.  I mean, I just --
25 I'm getting really hot right now too.  I might

155

1 have to take some more -- I might have to take
2 something.
3    Q.  Do you need to take a break?  We have
4 one more 5-minute break; if you want to take it
5 now, we can do it now.
6    A.  No, let's keep going.
7    Q.  Okay.  So in the subpoena that was
8 served on August 14th, 2018 that the judge ordered
9 you comply with, we requested documents?
10    A.  Um-hmm.
11    Q.  On October 2nd, 2018, you e-mailed
12 Gary Eidelman and myself and objected to the
13 document production?
14    A.  Um-hmm.
15    Q.  How did you know about objections to
16 document requests?
17    A.  Well, I don't get to talk to you
18 about things, so I figured I should e-mail them.
19    Q.  What do you mean?
20    A.  I can't pick up the phone and say, I
21 object to this, I object to that, so I --
22    Q.  Why can't you pick up the phone and
23 call us?
24    A.  Because I'm representing myself in
25 this and everything seems to be more formal.  I

156

1 don't know the process.
2    Q.  Okay.  But did anyone tell you that
3 you couldn't pick up the phone and call us?
4    A.  No.
5    Q.  Okay.  Did you think about calling us
6 about --
7    A.  No, no, I did not.
8    Q.  Okay.  So you sent us an e-mail and
9 you put objections in that e-mail?
10    A.  (Nodding head.)
11    Q.  Where did you learn about document
12 objections or objections to documents?
13    A.  Online, maybe someone I spoke with, I
14 don't know.  I can't remember.
15    Q.  Okay.  And what do you know about
16 objections to document requests?
17    A.  I had objections because the
18 documents -- most of the documents that I have, I
19 was able to find some, are in relation to my OCRC
20 case.
21    Q.  So I do want to --
22    A.  So let me ask you this, how many of
23 my other colleagues have you subpoenaed, deposed,
24 and asked for documents, what are their names?
25    Q.  Okay.  I want to make --

Transcript of Julie Kelly
Conducted on October 15, 2018

157

1      A. I don't think it happened.
2      Q. So have you talked to other people
3  about --
4      A. I haven't. That's why I'm asking
5  you, who else was deposed?
6      Q. Okay. But you said you don't think
7  that happened, so --
8      A. I don't. You won't answer me.
9      Q. It's not my deposition. I do want to
10 make very clear that the Attachment A to the
11 subpoena, the first --
12     A. Which subpoena are we talking about?
13     Q. The one on August 14th, Exhibit 6,
14 says: You are not being asked by way of this
15 subpoena or otherwise to produce any documents or
16 communications, e-mail, electronically stored or
17 otherwise, relating to the charge of
18 discrimination that you filed with the Ohio Civil
19 Rights Commission, Charge No.
20 DAYB-6-27240-0517-2018, including, but not limited
21 to, any communications you have had with the law
22 offices of Shawn Shearer, Shawn Shearer, Esq.,
23 and/or Brenda Barger regarding the charge of
24 discrimination. So it's pretty clear that we are
25 asking for documents, but we are making

158

1  specifically clear that it's not related to that
2  charge.
3          So I'm going to ask you again, why
4  did you feel that you needed to object to the
5  document request?
6      A. Because it's burdensome for me to
7  have to sort through my e-mail. You gave me how
8  many categories on that document?
9      Q. Okay. So let me read them, then.
10     A. And if I can just add to that, First
11 Data has a copy of everything I've ever done for
12 the past 20 years, and I would assume that would
13 be what is relevant to the Barger case, which
14 we've asked, what, one question about so far.
15     Q. Okay. All right. But the objections
16 that you put in the e-mail dated October 2nd,
17 2018, where did you find those?
18     A. Probably the Internet.
19     Q. Okay. Did you copy and paste them
20 out of a document?
21     A. Probably.
22     Q. Did somebody send them to you?
23     A. No. I think I got them online. I
24 can't remember.
25     Q. Okay.

159

1          (Thereupon, Kelly Exhibit 22, a
2  2-page, 2-sided e-mail dated 10/2/18 to Gary
3  Eidelman from Julie Kelly, was marked for purposes
4  of identification.)
5          MS. COOPER: I also want to point out
6  for the record that Exhibit 6, I think when it
7  printed, it might be missing a page. I will
8  confirm that on the next break. I just wanted to
9  make a note of that. I think it might be missing
10 a page of the subpoena.
11 BY MS. COOPER:
12     Q. Okay. So do you recognize this
13 document?
14     A. I do.
15     Q. What is this document?
16     A. And this is the e-mail I sent to you
17 with my document production objections --
18     Q. Okay.
19     A. -- on Tuesday, October 2nd.
20     Q. Okay. Did you draft this e-mail?
21     A. I did.
22     Q. Did anybody assist you in drafting
23 this e-mail?
24     A. I don't believe so, but I don't
25 remember.

160

1      Q. Okay.
2      A. May have had some editing.
3      Q. By who?
4      A. Probably my husband.
5      Q. Okay. In the second paragraph, you
6  write: My understanding is that these are fairly
7  standard general objections to document production
8  requests. How did you come to that belief?
9      A. On the Internet, I'm pretty sure.
10     Q. Okay.
11     A. My crash course 101.
12     Q. Thank you. So at some point on
13 October 2nd, you filed a Rule 72(a) motion. What
14 is a Rule 72(a) motion?
15     A. This is my asking Judge Dlott, the
16 higher-up judge, to take a look at my reasoning
17 for objecting to Judge Magistrate Bowman's order.
18     Q. Okay. And what was your reasoning
19 for objecting to Judge Bowman's order?
20     A. Basically, invalid subpoena.
21     Q. What about it was invalid?
22     A. Because I went to -- I showed up for
23 the first subpoena. Had I not shown up, you
24 probably would have compelled me, but I did show
25 up, and then you issued a second more burdensome

Transcript of Julie Kelly
Conducted on October 15, 2018

161

1  subpoena. I felt threatened through this entire
2  process, and no one seems to be listening to me.
3      Q.  Okay.
4      A.  And I'm asking for help.
5      Q.  How many copies -- you said that you
6  received an excerpt of the Rule 26(a) initial
7  disclosures?
8      A.  Yes. We reviewed that earlier.
9      Q.  Right. How many copies have you
10 received of those initial disclosures?
11     A.  I think the one from you.
12     Q.  Okay.
13     A.  I think -- I know for a fact the full
14 one came from you.
15     Q.  Okay.
16     A.  I thought -- it was very eye-opening
17 to see all of those other names on that 26(a)
18 disclosure who -- you know, were they put through
19 this same harassment that I'm being put through?
20     Q.  But you received one copy from
21 Mr. Shearer. Have you received any other copies
22 from Mr. Shearer?
23     A.  I received like an edited,
24 slimmed-down copy from Mr. Shearer. If there was
25 something else, maybe, but I don't know. I don't

162

1  think so.
2      Q.  Because in your 72(a) motion on page
3  11, you write: Mr. Eidelman and Ms. Cooper remain
4  listed as my counsel on their 26(a) disclosure
5  until September 27, 2018. How do you know that?
6          MR. SHEARER: Objection to the extent
7  that that requires her to testify as to any
8  conversation with counsel.
9  BY MS. COOPER:
10     Q.  Okay. You may answer.
11     A.  I may have had a conversation, but it
12 was in regards to what I'm filing for my OCRC
13 case.
14     Q.  Okay.
15         (Thereupon, Kelly Exhibit 8, a
16 2-page, 2-sided Notice of Electronic Filing dated
17 10/9/18, was marked for purposes of
18 identification.)
19 BY MS. COOPER:
20     Q.  I'm going to show you what we marked
21 as Exhibit 8.
22         MR. BYRNE: Can I request real quick,
23 the last document dated the 27th, did that have a
24 number?
25         MS. COOPER: 22.

163

1          MR. BYRNE: Thank you.
2  BY MS. COOPER:
3      Q.  Do you recognize this document?
4      A.  I do. You sent this to me.
5      Q.  Okay. Did you receive a copy of this
6  from anyone else?
7      A.  I think I got a copy in the mail.
8      Q.  From me or from --
9      A.  No, from the court.
10     Q.  Okay. When the court -- since you
11 don't have electronic filings, when the court
12 issues an order, how do you find out about it?
13     A.  I get a copy in the mail or I'll
14 update PACER in the morning.
15     Q.  Okay.
16     A.  I'll just like refresh.
17     Q.  Okay.
18     A.  So if something is posted, I don't
19 see the document. I can't click on the documents,
20 but I'll see like the summary.
21     Q.  So that you can see that something
22 has been entered, but you don't necessarily see
23 what the document is?
24     A.  Right.
25     Q.  Okay. You update PACER how often?

164

1      A.  Maybe just in the morning.
2      Q.  Okay.
3      A.  Because I guess it doesn't do a live
4  update. You have to pay for that, and I don't
5  have the means to pay to update the web page --
6      Q.  Okay.
7      A.  -- throughout the day.
8      Q.  Okay. So this is Judge Dlott's order
9  dated October 9th, 2018?
10     A.  Um-hmm.
11     Q.  And the order says that: Ms. Kelly
12 must bring any and all documents in her possession
13 as requested in this subpoena previously issued
14 for the August 31, 2018 deposition. And it sets
15 forth, you know, confirming that the motion to
16 compel is affirmed and that the 72(a) motion is
17 denied.
18         Did you discuss this order with
19 anyone?
20     A.  Yes, because I was confused because
21 she didn't specifically state what was under this
22 Docket 21. So basically, when I asked her to
23 review this, I wanted to know exactly what she was
24 going to rule for the motion to compel, which was
25 No. 1. I have asked for clarification, I'm still

Transcript of Julie Kelly
Conducted on October 15, 2018

165

1  waiting on that.
2      Q.  I'm sorry.  What do you mean?  I'm
3  not sure --
4      **A.  Because it doesn't specifically say**
5  **what she's ruling on the motion to compel.**
6      Q.  But the order says it's affirming the
7  judge's order to compel your deposition; is that
8  correct?
9      **A.  Um-hmm.**
10     Q.  So what other clarification --
11     **A.  It doesn't state the docket.  I just**
12 **asked for clarification, and you'll see it posted.**
13 **I just -- it's on PACER.**
14     Q.  Okay.  But why do you need to know
15 which docket?
16     **A.  I wanted to be able to adequately**
17 **prepare for today, so I was asking her for**
18 **clarification also on which subpoena we were**
19 **referring to.  Obviously, it hasn't been either**
20 **subpoena because we haven't really talked about**
21 **the Barger case.  So I'm not sure what that means.**
22     Q.  It says, though, the subpoena
23 previously issued for the August 31, 2018
24 deposition; is that correct?
25     **A.  That's what it states.**

166

1      Q.  Okay.  So with all of the filings in
2  this case that you have filed in the miscellaneous
3  action, how many people have you discussed the
4  motions or the writings or the research with?
5      **A.  Oh, I don't know.**
6      Q.  You know, one, two, five, ten?
7      **A.  I'm not sure, and anyone can read it**
8  **online.**
9      Q.  Right.
10     **A.  It's public.**
11     Q.  I'm curious about who you discussed
12 it with.
13     **A.  Yeah.  I'm not sure.**
14     Q.  Okay.  So you've discussed it with
15 all of these people.  What have you discussed with
16 Steve Barger?
17     **A.  About this?  Nothing.**
18     Q.  Why not?
19     **A.  I don't call -- I don't talk to him**
20 **every day.  He's a busy man.**
21     Q.  Yes.  But this is his case, it's his
22 lawsuit, so why not talk about this case with --
23 why talk about this case with other people and not
24 him?
25     **A.  I don't know.**

167

1      Q.  Have you reached out to him at all?
2      **A.  I may have.**
3      Q.  Has he reached out to you?
4      **A.  I don't know, maybe.**
5      Q.  Okay.  So you haven't worked for the
6  company since November 30th, 2017.  Since that
7  time, how many conversations have you had with
8  Mr. Barger?
9      **A.  Oh, I don't know.  I can't tell you**
10 **that.**
11     Q.  I mean, one -- I mean, it's a little
12 less than a year, about 11 months.
13     **A.  I honestly don't know.**
14     Q.  But you have spoken to him?
15     **A.  Of course.**
16     Q.  Okay.  At any time did he or somebody
17 acting on his behalf contact you about being a
18 witness in this case?
19     **A.  Did he -- can you repeat the**
20 **question?**
21     Q.  Did Mr. Barger ever contact you about
22 being a witness in this case?
23     **A.  No.**
24     Q.  Did Mr. Barger's attorneys ever
25 contact you about being a witness in this case?

168

1      **A.  No.**
2      Q.  Did Brenda Barger ever contact you
3  about being a witness in this case?
4      **A.  No.**
5      Q.  Okay.  Did you ever receive any sort
6  of questionnaire about your employment with First
7  Data from either Mr. Barger or his attorneys?
8      **A.  No.**
9      Q.  Okay.  Did Mr. Barger ever contact
10 you about a letter of recommendation?
11     **A.  Yes.**
12     Q.  Okay.  When was that?
13     **A.  Oh, I don't know, maybe last summer,**
14 **last spring.  I don't know.**
15     Q.  Were you still working for the
16 company when he reached out to you?
17     **A.  I don't know.  Probably.**
18     Q.  That e-mail, is it in the documents
19 that you provided here today?
20     **A.  Yeah.**
21     Q.  So what did he ask you for?
22     **A.  Just a letter of recommendation or**
23 **maybe it was a LinkedIn recommendation, I can't**
24 **remember.**
25     Q.  Okay.

Transcript of Julie Kelly
Conducted on October 15, 2018

169

1    (Thereupon, Kelly Exhibit 23, a
2  1-page document titled Confidential, from Julie
3  Kelly, Bates SBB-00780, was marked for purposes of
4  identification.)
5  BY MS. COOPER:
6    Q.  I'm going to show you what has been
7  marked as Exhibit 23.  Do you recognize this
8  document?
9    A.  I do.
10    Q.  What is this document?
11    A.  This is what I wrote for Steve.
12    Q.  Okay.  And so for the record, this
13  has been marked as SBB 000780, that's the Bates
14  number on this document.  And this is an e-mail
15  that you wrote or looks like a letter that you
16  wrote about Mr. Barger.  So you wrote:  During
17  this time, Steve was a leader like none other.
18  Tell me a little bit about how you believe Steve
19  or Mr. Barger was a leader like no other.
20    A.  I think I had talked about this a
21  little bit earlier, but he really had a
22  charismatic aura around him.  Is that what I
23  wrote?
24    Q.  Yeah.
25    A.  I just saw that.  And, you know, he's

170

1  very respectful.  He knew training, you could tell
2  he had done it for many years, but he also kept up
3  with technology.  He kept up with the changing of
4  the generations, and he really understood a
5  passion of mine, which was measuring the
6  effectiveness of training, and really pushed us to
7  look for new and innovative ways to have blended
8  learning programs, and virtual learning programs,
9  and hands-on experience training.
10    Q.  What is a blended learning program?
11    A.  So that might be something where if
12  you think about maybe you take a refresher law
13  course about ethics online maybe through
14  University of Phoenix or something, right, and you
15  go on and you get into a classroom with other
16  people and you have an instructor, might be on
17  video, and you're learning about your topics, and
18  then you go off and do an assignment in a group,
19  maybe in a chat room.  So it's pulling in many
20  different types of learning.
21    Q.  Okay.  You said that, you know, it
22  was obvious that he had a lot of experience in the
23  training area.
24    A.  Um-hmm.
25    Q.  What do you know about his experience

171

1  in training?
2    A.  Well, when I first started working
3  with him, we were taking one of his -- I'm not
4  sure if it was published programs, we were taking
5  one of his programs that he wrote and
6  transitioning that into something that he was
7  going to facilitate and train all of the First
8  Data sales force for.  And when I saw that
9  program, it was amazing.  It was one of the best
10  I've ever seen for involving people.  It wasn't
11  just a PowerPoint you throw up on the screen, you
12  know, people were doing activities and he was
13  getting involved with people.  And when I had the
14  opportunity to work with him on that to bring it
15  into First Data, it really led me to see exactly
16  what his experience was right there in front of
17  me.
18    Q.  What was the name of that program?
19    A.  I think it was: It's Your Business,
20  Own It, something like that.
21    Q.  Okay.  And that was -- you said it
22  wasn't a PowerPoint.  I'm just trying to get an
23  idea of what it was.
24    A.  I mean, there were different
25  components to it.  There were worksheets, there

172

1  were workbooks that you went there, there were
2  some virtual pieces, some video, some lecture, all
3  different types of things.
4    Q.  Was this something that was created
5  when he was at First Data?
6    A.  Yeah.
7    Q.  Okay.  So were you involved --
8    A.  Oh, originally? I'm not sure.  We
9  came in and this was something that he -- you
10  could tell he was passionate about.  I'm sure he
11  built it, and he's trained millions or probably
12  thousands of people on similar concepts.
13    Q.  Okay.  Are you aware of any other
14  positions he's had that involved training besides
15  the position that he's had at First Data?
16    A.  I'm sure I've read his biography and
17  talked to him about it before, but not off the top
18  of my head.
19    Q.  Okay.
20    A.  No, sorry.
21    Q.  You also mentioned, you know, him
22  staying up-to-date or ahead of the technology.
23    A.  Um-hmm.
24    Q.  So tell me a little bit about that.
25  What sort of technology are you talking about, how

Transcript of Julie Kelly
Conducted on October 15, 2018

44 (173 to 176)

173

1 did he, you know, stay ahead of it?
2     A.  So he was really receptive to
3 different types of technology, and, you know, we
4 had the implementing of the Clover device, right,
5 and how that, you know, can track all types of
6 things that merchants are doing.  And I'm not sure
7 what it's called now, but there was a product
8 called Insightics that, you know, is really
9 tracking everything merchants do, and, you know,
10 being able to -- you know, then merchants can I
11 guess buy a subscription to it and see all of this
12 data.  And, you know, he would catch onto the
13 different technologies.
14     We also had a different website that
15 we put together.  We also had this fantastic
16 innovative learning lab that we put together where
17 the students, they were new hires, they would go
18 through different scenarios that we wrote to give
19 them hands-on experience on what they would see
20 out in the real world, and we were tracking that
21 with iPads and different experiences.  And he
22 really allowed us to do some really cool things.
23     Q.  Okay.
24     A.  I'm probably rambling, I'm sorry.
25     Q.  No.  Some of it I asked because

174

1 there's a lot of terminology that's used I feel
2 like in the training world and I just don't know
3 what some of it is.
4     A.  I'm really passionate, so I'm going
5 to ramble.
6     Q.  Clover, so I know a little bit about
7 Clover from like personal experience.
8     A.  Sure.
9     Q.  But can you tell me a little bit
10 about that technology?
11     A.  Yeah.  So I was a part of the group
12 who -- when we originally brought it to First
13 Data, I was part of the original group, and,
14 again, it was a great experience.  We had code
15 names for it back then before we acquired them.
16 But basically, it was going to change the payments
17 scape and really give our merchants a device that
18 they could use to -- and these are small, at the
19 time it was small merchants -- to really manage
20 their whole business versus just having a credit
21 card machine and they had to go do inventory
22 somewhere else and they had to do their payroll
23 somewhere else.  This was putting everything,
24 similar to an iPad, in one location for them to
25 manage their business.  So offering our merchants

175

1 business solutions versus a better rate and fee
2 with a little swiper.
3     Q.  Okay.  And so how was the training
4 group involved in I, guess, the rollout of that
5 technology or the implementation of that
6 technology?
7     A.  Yeah.  So back then, this was
8 probably 2012, maybe '13, early '13, when we first
9 got involved, and this is pretty standard on how
10 we used to work when there was a new product or
11 software that was rolled out.  Training got
12 involved very upfront so that we could understand,
13 and we could either work with the vendors or work
14 with the internal product folks who were putting
15 out the product, and we would really learn it
16 because we then had to determine what type of
17 learning intervention needed to happen to transfer
18 that new product, how they were going to sell it.
19     And it's not just futures and
20 benefits of a new product, right, it's how to sell
21 it, it's the value of it, and it's so much more
22 than, okay, I'm going to teach you how to do a
23 sale, right, I mean.  So it's a lot, there's a lot
24 that goes into it doing that analysis, and then
25 you really have to design that program, obviously,

176

1 get approval, right, and then start developing.
2 It takes a lot of folks, and, again, it depends on
3 how big the product is or solution or methodology
4 or process before it goes through all of these
5 levels.
6     Q.  You said that was 2012, 2013?
7     A.  For Clover, yeah, I'm guessing.
8     Q.  Okay.  But that was before Mr. Barger
9 was at First Data?
10     A.  Yeah.
11     Q.  Okay.  So at some point, did you --
12 did you learn at any point that Mr. Barger was ill
13 or had been sick?
14     A.  I did, um-hmm.
15     Q.  When did you learn that?
16     A.  Again, I don't know exact dates, but
17 it was probably on a leadership call, he let us
18 know.
19     Q.  And what did he tell you?
20     A.  I don't think he knew at first what
21 was going on, so -- and it's been awhile.  He may
22 have said he's going for check-ups, and then I
23 think he did some radiation to try to get rid of
24 things first before he had to go into surgery and
25 get the stoma put in.

Transcript of Julie Kelly
Conducted on October 15, 2018

177

1    Q.  Okay.  Just so we're clear on the
2  record, so what did you -- what illness or disease
3  did you believe that he had or did you learn?
4    A.  Throat cancer.
5    Q.  Throat cancer?
6    A.  Um-hmm.
7    Q.  Okay.  And you don't recall when you
8  first learned that information?
9    A.  I don't.  Maybe the summer.  Yeah, I
10 don't want to speculate.
11   Q.  Okay.  Did Mr. Barger take any --
12 well, actually, before I go there, so he told you
13 about it on a call, I think you mentioned?
14   A.  I'm thinking -- I probably shouldn't
15 have said that.  I don't remember what it was, but
16 more than likely, it was a call because I was in
17 Cincinnati and he was in Atlanta.
18   Q.  Okay.  Did he talk about it on any
19 other occasion?
20   A.  Maybe to give us an update of his
21 progress.
22   Q.  Okay.
23   A.  Not often.
24   Q.  Okay.  But he did mention that he had
25 been diagnosed and was seeking treatment?

178

1    A.  Yeah.  I mean, we would ask, of
2  course.  I mean, we were concerned about him, like
3  he would be concerned about us.
4    Q.  Okay.  Did any employees ever
5  complain to you or anybody else that you might
6  have heard about Mr. Barger sharing the details of
7  his illness?
8    A.  No.
9    Q.  Okay.  Did you ever go to anybody and
10 complain that Mr. Barger had been sharing certain
11 details about his diagnosis?
12   A.  No.
13   Q.  Okay.  Did Mr. Barger take any time
14 off after he was diagnosed?
15   A.  There might have been days.  I didn't
16 manage his out-of-office or days off, so I
17 wouldn't -- I wouldn't know.  He always seemed to
18 be working.
19   Q.  Okay.  And so what do you mean by he
20 always seemed to be working?
21   A.  Even when he was -- you know, we
22 would hear that he's scheduled to go out for
23 surgery, and he would still be reading e-mails,
24 responding, getting project updates.
25   Q.  Okay.  Do you recall when that was?

179

1    A.  Through the whole thing until he
2  was -- I guess he was told he had to go out on
3  leave.
4    Q.  Okay.  So how often did you hear from
5  Mr. Barger during this time period?
6    A.  Daily.
7       MR. SHEARER:  Objection, objection.
8  You may proceed.
9       THE WITNESS:  I can't remember
10 honestly.  I mean, First Data has access to all of
11 my work e-mails.
12 BY MS. COOPER:
13   Q.  I'm just asking what you recall about
14 it.
15   A.  I recall that he was always active,
16 quite honestly.
17   Q.  Okay.  And you mentioned that at some
18 point, he took leave or went out on leave?
19   A.  Yeah.
20   Q.  What do you know about those
21 circumstances?
22   A.  I just know that we were told it
23 was -- I can't remember who was on the call, and I
24 may -- there are some things in my files you'll
25 see, but I think I had some conversations with

180

1  Ms. Ording that she was going to take over in the
2  interim while Steve was getting better.
3    Q.  Okay.  When was that, about?
4    A.  I want to say mid November 2016.
5    Q.  Yes.
6    A.  Yeah.
7    Q.  Yeah.  Okay.  So you found out that
8  Ms. Ording was going to take over as interim head
9  of the group?
10   A.  Um-hmm.
11   Q.  What were the first sort of -- I
12 don't want to say changes or, you know, what did
13 Ms. Ording do when she took over as the interim
14 role?
15   A.  I think it was similar to what anyone
16 would do when they're going to take on a new
17 organization, they want to get to know you, what
18 you do.
19   Q.  How did Ms. Ording do that?
20   A.  We probably had phone calls.  Again,
21 I don't want to speculate.  First Data has my
22 calendar, they could probably look it up.
23   Q.  When Ms. Ording took over as interim
24 head, how did things change in the group?
25   A.  Morale went down.  I think there were

---

181

1 a lot of unknown questions on what happened
2 because all of a sudden, you know, our beloved
3 boss was not there. No one was talking like what
4 had happened, how he was. You know, it was kind
5 of like, boom, he's gone.
6     Q. I just want to -- I'm talking about
7 November 2016 when he went out.
8     A. So am I, yeah.
9     Q. I just wanted to make sure.
10     A. Um-hmm.
11     Q. Okay.
12     A. I'm not sure or clear on FMLA laws.
13 I don't know if they cut off e-mail access, I
14 don't know. I know I've been out on leave for
15 having children, and, gosh, I just did not have
16 time to touch e-mails, so I don't know. I don't
17 know.
18     Q. Okay. How did -- so you said morale
19 decreased?
20     A. Yeah.
21     Q. How so?
22     A. I think just because it was change
23 and people didn't know -- it was very sudden, and
24 people didn't know what was going on, because
25 Steve would be available, he would be on our Adobe

---

182

1 Connect session, we set it up specifically for him
2 so that he could -- and I did this myself, so that
3 he could participate, so he could chat with
4 everyone.
5     Q. What is Adobe Connect?
6     A. It's a virtual connection platform
7 where you can have video, you can have chat, you
8 can do all kinds of things.
9     Q. You set this up for Mr. Barger?
10     A. I did, um-hmm.
11     Q. When was that?
12     A. I don't -- I don't know. Sometime in
13 the fall probably of that year.
14     Q. Okay. So you talked -- or you said
15 morale dropped. I want to talk about issues with
16 team members. Were there any issues with team
17 members when Barger was head of the group before
18 Ms. Ording took over?
19     A. Not with my team.
20     Q. Who do you put into your team, who do
21 you consider?
22     A. My instructional developers.
23     Q. How many people?
24     A. I probably had five or six at the
25 time in Omaha, all over.

---

183

1     Q. Okay. You said not with your team.
2 Were there issues with other teams?
3     A. I don't know. I can't speculate
4 what --
5     Q. Okay. What about issues with team
6 members when Ms. Ording took over as interim head?
7     A. I don't know.
8     Q. Okay. Are you aware of any issues on
9 your team?
10     A. Which team? Our teams changed
11 drastically, so it would --
12     Q. So how did the team change, then,
13 when Ms. Ording took over?
14     A. We were downsized quite a bit.
15     Q. Okay. By how many people?
16     A. I don't know.
17     Q. Or if you can give me like a
18 percentage?
19     A. I don't know. It was a very
20 stressful time. I don't know. I'm sure First
21 Data can look up in their books the numbers of
22 what they cut.
23     Q. Okay. What about it was stressful?
24     A. Being responsible for almost -- you
25 know, somewhat responsible for people losing their

---

184

1 jobs and their families.
2     Q. Okay. What is a line of business
3 quarterly review?
4     A. A line?
5     Q. A line -- LOB quarterly review, a
6 line of business.
7     A. This was probably -- gosh, okay.
8 These were meetings that were set up I believe by
9 Dan Charron, maybe his admin, to get an update
10 from your organization on a quarterly review.
11 They were often canceled.
12     Q. Okay. Did you ever attend any of
13 these quarterly reviews while Barger was --
14     A. I did not.
15     Q. You did not?
16     A. I helped prepare materials, but I did
17 not attend.
18     Q. Okay. Did you ever attend one of
19 these calls when Ms. Ording oversaw the group?
20     A. I did not. I helped prepare
21 materials, but I did not attend.
22     Q. Okay. So you've never attended one
23 of these calls with Mr. Barger?
24     A. No.
25     Q. Okay. So when did you learn that

185

1  Mr. Barger wasn't going to be returning to work?
2        **A.  I think in January 2016.**
3        Q.  Okay.
4        **A.  '17.**
5        Q.  '17?
6        **A.  '17.**
7        Q.  Okay.
8        **A.  Yeah.**
9        Q.  Who told you?
10       **A.  I believe it was a call with**
11  **Ms. Ording and Mr. Marino, but I -- can I redact**
12  **that because I don't know.  I can't remember.**
13       Q.  That's fine.
14       **A.  Yeah.**
15       Q.  But it wasn't -- was it Mr. Barger
16  who told you that he wasn't coming back?
17       **A.  No.  It was a conference call.  I**
18  **think we were expecting him, and all of a sudden,**
19  **we had this meeting instead that said that he**
20  **wasn't coming.**
21       Q.  Okay.  You talked a little bit about
22  people lost their jobs during this time period.
23       **A.  (Nodding head.)**
24       Q.  How many people on your team or in
25  your group lost their job?

186

1        **A.  I don't remember.**
2        Q.  Okay.
3        **A.  I'm sure First Data has those**
4  **numbers.**
5        Q.  Okay.  But there were people in your
6  group who were termed?
7        **A.  Sure, um-hmm.**
8        Q.  Do you know why they were termed?
9        **A.  You know, First Data has cuts all the**
10  **time.  I think they change the name, but**
11  **reductions, cuts, I don't know.**
12       Q.  Okay.  So they were laid off?
13       **A.  Yes.**
14       Q.  Okay.  They weren't -- what I'm
15  trying to get to is that they weren't termed for
16  performance-related issues?
17       **A.  Well, that might be a part of what**
18  **they use as far as requirements to select the**
19  **people.**
20       Q.  Okay.  But it wasn't some sort of
21  policy violation where that person was fired?
22       **A.  Right.  They didn't go through like**
23  **an employee performance plan and then get fired,**
24  **no.**
25       MS. COOPER:  Okay.  Got it.  Okay.

