# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JULIE KELLY,

Case No: 1:19-cv-372

                    Plaintiff,

Cole, J.

    v.

Bowman, M.J.

FIRST DATA CORPORATION, et al.,

                    Defendants.

## REPORT AND RECOMMENDATION

Plaintiff Julie Kelly, proceeding pro se, initiated this action on May 20, 2019 by filing a complaint against her former employer, First Data Corporation, First Data's CEO, her former supervisor at First Data, two law firms that have represented First Data, and two individual attorneys with those law firms. Pursuant to local practice, this case has been referred to the undersigned for initial consideration. For the following reasons, I now recommend that the motions of the two law firms and individual attorneys be granted in full, and that the motion of First Data and its individual employees be granted except as to a single claim against First Data under the Americans With Disabilities Act.[1]

### I.    Standard of Review

#### A.  Rule 12(b)(6) Standard for Motion to Dismiss

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of plaintiff's claims for relief, not to resolve

---

[1]Two groups of Defendants have requested oral argument. (*See* Docs. 19, 22) Having determined that oral argument is unnecessary for disposition, the undersigned denies the Defendants' request.

contested facts or rule upon the merits of the case. *See Klusty v. Taco Bell Corp.*, 909 F. Supp. 516, 519 (S.D. Ohio 1995). To avoid dismissal for failure to state a claim for relief, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the plaintiff need not plead specific facts, her statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197 (2007) (internal quotation marks and citations omitted).

"When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff." *Gadberry v. Bethesda*, 608 F. Supp.2d 916, 918 (S.D. Ohio 2009). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,127 S.Ct. 1955 (2007), the Supreme Court explained that, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*, 127 S.Ct. at 1969. At its outset, however, a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965; *accord Ashcraft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1950 (2009); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation"); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998) ("court need not accept as true legal conclusions or unwarranted factual inferences"). Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 127 S.Ct. at 1965 (citations omitted). While a complaint need not contain "heightened fact pleading of specifics," it must provide "enough facts to state a claim to relief that is plausible on its face" to survive

a motion to dismiss. *Id.* at 1974. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949.

Plaintiff filed her complaint pro se. Such pleadings ordinarily are construed more liberally than those drafted by attorneys. *Erickson v. Pardus*, 127 S. Ct. at 2200 (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Because Plaintiff admits that the complaint was drafted by her attorney in another matter, however, the complaint is not entitled to the same degree of liberal construction afforded to most pro se pleadings. In addition, no matter how liberally a pleading is construed, the Court will neither "conjure up unpled allegations…nor create a claim for Plaintiff." *Rogers v. Detroit Police Dept.*, 595 F.Supp.2d 757, 766 (E.D. Mich. 2009) (internal quotation marks and additional citations omitted).

## B.  Alternative Standard of Review for Summary Judgment

With rare exceptions, the standard of review applicable to a motion to dismiss generally constrains this Court's review to the pleadings and any exhibits attached thereto. Nevertheless, Defendants Jackson Lewis and Attorney Byrne have attached to their motion several exhibits, including an affidavit by Attorney Byrne, and correspondence between attorneys at Jackson Lewis and Plaintiff, which relate to Count VIII of Plaintiff's complaint. (Doc. 17-1). The motion of First Data, Frank Bisignano and Robin Ording, and the motion of Saul Ewing Arnstein & Lehr, LLP ("SEAL") and Cooper, both refer to a separate affidavit of a court reporter who recorded Plaintiff's deposition in another case. (Doc. 20). Acknowledging the limitations of this Court's scope of review under Rule 12, Defendants explain that they are alternatively moving for summary judgment solely as to Plaintiff's claim for eavesdropping/invasion of privacy (Count VIII).

In her opposition to dismissal, Plaintiff urges this Court not to consider matters outside the pleadings.[2]   For the reasons discussed below, the undersigned finds the motion to dismiss to be well-founded on all counts (including Count VIII) without consideration of evidentiary exhibits.   Should any reviewing court disagree, the undersigned alternatively recommends that summary judgment be granted to all Defendants with respect to Count VIII, on the basis of the court reporter's affidavit and the additional affidavit exhibits submitted by Defendants Jackson Lewis and Byrne.

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden

---

[2]Ironically, Plaintiff has attached several exhibits to her response and to her supplemental response in opposition to dismissal.  (Docs. 29, 30).

shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52. To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## II.    Background and Allegations of Complaint

Plaintiff's complaint spans 47-pages and ¶354 paragraphs and includes an additional 188 pages of exhibits. The complaint also explicitly incorporates all records filed in Case No. 1:18-mc-00010. (Complaint at ¶¶199-200). In light of those factors, Plaintiff's complaint cannot be described as a "short and plain statement" of her claims in compliance with Rule 8. Nevertheless, the undersigned considers the totality of the complaint and its exhibits for purposes of the pending motions to dismiss.

Plaintiff began her employment with First Data in 1998. She began working remotely from her home office in Ohio, long before the onset of any alleged disability, in April 2005. (Complaint at ¶¶38, 39, 44). Plaintiff continued to work for First Data until

November 30, 2017.

On December 12, 2012, Plaintiff gave birth to twins. Following that event, she experienced significant post-partum medical issues, both physical and mental. Plaintiff sought treatment, but does not allege that she requested or required any accommodations from her employer. To the contrary, she alleges that she returned to work in March 2013 without any change to her position or responsibilities. However, she has continued to receive medical treatment for the same conditions through the present time. (*Id.* at ¶¶ 46-51).

From August 2014 until November 2016, Plaintiff's direct supervisor was Steven Barger ("Barger"). While still under Barger's supervision, Plaintiff became pregnant again and was advised not to travel by her physician in October 2014. She requested a "no travel" work-from-home accommodation, which was approved by Barger. (*Id.* at ¶65; *see also* Doc. 1-2 at 22, document reflecting approval of limitations "through the duration of high-risk pregnancy).

In January 2015, while Plaintiff was still pregnant, the new CEO of First Data, Frank Bisignano, implemented a policy that required <u>all</u> employees to work from an office location except for those involved in direct sales. The new policy impacted Kelly, who had worked from home for many years. On February 20, 2015, Plaintiff gave birth to a son. (Complaint at ¶¶67-69, 72). Plaintiff again had medical complications including post-partum depression but nevertheless returned to work from her home on April 23, 2015. (*Id.* at ¶¶76-78). Based upon her understanding that she would be required either to work from First Data's Cincinnati office or to resign, Plaintiff wrote a resignation letter to Barger in April 2015 informing him that she would be unable to commute to the Cincinnati

office.[3]  (*Id.* at ¶¶83-84).  Upon receipt of the letter, Barger and Kelly engaged in further talks and Barger approved Kelly's request to continue working from home "as an accommodation."  (*Id.* at ¶¶85-88).

In mid-2016, Kelly experienced additional health issues, for which she was hospitalized.  Barger himself took a medical leave of absence shortly before Thanksgiving 2016, and Defendant Robin Ording took his place as interim supervisor.  On January 17, 2017, Ording announced that Barger had "retired" and that she would take his place permanently.  Kelly later learned that Barger had been terminated the day before he was scheduled to return from leave.  (*Id.* at ¶¶93-95).

In 2017, Ording began enforcing the same no-work-from-home policy that had been put into place two years earlier.  Kelly allegedly advised Ording that she had been able to work from home as a medical accommodation for many years, but Ording denied any continued accommodation.  Around the same time in January 2017, 30% of the sales transformation and training team were terminated as part of a reorganization.  Kelly "feared termination…if again she repeated her request for a work-from-home accommodation." (*Id.* at ¶¶107-109).    Ording began assigning more work to Kelly, including administrative tasks.  (*Id.* at ¶¶118-120).  Kelly advised Ording several times of her various medical conditions.  (*Id.* at ¶123).

In February 2017, Ording promoted Kelly and gave her a raise.  Ording transferred additional job duties to Plaintiff on March 31, 2017.  (*Id.* at ¶125).  Kelly alleges that she continued to perform all assigned duties "while driving 1.5 to 2 hours each way to the

---

[3]The complaint alleges that the letter stated the basis for her decision was "health and family obligations." However, the letter is attached to the complaint as an exhibit and includes no reference to any health concerns.  The Court is not required to accept an allegation that is clearly contradicted by an exhibit attached to the complaint.

Cincinnati office…." (*Id.* at ¶131). On unspecified dates in 2017, Kelly advised Ording of "the difficulties of the situation, over work and hours of commuting" and the negative impact on Plaintiff's health. (*Id.* at ¶132). Kelly also "asked Ording to work-from-home for medical reasons, or allow a schedule allowing some days of at-home work and others in the office, and Ording refused and continued to enforce the office attendance requirement." (*Id.* at ¶134).

