Julie Kelly (Pro Se)
823 Dorgene Lane
Cincinnati OHIO 45244
Telephone (513) 806.4893
*jul_kelly@mac.com*

# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JULIE KELLY, an individual | **Civil Case No. 1:19-cv-00372-DRC-SKB** |
| Plaintiff | |
| v. | |
| FIRST DATA CORPORATION, et al., | |
| Defendants. | **RESPONSE AND OBJECTIONS TO REPORT AND RECOMMENDATIONS [35]** |

## **RESPONSE TO MOTIONS ON REPORT AND RECOMMENDATIONS [35]**

I am Julie Kelly, Plaintiff in this case ("Plaintiff") representing myself *pro se*. I filed a Complaint against the Defendants on May 20, 2019 [Docket No. 1]. With respect to the court, please find the following response for each of the VI counts that have been recommended in the Report and Recommendations [Docket No. 35].

### 1. FMLA Interference Claim (Count I)

Plaintiff respects and accepts the courts recommendations regarding count I.

### 2. ADA Failure to Accommodate (Count II)

In response to the courts recommendations please consider the following points and clarification. The work from home accommodations were made clear to all of Plaintiff's superiors, Fricke, Barger, and Ording, during the time of Plaintiff's ADA requirements. It was made clear to these supervisors that accommodations were needed due to chest pain, dizziness, shortness of breath, anxiety, nausea, and post-partum depression and First Data fully supported the work-from-home accommodation as it would result in zero erosion of productivity since the team Plaintiff managed **all** worked either remotely or in different locations. All documentation of medical conditions was supplied to Plaintiff's direct supervisor VP of Sales of Transformation—Steve Barger **and HR Manager—James Britt**. There were several times Mr. Barger would request a call with HR Manger James Britt and Plaintiff to discuss accommodations due to Plaintiff's disability. Mr. Barger often said, "we'll figure this out Julie, let me call James and we'll discuss it with you to make this work". Additionally, to be clear to the court, it was made known to Mr. Barger and HR that the Plaintiff was medically diagnosed on 4/27/2016 as having a diagnosed stress disordered of *Adult Situational*

*Stress Disorder*-ASSD, which by the medical community terminology is the same as *Acute Stress Disorder*-ASD and can lead to *Post Traumatic Stress Syndrome*-PTSD. ASSD is recognized by ADA as a disorder that falls under the ADA act. Medical records from Plaintiff were made available showing the diagnosis dating 4/27/2016, this information was provided to Barger and First Data HR.

To understand ASD please find below an excerpt directly from the ADA.com website on Symptoms of ASD-Acute Stress Disorder, Plaintiff was experiencing all of the below symptoms:

"Symptoms of acute stress disorder typically manifest immediately after a traumatic event. For a diagnosis of ASD to be made, they need to be present for between three and 30 days. People who are affected by ASD tend to experience extreme feelings of terror and helplessness in reaction to the trauma and may develop psychological and physical symptoms.

The physical symptoms are typically caused by stress hormones such as adrenaline (epinephrine) and an overactivity of the nervous system. They may include:

- **Palpitations, i.e. a pounding heart**
- **Difficulty breathing**
- **Chest pain**
- Headache
- Stomach pain
- Nausea
- Sweating

**Many of the symptoms of ASD are almost identical to those of PTSD**. However, a diagnosis of PTSD will only be considered if the symptoms persist for more than 30 days or first appear more than one month after the trauma has occurred. Though many people who are diagnosed with ASD do not go on to develop PTSD, it is thought that having the

former may increase a person's risk of developing the latter. A prompt diagnosis of ASD can help people manage the condition and reduce the risk of them developing PTSD."

Reference www.ada.com

**Revocation of Accommodation**

During the period of October 2014 through November 2017, Plaintiff was disabled for purposes of the ADA. Plaintiff continued to perform the essential functions of her job with an accommodation exempting her from the no work-from-home policy that served no purpose in her situation where as there were no First Data employees that she interacted in the Cincinnati office and through the entirety of her nearly 20-year career at First Data she worked remotely.

Plaintiff's accommodation was not an undue burden on First Data. Plaintiff had been performing her functions remotely for a decade with no performance issues.

When Ms. Ording revoked Plaintiff's accommodation disability conditions worsened.

**Failure to Engage in Interactive Process**

The clearest evidence of First Data's and Ms. Ording's animus against the disabled can be seen in this very simple example.

