**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**JULIE KELLY,**

**Plaintiff,**

**v.**

**FIRST DATA CORPORATION, *et al.*,**

**Defendants.**

**Case No. 1:19-cv-372**
**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Stephanie Bowman**

**OPINION AND ORDER**

This cause comes before the Court on Plaintiff Julie Kelly's Objection (Doc. 42) to Magistrate Judge Stephanie Bowman's Report and Recommendation ("R&R") (Doc. 35) recommending that this Court dismiss seven of Kelly's eight claims. In Kelly's Objection, she "respects and accepts" the R&R's recommendations as to five of the seven claims that the R&R recommends dismissing. Accordingly, Kelly objects only to the R&R's recommended dismissal of two related claims for retaliation, and the Court thus limits its analysis to those two claims. For the reasons discussed below, the Court **OVERRULES** Kelly's Objection (Doc. 42), **ADOPTS** Magistrate Judge Bowman's R&R (Doc. 35), and accordingly **DISMISSES** seven of Kelly's claims, leaving her to proceed on her failure to accommodate claim under the Americans with Disabilities Act (the "ADA")(Count II of Kelly's Complaint).

**BACKGROUND**

This action arises from various disputes between Kelly and her former employer, Defendant First Data Corporation ("First Data"), which is one of the seven

defendants against whom Kelly has asserted claims here (collectively "Defendants"). Although Kelly has set out her allegations at length in a 354-paragraph Complaint (Doc. 1), the Court need focus on only a specific portion of those allegations that relate to her retaliation claims, as Kelly limits her Objection to that precise part of her Complaint. As to the remaining allegations and claims, Magistrate Judge Bowman's R&R nicely summarizes and resolves the parties' arguments relating to those disputes. Because the parties did not object to Magistrate Judge Bowman's findings on these issues, they are irrelevant to the Court's undertaking here.

More specifically, in her R&R, Magistrate Judge Bowman recommended that the Court dismiss seven of Kelly's eight asserted claims, leaving Kelly to move forward only on her claim that First Data failed to accommodate her disability, thereby violating the ADA (Count II). And, as for the seven counts that the R&R recommends dismissing, Kelly's only objection is that the R&R allegedly did not consider certain evidence relating to her retaliation claims (Counts IV and V). While the Court has an obligation to review the R&R *de novo*, the obligation extends only to the portion of the R&R to which Kelly has properly objected. *See* Fed. R. Civ. P 72(b). Thus, the sole issue currently before the Court is whether the R&R erred, for the reasons that Kelly raises in her Objection, in concluding that those two retaliation claims should be dismissed. That being said, while the issue before the Court is narrow, a summary of the underlying allegations is necessary to provide context to Kelly's claims and objection.

**A. Relevant Factual Allegations As Kelly Pled In Her Complaint.**

Kelly began working for First Data in 1998. During the seventh year of her employment there, in April 2005, Kelly began working remotely from home. (Kelly's Compl. at ¶¶ 38, 39, 44, #6–7). Nearly a decade later, in January 2015, First Data implemented a policy that required all employees to work at an office location, except for those employees involved in direct sales. (*Id.* at ¶ 67, #9). This new policy would have required Kelly to work in First Data's office, unless she needed and obtained a work-from-home accommodation. (*Id.* at ¶ 68, #9). After Kelly began experiencing medical complications in February 2015 as a result of giving birth to her son, Kelly contacted her direct Supervisor, Steven Barger, to request that First Data permit her to continue working from home as an accommodation. (*Id.* at ¶¶ 42, 62, 72, 85–86, #6, 8, 9, 11). Barger approved Kelly's request. (*Id.* at ¶ 87, #11).

About a year later, though, in mid-2016, Kelly experienced additional health issues and was hospitalized. (*Id.* at ¶ 90, #12). Kelly continued to perform her work remotely during this time, as Barger had granted her additional permission to do so. (*Id.* at ¶ 91). Then, Barger himself also began to experience health issues. "Approximately a week before Thanksgiving of 2016, Barger went on leave of absence to recover from cancer surgery[,] and [Robin] Ording was announced as the interim leader of Kelly's sales training group." (*Id.* at ¶ 92). A month later, "[i]n late[-]December 2016, Barger advised Kelly that he would be returning from leave in mid-January 2017." (*Id.* at ¶ 93). On January 17, 2017, however, First Data's Executive Vice President of HR held a teleconference meeting with the sales training group, including Kelly, and announced that Barger had retired and that Ording would

become the permanent leader of that group. (*Id.* at ¶ 94). A few days after the January 17th call, though, Kelly learned from Barger that he had not in fact retired, but instead that First Data had terminated him just prior to when he was scheduled to return from leave. (*Id.* at ¶ 95).

