Julie Kelly (Pro Se)

823 Dorgene Lane

Cincinnati OHIO 45244

Telephone (513) 806.4893

*jul_kelly@mac.com*

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JULIE KELLY, an individual | **Civil Case No. 1:19-cv-00372-DRC-SKB** |
| PLAINTIFF, | |
| v. | **District Judge Douglas R. Cole** |
| | **Magistrate Judge Stephanie Bowman** |
| FIRST DATA CORPORATION, et al., | |
| DEFENDANT, | |
| | PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

To the Honorable Court:

I am Julie Kelly, Plaintiff in this case ("Plaintiff") representing myself *pro se*. On this day, May 28th, 2021, Plaintiff files this Response to Defendants Motion for Summary Judgement. Plaintiff objects to Defendant argument as follows:

1. The "evidence" and sheer lack of facts presented by the Defendant in support of a Motion for Summary Judgement is distortive, untruthful, borderline fraudulent, and intentionally misleading to the courts to influence the support of a Summary Judgment. In defendant's motion section 2 they claim, "Undisputed facts concerning Kelly's employment", yet clearly these facts are not only in dispute they have been clearly refuted with actual medical records and employment history facts, not the defendants inuendo. By placing the word "the undisputed" before every other sentence does not make it become a reality for the Defendant or First Data, the evidence stands on its own merit while the defendant's arguments are obviously in dispute and proven to be false throughout this document.

2. Sufficient Evidence To Raise a Genuine Issue of Material Fact Regarding the Case:

The work from home accommodations were made clear to all of Plaintiff's superiors, Fricke, Barger, and Ording, during the time of Plaintiff's ADA requirements. Ording's two predecessors had both granted the accommodation and proper paperwork was submitted to HR Manager Bill Britt, who was also in place as HR Manager when Ording transitioned to Kelly's supervisor.  It was made clear to all supervisors, Fricke, Barger and Ording, that accommodations were needed due to her medically diagnosed ASSD condition which included symptoms of severe chest pain, dizziness, shortness of breath, anxiety, nausea, and post-partum depression. First Data fully supported the work-from-home accommodation as it would result in zero erosion of productivity since the team

2

Plaintiff managed **all** worked either remotely or in different locations. Not a single one of her direct or indirect reports worked out of the Cincinnati branch office. All documentation and medical records of medical conditions were supplied to Plaintiff's direct supervisor VP of Sales of Transformation—Steve Barger **and** **HR Manager—James Britt**.

Prior to Ording becoming Kelly's supervisor there were several times Mr. Barger would request a call with HR Manger James Britt and Mrs. Kelly to discuss accommodations due to Plaintiff's disability. Mr. Barger often said, "We'll figure this out Julie, let me call James and we'll discuss it with you to make this work". It was made known to Mr. Barger and HR that the Plaintiff was medically diagnosed on 4/27/2016 as having a diagnosed stress disordered of *Adult Situational Stress Disorder*-ASSD, within the medical community this terminology is the same as *Acute Stress Disorder*-ASD and can lead to *Post Traumatic Stress Syndrome*-PTSD. ASSD is recognized by ADA as a disorder that falls under the ADA act, which directly refutes and disproves Defendant's claim that Kelly "did not suffer from a disability." Medical records from Plaintiff were made available showing the diagnosis dating 4/27/2016, this information was provided to Barger and First Data HR and these records were available to Ording as was the paper trail of accommodations and medical history reports.

To understand ASSD / ASD please find the below excerpt directly from the ADA.com website on Symptoms of ASD-Acute Stress Disorder, please note the Plaintiff was experiencing all of the below symptoms:

> "For a diagnosis of ASD to be made, they need to be present for between three and 30 days. People who are affected by ASD tend to experience extreme feelings of panic, terror and helplessness in reaction to trauma and stress and may develop psychological and physical symptoms.