187

1  Let's take the last 5-minute break now.
2        THE WITNESS:  That's good.
3        (Brief recess.)
4        (Thereupon, Kelly Exhibit 24,
5  multiple documents, the top being a 4-page e-mail
6  dated 10/2/18 to Gary Eidelman from Julie Kelly,
7  was marked for purposes of identification.)
8  BY MS. COOPER:
9        Q.  So what I'm going to enter as Exhibit
10  24 -- so you brought a bunch of documents with you
11  today to the deposition.
12       **A.  (Nodding head.)**
13       Q.  I have briefly gone through them.  I
14  have not read every page in here, but I will enter
15  the entire stack that you brought as Exhibit 24.
16  This way we just have one complete copy of all of
17  the documents you brought here.
18       How did you search your records for
19  documents that were responsive to the subpoena?
20       **A.  I just searched.  I took each --**
21  **actually, I took the list that you sent me and**
22  **just went through and searched for what you asked**
23  **in each item in my e-mail, my documents.**
24       Q.  Okay.  Earlier, you mentioned a cloud
25  that you have.  Did you search the cloud?

188

1        **A.  Yeah.**
2        Q.  Okay.  Did you search your cell
3  phone?
4        **A.  Yeah.**
5        Q.  Okay.  Did you have any text messages
6  that were responsive?
7        **A.  Not relevant to the case.**
8        Q.  Okay.  Did you have any text messages
9  with Mr. Barger?
10       **A.  I might have a couple.  I sent him**
11  **pictures of my kids.**
12       Q.  Okay.  But I don't believe that those
13  were produced here?
14       **A.  No.  They weren't in relation to this**
15  **case.**
16       Q.  Okay.  But you do have text message
17  communications with Mr. Barger?
18       **A.  I have a couple, sure.**
19       Q.  Okay.  So I want you just to, you
20  know, don't -- I ask that you don't unclip it so
21  that nothing goes out of order.  I just want you
22  to take a look and make sure that this looks like
23  the documents that you brought here with you
24  today.
25       MS. COOPER:  Can we pause for a

189

1 second?
2         (Off the record.)
3         (Thereupon, Kelly Exhibit 25, a
4 multi-page document reflecting from FDC Litigation
5 to Julie Kelly, was marked for purposes of
6 identification.)
7         THE WITNESS: I mean, it looks --
8 (nodding head).
9 BY MS. COOPER:
10       Q. Okay. All right. Thank you. We'll
11 put this here. I'm going to show you what has
12 been marked as Exhibit 25. So here, you can take
13 a look at this and tell me what these
14 communications appear to be.
15       **A. So this is the legal hold I was sent**
16 **on August 4th, 2017 at 5:55 p.m. from an e-mail**
17 **address FDC Litigation, which I think if you look**
18 **at the back page, there's some First Data names**
19 **listed. And I have this so that I understood**
20 **exactly what I needed to preserve in regards to**
21 **the Barger case. It does say at the top: Yes or**
22 **no, do you understand the message below and agree**
23 **to comply? I never did either. I was actually**
24 **expecting someone to reach out to me.**
25       Q. Okay. You received this August 4th,

190

1 2017?
2       **A. That's what it says.**
3       Q. Okay. Why does it look like -- why
4 can I see 11 percent battery or 11 percent and
5 then the battery symbol that says 5:17 p.m.?
6       **A. I got it through an application**
7 **called Good.**
8       Q. Okay. So are these screen shots?
9       **A. They appear to be.**
10      Q. Okay. When did you screen shot them?
11      **A. 5:17 probably on -- I can't**
12 **speculate, but I'm assuming that day.**
13      Q. Well, the e-mail was sent at 5:55
14 p.m.
15      **A. Oh, then, yeah, maybe the next day.**
16 **I don't know, quite honestly.**
17      Q. So why did you screen shot it?
18      **A. Because I wanted to be clear on what**
19 **was being asked.**
20      Q. You had the e-mail, correct?
21      **A. I could not print.**
22      Q. Could you print the screen shots?
23      **A. I did, yeah.**
24      Q. Okay. So when did you print these?
25      **A. Yesterday.**

191

1       Q. Okay.
2       **A. Oh, you mean like the first time to**
3 **print them?**
4       Q. I don't know how many --
5       **A. I don't know. Probably Friday the**
6 **4th or the 6th, I don't know.**
7       Q. Why did you print it?
8       **A. Because I wanted to see -- I wanted**
9 **to have a copy of what was being asked of me.**
10      Q. Did you send these screen shots to
11 anybody?
12      **A. They were on my phone. No, not that**
13 **I'm aware of, no.**
14      Q. So you didn't send them to anybody
15 else?
16      **A. Not that I'm aware of, no.**
17      Q. Not anybody else, but just anybody?
18      **A. (Shaking head.)**
19      Q. Okay. Thank you. Since Mr. Barger's
20 employment ended at First Data, did you talk to
21 him about any other job opportunities?
22      **A. Did I?**
23      Q. Yes.
24      **A. For him?**
25      Q. For you.

192

1       **A. I did.**
2       Q. Okay. What were those conversations?
3       **A. I can't recall exactly, but I wanted**
4 **him to keep me in mind if there might be something**
5 **out there that I would be qualified for.**
6       Q. Okay. Why were you looking?
7       **A. Because I was under new management**
8 **that over my entire career in First Data I was**
9 **being asked to do certain things that I didn't**
10 **feel were correct.**
11      Q. Okay. Did Mr. Barger ever reach out
12 to you with any job opportunities?
13      **A. No.**
14      (Thereupon, Kelly Exhibit 26, a
15 1-page document reflecting Additional
16 harassment/threats, was marked for purposes of
17 identification.)
18 BY MS. COOPER:
19      Q. I'm going to show you what we've
20 marked as Exhibit 26. What is this document?
21      **A. Oh, this is my cover page for your**
22 **previous exhibit, the litigation, the legal hold**
23 **e-mail. It states here: E-mail received on**
24 **August 4th.**
25      Q. Okay.

Transcript of Julie Kelly
Conducted on October 15, 2018

193

1    A.  This just goes in front of that so I
2  know what it is.
3    Q.  Okay.  It wasn't in that order,
4  though, in --
5    A.  Sorry, I don't know if it got mixed
6  up.
7    Q.  So you said a cover sheet.  Who did
8  you send it to?
9    A.  This is for me so I know what that's
10  about.
11    Q.  Okay.  So you never sent this
12  information to anybody?
13    A.  No.  This is for you.
14    Q.  Okay.  So when you did draft this?
15    A.  Yesterday.
16    Q.  Okay.
17    A.  So you just wouldn't see random
18  screen shots.
19    Q.  So that's why we have the full stack,
20  this way we have -- if someone read the
21  transcript, they might be a little confused about
22  how the page was --
23    A.  I must have mixed it up or it got
24  caught in the printer.
25    Q.  I'm just trying to ask the questions

194

1  just to have something, if someone reads the
2  record, we know that we're talking about this.
3    A.  Yeah.  Sorry.
4    Q.  Okay.
5        (Thereupon, Kelly Exhibit 27, a
6  3-page, handwritten document dated 11/10/16, was
7  marked for purposes of identification.)
8  BY MS. COOPER:
9    Q.  I'm going to show you what we've
10  marked as Exhibit 27.  So what are these three
11  pages?
12    A.  These are some notes that I took.
13  The first page looks like it was November 10th of
14  2016, looks like it was a conversation between
15  Rhonda Johnson, Justin Stamie, and myself, and I
16  remember Rhonda talking about there was a
17  situation, it might have been an e-mail, and
18  there's a little bit of frustration with
19  Mr. Barger.  And she mentioned they were
20  interviewing for two different things.  I think it
21  was for Bryan Fricke's backfill because that had
22  yet to be filled.  And my suggestion was Dawn
23  Stewart, that's why her name was there.
24    Q.  But you said embarrassment,
25  frustration?

195

1    A.  I must have heard those and I just
2  jotted them down.  Typically, I would take more
3  formal notes on my computer, but this must have
4  just been an ad hoc call.
5    Q.  Okay.
6    A.  So I'm not sure exactly what those
7  are in relevance to.
8    Q.  Okay.  So where are these notes,
9  then, kept?
10    A.  I just have a notebook.  I just keep
11  them occasionally for maybe a couple of months --
12    Q.  Okay.
13    A.  -- and then I pitch them.
14    Q.  So these are notes that you took
15  while you were working at First Data?
16    A.  Yeah, um-hmm.
17    Q.  Okay.  And you still have the
18  originals?
19    A.  For this one, yeah.  I don't have --
20  I got rid of most of my things.  It's been over a
21  year, but I did go through to see if I had some
22  things that might be of relevance.  I don't know.
23    Q.  So the first page is dated November
24  10th, 2016.
25    A.  Um-hmm.

196

1    Q.  The second page is November 17th,
2  2016.  The third page doesn't appear to be dated.
3    A.  Yeah, that's why these actually were
4  in the notebook like this, (indicating).
5    Q.  Okay.
6    A.  And yeah, I don't know why.  I
7  typically had dates and I didn't, and that's the
8  only date that I saw close, so I don't know, but
9  it looks like this was perhaps my first
10  conversation with Ms. Ording about her taking over
11  for Steve.  I'm not sure if that's her phone
12  number, but it appears that maybe I called her --
13    Q.  Okay.
14    A.  -- and we had a conversation, and
15  these were just some of the notes that I just
16  jotted down while we were talking.
17    Q.  Okay.
18        (Thereupon, Kelly Exhibit 28, 1 page
19  of e-mails, the top dated 1/13/17 to Julie Kelly
20  from Robin Ording, was marked for purposes of
21  identification.)
22  BY MS. COOPER:
23    Q.  I'm going to show you Exhibit 28.
24  What is this document?
25    A.  This is an e-mail I sent to

Transcript of Julie Kelly
Conducted on October 15, 2018

197

1 Ms. Ording of some concerns I had with the team,
2 and this is when we were awaiting for Steve to
3 come back from his leave.
4      Q. Okay. So this is not an e-mail that
5 has been printed out?
6      A. No. I took a picture of it, and I
7 think I may have done it because I felt -- I just
8 felt a need to take a picture of it.
9      Q. Why?
10      A. Because we were really concerned -- I
11 was really concerned with the leadership of the
12 team at the time --
13      Q. Okay.
14      A. -- and the needs of the team and I
15 just wanted -- I mean, I don't know honestly.
16      Q. Okay.
17      A. I just felt a need to take it. I
18 have a couple of these.
19      Q. So it says at the top you forwarded
20 this message on 1/13/2017. Do you recall who you
21 forwarded it to?
22      A. I don't.
23      Q. Okay. Do you still --
24      A. Because I wrote it on -- I don't -- I
25 mean, First Data has all of my e-mails, so if it's

198

1 relevant, I'm sure they can find out.
2      Q. Okay. Do you still have the original
3 picture that you took on your phone or whatever
4 device you used?
5      A. Probably not.
6      Q. Okay. When did you print this image?
7      A. I guess yesterday, but I'm not sure
8 if it's embedded in something.
9      Q. What do you mean?
10      A. Like a Word document or something. I
11 don't know.
12      Q. Okay. Did you delete -- do you
13 recall deleting this after you printed it
14 yesterday from wherever you got it from?
15      A. No, I don't know.
16      Q. No or I don't know?
17      A. No, I didn't delete anything.
18      Q. Okay. Thank you. You mentioned the
19 receipt from the coffee from August 31st, 2018. I
20 didn't see that when I went through these
21 documents. Do you know if you included that
22 receipt?
23      A. I don't think I did.
24      Q. Okay. But you have it, you said?
25      A. I do.

199

1      MS. COOPER: Okay. Can we pause for
2 one moment?
3      (Off the record.)
4      MS. COOPER: We can go back on the
5 record. So at this point, I will -- it is 4:47.
6 As you know, we were ordered to be done by 5, so I
7 will ask that the receipt which we've talked about
8 today, that you provide a copy of that receipt.
9      THE WITNESS: Okay. I wrote that
10 down.
11      MS. COOPER: Okay. And, again, if
12 you find any additional documents in the search
13 for that receipt, you're always able to supplement
14 your document production that you have produced
15 today. And with that, I will conclude today's
16 deposition. All right.
17      THE WITNESS: Okay.
18      MS. COOPER: Thank you.
19      (Off the record.)
20      (Thereupon, Kelly Exhibit 29, a
21 1-page Invoice dated 10/15/18, was marked for
22 purposes of identification.)
23      MS. COOPER: Okay. So I'm going to
24 enter as the final exhibit, 29. It's the invoice.
25 BY MS. COOPER:

200

1      Q. The invoice is not -- it's for $375
2 for service for three children for baby-sitting.
3 There's no company that's issuing this invoice
4 noted on the invoice.
5      A. Right.
6      Q. So what company issued this invoice?
7      A. So I'm having a friend, a sitter,
8 watch the children.
9      Q. Okay. Does this friend have a
10 baby-sitting business?
11      A. No.
12      Q. Okay. Does the friend normally issue
13 invoices for baby-sitting?
14      A. No. I drafted that up according to
15 her charges. That's why my name is on that.
16      Q. Okay. Who set the price?
17      A. They did -- she did.
18      Q. And so she's charging $50 an hour for
19 baby-sitting?
20      A. Um-hmm.
21      MS. COOPER: Okay. We will enter
22 this as an exhibit, and I will discuss it with
23 First Data, and then we'll be in contact about it.
24      THE WITNESS: Okay.
25 BY MS. COOPER:

201

1    Q.  Actually, what is the name of the
2    friend who was baby-sitting?
3        A.  Aspen.
4        Q.  Aspen?
5        A.  Aspen Kelly.
6        Q.  Aspen Kelly?
7        A.  Um-hmm.
8        Q.  Is that a relative?
9        A.  Yes.
10       Q.  Okay.  How is -- you said it was a
11   friend or a --
12       A.  Yeah, a friend, stepdaughter.
13       Q.  Okay.  All right.
14       A.  Those are typical nanny rates.
15       Q.  Okay.
16           (Thereupon, the deposition was
17   concluded at 4:50 p.m.)
18               * * *
19
20
21
22
23
24
25

202

1            I, JULIE KELLY, do hereby certify
2    that the foregoing is a true and accurate
3    transcription of my testimony.
4
5
6
7            _____
8    Dated_____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

203

1    STATE OF OHIO          )
2    COUNTY OF MONTGOMERY )  SS:  CERTIFICATE
3            I, Lisa M. Conley Yungblut, a Notary
4    Public within and for the State of Ohio, duly
5    commissioned and qualified,
6            DO HEREBY CERTIFY that the
7    above-named, JULIE KELLY, was by me first duly
8    sworn to testify the truth, the whole truth and
9    nothing but the truth.
10           Said testimony was reduced to writing
11   by me stenographically in the presence of the
12   witness and thereafter reduced to typewriting.
13           I FURTHER CERTIFY that I am not a
14   relative or Attorney of either party, in any
15   manner interested in the event of this action, nor
16   am I, or the court reporting firm with which I am
17   affiliated, under a contract as defined in Civil
18   Rule 28(D).
19
20
21
22
23
24
25

204

1            IN WITNESS WHEREOF, I have hereunto set my
2    hand and seal of office at Dayton, Ohio, on this
3    25th day of October, 2018.
4
5            _____
             LISA M. CONLEY YUNGBLUT, RMR, CRR
6            NOTARY PUBLIC, STATE OF OHIO
             My commission expires 7-28-2019
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Transcript of Julie Kelly
Conducted on October 15, 2018

52

| A |
|---|

**aback**
28:15
**abide**
54:8, 56:17
**ability**
11:20, 14:16,
14:17
**able**
11:25, 13:5,
14:12, 14:13,
37:17, 63:16,
106:13, 107:4,
156:19, 165:16,
173:10, 199:13
**above**
92:2, 117:23,
127:12
**above-mentioned**
150:7
**above-named**
203:7
**abruptly**
140:7
**absolutely**
54:15, 55:10,
78:6, 109:21
**accept**
30:24, 31:5,
31:9, 125:12
**accepting**
31:12
**access**
13:3, 24:18,
114:20, 133:22,
179:10, 181:13
**accident**
95:2
**accommodate**
63:13
**according**
200:14
**account**
12:7, 13:3,
23:21, 23:23,
23:25, 24:7,
24:14, 24:24,

25:14, 140:17
**accounts**
24:3, 25:3
**accurate**
202:2
**accusing**
78:7
**acquired**
174:15
**acted**
29:24, 105:19
**acting**
167:17
**action**
23:3, 113:19,
121:17, 166:3,
203:15
**active**
179:15
**activities**
171:12
**activity**
100:1, 100:2
**actual**
114:11
**actually**
13:9, 32:17,
38:25, 48:8,
57:12, 58:12,
61:20, 70:23,
71:1, 71:3,
75:2, 76:11,
76:16, 83:6,
87:4, 90:6,
101:8, 106:11,
114:9, 114:10,
124:22, 177:12,
187:21, 189:23,
196:3, 201:1
**ad**
195:4
**add**
124:10, 158:10
**additional**
5:19, 124:10,
139:4, 139:13,
192:15, 199:12
**address**
10:12, 23:13,

25:18, 56:3,
91:3, 189:17
**addresses**
23:17, 24:2,
24:7, 24:11,
24:16
**adequately**
72:9, 72:12,
165:16
**admin**
184:9
**admit**
84:18
**admitted**
84:18
**adobe**
181:25, 182:5
**adult**
141:19
**advance**
37:16
**adventure**
55:25
**adverse**
99:5
**advice**
36:3, 36:4,
36:5, 36:7,
36:10, 36:14,
88:6, 88:9,
154:5
**advise**
117:19
**affect**
11:20
**affiliated**
203:17
**affirmed**
164:16
**affirming**
165:6
**afford**
13:21, 75:7
**after**
31:20, 32:11,
34:5, 38:19,
39:8, 39:9,
43:7, 43:10,

45:15, 45:16,
50:2, 57:22,
60:13, 66:22,
91:9, 107:19,
131:10, 133:6,
135:5, 138:16,
178:14, 198:13
**afternoon**
8:7
**again**
27:18, 44:7,
46:8, 56:4,
59:10, 64:2,
70:19, 72:22,
82:5, 88:5,
89:17, 90:18,
92:12, 92:15,
92:17, 98:21,
101:15, 110:24,
112:7, 113:1,
113:10, 115:4,
120:14, 121:14,
126:10, 127:18,
145:15, 146:5,
146:9, 147:23,
148:17, 158:3,
174:14, 176:2,
176:16, 180:20,
199:11
**against**
18:17, 40:10,
40:13, 41:20,
75:21, 78:4,
85:6, 98:24,
99:3, 102:9,
121:6
**age**
8:2, 37:13
**ago**
25:7, 48:7,
66:9, 66:10,
90:7, 103:9,
142:20
**agree**
42:18, 52:13,
94:5, 108:14,
111:11, 117:22,
120:4, 130:5,

Transcript of Julie Kelly
Conducted on October 15, 2018

53

130:8, 152:19,
152:23, 153:1,
189:22
**agreed**
51:22, 99:16,
123:23, 125:11,
129:22, 150:8
**ahead**
26:16, 36:16,
36:17, 58:13,
85:20, 106:11,
172:22, 173:1
**aleck**
70:6
**alias**
23:20
**aliases**
24:10
**all**
10:6, 15:2,
19:19, 20:20,
22:24, 24:10,
24:13, 25:22,
27:5, 37:23,
38:12, 46:12,
49:6, 49:20,
49:23, 52:16,
54:23, 55:19,
61:3, 61:19,
66:20, 73:20,
74:14, 75:19,
77:9, 79:6,
83:24, 84:16,
88:5, 89:18,
89:19, 99:16,
99:20, 101:22,
106:9, 109:17,
113:15, 115:7,
115:21, 116:17,
121:21, 125:23,
128:23, 128:24,
129:18, 130:6,
133:11, 134:11,
135:23, 137:12,
140:7, 142:2,
142:21, 144:19,
148:11, 151:4,
158:15, 161:17,

164:12, 166:1,
166:15, 167:1,
171:7, 172:2,
173:5, 173:11,
176:4, 179:10,
181:2, 182:8,
182:25, 185:18,
186:9, 187:16,
189:10, 197:25,
199:16, 201:13
**allow**
9:24, 10:1
**allowed**
32:18, 144:14,
154:11, 154:13,
154:14, 154:15,
154:16, 173:22
**almost**
22:22, 103:24,
123:18, 128:11,
139:25, 144:5,
183:24
**alone**
128:7, 128:9
**along**
126:8, 126:18,
139:9
**already**
26:17, 48:12,
99:23, 108:6,
108:9, 120:22,
128:8, 132:13
**also**
7:32, 8:10,
8:18, 9:7, 9:17,
10:3, 16:19,
21:18, 21:19,
23:15, 24:11,
24:12, 26:6,
37:25, 42:7,
47:16, 53:10,
63:21, 84:17,
86:23, 95:14,
98:23, 124:3,
125:11, 129:8,
140:20, 150:20,
159:5, 165:18,
170:2, 172:21,

173:14, 173:15
**alternative**
40:24, 42:1,
42:4
**although**
50:25
**altogether**
91:21
**always**
72:8, 128:15,
138:14, 143:8,
148:9, 178:17,
178:20, 179:15,
199:13
**amazing**
140:24, 142:24,
171:9
**amended**
16:20
**amount**
26:10, 110:2
**analysis**
175:24
**another**
9:22, 13:21,
51:22, 63:24,
88:8, 142:13,
149:17, 150:15
**answer**
10:2, 11:15,
11:21, 14:17,
16:25, 19:11,
36:16, 36:17,
46:2, 70:5,
88:18, 104:13,
145:4, 154:5,
157:8, 162:10
**answered**
41:8, 52:5,
76:7, 76:12
**answers**
10:6, 12:1,
41:5, 53:9, 61:1
**anthony**
1:11, 8:12
**anybody**
24:18, 24:23,
25:1, 33:6,

34:11, 34:16,
35:10, 35:12,
43:12, 45:2,
45:5, 48:4,
53:1, 58:2,
59:7, 63:3,
63:5, 68:25,
69:10, 70:2,
73:1, 114:2,
114:14, 127:13,
127:16, 133:7,
135:17, 153:25,
154:15, 159:22,
178:5, 178:9,
191:11, 191:14,
191:17, 193:12
**anyone**
19:2, 19:23,
20:2, 20:13,
33:18, 35:16,
35:19, 37:1,
40:24, 50:1,
50:10, 51:22,
53:16, 53:23,
53:24, 58:5,
58:8, 63:1,
69:7, 101:2,
102:10, 105:19,
110:21, 133:22,
135:2, 135:7,
145:22, 146:10,
151:11, 156:2,
163:6, 164:19,
166:7, 180:15
**anything**
13:14, 23:10,
29:1, 31:14,
47:4, 60:10,
86:18, 97:9,
113:21, 129:3,
152:1, 198:17
**anywhere**
26:25, 96:23
**apartment**
95:22
**apologize**
34:25
**apologizing**
92:12

Transcript of Julie Kelly
Conducted on October 15, 2018

54

| | | | |
|---|---|---|---|
| **apparently** | **around** | 173:25, 187:22, | **atlanta** |
| 108:15, 130:9 | 143:23, 149:20, | 190:19, 191:9, | 78:5, 177:17 |
| **appeal** | 169:22 | 192:9 | **attachment** |
| 153:19, 153:20, | **arrange** | **asking** | 2:7, 4:11, |
| 153:21 | 95:15, 95:19, | 14:2, 18:9, | 26:20, 124:16, |
| **appear** | 96:4 | 23:1, 36:6, | 157:10 |
| 52:17, 52:24, | **arranged** | 36:7, 44:8, | **attempting** |
| 57:4, 150:8, | 14:19, 96:10 | 75:6, 90:9, | 105:20, 106:4 |
| 150:14, 151:2, | **arrangements** | 93:12, 93:18, | **attend** |
| 152:14, 189:14, | 52:25, 109:19 | 97:17, 110:1, | 39:4, 40:20, |
| 190:9, 196:2 | **arranging** | 110:17, 111:3, | 42:10, 56:9, |
| **appearance** | 14:24, 91:20 | 112:15, 120:4, | 56:25, 63:14, |
| 27:20, 119:13, | **arrive** | 121:22, 128:6, | 63:16, 184:12, |
| 120:17 | 14:8 | 152:15, 154:18, | 184:17, 184:18, |
| **appearances** | **ask** | 157:4, 157:25, | 184:21 |
| 7:1 | 9:25, 10:3, | 160:15, 161:4, | **attended** |
| **appearing** | 10:6, 10:11, | 165:17, 179:13 | 184:22 |
| 26:3, 53:14, | 12:13, 12:15, | **asks** | **attending** |
| 53:17, 118:25 | 12:18, 18:4, | 88:5 | 78:7 |
| **appears** | 18:12, 26:7, | **aspen** | **attorney** |
| 103:8, 196:12 | 26:24, 27:2, | 201:3, 201:4, | 7:5, 7:15, |
| **apple** | 30:20, 36:5, | 201:5, 201:6 | 7:25, 8:8, 8:24, |
| 144:13 | 37:4, 37:5, | **assertions** | 13:20, 13:22, |
| **application** | 37:25, 68:3, | 105:18 | 41:23, 51:24, |
| 119:3, 190:6 | 70:2, 83:6, | **assignment** | 68:11, 68:23, |
| **applies** | 83:7, 87:15, | 170:18 | 69:8, 69:11, |
| 18:7 | 89:4, 101:13, | **assist** | 69:22, 69:23, |
| **apply** | 106:10, 108:18, | 73:1, 114:14, | 70:3, 70:12, |
| 18:7, 110:21 | 116:5, 121:18, | 127:13, 159:22 | 74:9, 74:21, |
| **appointment** | 154:14, 154:16, | **assistance** | 81:25, 82:4, |
| 123:10 | 156:22, 158:3, | 95:25 | 82:7, 82:14, |
| **appreciated** | 168:21, 178:1, | **assisted** | 82:15, 82:21, |
| 147:10 | 188:20, 193:25, | 114:2, 137:9 | 84:7, 87:3, |
| **approval** | 199:7 | **associate** | 87:5, 87:18, |
| 122:4, 176:1 | **asked** | 92:5, 92:8 | 87:24, 88:6, |
| **approved** | 11:15, 12:17, | **associate's** | 88:14, 89:5, |
| 132:21 | 29:2, 44:3, | 22:6 | 89:13, 91:15, |
| **april** | 52:7, 57:13, | **assume** | 93:20, 104:18, |
| 22:20 | 64:7, 76:22, | 116:1, 158:12 | 106:21, 107:2, |
| **area** | 86:18, 87:13, | **assumed** | 109:25, 110:16, |
| 132:10, 170:23 | 87:16, 89:7, | 44:12, 51:18, | 136:15, 203:14 |
| **aren't** | 89:16, 91:25, | 53:9, 56:11, | **attorney-client** |
| 30:16 | 92:10, 92:23, | 63:19, 63:23, | 17:24, 18:1, |
| **army** | 94:13, 106:17, | 69:9, 93:21 | 18:6 |
| 87:4 | 120:1, 149:1, | **assuming** | **attorneys** |
| **arnstein** | 156:24, 157:14, | 55:11, 74:10, | 32:16, 68:20, |
| 7:13, 8:9, | 158:14, 164:22, | 74:22, 74:23, | 69:4, 84:6, |
| 34:16, 101:25 | 164:25, 165:12, | 93:19, 190:12 | 91:7, 92:24, |

93:12, 110:8,
110:11, 110:22,
167:24, 168:7
**august**
72:20, 103:19,
103:25, 117:21,
118:15, 119:12,
122:24, 123:2,
125:5, 125:7,
125:8, 126:2,
129:23, 150:9,
150:14, 150:23,
150:24, 151:5,
151:18, 152:9,
152:10, 155:8,
157:13, 164:14,
165:23, 189:16,
189:25, 192:24,
198:19
**aura**
169:22
**authorization**
30:23, 31:5,
31:12
**auto**
92:11
**available**
37:23, 38:12,
38:15, 38:20,
39:12, 39:14,
50:11, 51:7,
51:15, 52:2,
54:23, 55:13,
94:5, 117:20,
118:17, 119:6,
181:25
**avenue**
7:6
**average**
30:2, 54:11,
121:8
**avoid**
91:20
**avoided**
116:19
**awaiting**
197:2
**aware**
24:25, 25:4,

91:6, 136:8,
172:13, 183:8,
191:13, 191:16
**away**
28:13, 109:14
**awesome**
144:11
**awhile**
66:6, 136:15,
176:21

**B**

**baby-sitter**
57:2
**baby-sitting**
200:2, 200:10,
200:13, 200:19,
201:2
**bachelor's**
22:3
**back**
28:1, 28:18,
32:6, 39:18,
48:1, 48:11,
49:16, 49:21,
60:13, 69:14,
85:11, 85:24,
85:25, 89:19,
90:11, 90:17,
94:16, 100:24,
101:1, 101:11,
102:22, 102:25,
110:17, 119:6,
119:14, 120:9,
120:10, 122:8,
129:21, 133:5,
174:15, 175:7,
185:16, 189:18,
197:3, 199:4
**back-and-forth**
120:10
**backfill**
194:21
**background**
21:8, 75:5,
116:16, 119:1
**backyard**
75:25, 76:17,

76:22
**banged**
45:24
**banging**
45:23
**bank**
131:21, 131:23
**barger**
1:4, 9:7,
12:23, 20:12,
23:7, 28:20,
40:10, 41:17,
47:18, 65:10,
65:22, 66:5,
66:19, 66:22,
67:4, 67:23,
69:17, 70:20,
74:3, 75:8,
79:11, 83:20,
91:11, 91:18,
92:25, 99:1,
102:8, 103:11,
106:13, 112:20,
113:7, 124:23,
136:22, 136:24,
137:2, 137:16,
137:24, 138:20,
139:16, 140:11,
141:18, 141:22,
142:5, 142:6,
142:14, 142:22,
145:11, 147:13,
148:12, 157:23,
158:13, 165:21,
166:16, 167:8,
167:21, 168:2,
168:7, 168:9,
169:16, 169:19,
176:8, 176:12,
177:11, 178:6,
178:10, 178:13,
179:5, 182:9,
182:17, 184:13,
184:23, 185:1,
185:15, 188:9,
188:17, 189:21,
192:11, 194:19
**barger's**
8:24, 19:15,