In August 2017,[4] former employee Barger filed an employment discrimination lawsuit against First Data and others in the United States District Court for the Eastern District of New York (E.D.N.Y. Case No. 1:17-cv-04869-FB-LB, the "*Barger* case"). Defendant law firm SEAL represents First Data in the New York case.

On October 5, 2017, Kelly suffered chest pains from "heightened anxiety and stress." She told Ording that she needed to go to the ER, where she was evaluated and advised to follow up with her cardiologist. No one notified Kelly of her FMLA rights at that time. (Complaint at ¶¶141-146).

On November 6, 2017, Ording and Kelly had a telephonic meeting during which Kelly alleges she announced her plan to resign due to health concerns. Ording stated that she would talk to HR "to see what First Data could do," which Kelly interpreted as meaning that she would speak to HR about the possibility of a severance package. (*Id.* at ¶148). The next day, Ording announced Kelly's departure during a conference call and stated Kelly would be leaving to focus on her health and family. (*Id.* at ¶149). On November 14, 2017, Kelly formally resigned via email. The email, attached as an exhibit to Kelly's complaint, states in relevant part:

---

[4]Plaintiff's complaint refers to the incorrect year of 2018, but correctly identifies the EDNY Case No. 1:17-cv-4869, which reflects the filing year of 2017. (*Id.* at 162).

After nearly 20 years of successfully achieving goals, projects and leading stellar teams for Frist Data, the change in policies, such as the requirement to work in an office location, have proven prohibitive to my success both professionally and personality [sic]. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the experiences and positive work life balance the company once promoted.

During the past two years, I have done a highly successful job of balancing the demands of First Data with the ever changing deadlines, priorities, teams and projects. With that said, I have also lost many precious hours that could have been dedicated to what means the most, my health and family. Lost time in the countless hours of commuting to a building where a handful of people report in to. After working successfully from home for nearly 10 years, the change First Data made has contributed to my numerous health issues with increased stress, financial constraints and extraordinary burdens on my family.

Through a long, hard, thought out process, and for my health and family, First Data and I must part ways as of November 30th, 2017. …

(Complaint at ¶152; Doc. 1-2 at 43).

The email concludes with a reiteration of Plaintiff's history of "driving results, pristine service dedication and commitment" and a formal request for a severance package "to assist in my transition." *Id.* Plaintiff specifically requests six months' pay, unused vacation time and bonus payouts, plus a payout of previously awarded (but not vested) stock grants. Ording and Kelly spoke about her request for a severance package on November 15, 2017. After that call, during which Ording was "hostile" and suggested the request would be denied due to Kelly's decision to resign, Kelly stopped working and used accumulated leave time until her last day of employment on November 30. (*Id.* at ¶¶154-55).

On November 26, 2017, First Data's counsel included Kelly on a list of individuals likely to have discoverable information in its Rule 26(a) disclosures in the *Barger* case, identifying Kelly has "an employee of First Data who worked with [Barger] in the Training Department, has knowledge of [Barger's] performance as Manager of the Training

Department and may have knowledge regarding the allegations set forth in the [Barger] Complaint." (Case No. 1:18-mc-00010, Doc. 10-1 at 13). Consistent with all other employees and former employees identified on the same list (except for Barger, whose opposing counsel is identified), the Rule 26(a) disclosure indicates that Kelly "may only be contacted through the undersigned counsel." (Complaint at ¶164; *see also* Case No. 1:18-cv-0010, Doc. 10-1 at 12).

Plaintiff was not aware when disclosures were filed in the *Barger* case that she had been listed as a witness and had no contact with First Data lawyers at that time. No First Data lawyer ever told Plaintiff that they were representing her personally. However, in a statement filed in this Court on August 31, 2018, Plaintiff indicates that when she eventually learned that she had been listed as a witness in the *Barger* case and could "only be contacted" through First Data's counsel, she concluded based on her "research" that "this act meant that they were my lawyers in the Barger v. First Data Corporation case." (Case No. 1:18-mc-00010, Doc. 10 at 2).

Soon after her final day of employment, on December 5, 2017, Kelly received a letter from First Data's counsel to "remind" her of post-employment obligations, including a two-year non-solicitation and a one year non-compete agreement. (Doc. 1-2 at 112). Months later, in correspondence directed to First Data's in-house legal counsel dated April 27 and May 3, 2018, Mr. Shearer asserted various claims and stated his intention to file a formal EEOC charge on Kelly's behalf. (Doc. 1-1 at 19, 58-59; *see also* Doc. 1-2 at 97). Through that correspondence, First Data learned that Kelly was claiming employment discrimination and was being represented by the same counsel who was representing Barger.

On or about May 10, 2018, believing Shearer to be representing Kelly, outside

counsel SEAL notified him that First Data intended to depose Kelly as a third-party witness in the unrelated *Barger* case. Shearer immediately responded by accusing First Data of retaliation, but also clarifying that he represented Kelly only in her own EEOC discrimination case, and not in the *Barger* case. (Case No. 18-mc-00010, Doc. 1-1 at 14). Shearer instructed SEAL to serve Kelly directly with any notice of deposition relating to the *Barger* case. (*Id.*)

On May 16, 2018, through Shearer, Kelly dual-filed her formal discrimination charge with both the EEOC and OCRC; she provided a copy to First Data's in-house counsel on May 17, 2018. Plaintiff later amended her discrimination charge to include retaliation claims based upon First Data's actions to depose her in the *Barger* case.

On May 23, 2018, First Data served a third-party subpoena upon Kelly, initially noticing her deposition for June 25, 2018. Consistent with Shearer's correspondence, Plaintiff alleges that her deposition in the *Barger* case was intended for "no purpose other than to harass Kelly for raising her discrimination charges with First Data's in-house legal department a week earlier, and to intimidate Kelly from filing those charges with the EEOC and OCRC." (Complaint at ¶¶170, 179). In May and June 2018, Kelly and SEAL continued to communicate about First Data's intention to depose her, during which time Kelly "indicated her understanding…that SEAL was her counsel" in the *Barger* Case based on First Data's Rule 26(a) disclosures in that case. Kelly questioned why "her lawyers," were seeking to depose her. (*Id.* at ¶181). Plaintiff also "expressed confusion" about the timing of the *Barger* case subpoena and stated her belief that the deposition was in retaliation for her filing a discrimination charge. (*Id.* at ¶182).

On June 6 and/or June 20, 2018, First Data formally denied Kelly's request for a severance package. (Doc. 1-2 at 54-55). In the June 20 letter to Attorney Shearer, First

Data explains that it is denying the request for severance pay "because [Kelly] is not eligible for severance under the Severance Plan, which excludes voluntary resignations." The letter states: "[E]ven if the company accepts as true the claim that your client was forced to resign (which is denied), a constructive termination is also a non-eligible termination reason under Section 7 [of] the Severance Plan." (*Id.*)

Plaintiff alleges that she appeared for a deposition that had been noticed for June 25, 2018 in the *Barger* case but that no one from First Data appeared. On July 3, 2018, she alleges that SEAL violated their "duty to Kelly as her listed counsel in the …Rule 26(a)(1) disclosures" by filing a response opposing Kelly's separate OCRC discrimination charge, and by seeking to reschedule her deposition in the *Barger* case. Kelly alleges that as of July 10, 2018,[5] she still "believed SEAL was representing her as her counsel in the Barger Case," and only learned on July 12, 2018 that First Data's OCRC position was adverse to her. (*Id.* at ¶¶195-196).

On July 18, 2018, Kelly amended her discrimination charge to allege that her summons to testify at a deposition in the *Barger* case and other events "were designed as retaliation against Kelly for raising her charges of discrimination with the OCRC and EEOC." (*Id.* at ¶197).

On July 23, 2018, First Data filed a miscellaneous action in this Court, Case No.

---

[5]Plaintiff's alleged belief that First Data's counsel somehow represented her is undermined by multiple other allegations and the exhibits attached to her complaint, in which she and/or Shearer strongly objected to her being deposed in the *Barger* case and accused First Data of issuing the subpoena as a form of "direct retaliation for" Kelly's own discrimination claims. (*See* Doc. 24-1 at 7; *see also* Case No. 1:18-mc-00010, Doc. 1-1 at 14). Kelly's professed belief is further undermined by other statements to this Court. Nowhere does Kelly allege that any First Data attorney communicated directly that they were representing her personally. To the contrary, exhibits in the record of Case No. 1:18-mc-00010 reflect that First Data's attorneys denied being Kelly's attorney in response to her inquiries. *See also* Case No. 1:18-mc-00010, Doc. 10 at 2 (Kelly's statement that she concluded, based upon her own (mis)interpretation of case law, that being listed on the Rule 26(a)(1) disclosure statement in the Barger case meant that First Data's lawyers represented her personally).