After Plaintiff's son was born in February 2015, and she returned to work, First Data began enforcing its policy against working from home, even if work in the office was not an essential function of the job. In response to this policy's impact on her health, Plaintiff wrote to her then supervisor, Mr. Steve Barger, by e-mail on May 12, 2015:

> "Steve,
> After 17 years of successfully achieving projects, goals and requirements working from a home office, the time and costs that it would take to commute into the Blue Ash

> corporate office (Cincinnati, OH) are prohibitive to my success both professionally and personally. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the positive work life balance the company once promoted. While inevitable, receiving this news so shortly after returning from maternity leave has been quite disheartening.
>
> My position does not require daily interaction with others face to face and will not change once in the Cincinnati, OH location. Moving toward a more virtual learning environment is a must for a company of this size and will only continue to be a priority. This has been a leadership quality I have excelled at bringing to the company working from a remote office."

In response to this e-mail, Mr. Barger, a veteran manager nearly 70 years old, instinctively knew that the loss of Plaintiff's talent was a loss to First Data and to his team. Mr. Barger responded to Plaintiff's notice of resignation by engaging her in an interactive process to discuss her disabilities arising from her two difficult pregnancies. Because of these conversations and interaction, Mr. Barger along with HR Manager James Britt made the managerial decision to allow Plaintiff to continue to work in the same manner in which she had been working for years as a reasonable accommodation and Plaintiff did not resign and continued to provide her recognized skills and performance to First Data. Mr. Barger did exactly what a manager should do when receiving an e-mail such as the one he received from Plaintiff in May 2015. He engaged in an interactive process to discuss her concerns and made appropriate and reasonable accommodations to address his employee's disabilities.

Ms. Ording's conduct just over two years later stands in stark contrast to the actions of Mr. Barger. When receiving a nearly identical e-mail, **but with even more indication of disability issues**, Ms. Ording responded 180 degrees opposite of the manner in which Mr. Barger responded.

In late 2016, Ms. Ording revoked Plaintiff's reasonable accommodation provided by her prior two managers and was requiring office attendance. Plaintiff discussed and made clear to Ms.

5

Ording the health-related issues she was having including chest pain, dizziness, shortness of breath and ASSD-Stress Disorder, Ms. Ording showed no interest or compassion with regard to these medical issues and simply stated "she would make sure every employee now worked out of an office or be terminated." Then, on November 14, 2017, by e-mail, Plaintiff expressed the very same issues to Ms. Ording that she had expressed to Mr. Barger. In fact, her request of Ms. Ording was even more direct than that received by Mr. Barger two years earlier. Plaintiff directly indicated to Ms. Ording that the stress and her health were an issue and felt forced to resign for the sake of avoiding the stress that she was under physician's care to treat and the impact on her health.

On November 14, 2017, Plaintiff informed Ms. Ording the following (compare to the May 2015 e-mail to Mr. Barger – the two are nearly identical, other than the inclusion of a blatant appeal to health and stress issues included in the e-mail to Ms. Ording):

> "Robin,
>
> After nearly 20 years of successfully achieving goals, projects and leading stellar teams for First Data, the change in policies, such as the requirement to work in an office location, have proven prohibitive to my success both professionally and personality. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the experiences and positive work life balance the company once promoted.
>
> During the past two years, I have done a highly successful job of balancing the demands of First Data with the ever-changing deadlines, priorities, teams and projects. With that said, I have also lost many precious hours that could have been dedicated to what means the most, **my health** and family. Lost time in the countless hours of commuting to a building where a handful of people report in to. After working successfully from home for nearly 10 years, **the change First Data made has contributed to my numerous health issues with increased stress**, financial constraints and extraordinary burdens on my family."

Unlike Mr. Barger, Ms. Ording, when faced with an obviously direct request for an accommodation, chose a completely different route than Mr. Barger. Rather than engage in an interactive process with Plaintiff as Mr. Barger did, Ms. Ording gladly accepted Plaintiff's

resignations and laughed, literally laughed, at Plaintiff's request for severance. Ms. Ording has no tolerance for disabilities or health issues within her organization.

It seems inconceivable, but it is a fact, that Ms. Ording, a 30-year plus human resources professional, is numb and oblivious to the requirements of the ADA as it applies to disabilities arising out of pregnancy complications and Adult Situational Stress Disorder.

Ms. Ording has testified that over her entire 30-year HR career, not a single employee of hers has requested a reasonable accommodation for a disability and, correspondingly, she has testified that she has never granted an employee's reasonable accommodation request. It is unfathomable that over 30-years managing employees at huge institutions like Citi, Chase, and First Data, Ms. Ording never had an employee request an accommodation. A perfect example of such a request is Plaintiff's November 14, 2017. Ms. Ording clearly does not know what a reasonable accommodation looks or sounds like, and Ms. Ording has no sensitivity to an issue that should be top-of-mind of any human resources professional. Ms. Ording is, frankly, incompetent, to be a manager in the field of human resources.