Soon after Ording assumed leadership of the sales training group in January 2017, she began to enforce the in-office policy. (*Id.* at ¶ 96, #13). As a result of that policy change, Kelly began working in First Data's Cincinnati office, which required Kelly to drive an hour-and-a-half to two hours each way for work. (*Id.* at ¶ 131, #16). Kelly notified Ording of the difficulties that she experienced because of her commute, including resulting health problems. (*Id.* at ¶ 133, #17). Kelly also asked Ording for accommodations, which included permission to work from home on either a full- or part-time basis. (*Id.* at ¶ 134, #17). Ording refused and continued to require that Kelly abide by the in-office attendance policy. (*Id.*). So, by that time (mid-2017), Kelly had become fearful for her job, as she believed Ording had reacted harshly to Kelly's requests for accommodation. (*Id.* at ¶ 140, #18).

Around that time, in August 2017, Barger sued First Data and six of its employees in federal court in New York.[1] (*Id.* at ¶ 162, #21).

[1] In Kelly's Complaint, Kelly asserts various claims about the timing of her resignation as it relates to certain activity in the *Barger* litigation. Upon a cursory review of her Complaint, though, several dates that Kelly provides conflict with some of her other allegations. For example, Kelly states that Barger filed suit against First Data in August 2018, yet Kelly then accurately lists the case number for that action (i.e., 1:17-cv-4869), which indicates that Barger sued First Data in 2017, rather than 2018. (Kelly's Compl. at ¶¶ 162, 164). Consistent with that determination, Kelly asserts that First Data sent its Initial Rule 26(a)(1) Disclosures in the *Barger* action on November 26, 2017. (*Id.* at ¶ 164). Based on the totality of Kelly's allegations, then, the Court construes those relevant dates as follows: Barger filed his lawsuit against First Data in August 2017 (*compare id.* at ¶ 162), Kelly sent her

A few months later, on October 5, 2017, Kelly began experiencing chest pains, heightened anxiety, and stress; so she went to the emergency room. (*Id.* at ¶¶ 141–42, #18). The physicians who treated Kelly concluded that the stress, anxiety, and overall pressure that Kelly had experienced because of her daily commute to and from work at First Data's office was exacerbating medical conditions related to her previous pregnancies. (*Id.* at ¶ 142, #18).

A month after Kelly received treatment for her health concerns, on November 6, 2017, Kelly called Ording for a one-on-one, manager-employee meeting to discuss Kelly's health conditions and her employment status at First Data. (*Id.* at ¶ 148, #19). During that meeting, Kelly told Ording that she had to resign from her position, given that the required commute was negatively impacting her health. (*Id.*).

The next day, on November 7, 2017, Ording held a conference call with her team, during which she announced that Kelly was leaving First Data to focus on her health and family. (*Id.* at ¶ 149, #19). A week later, on November 14, 2017, Kelly emailed Ording a resignation letter stating that she planned to leave First Data after 19 years of employment there because of her health issues, as well as First Data's refusal to accommodate her regarding her work-from-home requests. (*Id.* at ¶ 150, #19). After Kelly talked to Ording on the phone the next day about a possible severance package, Kelly stopped working and used her paid leave until her last official day as an employee at First Data on November 30, 2017. (*Id.* at ¶ 155, #20).

---

resignation email to her supervisor at First Data on November 14, 2017 (*compare id.* at ¶¶ 150, 165), and First Data submitted its initial disclosures in the *Barger* lawsuit on November 26, 2017 (*compare id.*).