*The physical symptoms are typically caused by stress hormones such as adrenaline*

*(epinephrine) and an overactivity of the nervous system. They may include:*

- *Palpitations, i.e. a pounding heart*
- *Difficulty breathing*
- *Chest pain*
- *Headache*
- *Stomach pain*
- *Nausea*
- *Sweating*

(Kelly had all the listed symptoms and these symptoms were reported and documented by HR

and by her medical doctors)

*"Many of the symptoms of ASD are almost identical to those of PTSD. However, a*

*diagnosis of PTSD will only be considered if the symptoms persist for more than 30 days*

*or first appear more than one month after the trauma has occurred. Though many people*

*who are diagnosed with ASD do not go on to develop PTSD, it is thought that having the*

*former may increase a person's risk of developing the latter. A prompt diagnosis of ASD*

*can help people manage the condition and reduce the risk of them developing PTSD."*

*Reference www.ada.com*

## 3. Response to Defendants "Argument" of failure to establish *prima facie*:

As the Defendant has correctly pointed out, their entire "argument" in section 4 of their filing, is

that the plaintiff must establish the 5 elements of prima facie, these 5 elements are the following.

(1) She is disabled under the ADA;

(2) She was otherwise qualified for her position, with or without reasonable accommodation;

(3) First Data knew or had reason to know about her disability;

4

(4) She requested an accommodation; and

(5) First Data failed to provide a reasonable accommodation.


*Aldini v Kroger Co of Mi, 628 f. App'x 347, 350 (6th Cir 2015)*

Please allow me to restate these 5 elements with the corresponding facts for the court as well as for the Defendant.

**(1) Must show Plaintiff was considered disabled under the ADA:**

Plaintiff provided documentation to First Data supervisor Fricke and then to Barger as well as HR Manager Britt and was first <u>granted an accommodation</u> in April of 2015 for complications related to a difficult pregnancy and post-partum depression. During this already approved accommodation the ASSD was diagnosed in April 2016 and Plaintiff was hospitalized with shooting heart pain in June of 2016 due to the ongoing medical condition she was suffering. *Adult Situational Stress Disorder* is clearly recognized by the ADA as cause for an accommodation, contrary to the Defendants own "expert" opinion that "Kelly did not suffer from a disability", the ADA along with Kelly's medical doctors say that she did/does suffer a recognized ADA disability. Plaintiff has conclusively proven her disability based on the ADA definition and acceptance of Adult Situational Stress Disorder as a condition meeting ADA requirement as well as her medical records, please find Exhibit 1 a copy of her medical record showing diagnosis of ASSD dated 4/27/2016.

**(2) Demonstrate Plaintiff was qualified for her position, with or without reasonable accommodations:**

Plaintiff was given the highest ratings and recognition from all supervisors for 19 years, she received many promotions and awards over those years including by Ording who recognized Plaintiff for her exemplary work and gave Plaintiff a promotion. Her qualifications and

5

performance were excellent and never wavered, this is not in dispute. An accommodation had no adverse effect on her employment as none of her direct reports or co-workers worked out of the Cincinnati office, it was simple harassment and disregard of ADA rights as well as human decency. Forcing the Plaintiff to go against her doctors orders was for no benefit of First Data, it was a deliberate act to force the Plaintiff to make a decision regarding her health over her job.

**(3) First Data knew or had reason to know about her condition and disability:**

Plaintiff worked closely with her direct reports Barger and Frikie along with HR Manager Britt to provide documentation to help them override the no work from home policy and grant an accommodation to Mrs. Kelly. It was made crystal clear and well documented with all supervisors and the HR Manager of Plaintiff's medical ADA condition and accommodations, this was also communicated clearly to Ms. Ording. All HR related documents were available to Ording when she became Plaintiff's supervisor. Plaintiff was hospitalized due to heart pain and irregularities and made her health concerns and medical record clear to Mrs. Ording during this ordeal. Ording used Barger and Britt as a resource during the transition and she elected to ignore the advice given to her regarding the ADA approval for the Plaintiff. In addition, Ording had accessibility to the HR medical records of the Plaintiff when she assumed a supervisor position over Plaintiff.

**(4) She requested an accommodation:**

She formally requested accommodations through her direct supervisor Fricke and then Steve Barger as well as First Data HR Manager James Britt and the Plaintiff was given an accommodation by both Fricke and Barger, this is not disputed. If the Defendant would like to dispute this fact please have them answer why the Plaintiff had 3 years of work from home prior

6

to Ording when there was a standing no-work-from-home policy in place? The obvious answer is that she was given an accommodation by Barger and Britt, both would testify to this fact.