20:3, 84:22,
93:15, 103:10,
145:1, 146:1,
146:24, 167:24,
191:19
**barry**
3:21, 96:16,
100:23, 101:24,
107:8
**base**
139:10
**based**
26:13, 51:20,
51:21, 111:10,
119:11, 120:15,
150:2
**basically**
110:15, 115:17,
117:11, 137:6,
141:9, 149:4,
160:20, 164:22,
174:16
**basis**
68:21, 108:7,
112:9
**bates**
5:7, 169:3,
169:13
**battery**
190:4, 190:5
**became**
38:20, 39:11
**because**
9:22, 12:14,
14:10, 14:15,
16:16, 28:6,
30:18, 32:13,
41:4, 41:13,
44:4, 53:7,
53:12, 54:4,
55:4, 68:15,
68:18, 69:15,
69:19, 70:16,
72:9, 82:7,
84:2, 84:8,
84:15, 90:16,
92:19, 96:22,
99:7, 99:13,

Transcript of Julie Kelly
Conducted on October 15, 2018

56

102:1, 103:25,
104:23, 105:9,
107:3, 108:11,
111:9, 112:9,
119:19, 120:20,
123:19, 125:11,
128:17, 128:20,
134:10, 134:14,
139:10, 143:25,
149:19, 152:4,
153:8, 154:23,
155:24, 156:17,
158:6, 160:22,
162:2, 164:3,
164:20, 165:4,
165:20, 173:25,
175:16, 177:16,
181:2, 181:22,
181:24, 185:12,
190:18, 191:8,
192:7, 194:21,
197:7, 197:10,
197:24
**becoming**
137:7
**been**
8:2, 9:9, 9:11,
21:1, 21:4,
23:2, 26:24,
28:12, 39:16,
39:25, 55:16,
63:8, 63:25,
64:15, 66:6,
67:1, 67:9,
70:9, 70:10,
70:11, 79:16,
79:17, 79:23,
81:7, 83:2,
83:3, 85:2,
88:13, 89:1,
90:3, 92:11,
92:13, 99:22,
101:25, 107:12,
116:17, 116:18,
117:2, 124:1,
124:13, 127:6,
128:17, 134:11,
140:14, 147:24,

149:9, 149:16,
154:23, 163:22,
165:19, 169:6,
169:13, 176:13,
176:21, 177:25,
178:10, 178:15,
181:14, 189:12,
194:17, 195:4,
195:20, 197:5
**before**
1:19, 10:2,
11:16, 11:17,
16:19, 19:6,
20:21, 20:24,
21:2, 27:7,
45:15, 50:2,
52:18, 70:25,
73:10, 78:18,
81:21, 89:19,
94:6, 103:19,
103:22, 103:24,
107:13, 110:19,
117:4, 125:21,
127:12, 135:1,
150:2, 150:6,
172:17, 174:15,
176:4, 176:8,
176:24, 177:12,
182:17
**begin**
10:2
**beginning**
38:1, 77:19,
149:19
**begins**
37:6, 59:9,
64:5
**behalf**
7:2, 7:12,
30:24, 102:8,
114:6, 167:17
**behavior**
16:21
**behaviors**
141:16
**behind**
76:1, 86:9
**being**
5:10, 9:10,

28:20, 32:14,
34:9, 80:21,
82:7, 92:23,
94:13, 96:24,
116:13, 132:5,
157:14, 161:19,
167:17, 167:22,
167:25, 168:3,
173:10, 183:24,
187:5, 190:19,
191:9, 192:9
**belief**
99:22, 160:8
**believe**
11:23, 22:19,
29:6, 33:11,
41:1, 41:6,
41:7, 42:15,
44:3, 48:10,
50:8, 57:14,
57:17, 63:14,
67:14, 68:11,
68:14, 68:15,
80:10, 81:24,
82:3, 92:20,
97:25, 98:10,
98:22, 99:14,
100:15, 100:25,
102:4, 105:22,
108:8, 110:2,
110:18, 112:3,
112:23, 115:12,
122:25, 132:8,
134:9, 135:13,
137:4, 139:1,
143:11, 149:4,
159:24, 169:18,
177:3, 184:8,
185:10, 188:12
**believed**
89:12, 110:25,
112:11
**bell**
46:4, 76:10
**beloved**
181:2
**below**
189:22

**benefits**
175:20
**besides**
19:1, 19:23,
45:5, 63:3,
85:15, 98:8,
110:22, 112:22,
172:14
**best**
9:24, 91:22,
102:4, 121:24,
171:9
**better**
143:22, 175:1,
180:2
**between**
31:22, 194:14
**beyond**
141:15
**big**
33:16, 111:5,
176:3
**bill**
26:8
**biography**
172:16
**birthdays**
143:2
**bisignano**
1:10, 8:11,
140:23
**bit**
11:10, 21:9,
23:8, 35:1,
62:10, 90:18,
95:12, 136:17,
136:23, 140:10,
143:13, 143:18,
144:9, 149:20,
150:4, 169:18,
169:21, 172:24,
174:6, 174:9,
183:14, 185:21,
194:18
**blacked**
129:16
**blended**
170:7, 170:10

Transcript of Julie Kelly
Conducted on October 15, 2018

57

blur
31:21, 32:12,
41:7, 132:2,
154:23
board
137:4, 140:22
bonus
139:3, 139:12,
139:14
book
25:18, 131:3
books
114:21, 183:21
boom
181:5
born
49:9
boss
96:25, 181:3
both
9:23, 15:7,
16:3, 25:8, 74:6
bottom
44:24, 55:6,
95:21, 103:2,
118:15, 127:9,
150:25
bowman
48:8, 122:24,
123:12, 123:15,
130:4, 130:10,
153:9, 153:13
bowman's
127:4, 160:17,
160:19
box
28:9, 30:2,
76:2
break
11:7, 11:12,
11:16, 11:17,
62:10, 62:18,
85:21, 119:22,
122:14, 122:15,
133:2, 155:3,
155:4, 159:8,
187:1
breakfast
56:1

breaks
11:9, 11:12,
151:7
brenda
157:23, 168:2
brewery
139:7
brian
33:5, 86:24,
87:6, 87:7,
87:11, 87:24,
89:5
brief
85:22, 122:21,
187:3
briefing
150:10
briefly
187:13
bring
14:10, 15:14,
56:5, 57:1,
61:17, 105:7,
128:19, 150:21,
151:3, 164:12,
171:14
bringing
151:23, 152:13
brother
37:13, 95:16,
95:25, 96:2
brought
61:18, 113:4,
114:4, 125:18,
137:5, 174:12,
187:10, 187:15,
187:17, 188:23
brushing
105:11
bryan
137:9, 140:7,
194:21
budget
37:21
building
130:22, 131:5,
131:17, 132:15,
135:14

built
172:11
bullet
79:7, 79:8,
111:1
bunch
78:1, 110:13,
187:10
burden
40:18, 42:8,
56:23
burdensome
136:5, 158:6,
160:25
business
21:20, 39:15,
57:17, 137:8,
137:22, 140:1,
140:17, 142:2,
148:20, 171:19,
174:20, 174:25,
175:1, 184:2,
184:6, 200:10
busy
166:20
buy
173:11
buzzer
57:12
byrne
7:24, 8:19,
162:22, 163:1
byrne@jacksonlew-
is
7:30

C

c) (1
17:20
calendar
39:16, 50:6,
180:22
call
32:19, 38:4,
48:8, 48:11,
48:19, 48:24,
49:13, 58:2,
58:5, 58:8,

59:24, 67:16,
77:1, 89:13,
91:19, 91:20,
122:24, 122:25,
123:3, 123:18,
123:23, 124:7,
125:12, 130:6,
130:9, 155:23,
156:3, 166:19,
176:17, 177:13,
177:16, 179:23,
185:10, 185:17,
195:4
callahan
3:17, 100:20,
101:4, 101:11,
101:18, 102:21,
106:17, 107:22
callahan's
101:20, 105:5,
105:15
called
1:17, 16:2,
33:20, 58:18,
60:6, 70:22,
82:7, 93:20,
94:20, 103:12,
109:7, 140:25,
153:17, 173:7,
173:8, 190:7,
196:12
calling
115:15, 156:5
calls
48:20, 130:10,
148:8, 180:20,
184:19, 184:23
came
28:2, 57:25,
86:14, 97:6,
137:3, 140:23,
161:14, 172:9
cameras
44:5, 45:8,
45:9
can
11:6, 12:18,
17:5, 17:8,

Transcript of Julie Kelly
Conducted on October 15, 2018

58

27:17, 31:17,
33:15, 33:16,
35:1, 36:16,
37:7, 37:20,
38:3, 39:18,
40:1, 47:25,
54:24, 61:23,
62:3, 62:16,
66:7, 68:2,
74:1, 74:15,
77:16, 77:17,
79:8, 79:12,
82:19, 82:21,
83:7, 85:24,
89:17, 90:18,
90:22, 91:5,
91:19, 91:20,
91:22, 94:17,
101:19, 103:4,
103:11, 105:6,
105:12, 106:10,
107:17, 110:15,
110:16, 110:19,
112:15, 117:23,
118:1, 120:4,
121:6, 121:18,
121:23, 122:1,
122:2, 123:18,
128:2, 128:25,
129:7, 132:10,
133:5, 141:12,
145:3, 145:24,
147:1, 155:5,
158:10, 162:22,
163:21, 166:7,
167:19, 173:5,
173:10, 174:9,
182:7, 182:8,
183:17, 183:21,
185:11, 188:25,
189:12, 190:4,
198:1, 199:1,
199:4
**can't**
9:22, 10:3,
10:4, 10:5,
13:21, 16:25,
28:7, 35:21,

36:4, 38:2,
43:9, 45:14,
45:18, 47:14,
63:7, 108:5,
108:8, 110:9,
114:7, 121:4,
121:12, 131:24,
131:25, 134:13,
135:4, 135:8,
136:14, 142:9,
145:5, 145:6,
146:22, 149:8,
154:21, 155:20,
155:22, 156:14,
158:24, 163:19,
167:9, 168:23,
179:9, 179:23,
183:3, 185:12,
190:11, 192:3
**canceled**
50:24, 51:9,
51:12, 184:11
**cancellation**
38:23, 39:2,
50:16, 50:17,
50:20, 59:10
**cancelling**
50:22, 59:24
**cancer**
177:4, 177:5
**cannot**
29:9, 46:17,
55:6, 55:10,
84:7, 94:5,
100:5, 134:12
**capability**
25:1
**capacity**
8:18
**caption**
40:12
**car**
29:7, 56:2,
59:5, 59:6,
113:24
**card**
57:18, 174:21
**care**
26:6, 37:12,

37:18, 95:15,
95:18, 96:5,
105:9
**cared**
143:12
**career**
192:8
**carolina**
21:18
**case**
1:7, 12:12,
12:23, 12:24,
13:6, 14:1,
17:13, 19:15,
19:17, 19:21,
28:20, 41:12,
41:24, 47:4,
47:18, 47:24,
55:5, 60:16,
65:10, 65:25,
67:2, 68:12,
68:18, 69:17,
70:19, 70:20,
74:3, 74:15,
75:8, 79:11,
80:18, 82:22,
83:11, 84:3,
84:22, 85:2,
91:12, 98:25,
99:2, 99:21,
100:5, 102:13,
103:11, 106:13,
106:22, 107:5,
112:20, 112:21,
113:7, 113:16,
114:21, 122:5,
123:16, 124:24,
128:24, 134:5,
134:8, 153:7,
153:10, 154:7,
156:20, 158:13,
162:13, 165:21,
166:2, 166:21,
166:22, 166:23,
167:18, 167:22,
167:25, 168:3,
188:7, 188:15,
189:21

**casual**
64:7
**catawba**
21:17
**catch**
173:12
**categories**
158:8
**caught**
193:24
**cell**
188:2
**center**
7:26
**certain**
102:7, 110:2,
115:1, 134:3,
137:13, 147:24,
178:10, 192:9
**certificate**
203:2
**certified**
8:3
**certify**
202:1, 203:6,
203:13
**cetera**
151:7
**chain**
90:16, 90:17,
101:15
**challenge**
147:20
**challenged**
146:14, 147:8,
147:9
**change**
15:16, 37:16,
38:11, 53:21,
138:16, 138:21,
138:23, 141:16,
142:22, 143:23,
174:16, 180:24,
181:22, 183:12,
186:10
**changed**
23:19, 39:4,
39:16, 81:7,

Transcript of Julie Kelly
Conducted on October 15, 2018                                    59

138:24, 140:16,
183:10
**changes**
149:19, 180:12
**changing**
53:5, 140:17,
170:3
**charge**
9:9, 12:11,
14:3, 23:11,
40:13, 41:19,
75:20, 84:3,
84:5, 85:6,
91:9, 107:2,
157:17, 157:19,
157:23, 158:2
**charges**
13:12, 200:15
**charging**
200:18
**charisma**
137:17
**charismatic**
169:22
**charron**
1:11, 8:12,
184:9
**chat**
170:19, 182:3,
182:7
**check**
24:23, 26:5,
57:19, 60:3,
60:9, 66:14,
72:8, 116:16,
119:2
**check-ups**
176:22
**checked**
12:20, 48:19,
57:24, 59:19,
66:13, 127:20
**child**
26:6
**childcare**
40:19, 42:9,
42:13, 42:19,
56:7, 56:13,

56:19, 56:24,
63:23, 84:19,
95:13, 108:23
**children**
28:2, 28:6,
28:7, 28:17,
29:20, 37:12,
49:9, 55:23,
56:5, 57:1,
57:6, 75:25,
108:20, 109:3,
109:10, 109:19,
128:6, 128:12,
128:13, 181:15,
200:2, 200:8
**children's**
119:22
**choose**
52:3
**chose**
51:16
**church**
56:10
**cincinnati**
1:22, 7:28,
10:14, 119:24,
130:25, 151:24,
177:17
**circumstance**
102:3
**circumstances**
102:4, 179:21
**civil**
1:18, 9:10,
157:18, 203:17
**claim**
16:18, 16:19,
16:23, 16:24,
17:5, 18:8,
18:10, 18:13,
18:17, 18:21,
20:3, 31:3,
78:4, 134:15,
134:18
**claims**
17:14
**clarification**
164:25, 165:10,

165:12, 165:18
**clarify**
41:20, 82:20
**classroom**
170:15
**clean**
95:3
**clear**
9:5, 10:9,
22:25, 23:9,
47:23, 91:5,
98:19, 105:15,
143:11, 157:10,
157:24, 158:1,
177:1, 181:12,
190:18
**clearly**
28:16, 29:20,
30:7, 55:5,
55:8, 100:4,
105:11, 123:22
**clement**
57:17
**clerk**
123:9
**clerk's**
114:1
**clerks**
72:9, 130:14
**click**
13:9, 163:19
**clients**
102:9
**close**
196:8
**closed**
47:4
**clothing**
29:11, 29:25,
46:20
**cloud**
133:9, 133:12,
133:25, 135:6,
187:24, 187:25
**clover**
173:4, 174:6,
174:7, 176:7
**code**
144:12, 174:14

**coffee**
130:18, 131:12,
198:19
**colleague**
57:20, 57:25
**colleagues**
129:8, 145:1,
145:10, 145:13,
146:23, 156:23
**college**
7:16, 21:14,
21:17
**com**
7:20, 7:30,
23:15, 23:16,
25:6, 90:21,
122:7
**come**
28:4, 38:2,
55:6, 60:4,
60:21, 68:19,
86:13, 92:23,
93:18, 109:10,
128:18, 132:15,
132:22, 140:8,
147:1, 160:8,
197:3
**comes**
25:12, 76:15,
116:16
**coming**
45:22, 46:6,
112:19, 140:22,
144:8, 185:16,
185:20
**command**
152:11
**commanded**
28:21, 32:15,
39:3, 53:7
**commands**
27:20
**commission**
9:10, 23:12,
157:19, 204:8
**commissioned**
203:5
**commitments**
37:15, 38:10

Transcript of Julie Kelly
Conducted on October 15, 2018                                    60

common
25:23, 141:19,
141:20, 141:21,
143:19
communicate
60:15, 139:22
communicated
63:15
communicating
91:7, 91:14
communication
38:23, 39:7,
61:2, 64:1
communications
65:11, 65:18,
66:19, 84:16,
84:20, 106:16,
157:16, 157:21,
188:17, 189:14
company
85:6, 140:24,
141:3, 167:6,
168:16, 200:3,
200:6
compel
94:8, 107:20,
108:3, 108:5,
108:11, 108:12,
111:6, 111:10,
112:22, 116:14,
116:21, 150:3,
151:1, 152:4,
164:16, 164:24,
165:5, 165:7
compelled
108:9, 160:24
complain
145:22, 147:12,
147:17, 148:21,
178:5, 178:10
complained
147:15, 148:12
complaining
146:1
complaint
9:8, 16:20,
38:3, 38:13,
55:7, 55:12,

55:14, 110:17
complaints
105:10
complete
12:1, 80:5,
81:11, 151:17,
187:16
completely
116:19, 140:14
complicated
67:13
comply
155:9, 189:23
components
171:25
comprehend
141:15
computer
195:3
concepts
172:12
concern
143:4, 143:5
concerned
14:15, 118:24,
178:2, 178:3,
197:10, 197:11
concerns
197:1
conclude
199:15
concluded
201:17
conduct
84:6, 97:3,
97:11, 97:13,
97:14, 97:18,
98:22, 99:21
conducted
2:1
conducting
97:15
conference
48:7, 122:25,
123:3, 150:7,
150:15, 185:17
confidential
5:6, 169:2

confirm
131:14, 159:8
confirmed
50:16, 50:19,
50:22, 59:10
confirming
51:6, 164:15
confused
41:12, 55:3,
55:9, 56:19,
56:20, 105:14,
128:6, 164:20,
193:21
confusing
151:15, 151:16,
152:2, 152:8,
152:16
confusion
84:24, 108:15,
108:17
conley
1:19, 203:3,
204:6
connect
91:4, 182:1,
182:5
connected
81:1
connection
8:25, 9:8,
17:2, 17:16,
18:2, 18:15,
18:17, 40:9,
41:16, 68:12,
84:4, 84:11,
88:2, 88:13,
89:1, 95:13,
102:7, 106:23,
182:6
consent
117:23, 120:6
consider
182:21
consultant
137:3, 137:12
consultants
140:18, 142:3
consultative
137:9, 141:25

contact
34:15, 38:25,
39:12, 50:1,
84:7, 167:17,
167:21, 167:25,
168:2, 168:9,
200:23
contacted
75:10, 79:13,
82:21, 96:15,
103:11
contacting
83:13, 83:15,
92:6, 92:8
contacts
83:5
contempt
53:11, 54:5
content
67:19, 136:20
context
12:17, 149:9
continues
105:16
contract
203:17
contributed
99:21
contributing
151:20
convenient
40:15, 51:2
conversation
15:8, 16:5,
16:11, 16:23,
19:8, 30:25,
31:11, 33:22,
47:1, 47:9,
64:8, 64:11,
64:24, 67:3,
67:6, 78:17,
78:24, 86:15,
88:7, 89:9,
94:22, 104:17,
123:5, 124:6,
130:4, 146:23,
147:7, 162:8,
162:11, 194:14,

Transcript of Julie Kelly
Conducted on October 15, 2018                                              61

196:10, 196:14
**conversations**
15:4, 16:6,
17:11, 18:12,
19:4, 19:22,
20:1, 28:23,
47:5, 65:15,
65:21, 66:21,
67:23, 69:3,
104:12, 135:7,
145:2, 145:10,
145:18, 146:19,
147:4, 148:15,
167:7, 179:25,
192:2
**cook**
119:23
**cooking**
144:1
**cool**
173:22
**cooper@saul**
7:20
**coordinating**
52:22
**copies**
27:4, 61:23,
61:25, 62:7,
62:16, 125:20,
161:5, 161:9,
161:21
**copy**
25:11, 25:13,
25:17, 25:25,
75:2, 99:11,
125:15, 133:8,
133:13, 158:11,
158:19, 161:20,
161:24, 163:5,
163:7, 163:13,
187:16, 191:9,
199:8
**copying**
90:22
**cornell**
110:13, 122:7,
149:10
**corporate**
8:17, 140:21

**corporation**
1:8, 1:9, 8:10,
40:11, 102:7,
102:12, 143:6
**correct**
8:24, 9:2,
29:5, 38:12,
54:24, 68:9,
71:19, 82:16,
92:12, 110:1,
113:20, 119:8,
165:8, 165:24,
190:20, 192:10
**correctly**
9:18
**cost**
40:19, 42:9,
42:22, 56:24
**costs**
26:6, 56:19
**could**
12:6, 13:7,
33:20, 53:11,
53:21, 55:16,
70:18, 75:7,
87:16, 87:25,
89:7, 92:3,
98:19, 105:11,
116:18, 117:15,
127:18, 140:6,
143:9, 152:7,
170:1, 172:10,
174:18, 175:12,
175:13, 180:22,
182:2, 182:3,
190:21, 190:22
**couldn't**
156:3
**counsel**
8:20, 8:21,
9:6, 9:7, 17:7,
17:22, 68:17,
68:20, 70:20,
75:11, 83:1,
84:8, 84:15,
89:1, 91:9,
91:12, 91:17,
93:20, 102:1,

103:10, 103:13,
104:12, 154:4,
162:4, 162:8
**count**
142:15
**county**
203:2
**couple**
8:14, 13:19,
33:13, 35:2,
47:13, 48:7,
48:13, 49:8,
50:15, 66:9,
66:10, 68:4,
68:10, 70:9,
72:16, 106:16,
116:18, 118:24,
119:4, 126:11,
139:23, 139:25,
150:18, 188:10,
188:18, 195:11,
197:18
**course**
109:5, 153:23,
160:11, 167:15,
170:13, 178:2
**courses**
21:21, 21:22
**coursework**
21:25, 22:1
**court**
1:1, 9:19,
11:8, 19:21,
20:23, 26:5,
28:21, 39:4,
53:7, 56:16,
74:2, 74:4,
74:5, 74:15,
74:17, 74:20,
82:25, 83:1,
85:8, 94:7,
103:9, 107:24,
108:2, 111:14,
111:22, 112:1,
116:10, 120:2,
121:1, 123:4,
130:12, 150:1,
150:2, 150:6,

150:9, 150:15,
163:9, 163:10,
163:11, 203:16
**courteous**
119:20, 120:20
**courtesy**
119:17, 120:7,
120:18
**courthouse**
1:21, 113:23,
113:25, 130:22
**cousin**
33:5, 87:12,
89:4
**cousins**
86:24
**cover**
192:21, 193:7
**crash**
153:23, 160:11
**create**
25:5, 124:10
**created**
172:4
**credit**
174:20
**criminal**
21:5
**cross-examination**
1:18, 8:5
**crossed**
91:2
**crr**
204:6
**cues**
10:4
**curious**
166:11
**current**
65:18, 67:7
**currently**
9:10, 11:19,
22:9, 23:11,
37:6, 37:11,
150:2
**curriculum**
137:14, 140:14,
144:20

Transcript of Julie Kelly
Conducted on October 15, 2018                                    62

cut
37:21, 181:13,
183:22
cuts
186:9, 186:11

**D**

d
203:18
daily
179:6
dallas
7:8
dan
1:10, 8:12,
184:9
dash
80:19, 80:21
data
1:8, 8:9, 8:17,
8:22, 16:21,
18:17, 22:2,
22:12, 22:17,
22:18, 22:22,
24:9, 24:11,
24:12, 28:20,
40:10, 40:14,
40:19, 41:20,
42:9, 47:18,
56:24, 63:22,
64:6, 64:8,
64:19, 65:19,
66:8, 67:7,
67:15, 74:3,
75:7, 75:9,
75:22, 78:1,
78:4, 94:12,
99:7, 99:10,
99:14, 100:15,
102:7, 102:12,
116:20, 129:9,
136:21, 137:5,
140:6, 141:24,
142:1, 144:14,
158:11, 168:7,
171:8, 171:15,
172:5, 172:15,
173:12, 174:13,

176:9, 179:10,
180:21, 183:21,
186:3, 186:9,
189:18, 191:20,
192:8, 195:15,
197:25, 200:23
data's
75:9, 79:11,
79:12, 93:4,
93:24
date
27:18, 41:3,
42:2, 42:5,
50:3, 51:18,
51:22, 52:14,
54:5, 60:14,
60:21, 60:23,
63:12, 63:18,
63:19, 75:15,
78:20, 82:4,
85:25, 94:6,
111:12, 117:6,
120:5, 121:3,
124:2, 125:3,
125:9, 129:22,
196:8
dated
2:6, 2:11,
2:15, 2:19,
2:23, 3:2, 3:12,
3:16, 3:21, 4:2,
4:6, 4:10, 4:22,
5:3, 5:11, 5:23,
6:2, 6:6, 26:19,
27:14, 27:19,
30:13, 32:2,
39:21, 40:4,
40:7, 43:2,
58:15, 61:6,
89:24, 90:20,
90:25, 100:19,
107:8, 116:23,
118:9, 118:15,
124:15, 125:7,
149:25, 158:16,
159:2, 162:16,
162:23, 164:9,
187:6, 194:6,

195:23, 196:2,
196:19, 199:21
dated____
202:8
dates
40:16, 40:25,
51:4, 51:8,
51:16, 52:2,
52:3, 94:4,
94:14, 117:13,
117:16, 117:20,
117:23, 117:25,
118:18, 119:4,
119:6, 119:13,
119:18, 138:4,
176:16, 196:7
daughter
15:14, 15:23,
53:3, 53:19,
109:8
david
142:12
dawn
194:22
day
37:18, 39:5,
47:13, 49:4,
55:24, 98:25,
101:22, 103:22,
119:21, 122:3,
127:21, 130:2,
130:3, 132:2,
133:5, 134:24,
139:25, 147:20,
147:22, 164:7,
166:20, 190:12,
190:15, 204:3
day-to-day
140:11
dayb-6--
157:20
days
47:14, 48:13,
110:2, 110:19,
126:11, 126:21,
127:10, 178:15,
178:16
dayton
204:2

dear
40:6, 90:24
decide
37:21, 52:17,
56:4, 62:6
decided
77:23, 124:3,
151:19
decision
52:24, 53:2,
85:7
declaration
71:16, 79:19,
115:10, 115:22,
115:25, 116:3,
116:6, 116:8
decoy
76:2
decreased
181:19
defendant
92:25, 93:14
defendant's
151:1
defendants
1:14, 1:17,
3:9, 7:12, 8:11,
71:25, 93:4,
93:12, 93:24,
94:12, 126:19
defined
203:17
degree
22:4, 22:7
delaware
1:9
delegate
143:15
delete
49:11, 49:14,
49:15, 198:12,
198:17
deleting
198:13
delivery
28:3, 34:8
deliveryman
28:4

Transcript of Julie Kelly
Conducted on October 15, 2018

63

demanded
75:24
denied
113:20, 150:20,
164:17
dentist
123:9
depends
176:2
depose
85:7
deposed
8:4, 83:25,
117:22, 156:23,
157:5
depositions
62:15, 83:4,
83:11, 83:23,
84:2
deputy
123:9
design
138:7, 141:5,
175:25
designated
111:13
desk
132:6, 132:7
details
65:4, 139:8,
178:6, 178:11
determine
175:16
developers
182:22
developing
176:1
development
21:22, 141:5
device
173:4, 174:17,
198:4
diagnosed
177:25, 178:14
diagnosis
178:11
didn't
13:9, 15:18,

28:25, 30:10,
32:13, 44:17,
46:2, 47:3,
51:9, 53:10,
57:18, 58:10,
60:3, 60:8,
60:9, 60:10,
61:25, 62:2,
65:7, 69:25,
79:23, 82:10,
85:1, 85:3,
86:18, 101:21,
105:4, 105:9,
112:16, 119:22,
120:1, 120:25,
123:24, 137:18,
143:7, 152:14,
152:19, 164:21,
178:15, 181:23,
181:24, 186:22,
191:14, 192:9,
196:7, 198:17,
198:20
different
24:13, 78:5,
93:6, 118:2,
124:3, 124:5,
139:11, 139:24,
143:20, 170:20,
171:24, 172:3,
173:3, 173:13,
173:14, 173:18,
173:21, 194:20
differently
56:21
difficult
140:9
dinner
31:21, 144:1
direct
128:10
directly
19:11
director
138:24, 139:9
disabilities
37:14
disagree
105:17

disclosure
79:11, 79:12,
105:1, 161:18,
162:4
disclosures
3:9, 71:4,
71:18, 71:25,
74:12, 75:9,
79:16, 82:24,
85:13, 89:20,
103:16, 104:1,
104:18, 161:7,
161:10
discrimination
9:9, 75:20,
78:4, 157:18,
157:24
discuss
15:1, 15:5,
35:15, 35:18,
45:1, 53:4,
62:25, 64:23,
65:9, 66:12,
67:2, 67:11,
77:24, 118:1,
150:7, 164:18,
200:22
discussed
134:23, 152:10,
166:3, 166:11,
166:14, 166:15
discussing
115:7
discussion
35:21, 35:25,
105:22, 124:7
disease
177:2
distracted
95:4
distribute
32:18
district
1:1, 1:2, 74:9,
94:7, 94:8,
117:19
dlott
153:11, 160:15

dlott's
164:8
doc
80:18
docket
12:21, 12:22,
72:14, 121:20,
126:10, 148:25,
149:23, 164:22,
165:11, 165:15
dockets
20:8
doctor
131:4
document
5:6, 5:15,
5:19, 5:23,
26:25, 27:7,
27:11, 27:25,
35:2, 35:3,
40:2, 43:25,
56:16, 58:22,
58:24, 59:4,
59:7, 62:21,
62:23, 62:25,
63:6, 71:6,
71:9, 72:6,
72:22, 72:24,
73:2, 73:10,
73:14, 80:8,
80:15, 80:17,
80:19, 80:20,
81:15, 81:23,
83:12, 90:5,
103:9, 107:13,
107:16, 112:4,
112:16, 117:3,
117:4, 117:7,
121:2, 124:19,
127:17, 133:14,
134:1, 135:3,
136:19, 149:21,
155:13, 155:16,
156:11, 156:16,
158:5, 158:8,
158:20, 159:13,
159:15, 159:17,
160:7, 162:23,