1:18-mc-00010, in order to compel Kelly to comply with the subpoena commanding her to appear for a deposition in the *Barger* case. (*Id.* at ¶199). First Data retained Jackson Lewis and Attorney Matthew Byrne as local counsel in the miscellaneous action. Plaintiff's complaint refers to August 3, 2018 as the first date in which she received communication from Defendant Byrne; namely, his response to her motion to quash the subpoena commanding her third-party deposition. Following an informal telephonic hearing, the undersigned entered a notational order that reflected the parties' agreement for Kelly to appear for her deposition on August 31.

Kelly did not sit for her scheduled deposition on that date. Instead, Kelly filed a pro se motion for protective order on August 31 again seeking to prevent her deposition from occurring. (*Id.* at ¶213). Kelly alleges that when she arrived at the deposition site, she discovered that First Data had brought Ording as its corporate representative, despite Defendants' awareness of "the OCRC Charge against Ording, including stress and anxiety caused by Ording to Kelly." (*Id.* at ¶216). Kelly alleges she left the deposition site "due to Ording's presence" to seek treatment "for anxiety and stress" based upon the "trigger for the re-occurrence" caused by Ording's presence.[6]

First Data responded with a new motion to compel. In turn, Kelly filed a motion to quash, along with a motion seeking a ruling on a motion for sanctions and a motion seeking to obtain electronic filing rights. The undersigned granted the motion to compel and denied several of Kelly's motions on September 19, 2018. (Case No. 1:18-mc-00010 at Doc. 21). Kelly filed objections and additional motions. On October 9, 2018, the

---

[6]The record of Case No. 1:18-mc-00010 reflects that the issue of how Kelly discovered Ording's presence, and whether Kelly actually appeared at the deposition site prior to filing her motion for a protective order, were strongly disputed. First Data submitted evidentiary exhibits that indicate that Kelly filed her motion *before* Ording arrived.

presiding district judge overruled Kelly's objections and affirmed the September 19 Order compelling Kelly to appear. In the same Order, U.S. District Judge Dlott denied Kelly's motion for sanctions, denied Kelly's motion for a protective order, and denied her motion to reconsider the undersigned's denial of electronic case filing rights. (*Id.* at Doc. 29).

Pursuant to the Court's order, Kelly finally appeared for her deposition in the *Barger* case on October 15, 2018 at the U.S. Potter Stewart Courthouse in Cincinnati, Ohio. Counsel for First Data, Gillian Cooper of SEAL, took Kelly's deposition; Ording was again present as First Data's corporate representative. Kelly alleges that the Defendants "brought Ording to the deposition for no purpose other than to continue to retaliate against, harass and intimidate Kelly for bringing her own charges of discrimination against First Data." (Complaint at ¶222). Contrary to the language of the subpoena and this Court's ruling in Case No. 18-cv-00010,[7] Plaintiff alleges that most of her 5-hour deposition "was spent by Cooper seeking information with respect to Kelly's pending OCRC Charge and the events between May 2018 and October 2018 regarding the litigation and events surrounding Kelly's deposition and the Kelly Compel Proceeding." (*Id.* at ¶224). Plaintiff alleges that Attorney Cooper "admitted on the record …that of all the employees that reported to Barger listed on First Data's Rule 26(a)(1) Disclosures…, Kelly was singled out for subpoena, litigation, and deposition *because* she had filed her own charge of discrimination against First Data." (*Id.* at ¶226, emphasis added). She

---

[7]Plaintiff made similar allegations in Case No. 1:18-mc-00010. Defense counsel have repeatedly denied any improper purpose and insisted throughout the miscellaneous proceeding that the deposition was to be limited to the matters at issue in the *Barger* case. The subpoena requiring Kelly to appear in the *Barger* case specifically states that Plaintiff is "not being asked by way of this subpoena or otherwise to produce any documents or communications…relating to the Charge of Discrimination that you filed with the [OCRC]…including but not limited to any communications you have had with the Law Offices of Shawn Shearer, Shawn Shearer, Esq., and/or Brenda Barger regarding [your] Charge of Discrimination." Case No. 1:18-mc-00010, Doc. 8 at 14.

alleges that her deposition "was motivated entirely as a means to retaliate against, harass and intimidate Kelly for bringing her own charges of discrimination against First Data," that the deposition was used "for the improper purpose of discovery in this case…while Kelly was appearing pro se and unrepresented in the Barger Case as a third-party witness…." (*Id.* at ¶¶227-228).

Kelly further alleges "upon information and belief" that First Data's counsel, including SEAL, Cooper, Jackson Lewis and Byrne "surreptitiously" made a video recording of her deposition. (*Id.* at ¶¶ 342-347). All of Plaintiff's claims for retaliation, violations of the Ohio Civil Rights Act, emotional distress and invasion of privacy in this case relate to her deposition in the *Barger* case.

Included among the exhibits to Plaintiff's complaint in this case is a Letter of Determination dated February 19, 2019 from the Ohio Civil Rights Commission, rejecting Plaintiff's allegations of discrimination and retaliation and dismissing her Charge (as amended) after concluding that it is "NOT PROBABLE that [First Data] has engaged in an unlawful discriminatory practice in violation of Ohio Revised Code Chapter 4112." (Doc. 1-2 at 112-113). The OCRC could not substantiate Kelly's claims of retaliation and instead found it "undisputed that throughout [Kelly's] employment she was granted FMLA and reasonable accommodation requests when she presented medical certification." (*Id.*). The OCRC further concluded that Kelly "did not provide [First Data] with medical certification requesting a reasonable accommodation after the 2015 work from home policy took effect." (*Id.*) Plaintiff initiated this federal lawsuit in response to the adverse OCRC determination.

Plaintiff's complaint contains the following claims: FMLA Interference (Count I); ADA Failure to Accommodate (Count II); Title VII and Pregnancy Discrimination Act

(Count III); Retaliation (Count IV); Ohio Civil Rights Act Violations (Count V); Constructive Discharge (Count VI); Emotional Distress Claims (Count VII); Eavesdropping/Invasion of Privacy (Count VIII).

## III. Analysis of Defendants' Motions

### A. Motions to Dismiss by Law Firms and Attorney Defendants (Docs. 17, 22)

Both Defendant Jackson Lewis P.C. and Attorney Matthew Byrne, and Defendant SEAL and Attorney Gillian Cooper, have filed separate motions to dismiss. (Docs. 17 and 22). Because their motions are based upon arguments that apply equally to all attorney Defendants, these two motions are discussed together.[8] For the reasons that follow, the undersigned recommends dismissing all claims against the law firms and individual attorneys, including Counts IV and V (retaliation), Count VII (emotional distress) and Count VIII (Eavesdropping/Invasion of Privacy).

### 1. Retaliation Claims Against the Law Firms and Attorneys (Count IV and Count V)

Plaintiff alleges that all Defendants, including the law firms of Jackson Lewis and SEAL and individual attorneys Byrne and Cooper, are liable under the Americans with Disabilities Act, Title VII and the PDA, and corresponding Ohio Civil Rights Act retaliation provisions, because they retaliated against her by choosing to depose her in her former supervisor's employment discrimination case against First Data. The Sixth Circuit has held that in order to establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate that her "employer" knew of protective activity and that her "employer"

---

[8]The motion to dismiss filed by Jackson Lewis and Byrne further points to their extremely limited involvement as local counsel for First Data in the miscellaneous matter, and the paucity of Plaintiff's allegations against them in this case. (*See, e.g.*, Complaint at ¶¶18-20, 205, 220). Other than noting that the additional arguments by Jackson Lewis and Byrne have merit, the undersigned finds no need to further discuss them.

took adverse action against her.  *Rorrer v. City of Stow*, 743 F.2d 1025, 1046 (6th Cir. 2014).  First Data was Kelly's employer.  By contrast, neither the law firms or the attorneys had any employment relationship with Plaintiff, which arguably defeats her retaliation claims against them.  *See Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

In opposition to dismissal on this basis, Plaintiff cites to language in the statute that prohibits retaliation by any "person," *see* 42 U.S.C. § 12203(a), and argues that the law firms and their attorneys all fall within that broad definition.  However, the statutory reference to "person" must be read in the context of the ADA as a whole as well as in light of interpretive case law.  Although some authority suggests that an individual supervisor might be liable for retaliation, or perhaps a future employer who declines to hire someone who engaged in protected activity during his or her prior employment, no controlling authority holds that an attorney or law firm who is merely *representing* an employer can be held liable for a retaliation claim under the ADA.