The obvious explanation of Ms. Ording's testimony that she has never received an accommodation request is that (i) Ms. Ording does not comprehend the concept of accommodating disabled employees in a manner that is reasonable and that is not an undue hardship on the employer, and (ii) the atmosphere at First Data is such that Ms. Ording's blind adherence to the enforcement of the no-work from home policy outweighs the legal requirement to accommodate disabled employees. Plaintiff had discussed her conditions many times, at a high level, with Ms. Ording. As a 30-year career professional, Ms. Ording should have heard these discussions as a cue to begin an interactive process to discuss accommodations. Ms. Ording was tone deaf to the signals. Then, when Ms. Ording received Plaintiff's "resignation" e-mail, as

a career HR professional, she should have seen the obvious request for an accommodation. Ms. Ording again was tone deaf and instead of seeking accommodations, laughed at Plaintiff and accepted the resignation.

Mr. Barger was sensitive enough to realize that Plaintiff's attempted resignation in 2015 was a request for an accommodation (even though that request hardly mentioned health issues). Mr. Barger properly discussed the issue with Plaintiff and made an exception to the no work from home rule as an accommodation. From that time forward, Plaintiff received outstanding reviews of her work and commitment to First Data, including outstanding reviews and financial rewards from First Data's EVP of HR. Plaintiff's performance over a 10-year period under prior supervisors was unblemished.

Ms. Ording, on the other hand, upon taking Mr. Barger's supervisory position, revoked the accommodations Plaintiff's prior managers and HR had granted, she did this in the face of many requests and pleadings by Plaintiff. Prior to submitting the resignation letter to Ms. Ording they had a number of conversations about the health issues Plaintiff was having and Plaintiff informed Ms. Ording she felt she was being forced to resign due to these medical conditions. Ms. Ording was callus to the health challenges Plaintiff was dealing with, even though in Oct 2017, 1-month prior Plaintiff was admitted to the ER for chest pains, and "chest pain" was communicated to Ms Ording and to the ER doctors, it was much more than a "racing" heart, it was shooting pain and the ER reports do state that clearly. Ms. Ording, when faced with a request for an accommodation (nearly identical, but more direct on health and stress issues, to that received by Mr. Barger), did not engage in an interactive process and merely accepted the resignation, laughed at Plaintiff's request for severance.

Ms. Ording's actions were a violation of the ADA, PDA, Title VII. There is no excuse. When faced with a request for an accommodation like Plaintiff's on November 14, 2017, Ms. Ording intentionally chose to ignore the law (she is a 30-year HR professional trained and aware of the law and has decades of experience).

Ms. Ording was more interested in keeping her bosses happy through cost controls and terminations within her group than she was listening to an employee's request for a serious health related accommodation. Ms. Ording knew better and is trained in HR. Ms. Ording bragged about her cost cutting and created an atmosphere of fear for job loss to control her employees. Plaintiff attempted to subtly raise her disability issues in this hostile atmosphere.

The EEOC states the following: "In its 1999 *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (revised 10/17/02)*, the Equal Employment Opportunity Commission said that allowing an individual with a disability to work at home may be a form of reasonable accommodation. **The Americans with Disabilities Act (ADA) requires employers with 15 or more employees to provide reasonable accommodation for qualified applicants and employees with disabilities**. In addition, the ADA's reasonable accommodation obligation, which includes modifying workplace policies, **might require an employer to waive certain eligibility requirements or otherwise modify its telework program for someone with a disability who needs to work at home. Changing the location where work is performed may fall under the ADA's reasonable accommodation requirement of modifying workplace policies, even if the employer does not allow other employees to telework. The individual does not need to use special words, such as "ADA" or "reasonable accommodation" to make this request, but must let the employer know that a medical condition interferes with his/her ability to do the job**. The

9

individual must explain what limitations from the disability make it difficult to do the job in the workplace, and how the job could still be performed from the employee's home. The employer may request information about the individual's medical condition (including reasonable documentation) if it is unclear whether it is a "disability" as defined by the ADA."

**Response to The Timeliness of Plaintiffs claims:**

Resignation was submitted Nov 14, 2017 claim was filed May 16, 2018 which is 182 days and falls in the 300 day window requirement. The majority of ADA accommodation denials took place in October and November of 2017 well within the 300 day window.

**In Summary:**

To establish a prima face case, Plaintiff has clearly met the 5 requirements the court and the ADA have outlined and requested, they are the following:

1. **Must show Plaintiff was considered disabled under the ADA:**

    Plaintiff provided documentation to First Data supervisor and HR Manager and was granted an accommodation in April of 2015 for complications related to a difficult pregnancy and post-partum depression. During this already approved accommodation the ASSD was diagnosed in April 2016 and Plaintiff was hospitalized with shooting heart pain in June of 2016 due to the ongoing condition she was suffering. *Adult Situational Stress Disorder* is recognized by the ADA as cause for an accommodation, Plaintiff has conclusively proven her disability based on the ADA definition and acceptance of Adult Situational Stress Disorder as a condition meeting ADA requirements.