While Kelly was taking that leave—and thus still a First Data employee—counsel for First Data submitted its initial disclosures for the Barger action to opposing counsel in that case on November 26, 2017. (*Id.* at ¶ 165, #22). In those disclosures, First Data listed ten First Data employees, including Kelly, who had worked with Barger and who had knowledge of his performance as a manager there. (*Id.* at ¶¶ 165, 289, #22, 38). First Data included Kelly as a possible witness, she says, even though First Data knew that Kelly's last day working for the company was only four days later. (*Id.* at ¶ 165, #22). And nine days after First Data submitted those initial disclosures, i.e., on December 5, 2017, which was also five days after Kelly's employment at First Data had officially ended, counsel for First Data sent Kelly a letter stating that, despite Kelly parting ways with First Data, she still owed post-employment obligations to the company, particularly that she must comply with a two-year non-compete agreement. (*Id.* at ¶ 158, #20–21). First Data further stated in the letter that, "[i]f you ignore this letter and violate your contractual obligations to First Data, the Company reserves the right to purse all of its legal rights against you, including suing you for injunctive relief and monetary damages." (*Id.* at Ex. E, Doc. 1-2, #124). As Kelly was unaware of any agreement that she had ever entered containing such restrictions, she responded to First Data and requested that its counsel send her any documents relevant to her alleged obligations. (*Id.* at ¶ 160, #21). Kelly never received a response to her request. (*Id.*).

On April 27, 2018, and again, on May 3, 2018, Shearer, the attorney representing Barger in his lawsuit against First Data—and who, by that time, had

become Kelly's attorney, as well—sent demand letters on Kelly's behalf to First Data alleging that First Data had discriminated against Kelly. (*Id.* at ¶ 168, #22). A week after Shearer had sent the second demand letter, counsel for First Data in the *Barger* action notified Shearer on May 10, 2018, that First Data planned to depose Kelly as a third-party witness regarding that case. (*Id.* at ¶ 169, #22). In Kelly's view, First Data's intention to depose Kelly for the *Barger* case "served no purpose other than to harass [her] for raising her discrimination charges with First Data's in-house legal department a week earlier, and to intimidate Kelly … from filing those charges with the [Equal Employment Opportunity Commission ("EEOC")] and the [Ohio Civil Rights Commission ("OCRC")]." (*Id.* at ¶ 170, #22). That alleged plan did not work, though, as less than a week later, on May 16, 2018, Kelly filed a Charge of Discrimination with both the EEOC and OCRC. (*Id.* at ¶¶ 2, 172, #2, 23)

A week after that, on May 23, 2018, First Data served Kelly a third-party subpoena to appear for a deposition in the *Barger* action. (*Id.* at ¶ 173, #23). As of that date, Kelly alleges, the parties in the *Barger* action had not yet conducted any depositions, nor scheduled any depositions. (*Id.* at ¶ 178, #24). As Kelly puts it, First Data decided to single her out because she had recently charged the company with discriminating against her. (*Id.* at ¶ 179, #24). To support her contention, Kelly alleges that in the *Barger* action, although First Data listed more than ten then-current or former employees as potential witnesses, Kelly was the only one (other than Barger) who First Data deposed throughout the case's entire discovery process. (*Id.* at ¶ 180, #24).

Based on this core set of allegations, as well as others that are irrelevant here, Kelly asserted the following eight claims in her Complaint: (1) interference in violation of the Family and Medical Leave Act; (2) failure to accommodate in violation of the Americans with Disabilities Act ("ADA"); (3) discrimination in violation of Title VII, as amended by the Pregnancy Discrimination Act; (4) retaliation in violation of Title VII and the ADA; (5) retaliation in violation of the Ohio Civil Rights Act ("OCRA"); (6) constructive discharge; (7) intentional infliction of emotional distress; and (8) eavesdropping/invasion of privacy. (*See generally* Compl.). For the reasons already discussed above, only Kelly's retaliation claims (Counts IV and V) are relevant here.

**B. Magistrate Judge Bowman Recommended That This Court Dismiss Kelly's Retaliation Claims.**

In the R&R, Magistrate Judge Bowman recommends dismissing Kelly's retaliation claims against all Defendants because Kelly failed to adequately state a basis for that legal claim. More specifically, Magistrate Judge Bowman concluded that Kelly did not allege any facts that plausibly indicate that any of the Defendants took an adverse action against Kelly, as required at the prima facie stage of the *McDonnell Douglas* burden-shifting framework. In particular, Kelly's allegations to support that element were limited to the fact that Defendants issued a subpoena to her so that she would testify as a third-party witness in the *Barger* action, which does not qualify as an adverse action.