Numerous accommodation requests were made to Ording during her time as Kelly's supervisor. In addition, accommodation requests were made clear after the ER event in Oct 2017 as well as in discussions with Ms. Ording leading up to the filing of the coerced resignation letter. Even within the letter itself Plaintiff clearly states "the change First Data have made has contributed to my numerous health issues." If Ording was ignorant of the Plaintiffs records The ADA states that the employer may request information about the individual's medical condition (including reasonable documentation) if it is unclear whether it is a "disability" as defined by the ADA. If Ording didn't have the information on Kelly's disability it was on her to simply ask for the documentation, to claim she didn't have it is not a defense or valid excuse according to the ADA. Even in the Defendants own words on P4 Section 2 they state that Ording "*suggested Kelly could request a leave of absence or temporarily work from home*", why would she say such a thing if a there were no request for an accommodation in place? Either this is a lie, and no such offer was made, or Kelly did request to Ording an accommodation and Ording was trying to protect herself and put a band-aid on the situation. Maybe Ording can explain that if an employee is resigning why all of a sudden would she say, "Oh, now you can work from home temporarily" if she had no knowledge of the many requests for accommodation and the previously granted accommodations? I think the question answers itself, Ording was fully aware of Plaintiffs ADA condition, health issues, accommodation history, and request directly to her for those accommodations to be reinstated. ADA does not allow for her feigned ignorance to be a defense, she was fully aware of plaintiffs condition and the requests for an accommodation.

7

**(5) First Data failed to provide an accommodation.**

It is clear and not in dispute that Ording revoked the existing accommodation even with formal approvals already in place by her predecessor and HR Manager, with many requests directly to Ording by Plaintiff, with a clear medical diagnosis that fell directly within the ADA written guidelines, and with the medical symptoms becoming more severe, dangerously so, as the work environment became "toxic and unhealthy" with Ording in charge. Accommodations were revoked by Ording with her goal to not allow any accommodations, deviations, or exceptions to her rules of every employee reporting to a satellite office, regardless of the already proven and established accommodation and disability. The EEOC states "The individual does not need to use special words, such as "ADA" or "reasonable accommodation" to make this request, but must let the employer know that a medical condition interferes with his/her ability to do the job. I think a history of hospitalization for severe chest pain would qualify as a medical condition that could interfere with her ability to do the job.

Within the above 5 points the Plaintiff has definitively established a *prima facie* case of failure to accommodate under the ADA or PWDCRA, with the Plaintiff clearly showing evidence that she 1) was disabled within the meaning of the ADA act, 2) she was/is qualified for the position, with or without a reasonable accommodation, 3) First Data clearly knew about her disability, 4) that she most assuredly did requested an accommodation, and 5) First Data revoked an already in place accommodation and failed to provide the reasonable accommodation. *Johnson v. Cleveland City School Dist*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). Once a Plaintiff establishes these elements, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id*. at 983

8

**4. Failure to Engage in Interactive Process**

The clearest evidence of First Data's and Ms. Ording's animus against the disabled can be seen in this very simple example.

After Plaintiff's son was born in February 2015, and she returned to work, First Data began enforcing its policy against working from home, even if work in the office was not an essential function of the job. In response to this policy's impact on her health, Plaintiff wrote to her then supervisor, Mr. Steve Barger, by e-mail on <u>May 12, 2015</u>:

> "Steve,
>
> After 17 years of successfully achieving projects, goals and requirements working from a home office, the time and costs that it would take to commute into the Blue Ash corporate office (Cincinnati, OH) are prohibitive to my success both professionally and personally. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the positive work life balance the company once promoted. While inevitable, receiving this news so shortly after returning from maternity leave has been quite disheartening.
>
> My position does not require daily interaction with others face to face and will not change once in the Cincinnati, OH location. Moving toward a more virtual learning environment is a must for a company of this size and will only continue to be a priority. This has been a leadership quality I have excelled at bringing to the company working from a remote office."