163:3, 163:19,
163:23, 169:2,
169:8, 169:10,
169:14, 189:4,
192:15, 192:20,
194:6, 196:24,
198:10, 199:14

**documents**
5:10, 12:10,
13:11, 13:16,
13:19, 20:5,
20:8, 23:4,
26:17, 82:24,
111:17, 112:25,
113:11, 114:6,
114:12, 114:15,
115:5, 115:8,
123:25, 124:8,
124:11, 125:19,
128:16, 130:7,
133:11, 136:5,
143:24, 150:22,
151:4, 152:11,
152:14, 155:9,
156:12, 156:18,
156:24, 157:15,
157:25, 163:19,
164:12, 168:18,
187:5, 187:10,
187:17, 187:19,
187:23, 188:23,
198:21, 199:12

**does**
8:25, 14:16,
15:21, 17:19,
23:23, 24:5,
24:18, 24:23,
25:1, 31:10,
42:19, 59:11,
82:19, 84:11,
95:22, 96:3,
104:14, 109:16,
110:21, 114:14,
130:10, 133:22,
141:7, 151:16,
151:17, 189:21,
190:3, 200:9,
200:12

**doesn't**
17:6, 17:7,
17:17, 17:21,
17:22, 18:6,
50:21, 106:4,
164:3, 165:4,
165:11, 196:2

**doing**
41:11, 44:20,
55:25, 66:14,
66:15, 119:19,
120:20, 121:24,
137:7, 137:8,
137:14, 143:21,
144:1, 154:18,
171:12, 173:6,
175:24

**done**
19:5, 19:6,
85:9, 108:10,
109:6, 120:3,
147:22, 154:24,
158:11, 170:2,
197:7, 199:6

**door**
28:4, 28:6,
29:9, 29:25,
45:22, 45:23,
45:25, 46:1,
46:2, 46:3,
46:6, 46:18,
75:24, 76:7,
76:10, 76:12,
86:5, 86:8,
86:11, 128:19

**dorgene**
10:13

**dot**
23:14, 23:16,
24:12, 25:6,
90:21, 122:7

**down**
9:20, 9:23,
10:3, 10:6,
90:19, 113:23,
114:4, 125:9,
180:25, 195:2,
196:16, 199:10

**download**
13:10

**downsized**
183:14

**downtown**
128:8, 128:16,
130:12

**draft**
35:8, 44:22,
58:24, 59:3,
62:23, 72:24,
116:2, 116:5,
159:20, 193:14

**drafted**
23:4, 115:24,
200:14

**drafting**
73:2, 73:3,
114:14, 127:14,
159:22

**drafts**
114:12

**drastically**
183:11

**dressed**
28:8, 56:1

**drive**
14:12, 14:13,
14:16, 14:20,
15:23, 95:22,
113:23

**driveway**
29:10, 46:18

**driving**
29:8

**dropped**
58:11, 182:15

**drove**
46:16

**due**
44:5

**duly**
8:3, 203:4,
203:7

**duplicate**
62:1

**during**
15:2, 37:20,

88:24, 109:16,
112:10, 122:23,
123:23, 124:7,
169:16, 179:5,
185:22

**E**

**e-mail**
3:21, 4:2,
4:22, 5:11,
23:13, 23:17,
23:22, 23:23,
24:1, 24:6,
24:10, 24:16,
24:24, 25:2,
25:12, 25:13,
30:13, 30:22,
59:16, 65:12,
65:17, 66:18,
70:9, 73:12,
77:20, 77:24,
78:25, 90:16,
90:17, 90:22,
91:3, 91:24,
92:6, 92:9,
98:17, 101:15,
101:20, 101:22,
102:3, 102:21,
105:16, 105:23,
107:8, 107:21,
111:2, 112:18,
116:23, 117:10,
118:5, 118:15,
125:17, 155:18,
156:8, 156:9,
157:16, 158:7,
158:16, 159:2,
159:16, 159:20,
159:23, 168:18,
169:14, 181:13,
187:5, 187:23,
189:16, 190:13,
190:20, 192:23,
194:17, 196:25,
197:4

**e-mailed**
100:23, 101:18,
155:11

Transcript of Julie Kelly
Conducted on October 15, 2018

65

e-mails
3:12, 3:16,
4:6, 6:2, 20:10,
20:11, 20:13,
20:15, 24:19,
25:11, 89:19,
89:24, 97:19,
97:20, 97:21,
100:19, 118:9,
125:23, 178:23,
179:11, 181:16,
196:19, 197:25
each
1:13, 187:20,
187:23
earlier
15:18, 52:4,
60:23, 64:3,
76:6, 94:24,
148:1, 161:8,
169:21, 187:24
early
137:2, 175:8
easily
62:16
east
1:22, 7:16,
7:27
eastern
1:2, 74:5, 74:9
easy
54:12
edited
127:19, 161:23
editing
73:3, 160:2
editor
73:5, 73:6,
73:8, 96:13
edits
35:13, 45:4,
63:5, 73:17
eeoc
40:13, 41:19
effect
10:23, 14:16
effectiveness
137:15, 141:8,

170:6
efficient
91:4
effort
117:17
eidelman
2:7, 2:11,
2:16, 2:19, 3:2,
4:23, 5:11,
20:19, 26:20,
27:14, 30:14,
32:2, 34:15,
35:7, 36:8,
38:9, 38:24,
39:7, 39:13,
39:22, 40:5,
40:23, 41:15,
43:2, 43:7,
44:3, 44:10,
47:21, 50:10,
51:1, 52:5,
56:18, 56:22,
57:13, 57:19,
61:6, 63:16,
68:7, 70:7,
74:2, 74:8,
74:20, 77:20,
77:23, 85:3,
89:15, 90:10,
90:11, 90:22,
92:3, 92:4,
92:10, 92:20,
96:23, 97:14,
97:23, 98:16,
102:10, 103:8,
111:14, 111:16,
112:10, 115:13,
120:12, 129:6,
129:16, 155:12,
159:3, 162:3,
187:6
eidelman's
58:6
either
24:19, 24:23,
25:2, 34:15,
48:4, 48:16,
50:10, 62:8,

65:18, 94:11,
118:17, 165:19,
168:7, 175:13,
189:23, 203:14
elaborate
93:25
elderly
37:14
electronic
5:2, 113:18,
114:8, 125:15,
132:17, 136:12,
162:16, 163:11
electronically
157:16
eligible
139:11
eliminate
149:5
eliminated
149:7
else
13:14, 19:2,
19:23, 24:18,
24:23, 25:1,
33:6, 34:11,
38:16, 45:5,
65:8, 97:10,
98:4, 98:21,
102:10, 110:22,
146:10, 152:1,
157:5, 161:25,
163:6, 174:22,
174:23, 178:5,
191:15, 191:17
embarrassment
194:24
embedded
198:8
employed
21:24, 22:9,
22:21, 136:21
employee
22:19, 29:21,
29:23, 46:9,
67:7, 75:24,
102:12, 146:1,
147:12, 186:23

employees
65:19, 146:16,
148:21, 178:4
employer
22:11, 75:21
employment
22:13, 168:6,
191:20
enclosing
27:15
end
22:14, 77:25,
89:11, 125:21
ended
22:15, 191:20
engaged
83:3
enough
37:22, 38:6
enter
75:24, 112:14,
120:5, 187:9,
187:14, 199:24,
200:21
entered
163:22
entering
30:16
entire
133:25, 140:18,
143:6, 161:1,
187:15, 192:8
entirely
91:10
entitled
26:3
entry
127:12
envelope
28:11
especially
37:20, 105:18,
154:22
esq
47:17, 157:22
et
151:7
ethics
170:13

Transcript of Julie Kelly
Conducted on October 15, 2018

66

even
10:21, 19:19,
31:6, 38:25,
44:14, 50:21,
75:6, 91:10,
123:24, 123:25,
130:15, 137:17,
178:21
evening
31:20, 33:24,
47:10, 101:23
event
203:15
events
102:2
eventually
36:25
ever
20:20, 20:23,
21:1, 21:4,
40:23, 42:4,
48:3, 69:8,
69:11, 70:2,
70:7, 74:20,
90:12, 111:14,
111:25, 112:1,
112:4, 138:16,
145:2, 145:22,
147:12, 158:11,
167:21, 167:24,
168:2, 168:5,
168:9, 171:10,
178:4, 178:9,
184:12, 184:18,
192:11
every
137:19, 147:20,
166:20, 187:14
everybody
141:12
everybody's
143:1
everyone
182:4
everything
9:20, 73:24,
73:25, 98:12,
155:25, 158:11,

173:9, 174:23
evidence
134:8
ewing
7:13, 8:8,
16:21, 34:16,
38:24, 39:12,
40:24, 60:5,
68:7, 68:11,
68:22, 69:4,
69:7, 69:11,
69:16, 70:3,
70:12, 79:13,
81:24, 82:3,
82:6, 82:14,
89:5, 89:13,
89:14, 92:20,
101:24, 103:7,
103:10, 103:12,
107:4, 110:25,
111:13, 111:25,
112:1, 112:2,
112:3, 112:9,
112:23, 128:25
ewing's
106:18, 106:21,
107:2
ex
64:6, 64:8,
64:19
exact
75:15, 78:20,
138:4, 176:16
exactly
12:20, 16:18,
43:10, 81:5,
164:23, 171:15,
189:20, 192:3,
195:6
examination
2:1
examined
8:3
example
147:2
excerpt
71:2, 71:11,
71:13, 71:14,

75:13, 75:14,
79:18, 79:21,
80:3, 80:4,
80:12, 81:3,
81:20, 161:6
exchanged
82:25
excuse
129:3
executives
140:17
exhibit
2:5, 2:10,
2:14, 2:18,
2:22, 3:1, 3:5,
3:8, 3:11, 3:15,
3:20, 4:1, 4:5,
4:9, 4:14, 4:18,
4:21, 5:1, 5:5,
5:9, 5:14, 5:18,
5:22, 6:1, 6:5,
26:18, 27:16,
30:12, 30:17,
32:1, 39:20,
43:1, 43:22,
58:14, 61:5,
62:20, 71:21,
71:24, 72:4,
75:18, 77:14,
79:18, 80:1,
80:2, 80:10,
80:20, 80:21,
81:8, 89:23,
90:4, 100:18,
101:14, 102:23,
107:7, 107:13,
116:22, 118:8,
118:14, 124:13,
124:14, 126:13,
127:6, 149:12,
149:17, 157:13,
159:1, 159:6,
162:15, 162:21,
169:1, 169:7,
187:4, 187:9,
187:15, 189:3,
189:12, 192:14,
192:20, 192:22,

194:5, 194:10,
196:18, 196:23,
199:20, 199:24,
200:22
exhibits
2:4, 111:21,
149:18
existed
34:20
exiting
141:2
expect
119:13, 120:17
expected
109:1
expecting
31:15, 185:18,
189:24
experience
143:10, 144:16,
170:9, 170:22,
170:25, 171:16,
173:19, 174:7,
174:14
experiences
146:9, 146:12,
173:21
expert
79:20
expires
204:8
explain
111:7
extent
16:10, 18:11,
67:18, 87:18,
89:8, 104:11,
105:18, 154:4,
162:6
extra
46:7
eye
19:10
eye-opening
161:16

**F**

facilitate
171:7

Transcript of Julie Kelly
Conducted on October 15, 2018                                    67

| | | | |
|---|---|---|---|
| **fact** | 175:1 | 83:1, 83:2, | 56:23 |
| 51:21, 69:21, | **feel** | 84:3, 91:9, | **find** |
| 100:14, 161:13 | 70:19, 97:3, | 98:24, 99:11, | 37:17, 38:5, |
| **factors** | 97:9, 97:10, | 102:8, 107:19, | 47:3, 64:5, |
| 151:20 | 98:21, 128:17, | 111:17, 111:21, | 99:9, 152:16, |
| **fairly** | 128:20, 128:22, | 111:23, 112:2, | 156:19, 158:17, |
| 160:6 | 129:2, 129:19, | 112:4, 114:1, | 163:12, 198:1, |
| **fake** | 151:16, 158:4, | 114:5, 115:9, | 199:12 |
| 129:1 | 174:1, 192:10 | 116:20, 120:2, | **fine** |
| **fall** | **feels** | 121:6, 124:1, | 11:24, 36:15, |
| 182:13 | 128:25 | 126:3, 127:11, | 81:2, 113:8, |
| **families** | **felt** | 127:13, 130:11, | 113:17, 121:19, |
| 184:1 | 96:24, 97:11, | 130:12, 131:9, | 126:12, 145:9, |
| **family** | 97:15, 105:9, | 132:13, 132:18, | 154:17, 185:13 |
| 29:20, 32:23, | 123:15, 134:10, | 134:7, 135:1, | **finish** |
| 32:25, 33:13, | 161:1, 197:7, | 135:5, 135:24, | 9:25, 10:1 |
| 136:14 | 197:8, 197:17 | 136:18, 148:24, | **fired** |
| **fantastic** | **few** | 150:11, 152:5, | 186:21, 186:23 |
| 143:3, 173:15 | 11:11, 32:16, | 152:19, 157:18, | **firm** |
| **far** | 37:19, 91:5, | 160:13, 166:2 | 20:14, 34:17, |
| 158:14, 186:18 | 98:19, 133:24 | **files** | 34:20, 39:7, |
| **fdc** | **fifth** | 133:21, 179:24 | 48:5, 48:17, |
| 5:15, 189:4, | 1:22, 103:1 | **filing** | 50:2, 50:11, |
| 189:17 | **figure** | 5:2, 73:10, | 53:23, 53:25, |
| **federal** | 46:23, 62:11, | 103:19, 112:1, | 61:14, 64:25, |
| 19:21, 26:2, | 62:17, 74:1, | 113:18, 114:8, | 67:17, 77:21, |
| 26:13, 94:12 | 95:3 | 118:25, 126:4, | 96:16, 102:2, |
| **fedex** | **figured** | 130:15, 132:17, | 102:6, 102:11, |
| 28:3, 28:9, | 155:18 | 133:7, 133:18, | 105:19, 203:16 |
| 28:16, 29:12, | **file** | 134:4, 135:3, | **fiu** |
| 29:14, 29:15, | 72:9, 72:12, | 136:12, 148:24, | 21:18 |
| 29:16, 29:21, | 113:21, 113:22, | 150:3, 162:12, | **five** |
| 29:23, 30:2, | 114:12, 115:21, | 162:16 | 166:6, 182:24 |
| 30:4, 30:5, | 117:23, 123:24, | **filings** | **five-year-olds** |
| 30:6, 32:17, | 126:7, 128:16, | 13:6, 71:15, | 86:21 |
| 33:16, 33:19, | 133:6, 136:10, | 113:2, 113:3, | **floor** |
| 33:23, 34:2, | 136:14, 153:1 | 114:3, 163:11, | 95:22 |
| 34:8, 34:10, | **filed** | 166:1 | **florida** |
| 44:4, 44:7, | 9:9, 23:2, | **fill** | 21:18 |
| 44:10, 44:16, | 23:5, 40:10, | 137:23 | **fmla** |
| 46:6, 46:9, | 41:16, 55:5, | **filled** | 19:20, 181:12 |
| 46:13, 46:14, | 70:10, 72:8, | 194:22 | **folders** |
| 46:20, 46:23, | 72:20, 74:6, | **final** | 134:2 |
| 47:2, 47:6, | 74:16, 74:23, | 136:22, 199:24 | **folks** |
| 75:23, 76:2, | 75:20, 77:7, | **finally** | 83:22, 175:14, |
| 129:1 | 78:18, 80:11, | 43:20 | 176:2 |
| **fee** | 80:19, 81:5, | **financially** | **follow** |
| 26:3, 26:12, | 81:18, 82:24, | 40:18, 42:8, | 91:13 |

Transcript of Julie Kelly
Conducted on October 15, 2018                    68

| | | | |
|---|---|---|---|
| follow-up | fricke | gary | 176:25, 180:17, |
| 65:15 | 137:9, 137:22, | 2:7, 2:11, | 184:9, 186:15, |
| following | 140:7, 140:22 | 2:16, 2:19, | 186:23 |
| 40:16, 51:4, | fricke's | 2:24, 3:2, 4:22, | gets |
| 117:20 | 194:21 | 5:11, 26:19, | 74:23 |
| follows | friday | 27:14, 32:2, | getting |
| 8:4, 102:5 | 52:18, 52:23, | 34:15, 35:6, | 15:12, 67:16, |
| food | 191:5 | 39:22, 40:5, | 96:23, 99:4, |
| 141:12 | friend | 43:2, 51:1, | 130:16, 142:2, |
| force | 200:7, 200:9, | 58:15, 59:9, | 154:25, 171:13, |
| 10:23, 137:6, | 200:12, 201:2, | 61:6, 68:7, | 178:24, 180:2 |
| 171:8 | 201:11, 201:12 | 90:22, 102:9, | gillian |
| forced | friendly | 155:12, 159:2, | 3:13, 4:3, 4:7, |
| 94:6 | 86:17 | 187:6 | 4:11, 7:14, |
| foregoing | friends | gave | 7:20, 8:8, |
| 202:2 | 15:17, 32:16, | 57:17, 93:3, | 89:25, 90:19, |
| form | 37:17 | 93:23, 144:11, | 99:15, 102:10, |
| 68:21 | front | 158:7 | 116:24, 117:11, |
| formal | 10:23, 29:9, | general | 118:9, 121:9, |
| 155:25, 195:3 | 46:18, 86:8, | 19:8, 73:8, | 124:15 |
| former | 86:11, 121:20, | 87:14, 102:1, | give |
| 65:19, 67:8, | 129:7, 171:16, | 160:7 | 11:25, 12:11, |
| 75:21, 102:12 | 193:1 | generations | 26:2, 26:5, |
| forms | frustrated | 170:4 | 26:11, 26:14, |
| 98:1 | 143:24 | genuine | 36:10, 49:21, |
| forth | frustration | 143:4, 143:5 | 66:7, 122:2, |
| 11:8, 137:15, | 194:18, 194:25 | get | 173:18, 174:17, |
| 164:15 | full | 15:18, 21:8, | 177:20, 183:17 |
| forward | 11:25, 26:10, | 23:24, 28:6, | given |
| 38:7, 46:7, | 49:14, 70:23, | 28:18, 33:21, | 20:21, 30:23, |
| 84:25, 107:5, | 71:6, 71:9, | 44:4, 44:12, | 103:8, 139:9 |
| 109:2, 109:18, | 71:18, 73:24, | 45:19, 46:5, | giving |
| 110:19 | 83:9, 83:17, | 54:11, 54:13, | 81:6 |
| forwarded | 103:1, 150:19, | 56:15, 57:12, | glad |
| 23:24, 197:19, | 161:13, 193:19 | 70:7, 74:16, | 23:15, 23:18, |
| 197:21 | full-time | 75:25, 77:16, | 23:23, 24:13, |
| found | 22:19, 37:12 | 86:12, 89:19, | 25:13, 25:20 |
| 70:16, 98:23, | fun | 90:12, 92:13, | go |
| 151:15, 180:7 | 55:25 | 92:14, 92:15, | 8:14, 11:10, |
| four | further | 97:23, 99:1, | 21:7, 21:14, |
| 37:12, 142:19 | 38:23, 53:9, | 106:18, 108:12, | 21:16, 23:3, |
| frank | 61:2, 99:25, | 109:10, 114:8, | 24:13, 24:15, |
| 1:10, 8:11, | 100:2, 105:22, | 122:4, 129:1, | 26:16, 27:1, |
| 140:23 | 141:13, 150:10, | 130:8, 142:25, | 36:16, 36:17, |
| freaked | 203:13 | 143:13, 143:24, | 49:10, 49:14, |
| 131:3 | futures | 155:17, 163:13, | 49:15, 54:3, |
| free | 175:19 | 170:15, 171:22, | 54:4, 55:2, |
| 102:16 | | 176:1, 176:23, | 55:24, 58:13, |
| | **G** | | |
| | garfield | | |
| | 119:24 | | |

Transcript of Julie Kelly
Conducted on October 15, 2018

69

61:19, 62:4,
69:25, 76:16,
76:22, 84:14,
85:20, 85:24,
94:16, 102:22,
103:1, 106:11,
109:2, 110:11,
110:19, 112:6,
113:24, 119:1,
120:9, 122:20,
128:16, 131:3,
132:12, 132:18,
133:5, 153:10,
170:15, 170:18,
173:17, 174:21,
176:24, 177:12,
178:9, 178:22,
179:2, 186:22,
195:21, 199:4
**goes**
23:20, 26:10,
80:7, 90:17,
150:4, 151:6,
153:2, 175:24,
176:4, 188:21,
193:1
**gone**
49:16, 77:8,
77:21, 98:8,
98:20, 109:18,
140:21, 140:22,
181:5, 187:13
**good**
8:7, 187:2,
190:7
**goodness**
43:9
**google**
110:4, 110:5,
114:18, 115:1,
149:10
**googled**
110:10, 115:3
**gosh**
45:14, 110:12,
138:12, 140:13,
142:19, 181:15,
184:7

**got**
11:18, 16:17,
28:3, 38:22,
48:13, 55:22,
55:23, 56:1,
56:2, 57:10,
69:21, 75:2,
79:18, 88:4,
99:11, 99:25,
106:5, 113:20,
125:8, 125:20,
129:15, 130:17,
130:18, 131:12,
144:5, 152:22,
158:23, 163:7,
175:9, 175:11,
186:25, 190:6,
193:5, 193:23,
195:20, 198:14
**govern**
84:6
**graduate**
21:9, 21:12
**graesser**
7:35, 8:21
**granted**
132:24, 151:1
**granting**
4:15, 126:3,
126:14, 127:7
**grasp**
119:16
**great**
54:4, 137:17,
141:13, 174:14
**ground**
8:15
**group**
23:8, 56:10,
139:17, 141:4,
142:15, 142:22,
143:14, 145:14,
146:2, 170:18,
174:11, 174:13,
175:4, 180:9,
180:24, 182:17,
184:19, 185:25,
186:6

**groups**
56:9, 143:20
**guess**
47:4, 103:12,
120:10, 129:3,
140:10, 142:4,
164:3, 173:11,
175:4, 179:2,
198:7
**guessing**
176:7
**guidance**
147:10
**gut**
68:17, 69:15,
70:1
**guy**
28:8, 129:1
**guys**
32:15, 63:18,
64:11, 123:20

---

**H**

**hadn't**
53:24, 123:25
**hand**
28:10, 46:14,
204:2
**handed**
28:11, 35:3
**handle**
62:12
**hands-on**
170:9, 173:19
**handwritten**
2:23, 5:23,
58:15, 194:6
**happen**
175:17
**happened**
38:22, 57:9,
57:22, 134:23,
157:1, 157:7,
181:1, 181:4
**happening**
45:19
**happens**
49:12

**happy**
105:25
**harassed**
96:24, 97:4,
97:9, 97:10,
98:21, 134:11
**harassment**
5:20, 75:22,
98:2, 99:22,
100:13, 100:15,
105:10, 161:19,
192:16
**hard**
60:12, 146:3,
146:13
**harvard**
21:20
**has**
9:9, 9:11,
10:22, 17:12,
17:23, 26:23,
30:23, 39:16,
39:25, 74:22,
90:3, 101:25,
109:25, 111:13,
111:20, 111:25,
112:3, 112:24,
114:2, 124:13,
149:16, 158:11,
163:22, 167:3,
169:6, 169:13,
179:10, 180:21,
186:3, 186:9,
189:11, 197:5,
197:25
**hasn't**
165:19
**haven't**
49:19, 128:14,
157:4, 165:20,
167:5
**having**
8:2, 128:15,
174:20, 181:15,
200:7
**he's**
19:5, 19:18,
64:21, 66:15,

Transcript of Julie Kelly
Conducted on October 15, 2018

70

85:2, 87:18,
88:6, 166:20,
169:25, 172:11,
172:14, 172:15,
176:22, 178:22,
181:5
**head**
10:5, 23:7,
24:20, 34:12,
37:3, 42:17,
50:5, 50:12,
68:24, 75:16,
113:13, 140:12,
142:15, 156:10,
172:18, 180:8,
180:24, 182:17,
183:6, 185:23,
187:12, 189:8,
191:18
**headed**
56:2
**health**
66:15
**hear**
76:18, 129:6,
132:16, 178:22,
179:4
**heard**
53:24, 60:13,
104:3, 104:5,
137:10, 178:6,
195:1
**hearing**
118:21, 119:7
**held**
53:11, 54:5,
83:23
**help**
123:20, 144:6,
161:4
**helped**
184:16, 184:20
**her**
9:8, 9:19,
9:20, 9:21,
15:17, 16:24,
17:2, 17:11,
17:13, 18:4,

18:8, 18:9,
18:12, 18:13,
18:15, 18:16,
18:17, 18:21,
30:24, 32:4,
36:10, 73:9,
73:12, 87:19,
95:22, 104:13,
123:16, 123:18,
130:10, 131:2,
131:17, 135:14,
139:7, 139:8,
148:9, 150:12,
150:14, 150:21,
150:22, 151:4,
162:7, 164:12,
164:22, 165:17,
194:23, 196:10,
196:11, 196:12,
200:15
**here**
8:13, 8:18,
8:20, 9:17,
16:17, 26:4,
44:11, 51:7,
51:15, 52:2,
55:5, 72:10,
74:2, 75:3,
76:5, 83:6,
93:2, 93:22,
94:17, 106:3,
107:23, 112:19,
120:4, 120:14,
123:20, 127:9,
134:17, 134:19,
136:20, 168:19,
187:14, 187:17,
188:13, 188:23,
189:11, 189:12,
192:23
**here's**
38:22
**hereby**
202:1, 203:6
**herein**
1:17, 8:2
**hereinafter**
8:3

**hereunto**
204:1
**hi**
66:14
**high**
21:9
**higher-up**
160:16
**him**
14:5, 14:23,
16:2, 31:4,
41:24, 44:3,
44:8, 65:5,
65:15, 67:16,
76:18, 86:18,
87:13, 87:15,
87:16, 89:7,
89:16, 96:5,
96:21, 116:5,
137:5, 137:9,
137:21, 139:17,
141:23, 143:8,
143:25, 144:9,
146:18, 147:8,
147:20, 147:21,
166:19, 166:24,
167:1, 167:14,
169:22, 171:3,
171:14, 172:17,
172:21, 178:2,
182:1, 185:18,
188:10, 191:21,
191:24, 192:4
**hire**
140:15
**hires**
173:17
**his**
28:10, 46:14,
47:21, 53:17,
57:17, 57:19,
57:24, 65:25,
66:14, 67:4,
67:23, 87:7,
92:5, 105:14,
137:23, 142:23,
143:5, 143:12,
143:14, 144:6,

145:14, 145:19,
145:23, 166:21,
167:17, 168:7,
170:25, 171:3,
171:5, 171:16,
172:16, 177:20,
178:7, 178:11,
178:16, 184:9,
197:3
**history**
48:20, 150:5
**hit**
133:20
**hoc**
195:4
**hold**
138:11, 189:15,
192:22
**holding**
29:15, 76:2
**home**
10:12, 15:18,
75:25, 95:21
**honestly**
13:22, 15:10,
15:15, 16:3,
24:9, 32:13,
42:16, 43:9,
45:20, 47:14,
49:12, 53:25,
58:19, 63:7,
77:14, 94:10,
95:1, 96:22,
96:25, 167:13,
179:10, 179:16,
190:16, 197:15
**honor**
127:12
**hopefully**
91:4, 91:20
**hoping**
91:5, 98:19
**hostile**
97:16
**hot**
154:25
**hour**
200:18

Transcript of Julie Kelly
Conducted on October 15, 2018

71

**hours**
116:18, 122:2
**house**
31:19, 44:5,
96:9
**how**
15:11, 15:16,
16:24, 17:13,
19:7, 24:5,
24:7, 24:8,
27:25, 33:1,
37:21, 47:5,
51:6, 51:23,
51:25, 55:21,
57:6, 60:2,
60:21, 62:11,
66:14, 66:15,
69:19, 69:24,
70:7, 73:18,
74:12, 76:15,
79:15, 83:10,
86:20, 87:16,
89:7, 95:3,
95:10, 96:18,
106:4, 106:8,
109:11, 111:7,
113:21, 121:5,
126:19, 129:19,
133:13, 133:19,
135:21, 138:10,
139:17, 139:21,
140:2, 140:6,
141:10, 141:15,
142:1, 142:4,
142:22, 143:15,
146:13, 152:6,
153:20, 153:21,
154:20, 155:15,
156:22, 158:7,
160:8, 161:5,
161:9, 162:5,
163:12, 163:25,
166:3, 167:7,
169:18, 172:25,
173:5, 175:3,
175:9, 175:18,
175:20, 175:22,
176:3, 179:4,

180:19, 180:24,
181:4, 181:18,
181:21, 182:23,
183:12, 183:15,
185:24, 187:18,
191:4, 193:22,
201:10
**however**
12:9, 91:16
**huge**
140:23, 144:15
**human**
23:12
**husband**
19:3, 19:14,
19:23, 28:2,
33:8, 35:11,
35:14, 35:17,
43:13, 45:3,
45:5, 53:3,
53:18, 58:19,
63:2, 63:3,
63:7, 76:7,
76:11, 76:17,
76:19, 76:21,
76:24, 77:6,
86:4, 114:4,
114:5, 127:18,
151:12, 160:4

**I**

**i'll**
49:14, 58:21,
61:22, 62:10,
62:16, 77:11,
85:11, 109:22,
122:8, 129:21,
163:13, 163:16,
163:20
**i've**
11:15, 19:6,
19:17, 23:19,
25:10, 26:17,
63:8, 75:2,
115:5, 130:18,
158:11, 171:10,
172:16, 181:14
**idea**
25:21, 30:8,