Plaintiff relies upon *Arias v. Raimondo*, 860 F.3d 1185 (9th Cir. 2017), in which the Ninth Circuit concluded based upon similar "any person" language in the Fair Labor Standards Act that an attorney could be held liable under that statute's anti-retaliation provision.  In contrast to the Ninth Circuit's decision, however, a panel of the Sixth Circuit expressly rejected *Arias* and reached the opposite conclusion when evaluating the same statutory language.  *See Diaz v. Langcore*, 751 Fed. Appx. 755, 759 (6th Cir. 2018) (holding that an employee may not maintain a retaliation claim against an employer's attorneys).  The undersigned must follow the Sixth Circuit's approach, and is also persuaded by it, as well as by similar conclusions drawn by other courts on this issue. *See generally*, *Hofmann v. Fermilab Nal/Ura*, 205 F. Supp.2d 900, 905 (N.D. Ill. 2002) (holding that plaintiff may not sue former employer's lawyers because they were not her

employer); *Tolar v. Bradley Arant Boult Cummings*, 2014 U.S. Dist. LEXIS 185272 at *21, 2016 WL 12836011 (N.D. Ala. Nov. 18, 2014) (holding that Title VII does not reach conduct allegedly taken by law firm defendant that had no employment relationship with aggrieved party).

The attorneys and law firms also are entitled to dismissal of this claim because the issuance of a subpoena requiring an employee to appear at a deposition is not the type of adverse employment action that can sustain a retaliation claim.[9] *See, e.g., Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp.3d 571, 598 (E.D. Pa. 2017) (holding that issuance of a subpoena is not an adverse employment action); *Wright v. Eastman Kodak Co.*, 550 F. Supp.2d 371, 380 (W.D.N.Y. 2008) (same). This is particularly true here, where the Court previously rejected Plaintiff's allegations of retaliation and of improper purpose when it compelled Kelly to appear for her deposition in the miscellaneous proceeding relating to the *Barger* case. *See, e.g.*, Case No. 1:18-mc-00010 at Docs. 21, 29, denying Kelly's motion for a protective order.

The undersigned declines Plaintiff's invitation to read Ohio's law on retaliation claims more broadly. Plaintiff's Ohio Civil Rights Act retaliation claim is analyzed in the same manner and fails for the same reasons. *See Brown v. Drywall Supply, Inc.*, 305 F. Supp.2d 814, 822 (S.D. Ohio 2004) (holding that the essential elements of a retaliation claim under Ohio law and under the ADA are the same).

### 2. Claims for Emotional Distress (Count VII)

Plaintiff's negligent, reckless, and intentional emotional distress claims against the

---

[9]In her response in opposition, Plaintiff argues that the anti-discrimination provision "does not say anything about an adverse employment action." (Doc. 29 at 15). However, an adverse action has long been held to be a key element of a retaliation claim. *See Blizzard v. Marion Technical College*, 698 F.3d 275, 288 (6th Cir. 2012).

law firms and individual attorneys similarly relate to the Defendants' representation of First Data. Plaintiff alleges that the Defendants are liable for the emotional distress that she suffered when she was compelled to appear for her deposition, based upon the attendance of Robin Ording as the corporate representative for First Data and Jackson Lewis and/or Byrne's sponsorship of the *pro hac vice* admission of Defendant Cooper. (Complaint at ¶¶ 311-314, 318-319). However, pursuant to Ohio law, a claim of negligent infliction of emotional distress is limited to "instances as where one was a bystander to an accident or was in fear of physical consequences to his own person" and there is "cognizance of a real danger." *Sericola v. Johnson*, 98 N.E.3d 874, 880 (Ohio Ct. App. 11th Dist. 2017) (internal quotation marks and additional citation omitted). In the absence of allegations of physical peril, there can be no claim for the negligent infliction of emotional distress under Ohio law. *Doe v. SexSearch.com*, 551 F.3d 412, 417 (6th Cir. 2008). Plaintiff does not allege such physical peril.

In her response in opposition to dismissal, Plaintiff argues that her "stress and anxiety" constitutes sufficient physical peril to support her claim. In support, she points to an allegation that stress and anxiety led her to experiencing "cardiac issues" during her employment on October 5, 2017, long before her deposition was noticed or taken. (Doc. 29 at 20). The alleged "cardiac issue" is far too attenuated to support a negligent infliction of emotional distress claim at the deposition a year later, even if Plaintiff had alleged that the law firms and attorneys had notice of Plaintiff's 2017 ER visit.

Plaintiff further alleges that the law firms and attorneys should have known that she did not attend the August 31, 2018 deposition due to "stress and anxiety attacks that forced me to seek medical attention," and that the Defendants were "aware" that her stress was exacerbated by Ording's presence but "intentionally chose Ording to attend

my depositions because they knew the stress and anxiety that would impose upon me." (*Id.* at 21). Again, Plaintiff's allegations of "stress and anxiety" are insufficient as a matter of law to support a negligent infliction of emotional distress claim. Plaintiff was not a bystander to an accident. Her deposition occurred in the federal courthouse and was compelled by this Court. Plaintiff admits that she was advised that she could contact the undersigned should any issues arise but did elected not to do so despite Ording's presence. The suggestion that a law firm or lawyer involved in the deposition could be liable under such circumstances for the negligent infliction of emotional distress based upon Plaintiff's "stress and anxiety" would require a significant and wholly unwarranted expansion of Ohio law.

For the same reasons, Plaintiff fails to make out a claim for the intentional or reckless infliction of emotional distress against the law firms or lawyers. To establish that claim, Kelly must show that (1) Defendants intended to cause or recklessly caused her serious emotional distress; (2) that the conduct of the law firms and attorneys "was outrageous and extreme beyond all bounds of decency and subsequently can be characterized as utterly intolerable in a civilized community"; (3) that the Defendants' conduct was the proximate cause of Kelly's serious psychic injuries; and (4) that Plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. *Bolandar v. BP Oil Co.*, 128 Fed. Appx. 412, 419 (6th Cir. 2005) (additional citations omitted). "To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Id.* (quoting *Baab v. AMR Services Corp.,* 811 F.Supp. 1246, 1269 (N.D. Ohio 1993)).

The actions of First Data's counsel in obtaining the Order of this Court to compel Kelly's deposition in the *Barger* case cannot establish Plaintiff's claim. Plaintiff's

allegations fall well short of the type of "extreme and outrageous" conduct required. This Court found legal cause to compel Kelly to attend her deposition in the *Barger* case. Neither the pursuit of a motion to compel her attendance, nor counsel's own attendance or conduct, can support an emotional distress claim on the facts alleged.

Plaintiff also cannot rely upon the presence of Ording to establish her claims. Although Kelly had requested that Ording be prohibited from attending the deposition, (*see* Doc. 13 in Case No. 18-mc-00010), this Court did not grant that request. Plaintiff acknowledges that her deposition was scheduled at the federal courthouse in part to accommodate her sensitivities and to allow her to more easily seek judicial assistance for any issues that arose. Plaintiff did not object or otherwise seek judicial intervention, despite Ording's presence, and instead proceeded with her deposition.

In sum, the Defendants are entitled to dismissal of all emotional distress claims because none of Plaintiff's allegations are sufficient to establish any such claim against the law firms or lawyers under Ohio law.

### 3. Claims for Eavesdropping/Invasion of Privacy (Count VIII)

The law firms and lawyers also are entitled to dismissal of Plaintiff's eavesdropping and/or invasion of privacy claims (Count VIII). These claims are based upon Plaintiff's allegations that representatives of First Data attended her *Barger* case deposition by telephone, and that Attorney Gillian Cooper used an iPad during that deposition.[10] Under Ohio law, the prima facie elements of an invasion of privacy claim are:

> The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate

---

[10]The certified court reporter who recorded Plaintiff's deposition filed an affidavit in this case stating that she provided the iPad to Attorney Cooper as part of the Realtime Translation transcription service offered by her court reporting company, by which attorneys may view the testimony of the witness and anyone else speaking at the deposition as the spoken words are being transcribed by the court reporter. (*See* Doc. 20, Affidavit of Court Reporter Lisa Conley Yungblut).

concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

*Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956). Even assuming the truth of all allegations, Plaintiff has not alleged any of these elements. And even if she had, she would not be able to make out a claim because a deposition is not a private activity. Counsel for First Data, Gillian Cooper, announced the presence of First Data's in-house counsel at the start of the deposition and on the record. (Complaint at ¶335). Kelly did not object to their participation.