2. **Demonstrate Plaintiff was qualified for her position, with or without reasonable accommodations:**

Plaintiff was given the highest ratings and recognition from all supervisors for 19 years and even Ording gave Plaintiff a promotion. Her qualifications were excellent and never wavered, this is not in dispute.

3. **First Data knew or had reason to know about her condition and disability:**

It was made crystal clear and well documented with all supervisors and HR of Plaintiff's medical ADA condition and accommodations, this was communicated clearly to Ms. Ording, and all HR related documents were available to Ording when she became Plaintiff's supervisor.

4. **She requested an accommodation:**

She requested formally through her direct supervisor Steve Barger and First Data HR Manager James Britt and the Plaintiff was given an accommodation by Barger, this is not disputed. Numerous accommodation requests were made to Ording after her forced compliance with the non-work-from-home policy. In addition, accommodation requests were made clear after the ER event in Oct 2017, in discussions with Ms. Ording leading up to the filing of the resignation letter, and within the resignation letter itself.

5. **First Data failed to provide an accommodation.**

It is clear and not in dispute that Ording would not recognize this accommodation even with formal approvals already in place by her predecessor and HR Manager, with many requests directly to Ording by Plaintiff, and with the medical symptoms becoming more severe as the work environment became "toxic and unhealthy" with Ording in charge.

To establish a *prima facie* case of failure to accommodate under the ADA or PWDCRA, a Plaintiff must show that: 1) she is disabled within the meaning of the act, 2) she is otherwise qualified for the position, with or without a reasonable accommodation, 3) her employer knew or

had reason to know about his disability, 4) she requested an accommodation, and 5) the employer failed to provide the reasonable accommodation. *Johnson v. Cleveland City School Dist*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). **Once a Plaintiff establishes these elements, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer."** *Id*. **at 983**

The Plaintiff has clearly established a prima facie case of failure to accommodate by meeting all 5 requirements of the ADA statute. It is also clear that based on over 10 years of work-from-home while receiving exceptional reviews and promotions, the accommodation request was proven that it would not pose a hardship to First Data. The environment of disdain for disabilities at First Data had created an atmosphere where resignation outweighed continuing to work in such an environment. Plaintiff was constructively discharged in direct violation of the ADA.

3. **Title VII and the Pregnancy Discrimination Act (Count III)**

Plaintiff respects and accepts the courts recommendations regarding count VI.

4. **Retaliation Claims (Count IV and V)**

With respect to the courts recommendation about retaliation claims IV and V, Plaintiff would ask the court to consider the fact there was never a non-compete signed by the Plaintiff or in place with First Data pertaining to the Plaintiff. First Data's legal counsel sent a threat of retaliation if the Plaintiff violated a fictitious and not existing non-compete, when there was never a non-compete in place. When the Plaintiff responded to Ms Graesser's letter requesting proof of said

non-compete, Ms Graesser never responded and never provided this proof leaving the Plaintiff in a difficult situation with the threat of legal action against her if she pursued employment within her known industry. Plaintiff is not asserting that an employee cannot pursue contractual rights agreed and signed to by their employee, but that is not the case here. Defendant intentionally made erroneous threats when stating "In connection with your employment you signed a legally binding agreement" which is an intentionally false statement, and the threat of retaliation is clearly stated as "If you ignore this letter and violate your contractual obligations to First Data, the company reserves the right to pursue all of its legal rights against you, including suing you for judgement relief and monetary damages." Plaintiff would concede this point with the defendant providing the simple truth of a signed contract by Julie Kelly, but no such contract exists. Therefore, with respect to the court, this should be viewed as clear retaliation against an employee.

   5.  **Constructive Discharge under ADA/Title VII/PDA/OCRA (Count VI)**

Plaintiff respects and accepts the courts recommendations regarding count VI.

   6.  **Emotional Distress and Eavesdropping / Invasion of Privacy Claims (Count VII and (VIII)**

Plaintiff respects and accepts the courts recommendations regarding count VII and (VIII).

**Conclusion and Recommendations**

Plaintiff respects and accepts the courts recommendations that the two motions to dismiss filed by the law firms and lawyers (Docs. 17, 22) be **GRANTED IN FULL**, and that the motion to dismiss filed by Defendants First Data, Bisignano, and Ording (Doc. 19) be **GRANTED IN PART**, with all claims to be dismissed against those three Defendants other than

Plaintiff's ADA and Ohio law claims against First Data (alone) for its "failure to accommodate" Plaintiff's work from home request and Retaliation Claims unless defendant provides simple truth of a signed contract by Plaintiff. Discovery should proceed on those claims.

DATED: March 6, 2020

                                                      Respectfully Submitted,

                                                      /s/ Julie Kelly
                                                      Julie Kelly, Plaintiff (Pro Se)