Kelly does not appear to disagree with that conclusion, or at the very least did not say so in her Objection. Rather, in her Objection, Kelly now raises a different set

of allegations in an attempt to show that First Data retaliated against her. Kelly now argues that the adverse act consisted of First Data "sen[ding] a threat of retaliation if [she] violated a fictious and no[n-]exist[ent] non-compete, when there was never a non-compete in place." (Objection at 12, #617). And, in terms of alleging what led First Data to retaliate against her, Kelly specifically alleges that First Data's retaliatory actions "were motivated by one or more of the following": (1) "Kelly's raising her charge of discrimination to First Data's in-house legal department;" (2) "Kelly's filing of her charge of discrimination with the EEOC and OCRC; and/or" (3) "Kelly amending her charge of discrimination being investigated by the OCRC." (Kelly's Compl. at ¶ 286, #37). Given the nature of Kelly's objection, the Court limits its review to whether Kelly has set forth in her Complaint a viable claim that First Data retaliated against Kelly for engaging in this allegedly protected activity by sending her a letter that stated First Data would potentially pursue legal action against her if she violated a non-compete agreement, an agreement that (according to Kelly) does not exist.

## STANDARD OF REVIEW

If a party objects to a report and recommendation within the allotted time, the district court must review de novo any portion of the magistrate judge's report "that has been properly objected to." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Here, Kelly is proceeding pro se, and Defendants are attacking the sufficiency of her pleadings. While a pro se litigant's pleadings are to be construed liberally and are held to less stringent standards than formal pleadings filed by attorneys, *Haines v. Kerner*, 404

U.S. 519, 520–21 (1972), pro se litigants must still comply with the procedural rules that govern civil cases. *McNeil v. United States*, 508 U.S. 106, 113 (1993).

Federal Rule of Civil Procedure 8(a)(2) says that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "A pair of Supreme Court decisions—*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 … (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 … (2009)—confirms that this rule imposes legal *and* factual demands on the authors of complaints." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013) (emphasis in original). In particular, for a complaint to survive a motion to dismiss, it must allege enough factual content, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Thus, although the Amended Complaint need not present "detailed factual allegations," it must allege sufficient "factual content" from which a court, informed by its "judicial experience and common sense," could "draw the reasonable inference," *Iqbal,* 556 U.S. at 678, that Defendants retaliated against Kelly for engaging in the alleged protected activity.

## LAW AND ANALYSIS

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this

chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Likewise, as to Kelly's Title VII and related Ohio law claims, the Sixth Circuit has explained that "[b]oth Title VII and Ohio Revised Code § 4112.02(I) contain a so-called opposition clause, under which employers may not retaliate against any employee that 'opposed' an unlawful practice." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016) (first citing Ohio Rev. Code § 4112.02(I); then 42 U.S.C. § 2000e–3(a)). "Because of these statutes' similar language and origin, Ohio courts have held that 'federal law provides the applicable analysis for reviewing retaliation claims' brought under Ohio Rev[ised] Code § 4112.02(I)." *Braun*, 828 F.3d at 510 (citing *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)) (cleaned up). In sum, each of the statutes (i.e., the ADA, Title VII, and related Ohio law) that underlie Kelly's retaliation claims prohibit a person (including a corporate entity) from taking adverse actions against another because the latter engaged in activity that is protected by the statute.

The preliminary question here, at the motion-to-dismiss stage, is what test the Court must apply to determine whether the allegations in Kelly's Complaint plausibly state a claim to relief for alleged retaliation. The R&R applied the *McDonnell Douglas* burden-shifting framework, stating that Kelly had to allege facts that support a prima facie case. (R&R at 36, #588). That was an incorrect standard. *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). As the Supreme Court has explained, the *McDonnell Douglas* burden-shifting framework "is an evidentiary

standard, not a pleading requirement." *Keys*, 684 F.3d at 609 (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002)). Indeed, the *McDonnell Douglas* framework does not even apply to all discrimination claims—for example, those where discovery reveals direct evidence of discrimination. *Id.* at 511–12. Thus, not surprisingly, the Supreme Court reasoned that it would be inappropriate for courts to require a plaintiff to plead facts that plausibly allege the elements of a potentially inapplicable test. *Swierkiewicz*, 534 U.S. at 511. Instead, the ordinary rules of notice pleading apply: the complaint must provide "fair notice" to a given defendant of the basis for the plaintiff's claims. *Id.* at 514.