In response to this e-mail, Mr. Barger, a veteran manager nearly 70 years old, instinctively knew that the loss of Plaintiff's talent was a loss to First Data and to his team. Mr. Barger responded to Plaintiff's notice of resignation by engaging her in an interactive process to discuss her

disabilities arising from her two difficult pregnancies. Because of these conversations and interaction, Mr. Barger along with HR Manager James Britt made the managerial decision to allow Plaintiff to continue to work in the same manner in which she had been working for years as a reasonable accommodation and Plaintiff did not resign and continued to provide her recognized skills and performance to First Data. Mr. Barger did exactly what a manager should do when receiving an e-mail such as the one he received from Plaintiff in May 2015. He engaged in an interactive process to discuss her concerns and made appropriate and reasonable accommodations to address his employee's disabilities.

Ms. Ording's conduct just over two years later stands in stark contrast to the actions of Mr. Barger. When receiving a nearly identical e-mail, **but with even more indication of disability issues**, Ms. Ording responded 180 degrees opposite of the manner in which Mr. Barger responded.

In late 2016, Ms. Ording revoked Plaintiff's reasonable accommodation provided by her prior two managers and was requiring office attendance.  Plaintiff discussed and made clear to Ms. Ording the health-related issues she was having including chest pain, dizziness, shortness of breath and the 4/2016 medical diagnosis of ASSD-Stress Disorder, Ms. Ording showed no interest or compassion with regard to these medical issues and simply stated "she would make sure every employee now worked out of an office or be terminated." Then, on November 14, 2017, by e-mail, Plaintiff expressed the very same issues to Ms. Ording that she had expressed to Mr. Barger. In fact, her request of Ms. Ording was even more direct than that received by Mr. Barger two years earlier. Plaintiff directly indicated to Ms. Ording that the stress and her health were an issue and felt forced to resign for the sake of avoiding the stress that she was under physician's care to treat and the impact on her health.

On November 14, 2017, Plaintiff informed Ms. Ording the following (compare to the May 2015 e-mail to Mr. Barger – the two are nearly identical, other than the inclusion of a blatant appeal to health and stress issues included in the e-mail to Ms. Ording):

> "Robin,
>
> After nearly 20 years of successfully achieving goals, projects and leading stellar teams for First Data, the change in policies, such as the requirement to work in an office location, have proven prohibitive to my success both professionally and personality. I have been fortunate to have 'grown-up' with First Data and have greatly appreciated the experiences and positive work life balance the company once promoted.
>
> During the past two years, I have done a highly successful job of balancing the demands of First Data with the ever-changing deadlines, priorities, teams and projects. With that said, I have also lost many precious hours that could have been dedicated to what means the most, **my health** and family. Lost time in the countless hours of commuting to a building where a handful of people report in to. After working successfully from home for nearly 10 years, **the change First Data made has contributed to my numerous health issues with increased stress**, financial constraints and extraordinary burdens on my family."

Unlike Mr. Barger, Ms. Ording, when faced with an obviously direct request for an accommodation, and quite literally a cry for help, Ording chose a completely different route than Mr. Barger. Rather than engage in an interactive process with Plaintiff as Mr. Barger did, Ms. Ording gladly accepted Plaintiff's resignations and laughed, literally laughed, at Plaintiff's

request for severance. Ms. Ording has no tolerance for disabilities or health issues within her organization.

It seems inconceivable, but it is a fact, that Ms. Ording, a 30-year plus human resources professional, is numb and oblivious to the requirements of the ADA as it applies to disabilities arising out of pregnancy complications and Adult Situational Stress Disorder.

Ms. Ording has testified that over her entire 30-year HR career, not a single employee of hers has requested a reasonable accommodation for a disability and, correspondingly, she has testified that she has never granted an employee's reasonable accommodation request. It is unfathomable that over 30-years managing employees at huge institutions like Citi, Chase, and First Data, Ms. Ording never had an employee request an accommodation. A perfect example of such a request is Plaintiff's November 14, 2017. Ms. Ording clearly does not know what a reasonable accommodation looks or sounds like, and Ms. Ording has no sensitivity to an issue that should be top-of-mind of any human resources professional. Ms. Ording is, frankly, incompetent, to be a manager in the field of human resources.