31:13, 70:8,
90:12, 92:14,
92:16, 93:3,
93:23, 94:11,
94:21, 94:23,
97:24, 132:17,
171:23
**ideas**
143:22
**identification**
2:9, 2:13,
2:17, 2:21,
2:25, 3:4, 3:7,
3:10, 3:14,
3:19, 3:23, 4:4,
4:8, 4:13, 4:17,
4:20, 4:24, 5:4,
5:8, 5:13, 5:17,
5:21, 5:25, 6:4,
6:7, 26:21,
32:3, 39:23,
43:4, 58:17,
61:8, 71:23,
72:1, 90:1,
100:21, 107:10,
116:25, 118:11,
124:17, 126:16,
149:14, 159:4,
162:18, 169:4,
187:7, 189:6,
192:17, 194:7,
196:21, 199:22
**identified**
29:12
**ill**
176:12
**illness**
177:2, 178:7
**image**
198:6
**immediately**
137:21, 137:23,
141:11
**impact**
11:23, 18:13
**impacted**
141:10
**impacts**
16:24, 17:13

**impersonated**
30:6, 34:9
**impersonating**
29:19, 29:22,
34:9, 46:5
**impersonator**
46:24
**implementation**
175:5
**implemented**
141:18
**implementing**
173:4
**imply**
64:20
**impression**
56:6, 123:16
**in-box**
24:15
**in-house**
8:21, 78:2
**inappropriately**
105:20
**inboxes**
24:24
**included**
66:20, 75:7,
198:21
**including**
78:2, 157:20
**incorrect**
63:24
**increase**
139:2, 139:10
**incredible**
137:20, 144:16
**indicate**
27:18
**indicated**
91:17
**indicating**
55:1, 196:4
**individual**
1:5, 1:13,
8:11, 14:1, 84:7
**individually**
143:1
**individuals**
91:8

Transcript of Julie Kelly
Conducted on October 15, 2018                                    72

| | | | |
|---|---|---|---|
| influence<br>147:24<br>informal<br>10:22<br>information<br>39:2, 78:9,<br>100:1, 177:8,<br>193:12<br>initial<br>3:9, 71:4,<br>71:18, 71:25,<br>74:12, 79:16,<br>82:23, 89:20,<br>103:16, 104:1,<br>105:1, 161:6,<br>161:10<br>innovative<br>170:7, 173:16<br>inside<br>57:11, 57:12,<br>131:2<br>insightics<br>173:8<br>inspirational<br>137:21<br>installed<br>45:13<br>installing<br>45:8<br>instance<br>98:3, 134:4<br>instances<br>97:8<br>instead<br>185:19<br>institutions<br>21:24<br>instruct<br>104:13<br>instructing<br>88:17<br>instructional<br>138:6, 141:4,<br>182:22<br>instructor<br>170:16<br>instructs<br>103:10 | interested<br>203:15<br>interesting<br>64:5, 85:9<br>interim<br>180:2, 180:8,<br>180:13, 180:23,<br>183:6<br>internal<br>175:14<br>international<br>21:19<br>internet<br>104:20, 104:22,<br>158:18, 160:9<br>interpreted<br>56:21, 56:25,<br>69:1, 69:24<br>interpreting<br>106:8<br>interrupted<br>128:17<br>intervention<br>175:17<br>interviewing<br>194:20<br>into<br>27:1, 62:4,<br>76:16, 99:4,<br>102:2, 105:13,<br>113:25, 131:5,<br>135:14, 148:24,<br>170:15, 171:6,<br>171:15, 175:24,<br>176:24, 182:20<br>introduce<br>30:11<br>introduction<br>10:11<br>invalid<br>160:20, 160:21<br>invasive<br>136:5<br>inventory<br>174:21<br>investigate<br>34:7<br>investigated<br>9:11 | investigation<br>44:21<br>invoice<br>6:6, 26:8,<br>26:9, 199:21,<br>199:24, 200:1,<br>200:3, 200:4,<br>200:6<br>invoices<br>200:13<br>involved<br>78:3, 85:2,<br>171:13, 172:7,<br>172:14, 175:4,<br>175:9, 175:12<br>involving<br>171:10<br>ipad<br>174:24<br>ipads<br>173:21<br>issue<br>16:16, 34:3,<br>118:22, 122:1,<br>122:3, 124:3,<br>130:16, 148:2,<br>148:3, 148:4,<br>200:12<br>issued<br>9:12, 44:6,<br>51:22, 56:16,<br>69:20, 125:25,<br>127:12, 151:5,<br>152:7, 152:24,<br>160:25, 164:13,<br>165:23, 200:6<br>issues<br>72:16, 130:14,<br>151:25, 163:12,<br>182:15, 182:16,<br>183:2, 183:5,<br>183:8, 186:16<br>issuing<br>200:3<br>it's<br>9:14, 16:19,<br>23:25, 24:9,<br>25:20, 25:23, | 26:8, 26:12,<br>30:3, 31:21,<br>36:1, 41:6,<br>49:4, 51:9,<br>54:8, 54:12,<br>60:12, 66:6,<br>70:9, 72:13,<br>74:6, 74:10,<br>74:14, 75:18,<br>77:13, 80:5,<br>80:25, 81:1,<br>81:7, 81:9,<br>83:6, 83:13,<br>88:7, 90:16,<br>90:21, 91:10,<br>93:20, 94:1,<br>101:8, 101:15,<br>102:4, 105:15,<br>110:2, 122:2,<br>122:9, 124:25,<br>125:22, 131:21,<br>131:24, 136:4,<br>141:21, 143:11,<br>143:18, 144:3,<br>144:4, 148:10,<br>148:18, 148:20,<br>148:25, 151:17,<br>152:7, 153:9,<br>154:23, 157:9,<br>157:24, 158:1,<br>158:6, 165:6,<br>165:13, 166:10,<br>166:21, 167:11,<br>170:19, 171:19,<br>173:7, 175:19,<br>175:20, 175:21,<br>175:23, 176:21,<br>182:6, 195:20,<br>197:25, 198:8,<br>199:24, 200:1<br>item<br>46:19, 187:23<br><hr>J<br><hr>jackson<br>7:22, 8:19<br>january<br>185:2 |

Transcript of Julie Kelly
Conducted on October 15, 2018                                           73

jersey
7:18
jill
7:34, 8:21,
78:3
job
9:19, 119:2,
141:16, 185:25,
191:21, 192:12
jobs
184:1, 185:22
joe
137:4, 137:11,
141:23
johnson
1:13, 8:13,
67:13, 148:3,
194:15
jotted
195:2, 196:16
jr
101:8
judge
10:24, 48:8,
48:11, 110:20,
122:4, 122:24,
123:12, 150:4,
151:6, 151:25,
153:2, 153:5,
153:6, 153:10,
153:12, 153:13,
153:15, 155:8,
160:15, 160:16,
160:17, 160:19,
164:8
judge's
153:22, 165:7
julie
1:16, 2:6,
2:12, 2:15,
2:20, 2:24, 3:3,
3:13, 3:17,
3:22, 4:2, 4:7,
4:10, 4:23, 5:7,
5:12, 5:16, 6:2,
8:1, 10:13,
24:11, 24:12,
25:18, 26:19,

29:3, 30:15,
32:2, 39:21,
43:3, 58:16,
61:7, 75:10,
89:25, 100:20,
101:21, 107:9,
116:23, 118:10,
124:15, 159:3,
169:2, 187:6,
189:5, 196:19,
202:1, 203:7
july
38:5, 40:17,
90:20, 98:17,
101:18, 101:23,
102:25, 103:25,
116:21, 117:8
june
27:20, 37:15,
37:23, 38:3,
38:10, 38:12,
38:13, 38:16,
38:19, 38:21,
39:12, 40:14,
40:17, 44:17,
48:24, 49:17,
50:2, 50:11,
51:2, 51:7,
51:11, 52:17,
53:14, 54:15,
54:23, 55:7,
55:13, 55:20,
57:4, 59:13,
61:14, 64:15,
77:22, 90:25,
108:19, 111:12,
111:19, 112:10,
119:23, 120:10
junior
101:4
jury
10:24
justin
194:15

K

karen
1:12, 8:12

keep
61:23, 98:12,
137:6, 155:6,
192:4, 195:10
kelly's
150:19
kept
170:2, 170:3,
195:9
khakis
28:9, 29:4,
29:14
kid
113:24
kids
66:14, 86:1,
86:7, 86:10,
95:1, 143:1,
188:11
kind
28:2, 29:7,
31:21, 41:7,
60:12, 90:17,
105:8, 106:8,
143:5, 144:3,
181:4
kinds
182:8
knew
34:20, 53:10,
55:23, 130:11,
135:19, 135:21,
143:1, 170:1,
176:20
knock
128:18
knocked
46:1, 75:24,
76:10
knowledge
12:10, 102:13
known
91:8, 115:6,
129:9

L

lab
173:16

laid
186:12
lane
10:13
last
15:17, 22:11,
38:1, 49:23,
60:13, 66:4,
70:23, 71:7,
71:8, 71:17,
81:11, 83:2,
83:18, 85:14,
85:15, 87:7,
87:9, 91:1,
115:8, 116:18,
128:1, 128:2,
162:23, 168:13,
168:14, 187:1
late
43:20, 123:7,
123:10, 138:3
later
47:14, 48:14,
58:11, 70:16,
75:23, 124:2
law
7:3, 7:5, 7:15,
7:25, 9:6,
34:16, 39:7,
50:10, 53:23,
53:25, 54:9,
61:14, 64:25,
67:17, 69:25,
77:21, 87:20,
96:16, 102:1,
102:6, 102:11,
105:19, 114:21,
122:7, 153:23,
157:21, 170:12
lawful
8:2
laws
121:5, 181:12
lawsuit
21:2, 40:9,
41:16, 67:4,
67:8, 67:23,
91:11, 91:19,

Transcript of Julie Kelly
Conducted on October 15, 2018

74

93:15, 94:13,
102:8, 166:22
**lawyer**
40:22, 41:23,
47:17, 47:24,
68:20, 74:3,
75:7, 78:2,
79:14, 92:1,
92:11, 93:3,
93:20, 93:23,
106:18
**lawyers**
90:10, 94:3,
94:12, 110:6,
110:10
**leader**
169:17, 169:19
**leadership**
142:23, 145:1,
145:14, 145:19,
145:23, 146:24,
176:17, 197:11
**learn**
68:6, 78:9,
110:3, 122:6,
140:8, 153:20,
156:11, 175:15,
176:12, 176:15,
177:3, 184:25
**learned**
78:11, 91:11,
144:9, 177:8
**learners**
141:11
**learning**
37:13, 140:1,
140:3, 141:20,
144:18, 144:19,
170:8, 170:10,
170:17, 170:20,
173:16, 175:17
**least**
37:19, 38:5,
38:6
**leave**
28:7, 31:24,
128:7, 128:9,
179:3, 179:18,

181:14, 197:3
**lecture**
172:2
**led**
17:12, 97:9,
97:10, 150:15,
171:15
**left**
48:9, 123:1,
131:20, 131:23,
131:24, 137:22,
140:7
**legal**
36:3, 36:5,
36:7, 36:10,
36:14, 56:16,
60:16, 63:14,
75:3, 75:22,
88:6, 88:8,
88:9, 189:15,
192:22
**lehr**
7:13, 8:9,
34:16, 101:25
**less**
19:19, 167:12
**lesson**
149:17
**let**
11:6, 11:7,
21:8, 26:11,
27:12, 37:21,
39:13, 40:15,
42:25, 51:3,
51:8, 71:3,
91:21, 107:12,
108:18, 118:1,
123:6, 132:19,
146:25, 147:1,
156:22, 158:9,
176:17
**let's**
17:3, 32:12,
55:19, 58:13,
85:20, 90:15,
90:16, 99:19,
102:22, 116:21,
121:2, 155:6,

187:1
**letter**
2:6, 2:11,
2:15, 2:19,
2:23, 3:2, 4:10,
9:11, 26:19,
27:13, 28:10,
30:13, 32:2,
35:6, 35:8,
35:10, 35:12,
35:18, 35:22,
36:7, 36:11,
36:14, 36:20,
38:8, 38:17,
39:10, 39:21,
40:2, 40:4,
40:6, 40:7,
41:6, 41:14,
41:25, 42:2,
42:7, 42:19,
43:2, 43:6,
43:8, 43:11,
43:12, 43:14,
43:18, 44:22,
45:1, 46:22,
47:17, 47:22,
49:21, 49:24,
50:2, 51:1,
52:1, 52:7,
54:21, 54:22,
56:17, 58:11,
58:15, 59:16,
60:13, 60:24,
61:6, 61:9,
89:15, 89:16,
90:25, 91:1,
91:3, 92:8,
98:15, 98:18,
102:20, 105:5,
124:15, 168:10,
168:22, 169:15
**letters**
63:8, 69:15,
91:2, 98:5, 98:7
**letting**
105:12
**level**
139:11, 142:5,

153:3
**levels**
176:5
**levin**
3:21, 96:16,
100:23, 100:24,
101:24, 102:9,
107:8, 107:22
**levin's**
96:18
**lewis**
7:22, 8:19
**liar**
78:15, 115:15,
116:13
**lie**
110:24, 111:4,
111:8, 129:7
**lied**
107:24, 121:7
**lies**
108:1, 112:23,
113:9
**like**
11:14, 12:11,
19:18, 41:9,
46:6, 46:9,
49:9, 52:4,
60:25, 72:8,
72:17, 80:3,
96:24, 102:14,
103:23, 110:8,
114:24, 119:21,
120:21, 128:25,
136:4, 142:5,
144:5, 146:13,
151:17, 151:19,
161:23, 163:16,
163:20, 169:15,
169:17, 169:19,
171:20, 174:2,
174:7, 178:2,
181:3, 181:5,
183:17, 186:22,
188:22, 190:3,
191:2, 194:13,
194:14, 196:4,
196:9, 198:10

Transcript of Julie Kelly
Conducted on October 15, 2018

75

liked
145:14
likely
77:10, 177:16
limited
157:20
line
48:9, 48:12,
103:1, 112:6,
112:7, 184:2,
184:4, 184:5,
184:6
lines
128:3, 150:18
link
13:10
linkedin
168:23
lisa
1:19, 203:3,
204:6
list
70:17, 70:21,
74:14, 79:7,
103:8, 104:23,
105:1, 147:22,
187:21
listed
19:20, 162:4,
189:19
listened
49:3, 60:6,
137:19
listening
161:2
listings
12:21, 12:22
litigation
5:16, 74:13,
189:4, 189:17,
192:22
little
11:10, 21:9,
23:8, 28:5,
28:14, 28:17,
35:1, 62:10,
90:7, 90:18,
93:5, 106:2,

131:10, 133:6,
135:5, 136:17,
136:23, 140:10,
143:13, 143:18,
144:4, 149:20,
150:4, 167:11,
169:18, 169:21,
172:24, 174:6,
174:9, 175:2,
185:21, 193:21,
194:18
live
109:14, 164:3
lives
73:19, 95:21
llc
119:24
llp
7:13, 101:25
lob
184:5
local
8:19, 126:25
location
57:5, 57:10,
58:3, 174:24
logothetis
119:23
long
38:6, 81:17,
85:2, 109:11,
126:19, 138:10,
138:15
look
12:20, 13:16,
17:3, 19:10,
28:5, 34:6,
35:2, 38:6,
40:1, 62:11,
69:14, 80:18,
102:17, 104:21,
105:13, 113:10,
115:4, 116:14,
125:17, 136:12,
152:25, 160:16,
170:7, 180:22,
183:21, 188:22,
189:13, 189:17,

190:3
looked
20:15, 46:8,
49:16, 49:24,
50:6, 50:25,
80:20, 102:2,
104:19, 127:1
looking
46:6, 72:19,
73:22, 106:20,
147:19, 192:6
looks
72:8, 72:17,
80:3, 169:15,
188:22, 189:7,
194:13, 194:14,
196:9
lori
7:35, 8:20
losing
183:25
lost
185:22, 185:25
lot
22:25, 43:19,
56:11, 63:8,
83:18, 110:13,
140:25, 141:2,
147:9, 170:22,
174:1, 175:23,
176:2, 181:1
lots
21:20
loud
37:7, 37:9
lying
78:7, 110:6,
110:8, 110:10,
110:11

**M**

ma'am
19:25, 20:4,
63:4
mac
23:14, 23:16,
25:6, 90:21
machine
174:21

made
52:24, 52:25,
68:3, 68:21,
68:22, 70:19,
78:15, 81:24,
85:7, 97:3,
98:21, 98:22,
103:19, 105:8,
109:4, 109:18,
125:20
magazine
73:7, 96:13
magistrate
110:20, 123:15,
127:4, 130:4,
130:10, 153:9,
153:13, 153:22,
160:17
mail
43:21, 58:11,
77:21, 91:2,
125:10, 125:13,
163:7, 163:13
mainly
141:4
make
9:4, 22:25,
23:9, 30:3,
35:13, 61:25,
62:16, 63:5,
73:17, 77:12,
84:16, 84:20,
95:20, 117:16,
130:19, 141:24,
143:22, 156:25,
157:10, 159:9,
181:9, 188:22
makes
69:22, 128:22,
151:18
making
157:25
man
75:23, 86:19,
137:17, 166:20
manage
143:16, 174:19,
174:25, 178:16

Transcript of Julie Kelly
Conducted on October 15, 2018

76

management
143:14, 192:7
manager
138:6, 138:7,
138:8, 138:14,
143:9, 143:15,
143:18, 144:4
managers
142:4
managing
101:24
manner
203:15
mantia
64:13, 64:14,
64:22, 65:8,
65:12, 94:19,
147:16, 148:2,
148:11, 148:16
many
33:1, 47:5,
57:6, 112:7,
121:5, 130:24,
142:4, 154:20,
156:22, 158:8,
161:5, 161:9,
166:3, 167:7,
170:2, 170:19,
182:23, 183:15,
185:24, 191:4
marino
1:11, 8:12,
185:11
marked
2:4, 2:8, 2:12,
2:16, 2:20,
2:24, 3:3, 3:7,
3:10, 3:14,
3:18, 3:22, 4:3,
4:8, 4:12, 4:16,
4:19, 4:23, 5:3,
5:8, 5:12, 5:16,
5:20, 5:24, 6:3,
6:6, 26:20,
26:24, 32:3,
34:25, 39:22,
40:1, 43:3,
58:16, 61:7,

61:10, 71:22,
71:25, 72:4,
80:1, 89:25,
90:4, 100:20,
107:9, 107:12,
116:24, 117:3,
118:10, 118:14,
124:13, 124:16,
126:15, 127:6,
149:13, 149:17,
159:3, 162:17,
162:20, 169:3,
169:7, 169:13,
187:7, 189:5,
189:12, 192:16,
192:20, 194:7,
194:10, 196:20,
199:21
masquerading
75:23
materials
184:16, 184:21
matter
8:10, 17:17,
17:19, 30:25,
37:23, 38:11,
54:22, 88:8,
105:22, 134:7,
150:1, 150:5
matters
84:13
matthew
7:24, 7:30,
8:19, 147:2,
147:9
may
14:13, 27:11,
27:14, 27:20,
27:21, 27:25,
30:13, 32:10,
35:7, 38:9,
38:20, 40:4,
40:7, 47:14,
49:8, 49:24,
51:1, 52:7,
54:22, 64:15,
68:8, 75:10,
75:20, 75:23,

77:8, 86:1,
91:5, 91:6,
98:15, 102:12,
104:2, 116:7,
119:3, 120:10,
129:8, 142:13,
145:16, 145:17,
146:8, 147:23,
149:9, 160:2,
162:10, 162:11,
167:2, 176:21,
179:8, 179:24,
197:7
maybe
20:18, 25:7,
36:25, 38:3,
44:11, 63:7,
66:9, 66:24,
114:18, 124:23,
137:2, 138:3,
138:4, 139:18,
142:7, 142:9,
146:3, 147:2,
156:13, 161:25,
164:1, 167:4,
168:13, 168:23,
170:12, 170:13,
170:19, 175:8,
177:9, 177:20,
184:9, 190:15,
195:11, 196:12
mcdonald
147:2
mckinney
7:6
mean
21:24, 30:2,
31:10, 36:16,
36:24, 36:25,
42:12, 42:21,
50:19, 54:2,
56:12, 57:1,
59:11, 60:3,
72:11, 80:4,
82:19, 85:1,
85:3, 95:5,
98:12, 99:3,
106:7, 113:14,

123:22, 129:19,
133:10, 137:17,
141:7, 142:19,
142:24, 143:2,
145:20, 146:8,
146:11, 148:6,
154:24, 155:19,
165:2, 167:11,
171:24, 175:23,
178:1, 178:2,
178:19, 179:10,
189:7, 191:2,
197:15, 197:25,
198:9
meaning
93:7, 93:8
means
10:18, 13:8,
31:6, 31:13,
59:12, 82:20,
103:14, 164:5,
165:21
measure
141:8
measurement
137:14, 141:5,
141:7
measuring
141:14, 170:5
medication
11:20, 11:22,
14:11, 122:12,
131:4
meet
13:19
meeting
50:22, 50:23,
64:8, 137:16,
185:19
meetings
184:8
members
33:13, 182:16,
182:17, 183:6
memory
143:3
mention
106:4, 144:12,

**mentioned**
70:8, 71:5,
100:3, 102:2,
148:1, 172:21,
177:13, 179:17,
187:24, 194:19,
198:18
**merchants**
173:6, 173:9,
173:10, 174:17,
174:19, 174:25
**mess**
72:13
**message**
48:4, 48:9,
48:13, 48:24,
123:1, 188:16,
189:22, 197:20
**messages**
48:16, 48:21,
49:7, 49:11,
49:17, 59:19,
188:5, 188:8
**met**
142:25
**methodology**
176:3
**michele**
142:13
**micro**
143:15, 143:17,
144:4
**mid**
180:4
**might**
15:6, 20:11,
20:13, 24:15,
37:16, 37:22,
83:2, 101:6,
114:18, 143:21,
145:6, 154:25,
155:1, 159:7,
159:9, 170:11,
170:16, 178:5,
178:15, 186:17,
188:10, 192:4,
193:21, 194:17,

**millions**
172:11
**mind**
49:5, 122:11,
140:25, 192:4
**mine**
170:5
**minute**
11:12, 122:15,
122:18, 127:12
**minutes**
13:19, 109:13,
109:14
**miscellaneous**
23:3, 113:18,
121:17, 134:7,
166:2
**miscommunications**
84:19
**misinterpret**
42:24, 145:16
**misinterpreted**
64:2
**misleading**
154:9
**missed**
48:24
**missing**
80:6, 159:7,
159:9
**misspelled**
92:11
**misunderstand**
42:11
**misunderstood**
108:23
**mixed**
193:5, 193:23
**mohan**
142:13
**mom**
49:13, 56:9
**moment**
40:1, 107:17,
199:2
**moments**
11:11, 35:2,

**momma**
128:7, 128:15
**mommy**
86:19
**monday**
1:23, 52:19,
52:20, 55:20
**money**
37:17, 37:20,
37:22, 38:6
**montgomery**
203:2
**month**
83:2, 103:24
**months**
37:19, 66:9,
66:10, 103:9,
167:12, 195:11
**morale**
180:25, 181:18,
182:15
**more**
11:10, 21:9,
37:16, 39:10,
47:1, 63:25,
64:20, 77:10,
83:7, 127:10,
137:8, 151:7,
155:1, 155:4,
155:25, 160:25,
175:21, 177:16,
195:2
**morning**
15:10, 15:12,
15:19, 15:22,
43:24, 55:21,
130:11, 136:10,
163:14, 164:1
**most**
22:1, 62:14,
91:4, 122:9,
156:18, 195:20
**mother**
116:15
**mother-in-law**
37:14, 73:5,
95:16, 95:21,

96:8, 96:12
**motion**
3:6, 4:16,
71:22, 72:7,
72:23, 80:22,
83:3, 107:20,
108:3, 108:11,
108:12, 111:6,
111:10, 112:22,
116:14, 116:20,
117:18, 117:25,
119:5, 120:5,
121:2, 126:4,
126:14, 126:20,
127:7, 127:11,
127:13, 127:14,
127:24, 132:13,
133:6, 134:6,
135:1, 135:24,
136:10, 149:1,
150:3, 150:10,
150:11, 150:12,
150:13, 150:19,
151:1, 152:4,
160:13, 160:14,
162:2, 164:15,
164:16, 164:24,
165:5
**motions**
150:7, 166:4
**move**
94:6, 107:5,
126:18, 143:23
**moved**
139:10
**mrs**
29:3
**much**
19:16, 37:19,
115:6, 128:14,
175:21
**multi-page**
3:6, 5:15,
71:22, 189:4
**multi-task**
137:19
**multiple**
5:9, 63:15,

Transcript of Julie Kelly
Conducted on October 15, 2018

78

70:4, 70:15,
84:10, 88:1,
187:5
**must**
91:2, 92:11,
151:2, 151:3,
164:12, 193:23,
195:1, 195:3
**myself**
25:17, 25:25,
34:15, 39:8,
39:13, 48:4,
48:16, 50:2,
50:10, 63:17,
68:7, 111:13,
154:10, 155:12,
155:24, 182:2,
194:15

**N**

**name**
8:7, 10:12,
29:3, 52:7,
52:14, 70:17,
71:14, 78:13,
79:10, 79:17,
87:7, 87:9,
96:18, 103:7,
116:16, 118:25,
131:3, 131:17,
135:14, 137:10,
140:16, 144:12,
171:18, 186:10,
194:23, 200:15,
201:1
**named**
78:3
**names**
32:24, 33:4,
72:14, 143:1,
156:24, 161:17,
174:15, 189:18
**nanny**
201:14
**nd**
52:21, 52:23
**necessarily**
83:24, 163:22

**need**
11:7, 12:17,
15:6, 60:14,
60:20, 68:17,
95:12, 95:19,
102:17, 116:8,
116:15, 122:4,
122:11, 130:18,
155:3, 165:14,
197:8, 197:17
**needed**
30:1, 44:4,
144:6, 152:2,
158:4, 175:17,
189:20
**needs**
9:12, 28:4,
95:24, 95:25,
197:14
**neighborhood**
45:20, 46:13
**neither**
102:9
**nervous**
135:10
**never**
19:6, 23:19,
38:22, 50:9,
50:16, 50:23,
51:16, 51:22,
54:5, 59:9,
59:23, 60:22,
63:15, 67:3,
70:25, 71:8,
71:18, 81:10,
83:1, 92:13,
184:22, 189:23,
193:11
**new**
1:2, 7:18,
12:24, 13:6,
39:3, 40:11,
41:2, 51:23,
54:5, 74:5,
74:7, 137:7,
140:9, 140:14,
140:15, 141:17,
141:22, 152:10,

170:7, 173:17,
175:10, 175:18,
175:20, 180:16,
192:7
**next**
47:13, 60:15,
75:19, 82:12,
118:20, 153:3,
159:8, 190:15
**nick**
64:13, 64:14,
67:10, 94:19,
95:6, 147:16,
147:18, 147:23,
148:2, 148:11
**night**
15:18, 43:20
**nodding**
156:10, 185:23,
187:12, 189:8
**none**
148:20, 169:17
**nonverbal**
10:4
**noon**
129:25, 151:3
**nor**
102:9, 102:10,
203:15
**normally**
48:22, 49:6,
200:12
**north**
21:17
**not-canceled**
94:15
**notary**
1:20, 203:3,
204:7
**note**
11:14, 64:5,
77:12, 159:9
**notebook**
47:15, 195:10,
196:4
**noted**
9:14, 16:12,
18:23, 88:21,

104:7, 200:4
**notes**
194:12, 195:3,
195:8, 195:14,
196:15
**nothing**
58:1, 65:10,
78:6, 116:19,
166:17, 188:21,
203:9
**notice**
5:2, 37:16,
162:16
**noticed**
16:22, 25:10
**notification**
50:24, 53:8,
110:16
**november**
22:15, 75:5,
167:6, 180:4,
181:7, 194:13,
195:23, 196:1
**now**
14:14, 17:4,
18:14, 39:14,
44:15, 50:11,
54:24, 61:20,
63:16, 69:23,
82:13, 89:19,
122:18, 154:25,
155:5, 173:7,
187:1
**number**
33:21, 48:1,
59:21, 60:2,
60:4, 74:22,
80:18, 80:19,
105:17, 162:24,
169:14, 196:12
**numbered**
80:20
**numbers**
183:21, 186:4

**O**

**oath**
10:16, 11:2

Transcript of Julie Kelly
Conducted on October 15, 2018

79

**object**
155:21, 158:4
**objected**
152:12, 152:13,
155:12
**objecting**
16:9, 88:19,
160:17, 160:19
**objection**
18:23, 35:20,
54:17, 87:18,
88:15, 88:21,
104:6, 145:3,
148:13, 152:17,
152:18, 154:3,
162:6, 179:7
**objections**
155:15, 156:9,
156:12, 156:16,
156:17, 158:15,
159:17, 160:7
**obligated**
39:17
**obligation**
119:19, 120:8,
120:19
**obvious**
170:22
**obviously**
28:18, 29:14,
81:21, 98:5,
129:4, 165:19,
175:25
**occasion**
177:19
**occasionally**
195:11
**occupation**
87:2
**ocr**
100:5
**ocrc**
16:19, 17:14,
75:21, 77:8,
91:10, 98:23,
99:12, 100:8,
100:9, 106:22,
107:2, 107:5,

128:23, 134:5,
134:8, 134:14,
134:17, 156:19,
162:12
**october**
1:23, 125:25,
151:2, 155:11,
158:16, 159:19,
160:13, 164:9,
204:3
**off**
29:13, 50:5,
75:15, 81:8,
105:13, 113:12,
113:14, 122:20,
133:3, 170:18,
172:17, 178:14,
178:16, 181:13,
186:12, 189:2,
199:3, 199:19
**offering**
117:12, 174:25
**office**
7:3, 9:6, 20:2,
30:14, 37:2,
52:1, 53:17,
58:3, 58:6,
58:7, 58:9,
62:16, 109:15,
114:1, 139:19,
148:9, 204:2
**offices**
157:22
**officially**
22:19
**often**
72:13, 139:17,
139:19, 163:25,
177:23, 179:4,
184:11
**oh**
19:5, 27:8,
43:9, 43:24,
44:11, 45:14,
49:1, 83:6,
103:3, 110:12,
114:24, 125:6,
138:12, 142:7,