Plaintiff alleges that a live video recording was created of her deposition without her knowledge. (*Id.* at ¶¶ 337-342). However, the complaint offers few clues as to the basis for this assertion. Plaintiff alleges that she was being listened to and watched during the deposition breaks because she "noticed that the conference line…was never disengaged during the breaks" and because an iPad was left in the room despite the departure of counsel and Ording during breaks. (*Id.* at ¶¶341, 338). The complaint also confusingly alleges that "opposing counsel" listened in on conversations "between Kelly and her attorney in this case," (*id.* at ¶349), even though Kelly proceeds pro se in *this* case.

Plaintiff's response in opposition to dismissal qualifies her allegations by stating: "Privileged conversations between me and Mr. Shearer (who was representing me in my EEOC charge) *could have* occurred and been listened to by First Data employees or First Data lawyers." (Doc. 29 at 23, emphasis added). In other words, Plaintiff concedes she does not know whether she had any "privileged conversations" relating to her EEOC charge (despite her contemporaneous knowledge that the phone line remained engaged), and can only speculate that unknown persons "could have" listened to her conversations

22

during the breaks. Rather than pointing to any factual basis for her claim, Plaintiff hypothesizes that there is no way to be certain of whether anyone was listening or watching "unannounced." (Doc. 29 at 22). She states that it was "upsetting" to learn that she "*possibly* was listened to during my deposition." (Doc. 29 at 22, emphasis added). Aside from the fact that Plaintiff's response significantly retreats from the allegations of her complaint, even if true her allegations would not support an invasion of privacy claim against the lawyers under Ohio law.

Plaintiff further claims that counsel invaded her privacy by failing to announce the telephonic presence of in-house counsel (Poole and Graessr) "on the record." But her complaint alleges the opposite. (Complaint at ¶335). And again, such conduct is legally insufficient to meet the standard for an invasion of privacy under Ohio law because it is not so outrageous that it would cause "mental suffering, shame or humiliation to a person of ordinary sensibilities." *Housh*, 165 Ohio St. 35.

As an alternative to dismissal for failure to state a claim, the undersigned recommends that summary judgment be granted. Consistent with the complaint, the court reporter's transcript reflects that the telephonic presence of First Data representatives Jill Poole and Lori Graesser was announced on the record. The affidavit submitted by the court reporter additionally reflects that the iPad was supplied by the court reporting service solely for the purpose of enabling defense counsel to review a "realtime" transcript of the Plaintiff's testimony, and that no other covert recording or surreptitious streaming occurred.

### 4. Ohio's Litigation Privilege

Defendants argue that Plaintiff's claims are also barred based upon the doctrine of state law litigation privilege. Plaintiff's claims against counsel are based upon "their

representation of First Data in the Barger Case." (Doc. 29 at 15). Ohio's litigation privilege typically is invoked by counsel as a defense against defamation. *See generally, Surace v. Wuliger*, 25 Ohio St. 3d 229, 233-34, 495 N.E.2d 939 (1986); *Hecht v. Levin*, 66 Ohio St. 3d 458, 461-62, 613 N.E.2d 585 (1993). Despite its more common application in the defamation context, the reasoning of the state courts suggests the potential for broader application. Still, Ohio courts do not uniformly bar all lawsuits based upon improper litigation conduct. *See Sutton v. Stevens Painton Corp.*, 193 Ohio App.3d 68, 951 N.E.2d 91 (Ohio Ct. App. 2011) (suggesting a plaintiff might maintain an invasion of privacy or emotional distress claim against a law firm). Instead, "[w]hether the absolute privilege applies is a question of law." *Morrison v. Gugle*, 142 Ohio App.3d 244, 260, 755 N.E.2d 404, 415 (2001). There is no corresponding federal "litigation privilege" and federal courts have declined to adopt one.

Given the lack of controlling case law and the earlier conclusion that Plaintiff's claims against counsel are barred for other reasons, the undersigned declines to reach this issue.

### 5. Defendants' Motion(s) to Strike Plaintiff's "Ghostwritten" Complaint

The law firms and attorneys request that Plaintiff's entire complaint be stricken because it has been "ghost written" by counsel. Plaintiff ostensibly filed her complaint "pro se." However, within the body of her complaint in this case, Plaintiff repeatedly refers to having counsel in <u>this</u> case. (*See, e.g.*, Complaint at ¶¶ 339, 343, 349). She also requests an award of attorney's fees.

Defendants persuasively argue that the references to counsel are to Shawn Shearer. In her response, Plaintiff concedes that Shearer (who is not admitted to practice

in Ohio) drafted the instant complaint on her behalf and forwarded it to her along with his research and the rest of her file after she determined she could not afford to continue to retain him in this case.  (Doc. 29 at 26-27; *id.* at 30 "[e]veryone, including SEAL and Jackson Lewis, knew Mr. Shearer wrote the Complaint.").  Plaintiff insists that she does proceed pro se because she appropriated his "draft" as her own.  She argues that striking the complaint and all of her claims would be "severe punishment" and grossly unfair to those who cannot afford counsel.

The undersigned cannot approve of Plaintiff's representation that she proceeds "pro se" while admittedly using a complaint that was drafted by her attorney in another matter.  At the same time, the Court agrees with Plaintiff that striking the complaint is too severe a penalty for her implicit misrepresentation as to the "pro se" nature of her complaint.  As a more appropriate remedy, the undersigned declines to construe the complaint with the same degree of liberality with which most pro se complaints are viewed.

### B. Motion to Dismiss by Defendants First Data Corporation, Frank Bisignano, and Robin Ording (Doc. 19)

Unlike the law firms and individual attorneys, First Data was Plaintiff's employer. Frank Bisignano is First Data's CEO, and Robin Ording was Plaintiff's direct supervisor. Plaintiff asserts the same retaliation, emotional distress and eavesdropping/invasion of privacy claims against this group of Defendants, along with five additional claims. Although the Defendants are entitled to dismissal of most claims for many of the same reasons discussed above, the undersigned concludes, at this early stage of litigation, that Plaintiff has sufficiently alleged a "failure to accommodate" claim against First Data to proceed to discovery.

### 1. FMLA Interference Claim (Count I)

In Count I of the complaint, Plaintiff alleges that First Data, Bisignano and Ording are liable for "FMLA interference" based upon their failure to advise her of FMLA eligibility for "cardiac issues" that caused her to leave work and go to the emergency room on October 5, 2017. FMLA regulations provide that "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). Plaintiff alleges that she informed Ording on October 5, 2017 that her heart was "racing" and that she needed to go to the emergency room that afternoon. (*Id.* at ¶¶141, 144). She further alleges that Defendants did not notify her of her eligibility for FMLA leave within five days of October 5, 2017.

Defendants persuasively argue that Plaintiff's "interference" claim fails because the complaint includes no allegations that the Defendants had information that would trigger an obligation to provide notice, or that the October 5, 2017 event was an FMLA-qualifying condition. A qualifying "serious health condition" would include an impairment that requires inpatient care in a hospital requiring an overnight stay, or continuing treatment by a healthcare professional that includes a period of incapacity of more than three consecutive days. *See* 29 C.F.R. §§825.114, 825.115. Plaintiff has failed to allege anything about the events of October 5, 2017 that would have put a reasonable employer on notice that her ER visit was for an FMLA-qualifying reason. Although Plaintiff alleges that she reported her heart was "racing" due to "stress" and that she had to leave work early, she does not allege that she was admitted to the hospital, or incapacitated for more

than three consecutive days, or that she was diagnosed with and informed the Defendants of any type of serious health condition that would qualify for FMLA leave. In fact, Plaintiff does not allege that she missed even a single full day of work on October 5 or on any subsequent day.