While *Twombly* and *Iqbal* followed *Swierkiewicz*, they don't change matters on this front. *Keys*, 684 F.3d at 609. In fact, *Twombly* expressly acknowledged *Swierkiewicz*, stating that *Swierkiewicz* "did not change the law of pleading, but simply re-emphasized that the … use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *Twombly*, 550 U.S. at 570 (cleaned up). And *Swierkiewicz* necessarily precludes the Court from requiring Kelly to establish a prima facie case of retaliation based on her pleadings to defeat the Defendants' motions to dismiss. *Keys*, 684 F.3d at 609. Rather, Kelly must only satisfy *Keys* to open the door to discovery. *Id.* at 610.

With that framework in mind, the Court turns to the R&R. As noted, the R&R erred in stating that Kelly must allege facts establishing *each element of* the prima facie test. But, while the R&R's statement of the law was wrong, its end result remains sound. That is because the R&R limited its analysis on Kelly's retaliation

claims to whether Kelly had alleged facts that could plausibly establish an "adverse action." (R&R at 36–39, #588–91). To be sure, an "adverse action" is one of the elements of the *McDonnell Douglas* prima facie case, and thus *Swierkiewicz* may seem to suggest that there is no need for a plaintiff to plausibly plead that an adverse action occurred. But an adverse action is not merely an element of the *McDonnell Douglas* prima facie case; rather, an adverse action is an essential element for *any* employment retaliation claim. And, because a plaintiff must establish an "adverse action" no matter what analytical framework applies (i.e., *McDonnell Douglas* or some other test), the existence of such an action is essential to the plaintiff's retaliation claim. *See Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 640 (6th Cir. 2009) (noting that an adverse action "is a fundamental requirement for demonstrating retaliation"). Factual allegations supporting the existence of that essential element are thus necessary to give rise to a plausible inference that any such claim exists.

Further confirming this result, providing the employer a factual allegation regarding the allegedly retaliatory adverse act is an essential part of providing "fair notice" of a plaintiff's retaliation claims, as the defendant otherwise has no basis on which to begin preparing its defense. After all, the adverse action is the central mechanism by which the defendant allegedly inflicted harm on the plaintiff, and thus exploration of the facts surrounding that action are essential to any defense.

Nor does that result impose any meaningful difficulty on a plaintiff claiming retaliation. Because the alleged adverse action must necessarily be an action that is

directed *at the plaintiff*, the plaintiff necessarily knows of at least the general nature of that action at the time that the plaintiff files a complaint. In that regard, the adverse action differs from other aspects of the claim (such as the causation), where much of the relevant information might be exclusively in the possession of the defendant, and thus more difficult for a plaintiff to allege with any specificity. In any event, whatever the underlying reason, it is clear that the plaintiff must plausibly allege a retaliatory adverse action at the pleading stage of any retaliation case. *See Keys*, 684 F.3d at 609.

The issue before the Court, then, is whether the letter that First Data sent to Kelly just after she left First Data, which stated that First Data would potentially pursue legal action against Kelly if she violated a non-compete agreement—an agreement that, according to Kelly, does not exist—plausibly constitutes a retaliatory adverse action for Kelly "raising," "filing," and "amending" discrimination charges against First Data from April to July 2018, which is what she alleges is the protected activity. In considering the question, the Court first addresses the significance of the fact that Kelly received the allegedly retaliatory letter "[f]ive days following termination of Kelly's employment." (Compl. ¶ 158). The answer to that question is different for her retaliation claim under the ADA, as opposed to her retaliation claim under Title VII and corresponding state law.

As to Kelly's retaliation claim under the ADA, the Sixth Circuit has held that "disabled former employees are not 'qualified individuals' with a disability under Title I of the ADA[,]" and therefore a former employee does not have standing to sue

her former employer under the ADA for retaliation that allegedly occurred after the employment ended. *McKnight v. Gen. Motors Corp.*, 550 F.3d 519, 528 (6th Cir. 2008). As Kelly lacks standing to bring a retaliation action under the ADA, the Court agrees that dismissal is warranted as to that claim.