The obvious explanation of Ms. Ording's testimony that she has never received an accommodation request is that (i) Ms. Ording does not comprehend the concept of accommodating disabled employees in a manner that is reasonable and that is not an undue hardship on the employer, and (ii) the atmosphere at First Data is such that Ms. Ording's blind adherence to the enforcement of the no-work from home policy outweighs the legal requirement to accommodate disabled employees. Plaintiff had discussed her conditions many times, at a high level, with Ms. Ording. As a 30-year career professional, Ms. Ording should have heard these discussions as a cue to begin an interactive process to discuss accommodations. Ms. Ording was tone deaf to the signals. Then, when Ms. Ording received Plaintiff's "resignation" e-mail, as

a career HR professional, she should have seen the obvious request for an accommodation. Ms. Ording again was tone deaf and instead of seeking accommodations, laughed at Plaintiff and accepted the resignation.

Mr. Barger was sensitive enough to realize that Plaintiff's attempted resignation in 2015 was a request for an accommodation (even though that request hardly mentioned health issues). Mr. Barger properly discussed the issue with Plaintiff and made an exception to the no work from home rule as an accommodation. From that time forward, Plaintiff received outstanding reviews of her work and commitment to First Data, including outstanding reviews and financial rewards from First Data's EVP of HR. Plaintiff's performance over a 10-year period under prior supervisors was unblemished.

Ms. Ording, on the other hand, upon taking Mr. Barger's supervisory position, revoked the accommodations Plaintiff's prior managers and HR had granted, she did this in the face of many requests and pleadings by Plaintiff. Prior to submitting the resignation letter to Ms. Ording, they had a number of conversations about the health issues Plaintiff was having and Plaintiff informed Ms. Ording she felt she was being forced to resign due to these medical conditions. Ms. Ording was callus to the health challenges Plaintiff was dealing with, even though in Oct 2017, 1-month prior Plaintiff was admitted to the ER for chest pains, and "chest pain" was communicated to Ms Ording and to the ER doctors, it was much more than a "racing" heart, it was shooting pain and the ER reports do clearly state "chest pain". Ms. Ording, when faced with a request for an accommodation (nearly identical, but more direct on health and stress issues, to that received by Mr. Barger), did not engage in an interactive process and merely accepted the resignation.

Ms. Ording's actions were a violation of the ADA, PDA, Title VII. There is no excuse. When faced with a request for an accommodation like Plaintiff's on November 14, 2017, Ms. Ording

intentionally chose to ignore the law (she is a 30-year HR professional trained and aware of the law and has decades of experience).

Ms. Ording was more interested in keeping her bosses happy through cost controls and terminations within her group than she was listening to an employee's request for a serious health related accommodation. Ms. Ording knew better and is trained in HR. Ms. Ording bragged about her cost cutting and created an atmosphere of fear for job loss to control her employees. Plaintiff attempted to subtly raise her disability issues in this hostile atmosphere.

The EEOC states the following: *"In its 1999 Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (revised 10/17/02), the Equal Employment Opportunity Commission said that allowing an individual with a disability to work at home may be a form of reasonable accommodation. The Americans with Disabilities Act (ADA) requires employers with 15 or more employees to provide reasonable accommodation for qualified applicants and employees with disabilities. In addition, the ADA's reasonable accommodation obligation, which includes modifying workplace policies, might require an employer to waive certain eligibility requirements or otherwise modify its telework program for someone with a disability who needs to work at home. Changing the location where work is performed may fall under the ADA's reasonable accommodation requirement of modifying workplace policies, even if the employer does not allow other employees to telework. The individual does not need to use special words, such as "ADA" or "reasonable accommodation" to make this request, but must let the employer know that a medical condition interferes with his/her ability to do the job. The individual must explain what limitations from the disability make it difficult to do the job in the workplace, and how the job could still be performed from the employee's home. The employer may request information about*

*the individual's medical condition (including reasonable documentation) if it is unclear whether it is a "disability" as defined by the ADA."*