146:21, 166:5,
167:9, 168:13,
172:8, 190:15,
191:2, 192:21
**ohio**
1:21, 1:22,
7:28, 8:20,
9:10, 10:14,
23:11, 38:4,
74:6, 94:8,
107:21, 107:24,
112:21, 113:1,
113:15, 117:12,
117:19, 119:25,
127:3, 157:18,
203:1, 203:4,
204:2, 204:7
**old**
23:19, 86:20
**oldest**
15:14, 53:3,
53:19, 109:7
**omaha**
182:25
**once**
52:14, 107:4,
139:18, 144:4
**one**
9:22, 11:5,
11:14, 20:18,
23:15, 23:20,
26:24, 28:10,
30:19, 37:18,
39:9, 47:3,
48:6, 49:4,
52:3, 59:12,
59:17, 64:10,
64:20, 64:21,
71:15, 78:2,
83:7, 85:15,
87:3, 87:5,
92:21, 94:15,
94:18, 95:1,
97:5, 97:6,
97:22, 98:3,
98:16, 98:24,
111:5, 114:4,
114:5, 114:7,

114:11, 117:13,
117:22, 122:1,
122:3, 122:8,
122:9, 123:1,
123:2, 124:25,
130:13, 135:19,
142:7, 142:9,
142:12, 148:23,
152:8, 155:4,
157:13, 158:14,
161:2, 161:11,
161:14, 161:20,
166:6, 167:11,
171:3, 171:5,
171:9, 174:24,
181:3, 184:18,
184:22, 187:16,
195:19, 199:2
**ones**
13:7, 98:8
**online**
20:7, 140:24,
152:25, 156:13,
158:23, 166:8,
170:13
**only**
64:21, 67:9,
70:18, 75:10,
79:13, 82:21,
98:16, 103:11,
196:8
**onto**
173:12
**opened**
28:19, 43:20,
43:24
**opinion**
98:1, 106:3
**opportunities**
191:21, 192:12
**opportunity**
84:23, 171:14
**opposed**
76:5
**opposing**
82:25
**order**
4:15, 4:19,

Transcript of Julie Kelly
Conducted on October 15, 2018

80

11:8, 11:9,
26:5, 35:1,
117:23, 120:6,
122:3, 123:24,
126:3, 126:14,
127:7, 130:12,
132:13, 132:18,
134:6, 135:2,
135:24, 135:25,
149:13, 149:25,
150:12, 150:13,
150:20, 151:8,
151:10, 151:15,
152:1, 152:16,
152:23, 152:24,
153:22, 154:19,
160:17, 160:19,
163:12, 164:8,
164:11, 164:18,
165:6, 165:7,
188:21, 193:3
**ordered**
150:21, 153:2,
155:8, 199:6
**ording**
6:3, 7:33,
8:16, 130:23,
135:13, 135:17,
135:25, 136:23,
138:22, 180:1,
180:8, 180:13,
180:19, 180:23,
182:18, 183:6,
183:13, 184:19,
185:11, 196:10,
196:20, 197:1
**organization**
141:6, 180:17,
184:10
**organizations**
143:19
**original**
23:18, 27:1,
51:18, 94:15,
120:9, 174:13,
198:2
**originally**
50:4, 55:9,

152:5, 172:8,
174:12
**originals**
195:18
**originator**
39:17
**other**
19:17, 19:22,
21:21, 23:19,
25:11, 40:20,
41:8, 48:15,
49:3, 49:4,
51:8, 51:15,
51:16, 52:2,
60:22, 61:25,
64:17, 65:17,
65:18, 67:22,
85:12, 85:16,
94:11, 94:14,
97:13, 98:7,
112:23, 113:9,
119:20, 120:21,
145:6, 148:21,
154:10, 156:23,
157:2, 161:17,
161:21, 165:10,
166:23, 169:17,
169:19, 170:15,
172:13, 177:19,
183:2, 191:21
**others**
102:7
**otherwise**
63:20, 157:15,
157:17
**our**
44:5, 45:19,
46:6, 46:13,
53:5, 53:21,
58:8, 84:20,
85:7, 102:9,
130:3, 137:6,
140:15, 141:25,
142:2, 174:17,
174:25, 181:2,
181:25, 183:10
**out**
15:17, 15:24,

28:1, 35:1,
37:7, 37:9,
46:23, 53:23,
55:21, 57:25,
62:11, 62:17,
63:13, 70:16,
73:14, 74:1,
76:1, 78:15,
86:12, 95:3,
96:20, 98:23,
98:25, 99:9,
119:4, 119:17,
120:7, 120:18,
123:18, 129:16,
131:3, 142:2,
143:6, 144:13,
144:14, 152:8,
158:20, 159:5,
163:12, 167:1,
167:3, 168:16,
173:20, 175:11,
175:15, 178:22,
179:2, 179:18,
180:7, 181:7,
181:14, 188:21,
189:24, 192:5,
192:11, 197:5,
198:1
**out-of-office**
178:16
**outside**
28:6
**outstanding**
117:25
**over**
8:14, 9:22,
28:8, 41:12,
66:16, 115:8,
137:17, 140:12,
141:18, 141:23,
142:6, 142:14,
142:22, 143:19,
151:12, 154:23,
180:1, 180:8,
180:13, 180:23,
182:18, 182:25,
183:6, 183:13,
192:8, 195:20,

196:10
**overlap**
100:4
**overnight**
40:7
**oversaw**
139:16, 184:19
**own**
31:3, 55:5,
95:22, 139:7,
144:9, 171:20

---

**P**

**pacer**
12:6, 12:7,
12:20, 19:17,
20:7, 130:17,
163:14, 163:25,
165:13
**pack**
77:6
**package**
28:5, 28:11,
28:19, 29:14,
29:16, 30:1,
46:14
**packages**
28:10
**packed**
56:2
**page**
2:1, 2:4, 4:5,
6:1, 40:12,
73:23, 75:4,
77:17, 79:7,
80:7, 81:8,
90:14, 90:18,
101:16, 102:22,
118:8, 118:20,
127:10, 128:1,
128:2, 128:4,
133:9, 133:18,
150:18, 150:25,
159:7, 159:10,
162:2, 164:5,
187:14, 189:18,
192:21, 193:22,
194:13, 195:23,

Transcript of Julie Kelly
Conducted on October 15, 2018                                81

196:1, 196:2,
196:18
**pages**
3:12, 3:16,
89:24, 100:19,
194:11
**paid**
22:2
**papers**
45:23, 70:10,
111:21
**paragraph**
37:5, 37:6,
38:1, 60:11,
63:22, 64:4,
73:24, 73:25,
75:5, 75:19,
77:19, 103:1,
150:19, 160:5
**park**
113:23
**part**
16:18, 16:20,
16:23, 30:19,
80:10, 80:22,
81:9, 90:8,
105:5, 123:22,
134:20, 144:15,
151:14, 152:15,
174:11, 174:13,
186:17
**partial**
81:12
**participate**
182:3
**particular**
84:13, 92:20,
146:15
**partner**
101:24
**party**
17:6, 17:22,
21:1, 21:4,
203:14
**passed**
127:10
**passion**
170:5

**passionate**
172:10, 174:4
**password**
24:21
**past**
126:11, 129:7,
131:21, 158:12
**paste**
158:19
**paths**
91:2
**pause**
133:1, 188:25,
199:1
**pay**
12:9, 13:7,
13:8, 37:18,
40:19, 42:9,
42:22, 56:24,
63:22, 103:7,
144:13, 164:4,
164:5
**payments**
174:16
**payroll**
174:22
**peers**
64:6, 64:9,
64:19, 83:19
**penalty**
11:2
**pending**
11:17, 12:24,
16:19, 23:11,
40:11, 85:6,
117:18, 119:5
**people**
19:10, 32:21,
33:1, 33:13,
45:22, 46:13,
74:15, 78:1,
103:8, 107:3,
128:7, 129:8,
130:24, 133:24,
134:3, 141:2,
142:25, 143:4,
143:12, 143:19,
145:6, 151:23,

154:10, 154:21,
157:2, 166:3,
166:15, 166:23,
170:16, 171:10,
171:12, 171:13,
172:12, 181:23,
181:24, 182:23,
183:15, 183:25,
185:22, 185:24,
186:5, 186:19
**people's**
33:4, 119:21,
120:21
**per**
92:8
**percent**
190:4
**percentage**
183:18
**performance**
186:23
**performance-rela-
ted**
186:16
**perhaps**
196:9
**period**
179:5, 185:22
**perjury**
11:3
**permitted**
12:15
**person**
17:4, 17:5,
17:8, 17:21,
28:16, 30:2,
30:6, 34:8,
34:10, 46:6,
48:17, 52:8,
54:12, 57:16,
64:10, 64:20,
84:14, 119:20,
120:20, 121:9,
139:17, 186:21
**personal**
174:7
**phoenix**
170:14

**phone**
7:34, 7:35,
8:20, 16:1,
16:2, 59:16,
64:8, 65:13,
65:14, 66:16,
133:15, 135:7,
137:18, 139:24,
155:20, 155:22,
156:3, 180:20,
188:3, 191:12,
196:11, 198:3
**photos**
61:13, 61:18
**pick**
41:2, 42:1,
117:13, 121:3,
141:2, 155:20,
155:22, 156:3
**picked**
109:19
**picture**
133:16, 197:6,
197:8, 198:3
**pictures**
188:11
**pieces**
141:1, 172:2
**pitch**
195:13
**place**
11:9, 15:7,
15:9, 16:3,
59:13, 78:22,
109:15, 119:24,
154:9
**plaintiff**
1:6, 7:2, 9:7,
68:16, 68:19,
82:8, 92:25,
93:13, 93:19,
136:22
**plaintiff's**
8:23
**plan**
186:23
**planning**
45:8

plans
53:5, 53:21,
128:17
platform
182:6
platforms
139:24
play
76:16, 106:2
please
37:8, 40:11,
40:15, 51:3,
60:14, 60:21,
92:3, 94:4,
101:19, 117:19,
118:1, 119:14,
120:1
plumeri
137:4, 137:12
plumeri's
141:23
plus
23:18
pnc
7:26, 130:22,
131:5, 131:16,
135:14
point
28:14, 38:19,
79:8, 84:8,
85:5, 88:12,
96:15, 115:9,
120:25, 122:23,
130:17, 148:12,
159:5, 160:12,
176:11, 176:12,
179:18, 199:5
points
79:7, 111:1
police
77:1
policy
186:21
poof
136:14
pool
28:2, 28:7,
28:18, 86:2,

86:12, 95:2
poole
7:34, 8:21,
78:3
position
83:19, 137:23,
172:15
positions
172:14
positive
145:20
possession
150:22, 151:4,
164:12
possible
55:16
post
138:20
posted
163:18, 165:12
potential
65:6, 75:8
potter
1:21
powerpoint
171:11, 171:22
practice
25:23, 49:10,
83:3, 141:9,
141:21
practices
141:20
pre-mark
149:18
pre-marked
26:17, 31:23,
31:24
precautions
14:14
prepare
12:4, 13:15,
113:1, 121:14,
165:17, 184:16,
184:20
prepared
113:5, 113:6,
115:6
prepping
19:5, 19:7

presence
203:11
present
7:32, 84:23
preserve
189:20
pretty
157:24, 160:9,
175:9
prevent
91:7, 91:13
previous
41:6, 47:21,
192:22
previously
19:18, 39:1,
150:6, 151:5,
164:13, 165:23
price
200:16
primarily
25:9
princeton
7:18
print
190:21, 190:22,
190:24, 191:3,
191:7, 198:6
printed
73:14, 125:23,
159:7, 197:5,
198:13
printer
193:24
prior
16:5, 71:9,
71:17, 82:4,
140:22
private
77:24
privilege
17:5, 17:9,
17:10, 18:6,
18:7, 88:5
privileged
16:10, 16:24,
17:14, 35:23,
87:22, 88:7,

88:10
privileges
113:18
pro
7:10, 154:6
probably
34:18, 35:11,
35:14, 35:17,
43:13, 43:20,
45:3, 55:22,
55:24, 58:18,
60:5, 63:2,
66:13, 74:6,
74:25, 79:1,
79:3, 81:22,
103:21, 124:22,
125:22, 127:25,
138:7, 147:5,
158:18, 158:21,
160:4, 160:24,
168:17, 172:11,
173:24, 175:8,
176:17, 177:14,
180:20, 180:22,
182:13, 182:24,
184:7, 190:11,
191:5, 198:5
problems
147:18
procedural
8:15, 150:5,
152:24
procedure
1:19
proceed
18:24, 154:5,
179:8
proceeding
21:5
proceedings
16:17
process
28:24, 30:24,
31:15, 31:19,
44:15, 45:24,
52:8, 76:22,
86:8, 86:15,
88:25, 122:23,

Transcript of Julie Kelly
Conducted on October 15, 2018

83

129:2, 136:6,
141:17, 141:25,
143:23, 153:17,
153:21, 154:1,
156:1, 161:2,
176:4
**processes**
144:10
**produce**
157:15
**produced**
188:13, 199:14
**product**
144:19, 173:7,
175:10, 175:14,
175:15, 175:18,
175:20, 176:3
**production**
155:13, 159:17,
160:7, 199:14
**productive**
105:23
**professional**
21:22, 84:5
**program**
140:15, 140:19,
141:10, 170:10,
171:9, 171:18,
175:25
**programs**
137:14, 137:15,
170:8, 171:4,
171:5
**progress**
177:21
**project**
144:11, 144:15,
144:17, 178:24
**promising**
103:6
**promotion**
138:25
**proposed**
40:25
**protection**
46:7
**protective**
130:12, 132:13,

132:18, 134:6,
135:2, 135:24,
135:25, 150:13,
150:20
**prove**
116:10
**provide**
42:4, 52:14,
57:2, 84:6,
84:12, 94:4,
94:14, 117:21,
199:8
**provided**
24:21, 42:2,
42:14, 42:20,
51:17, 56:7,
56:13, 60:23,
80:14, 91:3,
108:24, 168:19
**provides**
11:11
**providing**
80:15, 88:9
**public**
1:20, 12:7,
13:2, 13:7,
166:10, 203:4,
204:7
**publication**
96:13
**published**
171:4
**pull**
13:10
**pulled**
76:1, 81:6,
81:17
**pulling**
170:19
**purple**
28:9, 29:5
**purposes**
2:8, 2:13,
2:17, 2:21,
2:25, 3:4, 3:7,
3:10, 3:14,
3:18, 3:23, 4:4,
4:8, 4:12, 4:17,

4:19, 4:24, 5:3,
5:8, 5:13, 5:17,
5:21, 5:24, 6:4,
6:7, 9:21,
26:20, 32:3,
39:22, 43:3,
58:16, 61:7,
71:23, 72:1,
90:1, 100:21,
107:9, 116:24,
118:10, 124:16,
126:15, 149:13,
159:3, 162:17,
169:3, 187:7,
189:5, 192:16,
194:7, 196:20,
199:22
**pursuant**
1:18
**push**
147:20
**pushed**
143:5, 170:6
**put**
39:16, 54:14,
99:19, 105:13,
148:23, 153:21,
156:9, 158:16,
161:18, 161:19,
173:15, 173:16,
176:25, 182:20,
189:11
**putting**
174:23, 175:14

___

**Q**

**qualified**
192:5, 203:5
**quarterly**
184:3, 184:5,
184:10, 184:13
**question**
10:1, 11:15,
11:16, 11:17,
12:16, 12:17,
30:20, 33:16,
36:10, 36:13,
69:10, 82:12,

83:7, 88:20,
106:10, 158:14,
167:20
**questioned**
84:21
**questionnaire**
168:6
**questions**
11:6, 11:21,
12:1, 12:14,
12:16, 14:17,
19:9, 19:11,
21:8, 22:25,
23:1, 40:21,
41:5, 41:8,
41:9, 47:23,
52:5, 52:6,
53:9, 55:8,
61:1, 68:18,
121:18, 181:1,
193:25
**quick**
162:22
**quite**
13:22, 15:10,
15:14, 16:2,
24:8, 30:10,
32:13, 42:16,
45:20, 53:25,
58:19, 77:14,
82:10, 94:10,
96:22, 96:25,
133:24, 140:9,
143:18, 144:9,
179:16, 183:14,
190:16
**quote**
54:22, 56:23,
77:25, 107:23,
114:24, 123:18,
128:10

___

**R**

**radiation**
176:23
**raise**
17:5
**raised**
70:14

Transcript of Julie Kelly
Conducted on October 15, 2018

84

**ramble**
174:5
**rambling**
173:24
**random**
45:22, 193:17
**rang**
46:3, 76:10
**rate**
137:7, 175:1
**rates**
201:14
**rather**
64:7, 101:13
**rd**
27:11, 27:25,
32:10, 33:25,
75:23, 86:1,
116:21
**reach**
15:24, 98:25,
189:24, 192:11
**reached**
119:4, 167:1,
167:3, 168:16
**reaching**
53:22, 96:20
**reaction**
68:17, 70:1
**read**
12:6, 17:18,
19:17, 20:7,
30:12, 37:5,
37:7, 38:1,
40:6, 54:21,
74:24, 79:9,
90:22, 92:3,
97:20, 98:20,
99:15, 101:19,
102:16, 102:17,
103:4, 103:5,
105:4, 105:6,
107:17, 110:14,
110:15, 112:12,
115:7, 119:14,
120:22, 123:25,
128:2, 128:23,
149:8, 158:9,

**reading**
166:7, 172:16,
187:14, 193:20
**reading**
101:22, 114:11,
178:23
**reads**
194:1
**ready**
55:23
**real**
162:22, 173:20
**realized**
15:22
**really**
12:10, 19:19,
32:13, 33:15,
64:15, 105:8,
137:5, 137:8,
141:14, 142:2,
142:9, 143:3,
143:12, 145:17,
146:6, 147:10,
147:19, 154:25,
165:20, 169:21,
170:4, 170:6,
171:15, 173:2,
173:8, 173:22,
174:4, 174:17,
174:19, 175:15,
175:25, 197:10,
197:11
**reason**
11:25, 25:16,
63:25, 77:22
**reasoning**
153:1, 160:16,
160:18
**recall**
28:25, 31:17,
48:23, 103:5,
103:6, 111:3,
112:15, 113:8,
114:10, 123:4,
123:6, 126:4,
132:4, 145:25,
146:22, 151:8,
177:7, 178:25,
179:13, 179:15,

192:3, 197:20,
198:13
**receipt**
40:7, 90:24,
98:18, 131:14,
198:19, 198:22,
199:7, 199:8,
199:13
**receipts**
130:18, 130:20
**receive**
26:7, 27:25,
43:6, 48:3,
48:15, 70:5,
81:19, 82:2,
96:18, 100:24,
101:1, 104:1,
125:15, 139:2,
139:13, 163:5,
168:5
**received**
27:10, 27:24,
32:9, 33:12,
38:23, 39:6,
41:25, 43:10,
47:10, 48:6,
50:16, 50:23,
53:8, 59:10,
59:24, 61:2,
66:22, 68:8,
68:15, 70:6,
70:21, 77:24,
81:12, 82:5,
88:25, 91:1,
91:9, 92:19,
98:8, 101:3,
101:10, 102:20,
103:18, 103:21,
104:2, 125:9,
139:4, 154:4,
161:6, 161:10,
161:20, 161:21,
161:23, 189:25,
192:23
**receiving**
43:7, 48:23,
68:22, 69:2,
118:4, 151:8

**recently**
48:6
**receptive**
173:2
**recess**
85:22, 122:21,
187:3
**recognize**
35:3, 40:2,
58:22, 62:21,
90:4, 149:21,
159:12, 163:3,
169:7
**recognized**
9:13
**recommendation**
168:10, 168:22,
168:23
**record**
9:5, 9:15,
10:4, 10:5,
10:9, 10:12,
18:23, 27:1,
27:13, 27:17,
37:7, 55:3,
62:4, 77:25,
79:9, 84:17,
88:22, 104:8,
111:17, 122:20,
129:11, 130:10,
133:3, 159:6,
169:12, 177:2,
189:2, 194:2,
199:3, 199:5,
199:19
**recorded**
84:24
**recording**
130:9
**records**
187:18
**redact**
110:17, 185:11
**reduced**
203:10, 203:12
**reductions**
186:11
**refer**
40:12, 126:23

Transcript of Julie Kelly
Conducted on October 15, 2018                                      85

reference
30:19, 75:3,
89:16, 90:8
referenced
90:6
referred
101:25
referring
74:4, 80:13,
81:4, 121:11,
165:19
reflecting
5:15, 5:19,
189:4, 192:15
refresh
163:16
refresher
170:12
regard
105:20
regarding
16:23, 157:23
regardless
135:25
regards
134:4, 134:14,
162:12, 189:20
regular
12:7, 125:13
reimburse
56:18
reimbursed
108:24
reimbursing
26:6
related
40:13, 41:19,
64:5, 65:10,
107:2, 121:18,
158:1
relates
23:10
relating
157:17
relation
156:19, 188:14
relationship
17:24, 18:1,

23:6, 67:14,
136:24, 148:5,
148:7
relative
201:8, 203:14
relatives
32:17
relevance
130:7, 195:7,
195:22
relevant
102:13, 158:13,
188:7, 198:1
remain
162:3
remark
90:11
remember
31:18, 45:14,
47:14, 63:8,
95:10, 101:14,
110:9, 113:12,
114:7, 118:4,
121:12, 121:22,
123:19, 131:25,
135:4, 135:8,
142:9, 142:11,
142:16, 145:17,
146:6, 147:7,
148:8, 148:22,
149:8, 154:22,
156:14, 158:24,
159:25, 168:24,
177:15, 179:9,
179:23, 185:12,
186:1, 194:16
removed
79:10, 79:17
repeat
167:19
rephrase
11:6
reply
102:25, 119:10,
148:25
reported
83:19, 137:11,
147:9

reporter
9:19
reporting
203:16
represent
8:9, 8:10,
8:25, 17:1,
17:15, 18:14,
18:16, 69:16,
84:11, 85:4,
99:7, 99:13,
100:14, 154:10
representation
9:12, 60:16,
68:4, 69:5,
84:13, 119:11,
120:16
representative
8:17, 38:4
represented
84:8, 84:9,
84:14, 84:15,
88:14, 89:1,
89:3, 91:8,
91:12, 91:14,
91:17, 99:10
representing
84:4, 155:24
represents
41:10, 102:6,
102:11
request
4:15, 63:14,
88:8, 126:3,
126:7, 126:14,
127:7, 130:19,
136:4, 158:5,
162:22
requested
44:9, 44:11,
118:21, 119:7,
150:10, 150:22,
151:4, 155:9,
164:13
requesting
124:8
requests
155:16, 156:16,

160:8
require
104:15
required
91:13, 119:25
requirement
127:21
requirements
26:13, 124:5,
124:11, 130:5,
186:18
requires
16:10, 104:12,
162:7
reschedule
60:22
rescheduled
39:3, 51:13,
60:14, 60:21
rescheduling
50:23
research
114:18, 166:4
researching
128:15
resolve
117:12, 117:18,
117:24, 119:5,
120:5, 121:2
respect
44:7
respected
137:21
respectful
170:1
respectfully
105:17
respond
40:23, 41:1,
41:2, 42:1,
91:23, 92:9,
94:2, 94:9,
102:4, 102:22,
105:8, 117:15,
119:5, 120:17,
126:19
responded
60:22, 92:3,

94:10, 119:14,
121:7
**responding**
127:24, 178:24
**responds**
97:23
**response**
38:7, 44:2,
70:6, 99:6,
100:24, 101:1,
101:3, 101:10,
105:14, 106:1
**responses**
23:5
**responsibilities**
136:13, 139:5,
139:8
**responsible**
63:25, 141:1,
141:4, 144:18,
183:24, 183:25
**responsive**
187:19, 188:6
**rest**
102:16, 102:18,
103:5
**restrictions**
91:6
**retired**
73:8
**retract**
110:25
**returning**
185:1
**reveal**
104:12
**review**
20:5, 20:10,
35:12, 62:17,
112:16, 112:17,
112:25, 125:20,
126:10, 126:11,
127:16, 153:10,
164:23, 184:3,
184:5, 184:10
**reviewed**
73:15, 96:12,
125:19, 127:19,

161:8
**reviews**
184:13
**rewriting**
140:18
**rhonda**
1:12, 8:13,
67:13, 148:3,
194:15, 194:16
**rid**
176:23, 195:20
**ride**
15:7
**right**
9:11, 14:4,
14:14, 17:23,
20:20, 22:24,
25:22, 35:24,
41:14, 42:21,
47:19, 48:10,
49:6, 49:20,
49:23, 52:16,
52:20, 54:13,
55:19, 61:3,
61:19, 62:2,
63:18, 70:16,
71:3, 72:11,
73:20, 75:19,
77:9, 78:2,
79:6, 80:17,
81:3, 81:10,
81:14, 82:23,
83:11, 83:16,
85:8, 89:18,
93:2, 99:16,
99:20, 100:7,
100:12, 106:9,
108:14, 109:17,
111:19, 111:23,
113:5, 115:21,
117:17, 124:25,
125:14, 129:18,
131:20, 131:23,
132:8, 135:23,
142:21, 148:11,
152:13, 154:13,
154:25, 158:15,
161:9, 163:24,

166:9, 170:14,
171:16, 173:4,
175:20, 175:23,
176:1, 186:22,
189:10, 199:16,
200:5, 201:13
**rights**
9:10, 23:12,
114:9, 136:13,
149:5, 149:6,
157:19
**ring**
57:12
**rmr**
204:6
**road**
7:16, 137:13
**robin**
6:3, 7:33,
8:16, 130:23,
138:22, 196:20
**role**
144:17, 180:14
**roll**
144:14
**rolled**
175:11
**rollout**
175:4
**room**
1:22, 8:16,
9:17, 116:15,
129:13, 170:19
**rule**
17:20, 71:4,
74:24, 85:12,
89:20, 104:18,
109:23, 109:24,
110:21, 112:9,
112:12, 112:17,
120:2, 121:8,
121:10, 121:25,
124:2, 127:23,
160:13, 160:14,
161:6, 164:24,
203:18
**rules**
1:18, 8:15,

26:2, 84:5,
84:12, 85:8,
91:13, 126:25,
127:1, 127:3,
127:4, 127:20
**ruling**
165:5
**running**
146:2

S

**said**
12:19, 19:18,
27:22, 27:24,
28:3, 28:12,
29:4, 32:10,
32:20, 39:6,
44:9, 45:7,
46:20, 47:21,
50:15, 51:2,
52:4, 55:24,
57:23, 57:25,
59:18, 60:25,
63:14, 68:6,
68:10, 71:11,
76:17, 76:25,
83:10, 84:10,
86:1, 86:4,
86:23, 88:1,
92:5, 93:6,
94:1, 94:3,
94:19, 95:15,
96:12, 97:18,
99:23, 103:18,
103:21, 105:12,
105:21, 106:3,
112:1, 112:4,
112:10, 112:24,
118:23, 123:18,
123:19, 127:20,
129:16, 129:20,
131:9, 131:22,
138:7, 145:17,
157:6, 161:5,
170:21, 171:21,
176:6, 176:22,
177:15, 181:18,
182:14, 183:1,

Transcript of Julie Kelly
Conducted on October 15, 2018

87

185:19, 193:7,
194:24, 198:24,
201:10, 203:10
**salary**
139:3, 139:10
**sale**
137:9, 175:23
**sales**
23:7, 137:6,
140:15, 141:6,
171:8
**same**
9:24, 10:1,
10:23, 15:7,
16:3, 23:20,
23:25, 24:6,
24:7, 24:14,
24:15, 45:3,
56:11, 56:12,
63:21, 83:19,
93:9, 94:1,
98:25, 139:19,
142:5, 161:19
**sanctions**
3:6, 4:16,
71:22, 72:7,
72:23, 80:24,
126:4, 126:15,
126:20, 127:7,
127:11, 149:1,
149:2, 149:3,
150:11, 150:12
**sanity**
9:21
**saul**
7:13, 8:8,
16:21, 34:16,
38:24, 39:12,
40:24, 60:4,
68:7, 68:11,
68:22, 69:4,
69:7, 69:10,
69:16, 70:2,
70:12, 79:13,
81:24, 82:3,
82:6, 82:14,
89:5, 89:12,
89:13, 92:19,

101:24, 103:7,
103:10, 103:12,
106:17, 106:20,
107:1, 107:4,
110:25, 111:13,
111:25, 112:1,
112:2, 112:3,
112:9, 112:23,
128:25
**save**
37:17, 37:19,
38:6, 49:6,
133:11, 133:20
**saved**
37:22
**saves**
133:20
**saw**
27:10, 32:11,
71:2, 71:5,
71:11, 75:13,
81:10, 83:18,
89:20, 93:11,
129:16, 130:23,
131:2, 135:13,
135:14, 149:9,
169:25, 171:8,
196:8
**say**
9:20, 13:2,
17:21, 17:22,
21:23, 27:21,
29:1, 29:16,
29:22, 30:5,
31:14, 31:21,
38:9, 38:11,
42:19, 46:22,
47:16, 49:13,
51:9, 51:10,
51:14, 51:15,
52:13, 54:22,
55:6, 56:15,
60:20, 62:2,
63:11, 63:21,
64:19, 73:25,
75:9, 76:18,
76:24, 79:8,
86:18, 93:2,

94:17, 98:18,
105:16, 107:23,
112:8, 117:22,
118:20, 119:10,
120:6, 120:18,
120:25, 124:1,
137:2, 137:20,
138:3, 144:22,
145:7, 155:20,
165:4, 180:4,
180:12, 189:21
**saying**
9:18, 9:23,
9:25, 29:25,
52:1, 55:15,
59:23, 81:17,
88:12, 93:22,
117:11, 119:17,
120:14, 120:15,
154:15
**says**
17:4, 17:20,
25:18, 40:6,
41:15, 41:22,
42:8, 42:21,
56:18, 56:22,
60:12, 75:5,
79:12, 84:13,
90:19, 92:7,
105:16, 150:19,
151:1, 157:14,
164:11, 165:6,
165:22, 190:2,
190:5, 197:19
**sbb**
5:7, 169:3,
169:13
**scape**
174:17
**scenarios**
173:18
**schedule**
83:10, 105:21,
106:4, 117:24,
123:20, 150:15
**scheduled**
39:1, 50:4,
58:1, 98:6,