In opposition to dismissal, Plaintiff protests that Defendants knew of her history of "post-partum medical issues." (Doc. 29 at 4). However, Plaintiff does not allege that she experienced any "heart racing" prior to October 5, 2017. Whether Defendants knew of pregnancy-related complications that Plaintiff experienced in 2012,[11] during her second pregnancy in 2014, and/or immediately following the birth of her son in February 2015,[12] is irrelevant to the Defendants' understanding of the acute "heart racing" issues of which Plaintiff complained in October 2017. Liability for "interference" can arise only if Plaintiff can show that the Defendants had notice of a potentially-qualifying "serious medical condition" under the FMLA. Knowledge of *other* types of medical conditions that Plaintiff may have experienced over the years is not sufficient to put Defendants on notice that new and entirely different symptoms qualified for FMLA leave. Other than Plaintiff's conclusory assertion that her "condition on October 5, 2017 was a serious health condition for which FMLA leave was available," (*id*. at ¶145), the complaint contains no allegations to suggest that the ER visit constituted a new FMLA qualifying condition, or that it related to the FMLA leave taken more than two years earlier. (*See id*. at ¶239,

---

[11]Kelly does not allege that she ever requested *any* FMLA accommodations for any serious medical conditions following her first pregnancy in 2012. To the contrary, she alleges that she was able to return to work without change to her position or responsibilities.

[12]Plaintiff alleges that around October 2014 she alerted her direct supervisor (Barger) to the fact that her obstetrician had ordered "no travel" *during that pregnancy* – an accommodation that Barger approved. (Complaint at ¶¶63-65). She alleges that Barger later approved her request to continue working from home when she returned from maternity leave in April 2015 as an "accommodation" for her "post-partum medical conditions." (*Id*. at ¶ 85).

alleging that Plaintiff took FMLA leave "due to complications during pregnancy and following the birth of a child.").

The only fact that Plaintiff offers to support her conclusory assertion that her "heart racing" was an FMLA-qualifying condition is that she reported to the ER. However, many acute medical conditions, including allergic reactions, cuts requiring stiches, or a fall that warrants x-rays but does not result in broken bones, might require ER treatment but would not necessarily qualify as a "serious medical condition" under the FMLA in the absence of overnight hospitalization or incapacitation for three days or more. Plaintiff argues that this issue can be investigated "during discovery not through dismissal before facts are developed." (Doc. 29 at 4). But a plaintiff is not entitled to discovery when her allegations are insufficient as a matter of law to state any claim. And a plaintiff cannot state a claim merely by spouting legal conclusions without supporting facts. *Iqbal*, 129 S.Ct. at 1949. Thus, in the absence of any allegations that would suggest Plaintiff was experiencing a qualifying FMLA condition on October 5, 2017, much less that Defendants were aware of that "serious medical condition," the Defendants are entitled to dismissal of Plaintiff's FMLA interference claim.

Switching tactics, Plaintiff alternatively argues that her interference claim survives based upon the allegation that "Defendants' practice of terminating employees in mass and while on leave created an atmosphere that discouraged me from exercising my FMLA entitlements." She cites *Presson v. Parkview Med. Ctr., Inc.*, 2017 WL 1197298 (D. Colo. Mar. 30, 2017) as support for the proposition that an interference claim can be stated by showing that an employer provided a strong disincentive or discouraged use of available FMLA leave. As an unpublished trial court case from outside the Sixth Circuit, *Presson* is not controlling. In any event, *Presson* held that "interference claims must have some

direct nexus to an employee requesting, using, or returning from leave." *Id.*, 2017 WL 1197298, at *6. Plaintiff's allegations regarding company-wide lay-offs do not tie those events to any employee's use of FMLA leave, or otherwise suggest any overt or implicit employer hostility to the use of such leave. In fact, Plaintiff alleges that she was granted FMLA leave on other occasions on which she sought such leave. In the absence of allegations of hostility to the use of FMLA leave, Plaintiff's alleged "fear" of upsetting her employer is insufficient to state an interference claim.

Bisignano and Ording further argue that they cannot be held liable for an interference claim as individuals. Having determined that Plaintiff's allegations do not state any interference claim as a matter of law, the undersigned finds no need to review this alternative argument. *But see Shaw v. Total Image Specialists, Inc.*, 2010 WL 11537942 at *3 (S.D. Ohio Mar. 5, 2010) (suggesting that individuals can be held liable under appropriate circumstances).

### 2. ADA Failure to Accommodate (Count II)

In Count II, Kelly alleges that Defendant First Data failed to accommodate her disability by requiring her to work in a First Data office rather than at home.[13] To establish a prima face case for failure to accommodate, Kelly must show: (1) she is disabled under the ADA; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) First Data knew or had reason to know about her disability; (4) she requested an accommodation; and (5) First Data failed to provide a reasonable accommodation. *Aldini v. Kroger Co. of Mich.*, 628 Fed. Appx. 347, 350 (6th Cir. 2015).

### a. Plaintiff alleges sufficient facts to state a claim

---

[13]Plaintiff's "failure to accommodate" claim is alleged only against First Data, and not against any other Defendant. (Doc. 1 at ¶259).

First Data argues that Plaintiff fails to specifically allege that she is an individual with a "disability." However, the complaint does include an allegation that Kelly's "post-partum induced illnesses (depression, anxiety, liver, cardiac) were each a 'disability' ….as they impaired 'major life activity.'" (Complaint at ¶263).   Standing alone,  a single conclusory statement might not suffice to make out Kelly's ADA claim.  But the complaint contains numerous allegations that support Kelly's conclusion that she had some form of ADA "disability," whether that was her post-partum depression or some other "post-partum" medical issue.

Earlier in her complaint Plaintiff alleges that she began working from home in 2005 and continued to work from home both before and after the birth of twins in December 2012 despite "significant post-partum medical issues."   Undermining any claim of disability in 2012 or 2013, she alleges that she "returned to work…in March 2013 without change to her pre-leave position or responsibilities." (Complaint at ¶¶ 48-49).  However, during a second pregnancy on or about October 2014, Plaintiff alleges that her physician ordered her not to travel and she first requested an "accommodation" to continue working from home without travel. (*Id.* at ¶¶63-65).  Around the time that Plaintiff was due to return from her second maternity leave, First Data began to enforce the new no-work-from-home policy.  (*Id.* at ¶80).  Although contradicted by the exhibit  attached to the complaint,[14] Kelly alleges she "wrote a resignation letter identifying the effects on her health from

---

[14]Kelly alleges that the letter informed Barger that she could not commute "due to health and family." (Complaint at ¶85).  However, the letter recites her 17-year history of successful work from her home office without any reference to health concerns.  The letter complains that "the time and costs that it would take to commute into the Blue Ash corporate office…are prohibitive to my success both professionally and personally." (Doc. 1-2 at 109).  First Data points to similar language in Plaintiff's final resignation letter two years later, in November 2018, that calls into question whether Plaintiff sought to work from home as an "accommodation" or for financial and personal reasons.  In the context of the pending motion to dismiss, however, this Court draws all reasonable inferences in Plaintiff's favor.  Unlike the 2015 letter, Plaintiff's 2018 resignation letter includes *some* reference to the adverse effects of commuting on Plaintiff's "health."

complying with this new work-from-office requirement[]" when she returned from maternity leave in April 2015. (*Id.* at ¶83). After discussing "her need for an accommodation for her post-partum depression and other post-partum medical conditions continuing from the birth of her twins and exacerbated by the birth of her son two months earlier," Kelly requested that she be permitted to continue working from home as an "accommodation." (*Id.* at ¶¶85-86). Barger approved that request. (*Id.* at ¶87). First Data argues that Kelly fails to allege that her employer knew or should have known that she had any health condition that required her to work from home. Despite some ambiguity, the undersigned concludes that Plaintiff's discussions with Barger are sufficient to show First Data's knowledge of such a condition in late 2014 and/or early 2015.

Plaintiff alleges that First Data's knowledge continued after Ording became Plaintiff's supervisor. Around January 2017, Ording began enforcing First Data's no-work-from-home policy. (*Id.* at ¶96). Kelly alleges that she "advised Ording that she had been working from home as an accommodation granted by …her prior two supervisors." (*Id.* at ¶99). However, Ording "did not extend the accommodation" and instead "required Kelly to meet the office attendance requirements despite the accommodation previously granted to her." (*Id.* at ¶100). Kelly specifically alleges that "Ording was aware of Kelly's medical condition and request for a work-from-home accommodation," was aware "that Fricke and Barger had granted Kelly a work-from-home accommodation," but "made clear to Kelly that office attendance was required." (*Id.* at ¶¶107-108). Kelly alleges that she "advised Ording several times of her medical condition involving continuing effects of her pregnancies, including anxiety, stress disorders, high blood pressure, non-alcoholic liver disease, among others." (*Id.* at ¶123). She alleges that she "advised Ording of the difficulties of the situation, over work and hours of commuting, were causing her health."