The story is different, though, as to Kelly's retaliation claim under Title VII and corresponding Ohio law. Both Title VII and its Ohio law counterpart protect former employees, as well as current employees, from retaliatory acts by former employers. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997); *see Baker v. Buschman*, 713 N.E.2d 487, 491 (Ohio 1998). Thus, the fact that First Data sent the allegedly retaliatory letter after her employment ended does not present a barrier to her retaliation claim under these statutes.

That is not the end of the inquiry, however. As noted above, to set forth a plausible claim for retaliation, Kelly must identify facts creating at least an inference that she suffered a retaliatory adverse action. For purposes of Title VII and Ohio law retaliation claims, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 174 (2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. And "retaliate" means to "return or repay in kind (an injury, insult, etc.)." Oxford English Dictionary (3d ed. Mar. 2010),

https://www.oed.com/view/Entry/164167 (all internet materials as last visited June 29, 2020).

Applying that test to Kelly's allegations, which the Court takes as true at this stage of the proceeding, First Data's post-employment letter to Kelly cannot constitute an adverse action. That is because the letter preceded her purported protected activities by roughly six months. That is, Kelly alleges that First Data sent the letter to her on *December 5, 2017*. (Kelly's Compl. at ¶ 158, #20–21). But she specifically alleges in her Complaint that First Data retaliated against her for either raising, filing, or amending her charges of discrimination against First Data with the EEOC and OCRC. (*Id.* at ¶¶ 168, 172, 197, 286 #22, 23, 26, 37). All of these events occurred between April 27, 2018, and July 18, 2018, months *after* she received the December 2017 letter. Kelly's own timeline shows that her retaliation claim seeks to put the car before the horse—the alleged retaliation (the letter), occurred before she engaged in any protected activity. That doesn't work. *See EEOC v. New Breed Logistics*, 783 F.3d 1057, 1068 (6th Cir. 2015) (explaining that, in a retaliation claim, the plaintiff must oppose the unlawful conduct of an employer, *and then* the employer must initiate adverse action against the plaintiff); *see also Weatherby v. Fed. Express*, 454 F. App'x 480, 492 (6th Cir. 2012). Because Kelly has not alleged facts that plausibly establish that she suffered a retaliatory adverse action (i.e., an action that occurred after she engaged in the allegedly protected activity she raises in her Complaint), Kelly's retaliation claims under Title VII and Ohio law, at least as currently pled, fail as a matter of law.

If her theory is instead that First Data *threatened* retaliation that would occur if she engaged in protected activity (e.g., something like "if you report us to the EEOC, we will sue you on frivolous non-compete claims"), that doesn't work either. It is not that it fails as a legal matter—a threat to retaliate if someone engages in protected activity can violate antidiscrimination laws. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008); *see also Shaw v. City of Columbus*, No. 2:18-cv-483, 2020 WL 3128178, at *8–11 (S.D. Ohio June 12, 2020). But the problem here is that Kelly fails to allege any plausible connection between the adverse action (sending the letter) and the protected activities (reporting discrimination months later). Certainly, no link is apparent on the face of the letter; it ties the threat of suit to Kelly's future employment decisions, not her reporting decisions. That is, the letter appears to be designed to dissuade Kelly from considering certain potential employment offers from First Data's competitors, not to dissuade her from pursuing potential reporting activities. And Kelly fails to offer any other allegations that in any way tie the threat of a future suit contained in the letter to Kelly's future participation in the alleged protected activity. To the contrary, she repeatedly asserts in her Complaint that First Data responded to Kelly's protected activities by forcing her to appear as a witness in another lawsuit. As currently pled, that is simply not the stuff of a plausible claim for retaliation.

## CONCLUSION

For the reasons above, the Court **OVERRULES** Kelly's Objection (Doc. 42), **ADOPTS** Magistrate Judge Bowman's R&R (Doc. 35), and accordingly **DISMISSES**

**WITHOUT PREJUDICE** all of Kelly's claims except for her failure to accommodate claim under the ADA (Count II).

**SO ORDERED.**

June 30, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**