5. **Argument for Constructive Discharge vs. Defendant's claim of a "voluntary resignation"**

With regard to Mrs. Kelly's resignation, it was anything but "voluntary", it was a forced resignation due to the willful disregard for Mrs. Kelly's well-being and medical condition. The same laws that protect employees from discriminatory acts at work also protect workers from harassment in the workplace. Title VII Americans with Disabilities Act (ADA) protect workers from being harassed based on membership in protected groups while at work and require that employers take precautionary action when harassment is reported. Under some circumstances, workers are forced to resign due what's known as a hostile work environment. This occurs when the harassment in a particular workplace is so severe or pervasive that it significantly alters the conditions of employment that an employer knows about or should have known about. This may include many types of egregious behavior which make it difficult for an employee to continue working, forcing the employee to resign. In such instances, the forced resignation would be considered a constructive discharge. By definition, a constructive discharge occurs when conditions at work for an employee become so intolerable that a similarly situated person would quit. Most courts consider a constructive discharge one of the many tangible employment actions covered under Title VII and other federal employment discrimination laws. Kelly was hospitalized with chest pain in Oct 2017 and it was made clear in Kelly's letter to Ording her health issues had worsened and working in the toxic environment was no longer a health risk option that could be afforded. By forcing the Mrs. Kelly to commute into an office with a 45 minute drive each way and no one in that office that you work with, after 10+ years of working remotely and absolutely no sane reason for this mandate other to cause additional stress and harassment, First Data and Ms Ording have clearly displayed a toxic work environment that

15

would only worsen Mrs Kelly's health issues. She was forced out and forced to resign as a Constructive Discharge.

**In Summary:**

The Plaintiff has clearly established a prima facie case of failure to accommodate by meeting all 5 requirements of the ADA statute. It is also clear that based on over 10 years of work-from-home while receiving exceptional reviews and promotions, the accommodation request was proven that it would not pose a hardship to First Data. The environment of disdain for disabilities at First Data had created an atmosphere where resignation outweighed the health risks of continuing to work in such an environment. Plaintiff was refused reasonable accommodations and then constructively discharged in direct violation of the ADA.

DATED:      May 28, 2021

Respectfully Submitted,

 /s/ Julie Kelly

Julie Kelly, Plaintiff (Pro Se)

EXHIBIT 1

## Julie K Kelly
Summary of Care, generated on Jun. 12, 2018

## Patient Demographics - Female, born ~~Nov 27, 1957~~

| Patient Address | Communication | Language | Race / Ethnicity |
|---|---|---|---|
| ~~333 DORONEL LN~~ ~~CINCINNATI, OH 45244~~ | ~~513-555-1099~~ (Mobile) ~~513-555-1003~~ (Home) ~~juli.kelly@gmail~~.com | English (Preferred) | Unknown / Unknown |

## Note from The Christ Hospital
This document contains information that was shared with Julie K Kelly. It may not contain the entire record from The Christ Hospital.

## Reason for Visit

| Reason |
|---|
| Anxiety |
| Knee Pain |
| Eye Problem |

## Encounter Details

| Date | Type | Department | Care Team |
|---|---|---|---|
| 05/03/2017 | Office Visit | The Christ Hospital Physicians - Primary Care, Anderson 7545 Beechmont Avenue Suite C CINCINNATI, OH 45255-4205 513-564-4026 | **Bentz, Michael, PA** 7545 Beechmont Ave. Suite C Cincinnati, OH 45255 513-564-4026 513-564-4027 (Fax) |

## Allergies - as of this encounter

| Active Allergy | Reactions | Severity | Noted Date | Comments |
|---|---|---|---|---|
| Cat Dander | | | 04/27/2016 | Eyes and nasal |
| Bupropion Hcl | | | 02/09/2017 | mean |

18

## Active Problems

| Problem | Noted Date |
|---|---|
| Fatty liver | 05/03/2017 |
| Obesity | 02/09/2017 |
| Fatty liver | 11/10/2016 |
| High blood pressure disorder | 05/26/2016 |
| Elevated liver function tests | 04/29/2016 |
| Adult situational stress disorder | 04/27/2016 |