178:22
**scheduler**
123:17
**scheduling**
83:4, 83:5,
120:11
**school**
21:10, 21:20,
21:25, 69:25,
116:15
**scratch**
140:19
**screen**
171:11, 190:8,
190:10, 190:17,
190:22, 191:10,
193:18
**se**
154:6
**seal**
204:2
**search**
187:18, 187:25,
188:2, 199:12
**searched**
187:20, 187:22
**seat**
57:21
**second**
47:12, 54:25,
60:11, 63:10,
75:4, 77:19,
87:17, 101:8,
101:16, 103:1,
105:5, 122:3,
123:2, 124:4,
124:10, 124:20,
124:23, 128:20,
130:5, 133:2,
146:25, 152:7,
160:5, 160:25,
189:1, 196:1
**security**
44:4, 113:25
**see**
13:5, 26:9,
27:9, 28:19,
29:9, 29:10,

32:12, 32:17,
33:20, 34:6,
34:8, 45:18,
46:15, 46:17,
48:20, 49:16,
54:24, 57:20,
59:19, 60:10,
60:12, 66:15,
75:14, 80:18,
81:9, 106:2,
116:21, 128:8,
131:3, 131:17,
132:23, 139:17,
141:10, 143:24,
147:1, 161:17,
163:19, 163:20,
163:21, 163:22,
165:12, 171:15,
173:11, 173:19,
179:25, 190:4,
191:8, 193:17,
195:21, 198:20
**seeking**
36:3, 149:6,
177:25
**seem**
119:16
**seemed**
178:17, 178:20
**seems**
146:19, 155:25,
161:2
**seen**
27:7, 70:25,
71:8, 71:18,
85:12, 85:16,
107:13, 117:3,
171:10
**select**
186:18
**sell**
142:1, 175:18,
175:20
**selling**
142:1
**send**
25:2, 25:11,
110:16, 158:22,

191:10, 191:14,
193:8
**sending**
52:1
**sent**
36:8, 38:8,
38:17, 40:5,
44:7, 44:12,
49:20, 49:23,
69:22, 70:23,
81:11, 81:16,
83:9, 83:17,
85:14, 85:15,
89:15, 92:12,
101:23, 107:21,
125:22, 156:8,
159:16, 163:4,
187:21, 188:10,
189:15, 190:13,
193:11, 196:25
**sentence**
63:10, 103:2
**separate**
24:2, 24:6,
24:16, 134:2,
134:3
**september**
136:18, 148:24,
149:25, 150:16,
162:5
**seriously**
63:11
**serve**
32:18, 33:16,
102:1
**served**
28:12, 30:9,
40:9, 41:16,
52:8, 85:25,
87:16, 89:6,
89:8, 150:24,
155:8
**server**
28:24, 31:15,
31:19, 44:15,
45:24, 52:8,
76:22, 86:8,
86:16

**service**
30:24, 31:5,
31:9, 31:12,
125:12, 200:2
**services**
137:8
**servicing**
91:15
**serving**
45:23, 91:15,
97:18
**session**
182:1
**set**
44:5, 54:5,
60:14, 60:20,
63:18, 91:19,
91:22, 182:1,
182:9, 184:8,
200:16, 204:1
**sets**
11:8, 164:14
**setting**
10:22, 14:24
**shake**
10:5
**shaking**
24:20, 34:12,
37:3, 42:17,
50:12, 68:24,
191:18
**share**
133:23, 134:2
**sharing**
178:6, 178:10
**shawn**
7:3, 7:4, 9:5,
9:6, 40:22,
41:23, 47:17,
157:22
**shawn@shearerlaw**
7:10
**she**
9:19, 9:22,
10:3, 10:5,
15:17, 16:24,
36:4, 36:5,
36:13, 67:14,

67:15, 73:7,
73:8, 73:15,
73:17, 73:18,
73:19, 87:19,
88:5, 92:7,
95:22, 109:16,
123:17, 123:18,
123:19, 123:24,
124:1, 135:19,
135:21, 150:5,
153:13, 153:15,
164:21, 164:23,
180:1, 180:13,
194:19, 200:17
**she's**
8:18, 36:2,
36:3, 165:5,
200:18
**shearer**
7:3, 7:4, 8:23,
9:4, 9:5, 9:6,
13:23, 13:25,
14:8, 14:20,
15:24, 16:6,
16:9, 16:15,
17:3, 17:10,
17:17, 17:20,
17:25, 18:4,
18:11, 18:16,
18:20, 18:22,
19:1, 20:12,
27:17, 30:14,
30:16, 30:22,
31:1, 31:2,
32:4, 33:9,
35:19, 35:20,
35:24, 36:2,
36:9, 36:15,
36:19, 36:22,
40:22, 41:23,
43:15, 43:17,
47:17, 47:22,
47:24, 53:13,
54:17, 61:9,
62:3, 62:7,
78:11, 80:13,
81:13, 81:16,
84:4, 84:9,

Transcript of Julie Kelly
Conducted on October 15, 2018

89

84:22, 85:1,
87:17, 88:4,
88:15, 88:19,
104:6, 104:11,
115:10, 115:20,
116:9, 129:15,
145:3, 148:13,
152:17, 154:3,
157:22, 161:21,
161:22, 161:24,
162:6, 179:7
**shearer's**
20:2, 37:2,
71:15, 79:19,
115:24
**sheet**
131:18, 132:5,
135:15, 141:12,
193:7
**shift**
140:23
**shirt**
28:9, 29:5
**shocking**
30:10
**short**
142:12
**shot**
190:10, 190:17
**shots**
190:8, 190:22,
191:10, 193:18
**should**
40:21, 63:25,
90:25, 155:18
**shouldn't**
87:19, 149:18,
154:5, 177:14
**show**
26:23, 28:21,
34:24, 35:10,
39:17, 39:25,
43:12, 43:14,
43:22, 53:11,
58:21, 59:7,
62:20, 72:3,
79:25, 101:14,
107:12, 111:15,

111:18, 112:4,
112:11, 115:18,
117:2, 118:13,
119:22, 120:13,
122:2, 123:23,
124:12, 127:5,
149:16, 151:18,
151:19, 151:21,
160:24, 162:20,
169:6, 189:11,
192:19, 194:9,
196:23
**showed**
31:19, 44:1,
73:9, 94:15,
107:20, 108:13,
111:9, 111:11,
129:4, 143:3,
152:5, 160:22
**showing**
90:3, 97:6,
108:16
**shown**
108:19, 160:23
**shows**
137:13
**sick**
148:10, 176:13
**side**
131:20, 131:23
**sign**
28:5, 30:1
**sign-in**
131:18, 132:5,
135:15
**signature**
44:24, 59:1
**signature-ssc**
204:4
**signed**
125:1
**similar**
24:9, 46:12,
146:8, 146:11,
172:12, 174:24,
180:15
**since**
84:10, 88:25,

91:15, 127:11,
163:10, 167:6,
191:19
**sit**
132:11
**site**
143:8
**sitter**
96:9, 96:10,
200:7
**sitting**
78:2
**situation**
87:25, 115:2,
194:17
**situations**
115:1, 144:6
**six**
182:24
**skip**
150:17
**slander**
115:14
**slandered**
78:6, 78:13,
115:12
**slimmed-down**
161:24
**small**
28:10, 174:18,
174:19
**smart**
70:6
**snail**
91:2
**snarky**
90:11
**software**
175:11
**solution**
144:9, 176:3
**solutions**
175:1
**solve**
144:7
**some**
8:15, 10:10,
12:17, 20:15,

21:8, 23:4,
23:5, 33:21,
37:17, 38:19,
41:5, 44:4,
45:4, 49:14,
49:15, 52:5,
52:25, 60:25,
64:6, 77:22,
84:18, 96:13,
96:15, 100:12,
107:3, 108:15,
111:1, 114:18,
115:9, 122:12,
122:23, 125:18,
136:20, 144:10,
144:25, 146:19,
147:6, 147:18,
147:24, 148:2,
148:12, 151:7,
155:1, 156:19,
160:2, 160:12,
172:2, 173:22,
173:25, 174:3,
176:11, 176:23,
179:17, 179:24,
179:25, 186:20,
189:18, 194:12,
195:21, 196:15,
197:1
**somebody**
86:5, 88:5,
104:25, 158:22,
167:16
**someone**
23:22, 31:9,
34:7, 34:8,
34:9, 46:5,
49:13, 50:22,
51:10, 91:14,
95:20, 128:18,
128:19, 129:19,
140:9, 156:13,
189:24, 193:20,
194:1
**someone's**
149:5
**something**
30:3, 38:16,

Transcript of Julie Kelly
Conducted on October 15, 2018

90

39:15, 49:9,
50:6, 50:24,
55:25, 70:8,
73:21, 77:11,
108:5, 108:9,
108:12, 109:4,
110:1, 110:8,
121:12, 125:9,
134:11, 136:14,
139:6, 144:2,
149:5, 149:9,
155:2, 161:25,
163:18, 163:21,
170:11, 170:14,
171:6, 171:20,
172:4, 172:9,
192:4, 194:1,
198:8, 198:10
**sometime**
95:11, 182:12
**somewhat**
183:25
**somewhere**
55:24, 174:22,
174:23
**sorry**
15:21, 29:19,
31:7, 34:23,
38:1, 38:2,
38:20, 44:9,
47:19, 52:15,
55:2, 55:6,
62:13, 72:21,
82:11, 95:14,
115:14, 125:7,
129:10, 130:1,
153:8, 165:2,
172:20, 173:24,
193:5, 194:3
**sort**
19:9, 41:9,
73:6, 95:18,
96:13, 99:21,
118:25, 119:2,
148:2, 158:7,
168:5, 172:25,
180:11, 186:20
**sound**
151:19

**southern**
94:7, 117:18
**spacing**
107:14
**speak**
14:23, 32:15,
38:20, 40:21,
41:22, 47:22,
64:14, 64:17,
91:18, 93:13,
93:19, 113:1
**speaker**
137:20
**speaking**
67:12, 67:17
**special**
95:24
**specific**
12:14, 73:21
**specifically**
11:11, 97:22,
112:21, 134:1,
152:15, 158:1,
164:21, 165:4,
182:1
**specifics**
97:17, 151:7
**speculate**
145:6, 145:16,
146:9, 146:18,
148:17, 177:10,
180:21, 183:3,
190:12
**speed**
126:8
**spoke**
31:2, 32:22,
33:13, 53:18,
57:16, 64:3,
64:10, 64:21,
66:5, 87:11,
94:17, 94:19,
154:4, 154:19,
154:20, 156:13
**spoken**
70:18, 167:14
**sponsored**
22:2

**sports**
143:2
**spring**
137:2, 140:25,
168:14
**ss**
203:2
**st**
48:24, 49:18,
117:8, 125:5,
125:25, 129:23,
133:6, 134:20,
134:23, 150:9,
151:18, 152:11,
198:19
**stack**
61:22, 187:15,
193:19
**stamie**
194:15
**stamp**
72:18
**stamped**
130:13, 133:8
**standard**
160:7, 175:9
**standing**
98:6
**start**
10:10, 22:16,
55:21, 90:16,
118:2, 118:14,
136:19, 139:7,
176:1
**started**
22:18, 75:22,
84:3, 123:7,
123:17, 137:1,
171:2
**starting**
140:14
**starts**
100:3, 100:4,
103:2
**state**
1:20, 10:11,
27:13, 38:4,
107:21, 151:17,

164:21, 165:11,
203:1, 203:4,
204:7
**stated**
63:22, 124:9
**statement**
68:3, 76:11,
77:5, 108:8
**states**
1:1, 76:12,
94:7, 165:25,
192:23
**status**
150:6
**stay**
173:1
**staying**
172:22
**stenographically**
203:11
**step**
137:24, 152:24
**stepdaughter**
201:12
**stephanie**
123:15
**steps**
60:15
**steve**
8:24, 9:7,
40:10, 41:17,
65:22, 67:23,
137:12, 147:10,
147:19, 166:16,
169:11, 169:17,
169:18, 180:2,
181:25, 196:11,
197:2
**steve's**
12:12
**steven**
1:4, 28:20,
47:18, 102:8,
124:23
**stewart**
1:21, 194:23
**still**
25:8, 44:20,

Transcript of Julie Kelly
Conducted on October 15, 2018

91

51:19, 53:10,
53:12, 66:8,
67:15, 77:23,
79:12, 79:14,
121:7, 152:8,
164:25, 168:15,
178:23, 195:17,
197:23, 198:2
**stoma**
176:25
**stood**
106:5
**stop**
102:15
**stored**
157:16
**story**
89:11
**street**
1:22, 7:27,
135:13
**streets**
130:24
**stressful**
55:18, 183:20,
183:23
**stuck**
63:19
**students**
173:17
**stuff**
116:17, 132:17,
136:16, 154:22
**subject**
11:2, 30:15
**submit**
128:24
**subpoena**
13:17, 16:22,
27:15, 27:19,
28:19, 30:9,
31:1, 31:16,
32:10, 32:11,
33:10, 33:12,
33:14, 34:18,
34:19, 36:23,
37:2, 39:3,
39:8, 40:8,

40:12, 41:15,
44:6, 47:11,
51:23, 52:9,
53:12, 54:11,
54:14, 55:4,
55:9, 56:3,
56:15, 57:5,
63:11, 65:24,
66:23, 68:8,
68:16, 68:22,
69:2, 69:19,
69:21, 69:23,
76:1, 82:6,
86:1, 87:1,
87:12, 88:13,
88:25, 89:6,
91:16, 92:17,
93:11, 95:13,
97:5, 97:7,
97:18, 98:6,
106:24, 107:20,
108:13, 111:9,
119:25, 120:3,
122:1, 122:4,
124:4, 124:8,
124:10, 124:20,
124:23, 125:4,
125:16, 125:24,
129:1, 129:2,
130:5, 150:23,
151:5, 152:5,
152:7, 152:10,
155:7, 157:11,
157:12, 157:15,
159:10, 160:20,
160:23, 161:1,
164:13, 165:18,
165:20, 165:22,
187:19
**subpoenaed**
64:7, 83:22,
83:25, 156:23
**subpoenas**
32:18, 32:19,
33:17, 34:4,
87:13, 89:7,
121:6, 121:11,
121:25

**subscription**
173:11
**such**
154:23
**sudden**
128:25, 181:2,
181:23, 185:18
**sue**
9:11
**suffice**
105:16
**suggest**
105:19
**suggested**
119:4
**suggestion**
194:22
**suggestions**
60:23
**suite**
7:7, 7:17,
119:24
**summary**
12:11, 163:20
**summer**
37:20, 95:11,
109:16, 119:22,
128:16, 137:3,
138:3, 138:4,
138:17, 153:24,
154:24, 168:13,
177:9
**summoned**
32:14
**sunday**
144:1
**supervisor**
136:25, 137:11
**supervisors**
136:22
**supplement**
136:18, 199:13
**support**
148:25
**supportive**
143:9
**supposed**
41:11

**sure**
45:4, 67:14,
67:15, 69:12,
76:9, 84:16,
84:20, 95:20,
101:4, 101:21,
107:18, 110:18,
121:19, 122:13,
122:19, 125:2,
126:25, 130:21,
139:7, 141:24,
144:24, 145:12,
146:25, 148:10,
148:18, 151:12,
160:9, 165:3,
165:21, 166:7,
166:13, 171:4,
172:8, 172:10,
172:16, 173:6,
174:8, 181:9,
181:12, 183:20,
186:3, 186:7,
188:18, 188:22,
195:6, 196:11,
198:1, 198:7
**surgery**
176:24, 178:23
**surveillance**
45:9
**susan**
153:11
**swiper**
175:2
**sworn**
8:3, 10:19,
203:8
**symbol**
190:5

**T**

**table**
105:11
**take**
9:19, 11:8,
11:9, 11:16,
15:9, 32:6,
35:1, 37:18,
38:5, 39:18,

40:1, 42:25,
47:25, 59:13,
61:22, 62:10,
68:2, 85:11,
85:20, 94:17,
102:14, 102:17,
107:17, 109:22,
110:17, 113:10,
122:8, 122:12,
122:14, 129:21,
133:2, 143:19,
153:18, 155:1,
155:3, 155:4,
160:16, 170:12,
177:11, 178:13,
180:1, 180:8,
180:16, 187:1,
188:22, 189:12,
195:2, 197:8,
197:17
**taken**
1:19, 28:15,
109:12
**taker**
37:12
**takes**
136:15, 140:9,
142:22, 176:2
**taking**
11:19, 11:22,
14:10, 14:14,
78:22, 113:15,
139:8, 171:3,
171:4, 196:10
**talk**
9:22, 12:19,
13:18, 13:20,
13:23, 14:5,
18:18, 19:1,
23:6, 23:8,
33:2, 33:6,
33:9, 33:18,
34:11, 36:13,
36:19, 36:22,
37:1, 38:2,
38:13, 38:15,
41:24, 43:17,
53:1, 53:13,

53:16, 55:7,
55:11, 55:14,
55:19, 65:7,
68:16, 68:19,
74:15, 76:4,
82:8, 86:8,
92:24, 99:1,
99:18, 100:5,
106:13, 106:20,
107:1, 112:20,
113:5, 113:6,
113:15, 121:14,
133:7, 134:12,
134:13, 134:17,
134:19, 134:22,
136:17, 136:20,
144:8, 146:16,
151:10, 153:25,
154:10, 154:15,
155:17, 166:19,
166:22, 166:23,
177:18, 182:15,
191:20
**talked**
13:25, 32:16,
36:4, 36:5,
84:21, 86:23,
95:12, 98:17,
100:7, 100:10,
103:15, 157:2,
165:20, 169:20,
172:17, 182:14,
185:21, 199:7
**talking**
9:23, 16:12,
16:13, 18:20,
23:10, 57:18,
64:9, 95:6,
113:3, 116:17,
121:17, 136:19,
154:7, 154:8,
157:12, 172:25,
181:3, 181:6,
194:2, 194:16,
196:16
**targeted**
96:24, 97:3
**task**
147:21

**tasks**
141:3
**teach**
175:22
**team**
140:2, 141:1,
145:21, 182:16,
182:19, 182:20,
183:1, 183:5,
183:9, 183:10,
183:12, 185:24,
197:1, 197:12,
197:14
**teams**
183:2, 183:10
**technical**
21:22
**technologies**
173:13
**technology**
170:3, 172:22,
172:25, 173:3,
174:10, 175:5,
175:6
**telephone**
48:1, 65:12,
78:25, 79:3,
79:4, 150:6
**tell**
10:19, 31:4,
34:2, 43:9,
65:5, 67:19,
68:25, 69:8,
69:11, 74:8,
74:11, 78:12,
85:3, 119:19,
120:2, 120:11,
120:12, 120:19,
121:4, 121:23,
130:2, 135:2,
135:17, 135:20,
136:23, 140:10,
143:9, 143:13,
145:13, 156:2,
167:9, 169:18,
170:1, 172:10,
172:24, 174:9,
176:19, 189:13

**telling**
56:14, 119:17,
120:6, 120:18,
121:19
**tells**
74:2
**ten**
166:6
**termed**
186:6, 186:8,
186:15
**terminal**
137:7
**terminating**
149:2
**terminology**
174:1
**terms**
110:18
**testified**
20:23, 76:7,
108:22, 135:12
**testify**
82:7, 162:7,
203:8
**testifying**
87:19
**testimony**
10:22, 11:1,
54:18, 76:5,
202:3, 203:10
**texas**
7:8
**text**
16:1, 59:17,
65:12, 188:5,
188:8, 188:16
**th**
1:23, 22:15,
22:20, 27:14,
27:21, 35:7,
37:15, 37:24,
38:3, 38:9,
38:10, 38:12,
38:14, 38:16,
38:20, 38:21,
39:12, 40:5,
40:8, 40:14,

Transcript of Julie Kelly
Conducted on October 15, 2018                                    93

44:18, 49:24,
50:3, 50:11,
51:1, 51:2,
51:7, 51:11,
52:7, 52:17,
52:20, 53:10,
53:11, 53:14,
54:15, 54:22,
54:23, 55:7,
55:14, 55:20,
57:4, 59:14,
61:15, 72:20,
77:22, 78:18,
80:11, 90:20,
90:25, 98:15,
98:18, 101:19,
101:23, 102:25,
103:19, 103:25,
108:19, 111:12,
111:19, 112:10,
115:18, 119:12,
119:23, 122:24,
123:3, 125:7,
125:8, 126:2,
148:24, 150:16,
150:24, 155:8,
157:13, 162:23,
167:6, 194:13,
195:24, 196:1,
204:3
**than**
19:17, 19:19,
64:20, 77:10,
93:6, 94:11,
101:13, 127:10,
167:12, 175:22,
177:16
**thank**
32:7, 39:18,
42:25, 61:22,
68:2, 80:1,
100:10, 105:12,
109:22, 126:2,
129:21, 160:12,
163:1, 189:10,
191:19, 198:18,
199:18
**that's**
9:2, 11:24,

12:10, 12:24,
16:4, 16:18,
23:11, 36:14,
36:15, 38:12,
39:4, 47:20,
49:4, 54:17,
55:5, 56:16,
62:14, 64:2,
69:1, 69:9,
69:24, 72:19,
75:12, 76:15,
77:11, 81:2,
87:21, 87:22,
93:2, 93:5,
93:7, 93:9,
93:21, 95:10,
98:1, 98:3,
98:16, 100:12,
105:8, 106:8,
113:8, 113:17,
113:20, 115:12,
115:23, 121:19,
123:10, 126:12,
127:25, 129:3,
130:13, 145:9,
152:19, 154:17,
154:18, 157:4,
165:25, 169:13,
174:1, 185:13,
187:2, 190:2,
193:9, 193:19,
194:23, 196:3,
196:7, 196:11,
200:3, 200:15
**their**
32:24, 37:18,
75:7, 83:23,
87:1, 128:16,
141:16, 143:2,
148:5, 148:7,
156:24, 162:4,
174:20, 174:22,
174:25, 183:21,
183:25, 184:1,
185:22, 185:25
**them**
19:5, 19:6,
45:12, 61:17,

62:3, 62:11,
62:17, 95:19,
98:14, 103:18,
110:1, 110:17,
111:23, 112:6,
114:12, 124:2,
125:20, 128:8,
128:14, 128:21,
130:18, 140:17,
142:25, 143:13,
145:2, 146:3,
155:18, 158:9,
158:19, 158:22,
158:23, 173:19,
174:15, 174:24,
187:13, 190:10,
191:3, 191:14,
195:2, 195:11,
195:13
**then**
11:12, 15:16,
18:4, 21:18,
21:19, 23:5,
26:16, 28:13,
31:25, 36:24,
41:6, 41:22,
51:16, 54:4,
54:14, 57:15,
59:6, 61:1,
62:11, 70:9,
70:16, 75:22,
76:1, 82:3,
82:10, 82:17,
82:19, 84:10,
90:20, 91:23,
92:9, 92:13,
95:24, 97:6,
98:5, 98:17,
99:25, 103:5,
108:18, 117:21,
118:19, 119:3,
119:10, 119:14,
120:14, 120:17,
120:22, 122:3,
128:24, 129:6,
129:8, 131:2,
131:16, 132:1,
135:6, 135:13,

136:23, 141:15,
144:4, 144:5,
150:11, 150:18,
150:25, 151:6,
152:9, 152:14,
154:5, 158:9,
160:25, 170:18,
173:10, 174:15,
175:7, 175:16,
175:24, 176:1,
176:22, 183:12,
186:23, 190:5,
190:15, 195:9,
195:13, 200:23
**there**
11:8, 11:24,
17:23, 17:25,
21:21, 25:16,
28:1, 28:8,
33:8, 39:9,
41:7, 48:20,
49:17, 51:21,
53:8, 54:4,
55:10, 57:25,
59:19, 70:17,
72:17, 73:21,
76:13, 78:2,
83:18, 84:17,
84:18, 84:24,
86:5, 91:6,
95:20, 97:9,
98:1, 98:7,
98:22, 102:15,
105:1, 106:2,
108:15, 108:17,
115:23, 121:1,
121:5, 124:6,
125:22, 128:9,
130:15, 130:16,
135:19, 135:21,
136:1, 140:25,
141:3, 143:8,
146:15, 147:1,
147:19, 147:21,
148:2, 151:14,
151:20, 152:1,
152:8, 161:24,
171:16, 171:24,

171:25, 172:1,
173:7, 175:10,
177:12, 178:15,
179:24, 180:25,
181:3, 182:16,
183:2, 186:5,
192:4, 192:5,
194:16, 194:23
**there's**
11:17, 18:5,
19:20, 28:3,
63:8, 99:22,
112:7, 130:23,
132:10, 148:23,
152:24, 174:1,
175:23, 189:18,
194:18, 200:3
**thereafter**
203:12
**thereupon**
2:5, 2:10,
2:14, 2:18,
2:22, 3:1, 3:5,
3:8, 3:11, 3:15,
3:20, 4:1, 4:5,
4:9, 4:14, 4:18,
4:21, 5:1, 5:5,
5:9, 5:14, 5:18,
5:22, 6:1, 6:5,
26:18, 32:1,
39:20, 43:1,
58:14, 61:5,
71:21, 71:24,
89:23, 100:18,
107:7, 116:22,
118:8, 124:14,
126:13, 149:12,
159:1, 162:15,
169:1, 187:4,
189:3, 192:14,
194:5, 196:18,
199:20, 201:16
**these**
24:10, 24:13,
26:17, 27:2,
31:24, 32:21,
72:9, 82:23,
82:24, 111:17,

117:13, 117:16,
121:21, 126:11,
128:7, 141:20,
160:6, 166:15,
174:18, 176:4,
184:8, 184:13,
184:19, 184:23,
189:13, 190:8,
190:24, 191:10,
194:10, 194:12,
195:8, 195:14,
196:3, 196:15,
197:18, 198:20
**they**
18:13, 20:8,
24:1, 24:5,
24:6, 24:9,
24:13, 24:15,
32:19, 34:3,
34:6, 34:7,
44:20, 47:3,
55:23, 57:25,
67:13, 68:18,
68:19, 69:8,
69:11, 70:3,
72:13, 74:12,
74:15, 74:16,
79:13, 82:25,
83:1, 83:2,
83:24, 86:12,
86:14, 86:15,
86:17, 86:18,
86:20, 89:6,
105:19, 107:24,
110:19, 111:16,
128:8, 128:9,
128:20, 128:25,
130:14, 137:22,
137:23, 140:15,
141:14, 141:15,
142:11, 143:2,
143:20, 143:21,
145:14, 145:16,
146:8, 146:18,
154:21, 161:18,
173:17, 173:19,
174:18, 174:21,
174:22, 175:18,

180:17, 180:22,
181:13, 183:22,
184:11, 186:8,
186:10, 186:12,
186:14, 186:15,
186:18, 186:22,
188:14, 190:9,
191:12, 193:21,
194:19, 198:1,
200:17
**they'll**
42:22
**they're**
24:2, 24:16,
32:23, 54:3,
66:20, 86:17,
128:14, 149:4,
180:16
**thing**
11:14, 26:1,
26:24, 45:19,
45:21, 54:12,
67:9, 70:23,
94:1, 117:12,
143:5, 148:23,
179:1
**things**
8:15, 19:12,
23:2, 52:22,
91:5, 96:1,
98:19, 114:19,
114:24, 126:8,
126:18, 128:24,
134:3, 140:20,
143:23, 147:6,
147:22, 147:25,
149:20, 155:18,
172:3, 173:6,
173:22, 176:24,
179:24, 180:24,
182:8, 192:9,
194:20, 195:20,
195:22
**think**
13:7, 13:12,
14:18, 20:18,
29:2, 29:13,
30:3, 32:15,

37:22, 38:25,
39:9, 46:8,
47:13, 48:9,
49:3, 52:18,
52:19, 53:22,
67:13, 69:22,
70:8, 74:1,
77:7, 77:13,
95:1, 98:14,
98:16, 114:8,
114:10, 121:8,
122:2, 123:2,
123:6, 125:8,
125:23, 127:24,
130:13, 131:24,
139:6, 139:10,
142:12, 143:17,
145:1, 145:6,
145:24, 146:25,
147:18, 147:23,
148:10, 156:5,
157:1, 157:6,
158:23, 159:6,
159:9, 161:11,
161:13, 162:1,
163:7, 169:20,
170:12, 171:19,
176:20, 176:23,
177:13, 179:25,
180:15, 180:25,
181:22, 185:2,
185:18, 186:10,
189:17, 194:20,
197:7, 198:23
**thinking**
146:16, 177:14
**third**
37:4, 64:4,
101:4, 101:5,
101:16, 139:6,
196:2
**third-party**
106:24
**those**
15:4, 19:4,
19:11, 21:24,
22:1, 24:19,
24:24, 25:2,

Transcript of Julie Kelly
Conducted on October 15, 2018                    95

28:10, 33:4,
40:24, 45:13,
52:3, 61:1,
61:20, 83:22,
89:17, 91:13,
96:1, 97:8,
111:21, 113:6,
118:17, 119:6,
119:13, 119:18,
130:20, 144:7,
144:10, 147:4,
158:17, 161:10,
161:17, 179:20,
186:3, 188:12,
192:2, 195:1,
195:6, 201:14
**though**
10:21, 24:2,
44:14, 91:10,
165:22, 193:4
**thought**
28:16, 42:13,
53:25, 54:3,
69:15, 82:6,
89:3, 96:25,
112:19, 130:23,
146:18, 152:1,
161:16
**thousands**
172:12
**threatened**
128:18, 128:21,
128:22, 129:2,
134:10, 161:1
**threatening**
136:6
**threats**
5:20, 192:16
**three**
37:12, 57:8,
57:9, 108:19,
109:2, 117:13,
128:3, 194:10,
200:2
**three-year-old**
86:22
**threw**
113:14

**throat**
177:4, 177:5
**through**
11:10, 21:7,
21:20, 21:21,
23:4, 49:11,
49:15, 61:19,
69:14, 70:19,
75:10, 79:13,
79:19, 82:21,
84:14, 98:9,
98:20, 98:23,
103:12, 112:6,
113:25, 115:4,
119:1, 120:23,
125:17, 130:16,
140:21, 140:23,
144:8, 146:10,
148:18, 150:4,
150:17, 151:6,
158:7, 161:1,
161:18, 161:19,
170:13, 173:18,
176:4, 179:1,
186:22, 187:13,
187:22, 190:6,
195:21, 198:20
**throughout**
164:7
**throw**
171:11
**thursday**
101:23
**time**
9:24, 16:22,
31:18, 34:14,
34:19, 38:5,
38:17, 39:11,
42:3, 44:13,
50:9, 55:8,
55:11, 55:18,
62:15, 66:4,
71:5, 72:18,
77:4, 78:20,
79:24, 82:11,
84:2, 85:2,
88:24, 90:17,
105:24, 110:2,