31

(*Id.* at ¶133).  On an unspecified date, Kelly alleges she "again asked Ording to work-from-home for medical reasons, or allow a schedule allowing some days of at-home work and others in the office, and Ording refused and continued to enforce the office attendance requirement."  (*Id.* at ¶134).  Plaintiff reiterates that she "requested that First Data and Ording reinstate her remote work accommodation," but that "First Data and Ording denied Kelly's work-from-home and modified schedule reasonable accommodation requests" despite allowing another non-disabled employee to work remotely.  (*Id.* at ¶¶ 268, 272).

Defendants argue that Plaintiff's "failure to accommodate" claim must be dismissed "because Kelly does not allege any of her medical ailments substantially limited one or more major life activities," and that Kelly "fails to plead facts establishing that First Data knew or should have known she had a disability."  (Doc. 19 at 11).  Considering the above allegations, I disagree.  Construed liberally in the context of a motion to dismiss, the complaint sufficiently alleges that Plaintiff requested a continuing "accommodation" for a disability of which First Data was aware, but that First Data (through Ording) unreasonably denied Plaintiff's request.  Although First Data correctly points out that knowledge of a "medical condition" is not the same as knowledge of a "disability," it is reasonable to infer based on the allegations that Plaintiff is claiming that her medical condition(s) qualified as a "disability" under the ADA and that by previously accommodating the same medical condition(s), First Data was or should have been aware of Plaintiff's need for accommodation.  *See also generally Hostettler v. College of Wooster*, 795 F.3d 844, 853-854 (6th Cir. 2018) (reversing grant of summary judgment, concluding that a genuine issue of material fact existed as to whether the plaintiff's post-partum depression constituted an ongoing disability).

Defendants alternatively argue that the denial of Kelly's request cannot give rise to liability under the ADA because allowing Kelly to work from home was not a "reasonable" accommodation. However, no controlling case law within the Sixth Circuit supports Defendant's view, and *Hostettler* arguably runs contrary to Defendants' contention.

### b. The Timeliness of Plaintiff's Claims

Defendants assert that both the ADA "failure to accommodate" claim and the Title VII/PDA claims are time-barred. Ording became Kelly's supervisor and started enforcing the office policy in January 2017, but Kelly did not file her charge until May 16, 2018. Both the ADA and Title VII require a plaintiff to file a discrimination charge within 300 days after the alleged discriminatory act in deferral states like Ohio. Based upon the May 16, 2018 charge filing date, any conduct prior to July 20, 2017 would be time-barred.

In response to the Defendants' argument that her claims are time-barred, Plaintiff argues that the operative dates include "Ording's failure to grant my <u>repeated</u> requests for the reinstatement of [my] previously revoked accommodation," including at the time of her resignation in November 2017. (Doc. 29 at 31 (emphasis added)). The issue of the timeliness of Plaintiff's ADA claim is close. However, because this limitations issue can be better addressed after some discovery in the context of Rule 56, the undersigned recommends that Defendants' motion to dismiss Plaintiff's "failure to accommodate" claim be denied.

### c. Filing a Complaint Prior to Receipt of EEOC Notice

In addition to the time limitation, the Defendants argue for dismissal on grounds that Plaintiff did not receive a Right to Sue letter from the EEOC before filing this federal case. Plaintiff incorrectly refers to a "Letter of Determination" from the OCRC as a "Right

to Sue" notice. In a Supplement to her memorandum in opposition to dismissal, Plaintiff represents that the EEOC closed its charge based upon the duplicate charge filed with the OCRC. Plaintiff's supplemental memorandum also refers to (and attaches as an exhibit) a Notice of her Right to Sue from the EEOC dated June 18, 2019, reflecting the EEOC's adoption of the OCRC findings. Despite the Notice being dated a few weeks after Plaintiff filed this lawsuit, dismissal would be inappropriate because the receipt of the Notice cured any procedural defect. *Kohn v. GTE North, Inc.*, 754 F.Supp. 563, 570 (S.D. Ohio 1990) (premature filing prior to the receipt of a notice of right to sue will not defeat a plaintiff's claim); *see also Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843 (2019) (holding that Title VII's charge-filing requirement is not jurisdictional).

### 3. Title VII and the Pregnancy Discrimination Act (Count III)

In order to establish a prima facie case under Title VII and the PDA, Kelly must allege that she: (1) is a member of a protected class; (2) was qualified for her job; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *See White v. Baxter Heatlhcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Defendants persuasively argue that Plaintiff fails to state this claim.

In opposition to dismissal, Plaintiff argues that the fact that she is female and qualified for her job is sufficient. It is not. Plaintiff's gender and qualifications satisfy only the first two elements of her claim. Plaintiff also must show that she suffered an adverse employment action because of her pregnancy or gender. Although Plaintiff generally alleges that her medical conditions arose from her 2012 and 2015 pregnancies, she fails to connect any adverse employment action to those pregnancies. In fact, she seems to allege the opposite: that she was granted a "no travel" restriction when she requested it

late in her second pregnancy, and otherwise returned from both maternity leaves without restrictions.  (Complaint at ¶¶49, 79).

In opposition to dismissal, Plaintiff asserts that once Ording began enforcing the January 2015 policy against her in January 2017, she was forced to choose between commuting to the Cincinnati office and resigning.  However, institution of a neutral company-wide policy is not the type of adverse employment decision that can support a claim.  There is no basis to infer that the policy was related to pregnancy or gender.

The undersigned also recommends dismissal based upon Plaintiff's failure to allege and inability to prove the fourth element of her claim, that she was "replaced by a person outside the protected class."  Plaintiff asserts that after she resigned in November 2017, her "job responsibilities were transferred to First Data employees in Europe."  (Doc. 29 at 8).  Plaintiff does not identify whether these employees were male or female. Being physically located in the United States is not a protected class, in part because Title VII protections extend to employees of American companies located in Europe unless the employer can prove compliance with the U.S. law "would cause [the] employer…to violate the law of the foreign country in which such workplace is located." 42 U.S.C. § 2000e-1(b); *see also Wang v. General Motors, LLC*, 371 F.Supp.3d 407, 418-19 (E.D. Mich. 2019).

Plaintiff fails to include any allegations that would give rise to an inference that she suffered an adverse employment action *on the basis of* her gender or pregnancy. Therefore, she has failed to state a Title VII or PDA claim.

### 4.  Retaliation Claims (Counts IV and V)

As discussed, Plaintiff's retaliation claims are based wholly upon the fact that First Data and its counsel scheduled her deposition in the *Barger* case shortly after Plaintiff

notified First Data of her own complaints of discrimination.  In Count IV, Plaintiff alleges:

> 286.  All of the events, litigation, and actions taken by [all Defendants] from May 2018 to October 2018 in connection with Kelly's third-party deposition in the Barger Case were motivated by one or more of the following:  Kelly raising her charge of discrimination to First Data's in-house legal department; Kelly's filing of the charge of discrimination with the EEOC and OCRC; and/or Kelly amending her charge of discrimination being investigated by the OCRC.
>
> 287.  Within less than 10-days, each time Kelly provided notice of her charges of discrimination or filed documents in connection with the charges, the Defendants took prompt action to harass Kelly in the Barger Case;
>
> 288.  The temporal proximity between each of Kelly's actions in pursuing her charges of discrimination under the ADA, Title VII, PDA and OCRA, and the retaliatory action against her with regards to her subpoena, motions to compel, protective orders, and sanction motions, demonstrate clear retaliatory intent.

(Doc. 1, Complaint).

To establish a retaliation claim under the ADA, Title VII, the PDA or Ohio law, an employee must allege: (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.  *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (ADA retaliation); *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (Title VII and Ohio law); A plaintiff "may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Id.*, 703 F.3d at 336 (quoting *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir.2003)); *Blizzard v. Marion Technical College*, 698 F.3d at 288.

Defendants argue that Plaintiff's retaliation claim fails because an employee cannot bring a "retaliation" claim following the termination of an employment relationship.  However, Defendants cite to cases under the Age Discrimination in Employment Act,

which is not a statute upon which Kelly relies. In contrast to the anti-retaliation provision of the ADEA, Title VII's anti-retaliation provision extends to former employees. *See Robinson v. Shell Oil Company*, 519 U.S. 337, 345 (1997).