113:15, 118:2,
119:21, 120:21,
120:22, 121:5,
122:16, 124:3,
128:20, 131:7,
137:11, 138:5,
138:15, 139:6,
140:13, 140:16,
142:25, 143:13,
144:21, 150:8,
167:7, 167:16,
169:17, 174:19,
178:13, 179:5,
181:16, 182:25,
183:20, 185:22,
186:10, 191:2,
197:12
**timeline**
127:2
**timely**
72:13, 130:15
**times**
50:15, 63:15,
68:4, 68:10,
70:4, 70:15,
84:10, 88:1,
117:21, 117:25,
139:25
**timothy**
3:17, 100:20,
101:3
**tipped**
29:13
**title**
138:5, 138:11,
138:14, 139:9
**titled**
5:6, 169:2
**today**
8:13, 8:16,
9:20, 10:16,
11:9, 11:21,
12:2, 14:9,
15:23, 16:16,
16:22, 26:4,
61:17, 98:9,
100:6, 113:4,
125:19, 134:12,

154:7, 165:17,
168:19, 187:11,
188:24, 199:8,
199:15
**today's**
12:5, 13:15,
13:24, 14:6,
14:20, 15:12,
16:5, 16:7,
16:13, 16:16,
19:24, 20:3,
20:6, 20:12,
96:5, 199:15
**toe**
113:24
**together**
27:15, 137:13,
140:7, 173:15,
173:16
**told**
19:13, 34:3,
50:9, 57:20,
59:12, 59:17,
62:1, 63:12,
63:19, 64:24,
67:12, 67:16,
70:11, 74:20,
75:12, 76:21,
77:20, 82:5,
86:4, 87:19,
94:23, 104:4,
104:10, 104:25,
108:1, 109:25,
111:14, 111:16,
111:25, 115:5,
115:16, 115:19,
116:13, 120:3,
128:13, 128:14,
130:6, 135:22,
136:4, 177:12,
179:2, 179:22,
185:9, 185:16
**tommy**
33:5, 86:24
**tommy's**
87:9
**tons**
143:10

Transcript of Julie Kelly
Conducted on October 15, 2018

96

too
55:3, 57:25,
75:3, 154:25
took
28:11, 63:11,
81:8, 109:15,
133:16, 140:11,
141:18, 141:23,
142:6, 142:14,
142:24, 143:12,
179:18, 180:13,
180:23, 182:18,
183:6, 183:13,
187:20, 187:21,
194:12, 195:14,
197:6, 198:3
tool
83:13
top
3:12, 3:16,
4:6, 5:10, 6:2,
49:4, 50:5,
75:16, 80:18,
81:9, 89:24,
100:19, 113:12,
118:9, 128:2,
172:17, 187:5,
189:21, 196:19,
197:19
topics
170:17
total
47:5
touch
106:18, 181:16
towards
97:15
town
128:20
track
98:12, 173:5
tracking
33:21, 173:9,
173:20
train
171:7
trained
172:11

training
138:7, 138:8,
138:14, 138:24,
141:6, 141:9,
144:19, 170:1,
170:6, 170:9,
170:23, 171:1,
172:14, 174:2,
175:3, 175:11
transcript
84:24, 193:21
transcription
202:3
transfer
175:17
transform
137:6
transformation
23:8, 142:3
transitioning
171:6
trap
54:1, 54:2
treatment
177:25
tried
73:24, 73:25,
98:25
trip
61:14
true
87:21, 202:2
trust
144:5
truth
10:19, 109:25,
120:2, 203:8,
203:9
truthful
12:1, 112:3
try
9:21, 37:20,
126:8, 130:8,
176:23
trying
62:5, 95:2,
116:15, 154:9,
171:22, 186:15,

193:25
tuesday
90:20, 159:19
turn
77:17, 79:6,
90:18, 101:15,
118:19, 128:1,
144:13
twice
113:20, 139:18
two
11:11, 23:17,
24:1, 24:2,
24:6, 24:16,
33:3, 33:4,
47:7, 47:8,
86:21, 97:8,
113:24, 136:22,
142:7, 142:10,
166:6, 194:20
type
33:21, 45:19,
45:21, 124:4,
137:18, 139:11,
140:11, 175:16
types
19:11, 96:1,
170:20, 172:3,
173:3, 173:5
typewriting
203:12
typical
201:14
typically
195:2, 196:7

U

uh-huh
101:12
um-hmm
13:4, 14:22,
25:15, 34:1,
40:3, 41:18,
44:25, 45:10,
45:12, 46:25,
49:25, 50:18,
51:5, 52:10,
60:17, 66:11,

66:17, 68:5,
70:13, 71:12,
72:5, 73:16,
75:12, 76:3,
77:18, 83:8,
83:21, 86:3,
86:6, 86:25,
95:17, 96:14,
96:17, 97:19,
101:17, 102:24,
103:20, 106:19,
108:21, 108:25,
111:24, 118:3,
119:9, 120:24,
126:1, 127:8,
127:22, 130:1,
131:11, 131:13,
131:15, 132:14,
133:17, 134:21,
135:16, 138:9,
149:24, 153:16,
155:10, 155:14,
164:10, 165:9,
170:24, 172:23,
176:14, 177:6,
180:10, 181:10,
182:10, 186:7,
195:16, 195:25,
200:20, 201:7
unable
37:15, 38:10
unavailable
54:15, 119:12,
119:18, 120:7,
120:12, 120:13,
120:15, 120:16,
120:19
unbeknownst
75:6
unclip
188:20
under
10:16, 11:2,
26:2, 26:5,
37:12, 56:6,
85:8, 102:3,
105:11, 119:18,
120:19, 131:4,

138:22, 142:5,
142:23, 145:14,
147:24, 164:21,
192:7, 203:17
**underscore**
23:14, 23:15,
23:23, 25:6,
25:12, 25:13,
90:21
**undersigned**
75:11, 103:13
**understand**
10:15, 10:18,
10:21, 11:1,
11:5, 11:21,
40:14, 42:12,
51:2, 77:23,
82:11, 82:13,
94:13, 120:15,
121:16, 143:20,
146:17, 148:5,
152:3, 152:6,
153:12, 175:12,
189:22
**understanding**
109:24, 160:6
**understood**
10:8, 47:25,
119:11, 170:4,
189:19
**unemployed**
37:6, 37:11
**unethical**
97:12, 98:22
**unique**
24:1, 24:6
**united**
1:1, 94:7
**university**
21:19, 140:21,
140:25, 170:14
**unknown**
181:1
**unless**
50:6, 63:19
**unrelated**
91:10
**unrepresented**
88:2

**until**
15:12, 15:18,
16:22, 39:1,
68:7, 73:8,
81:11, 82:2,
124:2, 125:8,
136:9, 162:5,
179:1
**up-to-date**
172:22
**update**
144:2, 163:14,
163:25, 164:4,
164:5, 177:20,
184:9
**updated**
79:16, 79:23
**updates**
178:24
**upfront**
175:12
**upload**
133:8, 133:13,
133:19
**uploaded**
135:6
**upon**
51:22, 111:10,
129:22, 150:2
**upset**
28:17, 32:13,
121:5
**use**
25:8, 25:9,
44:4, 44:10,
60:14, 60:21,
83:11, 122:9,
174:18, 186:18
**used**
74:12, 78:1,
110:12, 174:1,
175:10, 198:4
**usps**
60:14, 60:21
**usually**
45:18, 113:24,
139:21
**utilized**
139:24

| V |
|---|
**valid**
51:19, 53:12
**value**
175:21
**various**
21:21, 140:20,
141:3
**vehicle**
46:16
**vehicles**
29:10, 46:17
**vendors**
175:13
**verbal**
10:7
**versions**
85:12, 85:16
**versus**
28:20, 47:18,
74:3, 75:9,
174:20, 175:1
**very**
9:24, 12:13,
22:25, 23:9,
46:12, 54:6,
54:8, 55:18,
63:11, 86:17,
90:11, 95:3,
105:13, 105:14,
118:24, 121:4,
123:7, 137:20,
143:9, 145:20,
152:7, 154:8,
157:10, 161:16,
170:1, 175:12,
181:23, 183:19
**veteran's**
73:7
**via**
16:1, 65:12,
77:20, 78:24,
125:12
**video**
45:8, 170:17,
172:2, 182:7
**videoconference**
139:23

**videos**
61:14
**violated**
112:9
**violation**
186:21
**virtual**
170:8, 172:2,
182:6
**vision**
141:23
**voicemail**
48:4, 48:16,
48:24, 49:7,
49:11, 49:14,
49:17, 59:19,
60:3
**vp**
139:5
**vs**
1:7

| W |
|---|
**wait**
87:17, 132:23
**waited**
130:15, 136:9
**waiting**
41:4, 41:8,
52:4, 60:25,
132:10, 132:16,
165:1
**walk**
113:25, 130:24,
131:22, 132:4
**walked**
28:8, 28:13,
131:16
**want**
8:14, 9:4,
12:19, 17:4,
22:24, 23:9,
26:1, 26:13,
30:18, 32:4,
32:19, 46:7,
55:2, 61:21,
62:9, 68:1,
68:3, 68:19,

Transcript of Julie Kelly
Conducted on October 15, 2018

98

76:4, 79:25,
83:5, 85:24,
89:16, 94:16,
103:15, 104:23,
106:12, 107:1,
115:11, 117:11,
117:13, 120:9,
121:1, 121:2,
122:13, 122:17,
136:17, 136:19,
138:3, 141:10,
143:20, 144:7,
144:8, 144:22,
145:15, 146:9,
146:18, 148:17,
153:18, 155:4,
156:21, 156:25,
157:9, 159:5,
177:10, 180:4,
180:12, 180:17,
180:21, 181:6,
182:15, 188:19,
188:21

**wanted**
47:23, 48:11,
51:10, 76:16,
84:16, 84:20,
105:7, 126:18,
143:25, 144:2,
147:21, 159:8,
164:23, 165:16,
181:9, 190:18,
191:8, 192:3,
197:15

**wanting**
28:18

**wasn't**
28:17, 41:13,
46:19, 56:20,
58:7, 62:1,
96:22, 138:13,
143:7, 171:10,
171:22, 185:1,
185:15, 185:16,
185:20, 186:20,
193:3

**waste**
119:20, 120:21

**wasted**
119:21, 120:22

**watch**
200:8

**way**
29:24, 29:25,
44:5, 63:13,
82:5, 90:19,
97:5, 99:19,
141:24, 142:1,
157:14, 187:16,
193:20

**ways**
170:7

**we'll**
13:18, 23:8,
26:9, 61:19,
62:10, 62:11,
62:17, 122:20,
131:14, 189:10,
200:23

**we're**
9:23, 10:10,
15:7, 16:3,
16:12, 16:13,
16:15, 18:18,
21:7, 23:3,
23:6, 26:5,
26:16, 62:11,
62:15, 89:18,
99:18, 106:12,
113:3, 133:2,
134:17, 134:19,
154:7, 177:1,
194:2

**we've**
80:1, 83:3,
95:12, 98:16,
98:20, 99:16,
116:17, 118:13,
120:22, 158:14,
192:19, 194:9,
199:7

**wear**
46:13

**wearing**
29:4, 29:11,
46:10, 46:19

**weaver**
87:8, 87:10

**web**
164:5

**website**
96:19, 110:11,
173:14

**websites**
114:21

**week**
70:23, 71:7,
71:8, 71:17,
75:22, 81:11,
83:18, 85:14,
85:16, 91:1,
91:19

**weekend**
115:8

**weeks**
48:7, 53:25

**well**
12:6, 18:4,
18:11, 18:20,
19:16, 20:7,
33:15, 41:22,
44:12, 45:4,
46:1, 51:14,
55:22, 60:4,
71:1, 74:5,
83:13, 93:5,
98:3, 99:23,
104:14, 111:5,
126:6, 127:3,
131:9, 136:6,
136:18, 141:5,
141:23, 142:21,
150:12, 155:17,
171:2, 177:12,
186:17, 190:13

**went**
21:17, 57:11,
57:24, 63:13,
77:25, 78:13,
86:7, 99:3,
128:8, 130:11,
130:17, 131:2,
131:5, 134:5,
135:14, 141:13,

146:10, 151:12,
160:22, 172:1,
179:18, 180:25,
181:7, 187:22,
198:20

**weren't**
20:8, 83:24,
186:14, 186:15,
188:14

**whalen**
1:12, 8:12

**what's**
28:15, 80:6,
87:7, 87:9,
107:12, 115:2,
117:2, 127:6

**whatever**
32:19, 68:20,
119:3, 198:3

**where**
16:15, 21:16,
56:22, 58:12,
59:3, 64:2,
70:17, 75:25,
76:15, 78:9,
86:7, 90:12,
92:15, 97:22,
98:18, 106:3,
109:15, 110:3,
120:11, 122:6,
130:14, 130:21,
130:22, 131:17,
131:19, 131:23,
132:4, 132:7,
132:10, 156:11,
158:17, 170:11,
173:16, 182:7,
186:21, 195:8

**whereof**
204:1

**wherever**
92:14, 97:23,
122:5, 198:14

**whether**
25:20, 36:4,
36:5, 67:7,
70:3, 76:9,
88:7, 89:5,

Transcript of Julie Kelly
Conducted on October 15, 2018                    99

93:19, 106:7,
108:15, 135:25
**which**
11:10, 16:20,
40:15, 41:12,
50:3, 51:3,
52:6, 56:15,
63:23, 70:19,
79:2, 85:7,
87:5, 108:13,
111:12, 114:7,
129:1, 131:19,
149:17, 150:15,
151:22, 152:12,
153:4, 153:6,
153:11, 154:7,
157:12, 158:13,
164:24, 165:15,
165:18, 170:5,
183:10, 189:17,
199:7, 203:16
**while**
28:5, 58:2,
63:12, 90:7,
103:2, 103:4,
103:6, 109:2,
143:7, 180:2,
184:13, 195:15,
196:16
**white**
28:11
**who**
8:11, 8:16,
8:21, 22:11,
32:21, 41:10,
46:24, 52:8,
64:10, 64:12,
65:2, 69:22,
73:4, 76:13,
78:3, 84:7,
86:19, 91:8,
91:14, 92:24,
94:11, 94:20,
95:25, 96:12,
98:24, 102:11,
104:4, 104:10,
114:12, 115:19,
115:24, 129:10,

129:12, 129:13,
137:4, 139:5,
142:11, 147:15,
154:19, 154:21,
157:5, 160:3,
161:18, 166:11,
174:12, 175:14,
179:23, 182:20,
185:9, 185:16,
186:6, 193:7,
197:20, 200:16,
201:2
**who's**
41:23
**whole**
97:11, 111:5,
129:2, 132:2,
132:17, 136:6,
154:7, 154:22,
154:24, 174:20,
179:1, 203:8
**whom**
94:20
**whose**
78:21
**why**
23:17, 29:22,
30:16, 31:9,
32:14, 41:24,
42:15, 44:8,
46:8, 49:4,
52:2, 56:4,
68:14, 69:18,
77:3, 82:3,
84:1, 89:13,
94:13, 96:20,
104:21, 106:20,
108:8, 116:8,
120:25, 123:10,
126:6, 128:7,
128:9, 128:15,
132:15, 134:9,
134:13, 134:16,
143:20, 151:17,
151:20, 152:19,
153:1, 155:22,
157:4, 158:3,
165:14, 166:18,

166:22, 166:23,
186:8, 190:3,
190:17, 191:7,
192:6, 193:19,
194:23, 196:3,
196:6, 197:9,
200:15
**will**
9:24, 11:7,
11:9, 11:10,
12:13, 18:23,
25:11, 27:1,
31:24, 31:25,
32:6, 38:5,
40:19, 42:9,
42:18, 42:19,
49:13, 52:13,
54:21, 56:18,
56:24, 57:2,
77:12, 84:18,
91:4, 94:6,
101:14, 106:14,
125:20, 130:19,
132:18, 159:7,
187:14, 199:5,
199:7, 199:15,
200:21, 200:22
**willing**
91:18
**within**
1:20, 203:4
**without**
75:6, 99:4
**witness**
1:16, 8:2,
17:7, 26:3,
26:12, 58:18,
62:13, 70:18,
75:8, 87:21,
88:17, 106:24,
122:11, 122:16,
122:19, 145:5,
152:18, 154:6,
167:18, 167:22,
167:25, 168:3,
179:9, 187:2,
189:7, 199:9,
199:17, 200:24,

203:12, 204:1
**witnesses**
83:5, 83:14,
107:4
**women's**
56:10
**won't**
100:11, 128:7,
128:9, 144:12,
157:8
**wondering**
128:15
**word**
137:19, 198:10
**words**
106:3
**work**
21:18, 21:20,
21:25, 24:5,
40:16, 46:23,
51:4, 63:12,
78:1, 95:25,
109:5, 117:25,
139:19, 140:7,
140:11, 140:19,
171:14, 175:10,
175:13, 179:11,
185:1
**workbooks**
172:1
**worked**
21:23, 29:16,
73:7, 137:13,
140:2, 140:6,
167:5
**working**
22:16, 22:18,
66:8, 137:1,
139:6, 168:15,
171:2, 178:18,
178:20, 195:15
**works**
24:8, 51:8,
51:23, 52:1,
67:15, 91:21,
96:2, 102:11
**worksheets**
171:25

Transcript of Julie Kelly
Conducted on October 15, 2018

100

**world**
173:20, 174:2
**worried**
54:6
**would**
11:14, 11:20,
11:23, 11:25,
12:11, 14:20,
15:23, 30:3,
30:9, 31:9,
31:21, 37:18,
41:24, 44:12,
56:7, 60:2,
60:4, 60:5,
60:6, 63:22,
63:23, 64:20,
67:9, 89:5,
95:18, 101:22,
102:14, 105:23,
108:16, 108:23,
108:24, 109:1,
109:4, 109:6,
109:7, 109:11,
109:18, 111:5,
112:25, 113:10,
115:4, 115:7,
116:1, 121:9,
125:12, 129:19,
130:7, 135:3,
135:23, 137:2,
137:18, 140:13,
140:19, 144:7,
152:11, 152:25,
158:12, 160:24,
173:12, 173:17,
173:19, 175:15,
178:1, 178:3,
178:22, 178:23,
180:16, 181:25,
183:11, 192:5,
195:2
**wouldn't**
59:21, 59:22,
67:1, 142:16,
144:7, 178:17,
193:17
**write**
9:22, 10:3,

26:25, 27:2,
110:15, 117:17,
118:16, 127:9,
136:15, 140:14,
160:6, 162:3
**writes**
30:23, 150:1,
150:5
**writing**
51:11, 54:14,
63:9, 65:15,
88:2, 137:13,
137:14, 203:10
**writings**
166:4
**written**
47:15, 115:5
**wrong**
88:5, 107:14,
116:19
**wrote**
35:6, 58:10,
76:5, 76:11,
77:6, 79:24,
92:4, 99:15,
101:14, 106:23,
107:19, 125:9,
169:11, 169:15,
169:16, 169:23,
171:5, 173:18,
197:24, 199:9

---

**Y**

**yeah**
24:17, 34:21,
42:21, 44:17,
45:18, 48:12,
48:13, 49:22,
52:22, 52:25,
58:23, 59:2,
61:22, 62:5,
72:19, 73:11,
79:5, 81:2,
81:5, 85:11,
87:21, 93:25,
101:9, 103:23,
114:7, 133:23,
141:12, 141:22,

142:21, 144:24,
145:5, 145:12,
152:18, 166:13,
168:20, 169:24,
172:6, 174:11,
175:7, 176:7,
176:10, 177:9,
178:1, 179:19,
180:6, 180:7,
181:8, 181:20,
185:8, 185:14,
188:1, 188:4,
190:15, 190:23,
194:3, 195:16,
195:19, 196:3,
196:6, 201:12
**year**
66:7, 68:8,
139:18, 167:12,
182:13, 195:21
**years**
22:22, 23:18,
25:7, 69:25,
136:21, 142:20,
158:12, 170:2
**yes**
10:5, 10:17,
10:20, 10:25,
11:4, 13:1,
14:25, 21:11,
22:23, 27:8,
34:23, 35:4,
35:9, 37:10,
48:10, 48:13,
52:12, 60:19,
61:11, 61:16,
62:24, 66:20,
68:2, 68:13,
76:8, 76:23,
79:10, 81:8,
82:1, 82:17,
85:5, 85:14,
86:6, 89:21,
90:6, 96:14,
97:22, 99:8,
100:16, 103:3,
103:6, 103:17,
106:14, 106:25,

107:3, 107:14,
107:25, 117:5,
119:16, 123:8,
123:11, 123:14,
128:5, 131:6,
132:25, 136:2,
147:14, 151:9,
152:4, 161:8,
164:20, 166:21,
168:11, 180:5,
186:13, 189:21,
191:23, 201:9
**yesterday**
190:25, 193:15,
198:7, 198:14
**yet**
9:11, 49:21,
54:13, 56:19,
70:14, 120:13,
194:22
**york**
1:2, 12:25,
13:6, 40:11,
74:5, 74:7
**you'll**
25:13, 143:24,
165:12, 179:24
**you're**
9:25, 14:15,
26:3, 38:10,
51:7, 51:14,
55:15, 56:14,
56:16, 56:19,
59:23, 80:15,
81:6, 81:17,
93:22, 102:16,
118:24, 120:7,
120:12, 120:13,
120:14, 120:16,
121:10, 143:21,
146:16, 154:15,
170:17, 199:13
**you've**
28:12, 50:15,
50:16, 67:3,
67:22, 68:10,
70:11, 70:14,
88:4, 88:25,

Transcript of Julie Kelly
Conducted on October 15, 2018

95:14, 108:9,
137:10, 146:19,
154:23, 166:14,
184:22
**young**
28:7
**yourself**
38:24, 96:23,
97:15, 117:10
**yungblut**
1:20, 9:18,
203:3, 204:6

---

**$**

**$375**
200:1
**$5.50**
13:12
**$50**
200:18
**$62.80**
26:12

---

**0**

**0/2/18**
4:22, 5:11,
159:2, 187:6
**0/9/18**
5:3, 162:17
**00**
55:22, 57:13,
57:14, 119:23
**000780**
169:13
**0050**
7:29
**00780**
5:7, 169:3
**02**
72:20
**05**
92:2
**0517**
157:20
**07**
1:23, 130:13
**08540**
7:18

---

**1**

**1-page**
2:5, 2:10,
2:14, 2:18,
2:22, 3:1, 3:20,
4:1, 4:9, 5:5,
5:18, 6:5,
26:18, 32:1,
39:21, 43:2,
58:15, 61:6,
107:8, 116:23,
124:14, 169:2,
192:15, 199:21
**10**
2:14, 5:23,
6:6, 30:13,
39:20, 40:1,
51:1, 57:13,
57:14, 90:20,
92:2, 98:18,
109:13, 109:14,
119:23, 194:6,
194:13, 195:24,
199:21
**100**
1:21, 3:19
**101**
153:23, 160:11
**107**
3:23
**11**
2:18, 5:23,
43:1, 43:23,
109:23, 109:24,
112:9, 112:12,
112:17, 120:2,
121:8, 130:13,
131:10, 133:6,
135:6, 162:3,
167:12, 190:4,
194:6
**116**
4:4
**118**
4:8
**12**
1:23, 2:22,

58:14, 61:10,
101:23, 129:25,
151:3
**124**
4:13
**126**
4:17
**13**
3:1, 3:12, 6:2,
40:17, 61:5,
62:20, 81:22,
82:3, 89:24,
136:19, 148:24,
175:8, 196:19,
197:20
**14**
3:5, 4:10,
71:21, 72:4,
72:20, 78:18,
80:11, 80:19,
80:20, 81:21,
103:19, 103:25,
122:24, 123:3,
124:15, 125:7,
126:21, 127:10,
127:21, 155:8,
157:13
**149**
4:20
**15**
1:23, 3:8, 6:6,
11:12, 22:20,
25:7, 71:24,
80:1, 80:2,
122:15, 122:18,
147:22, 151:3,
199:21
**155**
7:7
**159**
4:24
**16**
2:6, 3:11,
5:23, 26:19,
27:14, 27:20,
27:21, 27:22,
40:17, 89:23,
90:4, 194:6

**162**
5:4
**169**
5:8
**17**
1:7, 3:15, 6:2,
40:17, 100:18,
101:15, 102:23,
148:25, 185:4,
185:5, 185:6,
190:5, 190:11,
196:1, 196:19
**18**
2:6, 2:11,
2:15, 2:19,
2:23, 3:2, 3:12,
3:16, 3:20,
3:21, 4:2, 4:10,
6:6, 26:19,
27:22, 32:2,
39:21, 43:2,
58:15, 61:6,
80:19, 89:24,
100:19, 102:25,
107:7, 107:8,
107:13, 116:23,
124:15, 150:16,
150:24, 199:21
**187**
5:13
**189**
5:17
**19**
4:1, 40:17,
101:19, 116:22,
117:3, 125:8,
149:25
**192**
5:21
**194**
5:25
**196**
6:4
**199**
6:7
**1996**
21:13
**1998**
22:20

Transcript of Julie Kelly
Conducted on October 15, 2018                              102

**1:-cv**
1:7

**2**

**2**
122:17
**2-page**
3:8, 4:18,
4:21, 5:1,
71:25, 149:13,
159:2, 162:16
**2-sided**
3:11, 3:15,
4:15, 4:19,
4:22, 5:2,
89:24, 100:19,
126:14, 149:13,
159:2, 162:16
**20**
3:16, 4:5,
22:22, 23:18,
100:19, 102:25,
103:25, 118:8,
118:14, 136:21,
150:24, 158:12
**201**
7:27
**2012**
175:8, 176:6
**2013**
176:6
**2014**
137:3, 138:3,
138:17
**2015**
144:22, 147:5
**2016**
180:4, 181:7,
185:2, 194:14,
195:24, 196:2
**2017**
22:15, 75:6,
167:6, 189:16,
190:1, 197:20
**2018**
1:23, 27:11,
27:14, 27:20,
27:21, 30:13,

35:7, 40:8,
40:14, 54:22,
55:20, 57:4,
59:14, 75:20,
90:20, 90:25,
101:19, 101:23,
102:25, 103:19,
116:21, 118:16,
122:25, 123:3,
125:25, 126:3,
129:23, 150:1,
150:9, 150:14,
150:23, 150:24,
151:3, 151:6,
155:8, 155:11,
157:20, 158:17,
162:5, 164:9,
164:14, 165:23,
198:19, 204:3
**2019**
204:8
**203**
1:22
**21**
4:14, 48:24,
49:18, 110:2,
110:19, 126:13,
127:6, 164:22
**22**
4:21, 52:21,
52:23, 159:1,
162:25
**23**
5:5, 27:11,
27:25, 32:10,
33:25, 40:17,
75:23, 86:1,
116:21, 169:1,
169:7
**24**
2:11, 3:21,
5:9, 32:2, 35:7,
38:9, 38:20,
40:8, 40:17,
54:22, 107:8,
187:4, 187:10,
187:15
**25**
2:15, 2:23,

5:14, 27:21,
37:15, 37:24,
38:3, 38:10,
38:12, 38:14,
38:16, 38:21,
39:12, 39:21,
40:5, 40:14,
40:18, 50:3,
50:11, 51:1,
51:2, 51:7,
51:11, 52:17,
52:20, 53:10,
53:11, 53:14,
54:15, 54:23,
55:7, 55:14,
55:20, 57:4,
58:15, 59:14,
61:15, 77:22,
98:15, 108:19,
111:12, 111:19,
112:10, 115:18,
119:23, 149:23,
189:3, 189:12,
204:3
**254**
7:7
**26**
2:9, 5:18,
40:18, 70:22,
71:4, 74:10,
74:12, 74:24,
75:20, 79:11,
79:16, 80:3,
81:11, 83:18,
85:12, 89:20,
104:18, 104:19,
161:6, 161:17,
162:4, 192:14,
192:20
**2600**
7:26
**27**
3:2, 5:22,
40:17, 61:6,
90:25, 162:5,
162:23, 194:5,
194:10
**27240**
157:20

**28**
6:1, 40:17,
117:21, 119:12,
196:18, 196:23,
203:18, 204:8
**29**
2:19, 6:5,
43:2, 44:18,
49:24, 52:7,
117:21, 119:12,
126:2, 199:20,
199:24
**2nd**
118:15, 155:11,
158:16, 159:19,
160:13

**3**

**3-page**
5:22, 194:6
**30**
17:20, 22:15,
31:22, 117:22,
119:12, 119:24,
121:12, 122:17,
167:6
**31**
4:2, 116:23,
117:8, 125:5,
125:25, 129:23,
133:6, 134:20,
134:23, 150:9,
150:14, 150:23,
151:5, 151:18,
152:11, 164:14,
165:23, 198:19
**32**
2:13
**3839**
7:6
**39**
2:17

**4**

**4**
199:5, 201:17
**4-page**
4:14, 5:10,

Transcript of Julie Kelly
Conducted on October 15, 2018                                103

126:14, 187:5
**4000**
7:17
**43**
2:21
**4499**
7:9
**452**
7:19
**45202**
7:28, 119:25
**45244**
10:14
**47**
199:5
**4869**
1:7
**4893**
48:2
**4th**
136:19, 189:16,
189:25, 191:6,
192:24

---
**5**
---

**5**
189:16, 190:5,
190:11, 190:13
**5-minute**
11:12, 85:21,
122:14, 155:4,
187:1
**50**
201:17
**5021**
7:19
**513**
7:29, 48:2
**540**
119:24
**55**
189:16, 190:13
**58**
2:25
**5th**
7:27

---
**6**
---

**6**
31:22, 55:22

**609**
7:19
**61**
3:4
**650**
7:16
**6603**
7:18
**6th**
191:6

---
**7**
---

**7**
31:22
**7-**
204:8
**71**
3:7, 3:10
**72**
160:13, 160:14,
162:2, 164:16
**75204**
7:8

---
**8**
---

**8/2/18**
4:6, 118:9
**803**
7:9
**806**
48:2
**823**
10:13
**89**
3:14
**898**
7:29

---
**9**
---

**9**
72:20
**92**
204:4
**972**
7:9
**9th**
164:9