Defendants' second argument – that none of the alleged actions taken by the Defendants concerning Plaintiff's deposition in the *Barger* case constitutes an "adverse action" – is more persuasive. Although an adverse action under Title VII's anti-retaliation provision is not restricted to the terms and conditions of employment, the adverse action must be of "material" significance and have some nexus to the protected activity. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms"). The magnitude of adverse action required is defined by reference to an objective standard, avoiding "the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id*. at 68-69. Thus, Title VII "prohibits employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. North American Stainless, LP*, 131 S.Ct. 863, 868 (2011) (quoting *Burlington*, 548 U.S. at 68). In the case of a former employee, an adverse action sufficient to support a retaliation claim might include a negative job reference, which would be sufficiently "material" because it could impact prospects of future employment. *See, e.g.*, *Abbott v. Crown Motor Co.*, 348 F.3d at 543; *Taylor v. Geithner*, 703 F.3d at 339; *Bryant v. Central Cmty Health Board*, 2017 WL 1164345, *5 (S.D. Ohio Mar. 29, 2017) (finding a former employer's email to a current employer regarding a plaintiff's work abilities constitutes an adverse action).

Here, Plaintiff fails to allege any "material" adverse action. Plaintiff bitterly complains about the fact that First Data sought to take her deposition as a fact witness in

the *Barger* case. Plaintiff alleges that it was only *after* First Data was notified by her attorney in late April or May of 2018 that she intended to file an EEOC charge that First Data first notified her of its intent to depose her. However, undermining that temporal proximity is the fact that Plaintiff was listed as a potential witness on First Data's Rule 26(a)(1) disclosures long before she engaged in any protected activity, when she was still employed by First Data. Even more critically, being deposed as a witness in an unrelated employment discrimination case is not a materially adverse action that would dissuade a "reasonable worker" from making or supporting a discrimination charge.[15]

Even if being deposed could support a retaliation claim in some hypothetical circumstance that the undersigned does not currently comprehend, Plaintiff cannot possibly make out a retaliation claim in this case based upon this Court's multiple rulings in First Data's favor in Case No. 1:18-mc-00010. In the miscellaneous case, the Court compelled Plaintiff to attend her deposition and denied Plaintiff's motions for a protective order and for sanctions, rejecting Plaintiff's contention that the deposition was for an improper purpose. Plaintiff did not appeal those rulings, which are incompatible with Plaintiff's present retaliation claim. Thus, no viable "retaliation" claim can be stated against First Data for its actions in asserting a legally enforceable right to compel Plaintiff's deposition in the *Barger* case.

Plaintiff argues that additional circumstances surrounding the deposition, including First Data's "no-show" for her first deposition date of June 25, 2018, the motion to compel her to appear for a later deposition date and First Data's opposition to Plaintiff's motions for a protective order, can independently qualify as adverse actions. However, none of

---

[15]The complaint makes clear that Plaintiff was not dissuaded from amending her own existing charge against First Data in order to include new allegations arising from the same alleged "retaliation."

these actions are sufficiently "adverse" under any objective standard, even if the claim were not foreclosed by this Court's prior rulings in Case No. 1:18-mc-00010.

In her opposition to dismissal Plaintiff suggests two more possible "adverse actions" alleged in the background section of her complaint, though not specifically restated as part of her retaliation claims. First, she suggests that her receipt of a post-termination letter from First Data's attorney advising her that she was subject to non-compete and non-solicitation contractual provisions was a sufficiently "adverse action." But surely, First Data's assertion of contractual rights cannot constitute retaliation; otherwise, an employer could never enforce a non-compete agreement against any employee who asserted any type of employment discrimination claim.

Second, Plaintiff suggests that First Data denied her request for severance pay in retaliation for her EEOC charge. That argument is also unpersuasive, because nowhere in the complaint does Plaintiff allege that she was actually entitled to any such benefits. *See E.E.O.C. v. SunDance Rehabilitation Corp.*, 466 F.3d 490, 501 (6th Cir. 2006) (holding that plaintiff suffered no adverse employment action when employer did not pay her the severance benefits, to which she was not otherwise entitled, when she refused to sign a separation agreement).

Having determined that First Data, Bisignano and Ording are entitled to dismissal of Plaintiff's retaliation claims for the reasons stated, the undersigned declines to reach the additional argument that Bisignano and Ording cannot be held liable because they are individuals. *But see Parker v. Strawser Constr., Inc.*, 307 F.Supp. 3d 744, 752 (S.D. Ohio 2018) (suggesting that, under appropriate circumstances, individuals may be held liable for retaliation claims under Ohio law)

### 5. Constructive Discharge Under ADA/Title VII/PDA/OCRA (Count VI)

Defendants argue that Plaintiff's "constructive discharge" claim fails because constructive discharge "is not itself a cause of action." (Doc. 19 at 20). Plaintiff concedes that point in her response. Nevertheless, Plaintiff asserts that she has stated a claim because First Data deliberately created an "intolerable" work environment that forced her to resign. More specifically, Plaintiff alleges that "with respect to the ORA, Title VII, PDA, ADA failure to accommodate, FMLA failure to notify of eligibility, the discriminatory atmosphere created by Ording and First Data, termination of Barger while he was on approved leave of absence, all illegal, made Kelly's working conditions so difficult and unpleasant that resignation was her only choice." (*Id.* at ¶303).

To the extent that Plaintiff is attempting to assert either a separate "retaliation" or a discrimination claim based upon the creation of intolerable working conditions, her allegations fall short of the requisite standard.

> "To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (internal quotation marks and alterations omitted) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (quoting *Moore*, 171 F.3d at 1080).

*See Russell v. CSK Auto Corp.*, 739 Fed. Appx. 785, 794 (6th Cir. 2018) (evaluating construction discharge as an "adverse action" in the context of an FMLA retaliation claim). The type of proof required to show constructive discharge is high. *See Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018); *see also Cleveland v. S. Disposal Waste Connections*, 491 Fed. Appx. 698, 708 (6th Cir. 2012) (disparaging comments isolated to only a few incidents and by a few individuals do not alter working conditions).

To determine whether an employee's working conditions were objectively intolerable, courts consider whether the employee was demoted, had a reduction in salary or job duties, was reassigned to menial or degrading work, or otherwise badgered, harassed, or humiliated. *Russell*, 739 Fed. Appx. at 794-795.

Plaintiff alleges that she quit her job but includes no allegations of objectively "intolerable" conditions that would support the other elements of her claim. Plaintiff does not suggest she was subjected to a pattern of discriminatory comments, or demoted. Instead, Ording promoted her and gave her a raise. Plaintiff complains of no conditions other than the enforcement of an otherwise neutral "no-work-from-home" policy and the allegedly "illegal" termination of Plaintiff's former supervisor, an isolated incident that occurred in early January 2017.[16] Even assuming that the Defendants violated the ADA by refusing to reasonably accommodate Plaintiff's disability, the undersigned finds no authority to suggest that condition would be so "intolerable" as to state a *separate* claim beyond the failure to accommodate claim.

### 6. Emotional Distress and Eavesdropping/Invasion of Privacy Claims (Counts VII and VIII)

For the convenience of this Court, the motion of First Data, Bisignano and Ording has been discussed separately. However, with respect to Plaintiff's claims for the negligent, reckless, and intentional infliction of emotional distress claims (Count VII) and her eavesdropping/invasion of privacy claims (Count VIII), all Defendants are entitled to dismissal on the same grounds. Therefore, for the reasons discussed above, First Data, Bisignano and Ording are entitled to dismissal of these claims.

---

[16]Contradicting her reference to Barger's termination, Plaintiff repeatedly argues that the retaliation against her did not begin until May 2018, long after that event. (*See* Doc. 29 at 13,"[I]t was when I sought counsel that First Data started retaliating."; *see also id.* at 12, "[W]hen my counsel wrote, the retaliation started.").

## IV.     Conclusion and Recommendations

Accordingly, **IT IS RECOMMENDED THAT** the two motions to dismiss filed by the law firms and lawyers (Docs. 17, 22) be **GRANTED IN FULL**, and that the motion to dismiss filed by Defendants First Data, Bisignano, and Ording (Doc. 19) be **GRANTED IN PART**, with all claims to be dismissed against those three Defendants other than Plaintiff's ADA and Ohio law claims against First Data (alone) for its "failure to accommodate" Plaintiff's alleged need to work from home.   Discovery should proceed solely on that claim.   If a reviewing court should disagree with the recommendation to dismiss Plaintiff's claim for eavesdropping/invasion of privacy (Count VIII) under Rule 12(b)(6), the undersigned alternatively recommends that summary judgment be granted to all Defendants on that claim.

_s/ Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JULIE KELLY,

                                                               Case No: 1:19-cv-372

                   Plaintiff,                              Cole, J.
      v.                                                Bowman, M.J.

FIRST DATA CORPORATION, et al.,

                   Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).